**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISON**

NATIONAL ASSOCIATION OF
IMMIGRATION JUDGES, affiliated with the
International Federation of Professional and
Technical Engineers,

      Plaintiff,

  v.

JAMES R. MCHENRY III, in his official
capacity as Director of the Executive Office
for Immigration Review,

Serve:
      James R. McHenry III
      Director
      Executive Office for Immigration
      Review
      5107 Leesburg Pike
      Falls Church, VA 22041

      William P. Barr
      Attorney General of the United States
      of America
      U.S. Department of Justice
      950 Pennsylvania Ave., NW
      Washington, D.C. 20530

      Civil Process Clerk
      United States Attorney's Office for the
      Eastern District of Virginia
      Justin W. Williams United States
      Attorney's Building
      2100 Jamieson Ave.
      Alexandria, VA 22314

      Defendant.

Civil Action No. 20-cv-731

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

1.      This lawsuit challenges a policy of the Executive Office for Immigration Review ("EOIR") that imposes an unconstitutional prior restraint on immigration judges who wish to speak or write publicly in their personal capacities. The policy applies regardless of what immigration judges plan to speak about, their intended audience, or the forum in which they wish to share their views. Judges who violate the policy face a range of disciplinary sanctions, including reprimand, suspension, and even removal from the federal service.

2.      For years, EOIR permitted immigration judges to speak in their personal capacities on issues relating to immigration, so long as they provided a disclaimer that they were not speaking on behalf of the agency. Judges often spoke at schools, universities, and bar associations about the immigration courts and their function within them. Their efforts educated the public about the immigration courts and made the immigration system more transparent.

3.      In recent years, however, the agency has taken steps that have strictly limited the ability of immigration judges to speak publicly in their personal capacities. On September 1, 2017, EOIR's Director issued a policy that imposed a preapproval requirement on all judges who wish to speak at public events in their personal capacities (the "2017 Policy"). On January 17, 2020, the Director replaced this policy with a still more restrictive one (the "2020 Policy"). Under this new policy, which remains in force today, immigration judges are categorically prohibited from speaking in their personal capacities about immigration law or policy or about EOIR programs or policies. On all other topics, immigration judges may speak publicly only if they obtain EOIR's prior approval. These new restrictions apply to all public speaking and writing as well as to communications with members of the news media.

4.      EOIR issued the 2020 Policy at a time of intense scrutiny of the nation's immigration system. President Trump made immigration a signature issue of his presidential campaign, and his administration has made sweeping changes to the immigration court system. For example, the Justice Department has instituted case completion quotas for immigration judges, restricted the ability of immigration judges to close cases administratively or grant continuances, and reassigned judges from their home dockets to prioritize the disposition of cases involving migrants who apply for asylum from Mexico. There is significant public interest in these changes and in their effects on the independence of immigration judges and the process afforded migrants who appear before them. Immigration judges are uniquely positioned to inform the public on these issues, but the 2020 Policy prevents them from doing so.

5.      In recent months, immigration judges have also been prevented from commenting on the impact of the COVID-19 pandemic on the immigration courts and detained immigrants. Despite repeated calls that they be temporarily closed, nearly all of the nation's sixty-nine immigration courts and adjudication centers have remained open for proceedings involving detained immigrants. EOIR recently announced its intention to resume hearings for non-detained immigrants and to suspend interim rules allowing for the filing of certain court documents via email. These changes have already had, and will continue to have, profound implications for public health, but few immigration judges have felt free to speak out. As officers of the National Association of Immigration Judges ("NAIJ"), a handful of immigration judges have been able to speak out in their capacities as union representatives, given federal labor-law protections for union speech about employee working conditions. But hundreds more remain silenced.

6.      The 2020 Policy imposes a prior restraint in violation of the First Amendment. As the Supreme Court has repeatedly held, people do not surrender their free-speech rights when they

accept government employment. They retain their rights, as citizens, to speak on matters of public importance, and the government can silence them only if it can show that its interest in doing so outweighs the employees' interests in speaking and the public's interest in hearing what they have to say.

7.     The government cannot satisfy this test here. The interests of immigration judges in engaging in the speech restrained by the Policy is substantial, and so is the public's interest in hearing it. There is an ongoing national debate about the wisdom and fairness of recent changes to immigration laws and policies and about the effect of those changes on the immigration court system. Immigration judges have unique insights to contribute to this discussion. While EOIR has a legitimate interest in promoting the efficiency of the services it performs through its employees, the 2020 Policy is not appropriately tailored to that interest. It imposes a sweeping prohibition on personal-capacity speech about immigration or the agency itself, as well as an onerous preapproval process on all other personal-capacity speech. These restrictions apply even where the speech in question could not reasonably be expected to disrupt EOIR's operations. Moreover, the agency's preapproval requirement lacks the procedural safeguards generally required of prior restraints. For example, it does not include criteria that would appropriately cabin the discretion of EOIR officials or a definite time limit for decision.

8.     NAIJ is a non-partisan, non-profit, voluntary association of immigration judges and the recognized representative of all non-managerial immigration judges for the purposes of collective bargaining. NAIJ brings this challenge on behalf of its members, who were injured by the 2017 Policy and continue to be injured by the 2020 one. Numerous members of NAIJ have been denied approval to speak about immigration-related topics in their personal capacities. Some have failed to receive a timely decision or any decision whatsoever. Still others have been chilled

from even submitting requests to participate in speaking engagements. NAIJ respectfully requests that the Court declare that the 2020 Policy is unlawful and enjoin the government from enforcing it.[1] Unless the Policy is enjoined, it will continue to prevent immigration judges from speaking publicly in their personal capacities about matters of immense public concern.

### Jurisdiction and Venue

9.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and the U.S. Constitution.

10.      This Court has authority to issue declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and this Court's inherent equitable jurisdiction. The Court also has authority to award costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

11.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (e)(1). A substantial part of the events giving rise to this claim occurred in this district, and the Defendant is an officer of the United States sued in his official capacity.

### Parties

12.      Plaintiff NAIJ is a labor organization that represents all immigration judges employed by EOIR throughout the United States and its territories. NAIJ is affiliated with the International Federation of Professional and Technical Engineers. In 1979, NAIJ was designated as the collective bargaining representative for all non-managerial immigration judges. As of the date of filing, there are approximately 460 immigration judges located in sixty-seven immigration courts and two adjudication centers. NAIJ's mission is to promote the independence of immigration judges and to enhance the professionalism, dignity, and efficiency of the nation's

---

[1] NAIJ's understanding is that the 2020 Policy supersedes the 2017 Policy and that the 2017 Policy is no longer operative. To the extent that the 2017 Policy remains operative, NAIJ challenges its constitutionality as well.

immigration courts. To accomplish its goals, NAIJ officers conduct public education campaigns, provide testimony at Congressional oversight hearings, represent immigration judges in disciplinary hearings, and file formal and informal grievances with EOIR. These officers have been permitted to do these things without seeking EOIR's prior approval because NAIJ is a union and federal labor law protects a union's right to present its views to "appropriate authorities," including Congress and the press. 5 U.S.C. § 7102.[2] NAIJ represents the interests of immigration judges with respect to EOIR's speaking engagement policies. As discussed further below, in 2018, NAIJ negotiated a memorandum of understanding with EOIR that addressed the application of those policies to immigration judges. Immigration judges have also contacted NAIJ officers for assistance when their speaking engagement requests have gone unanswered or when they have received denials they consider unfair.

13.     Defendant James R. McHenry III is the Director of EOIR. EOIR is an agency of the federal government within the Department of Justice and is located in Falls Church, Virginia. Defendant McHenry has authority over all EOIR policies and practices, including those challenged here. Plaintiff sues him in his official capacity only.

### Facts

### I.     Immigration Judges and the Immigration Court System

14.     Immigration judges are judicial officers that exercise the authority of the U.S. Attorney General. Their primary responsibility is to serve as neutral and impartial arbiters in the immigration court system. They are also active members of the legal and civic communities, and have for many years contributed to public understanding of immigration law and policy through

---

[2] In August 2019, the Department of Justice filed a petition to decertify NAIJ as a union. If that petition is successful, NAIJ officers will no longer qualify for this statutory protection.

speaking engagements, including at the invitation of bar associations, schools, universities, and other institutions.

15.     As Immigration Judge A. Ashley Tabaddor, the president of NAIJ, has testified to the Senate, these two roles are closely related. When immigration judges are active in their communities, they "help the community better understand . . . Immigration Courts and their function in the community, helping to demystify the system and bring transparency." And "[p]ublic access and understanding of what courts do is essential to build the understanding and trust needed for the [immigration] judicial system to function smoothly."

16.     Interest in the immigration court system has grown in recent years, particularly as President Trump has made immigration enforcement a signature issue of his administration. At the direction or encouragement of the President, the Justice Department has introduced a series of changes to the immigration court system. For example, the Attorney General has subjected immigration judges to case completion quotas and other performance benchmarks; limited their ability to close cases administratively and grant continuances; given EOIR's Director the authority to overrule their decisions; issued hiring policies that give political appointees greater influence in the selection of new judges; and required certain judges to conduct hearings via videoconference at temporary tent facilities along the U.S.–Mexico border as part of the Trump Administration's "Remain in Mexico" program. The Justice Department has justified many of these changes as necessary to address the backlog in the nations' immigration courts; as of December 2019, the number of pending cases topped one million.

17.     These changes have received considerable congressional and news attention. In January 2020, the House Subcommittee on Immigration and Citizenship held a public hearing on the impact of the changes on "judicial independence and due process in U.S. immigration courts."

The hearing followed extensive news and media interest in the state of the courts. For example, the *Associated Press* visited almost a dozen immigration courts in the fall of 2019 and reported "nonstop chaos." Journalists observed that "[f]requent changes in the law and rules for how judges manage their docket make it impossible to know what the future holds when immigrants finally have their day in court." A story published in the *Wall Street Journal* reported concerns that "the unique conditions of tent courts deny migrants due process by depriving them of meaningful access to lawyers or interaction with judges, making the set up essentially a rubber stamp for deportation." And a story published by the *Guardian* reported that although the tent court it visited in Brownsville, and others in Laredo, "are now technically open to the public, their operations remain shrouded in opacity."

18.     In the midst of the current pandemic, interest in the immigration courts has also focused on how they should address the risk of COVID-19 transmission. While much of the country has observed strict social-distancing policies to reduce the spread of the novel coronavirus, most immigration courts remain open for hearings, at least for those involving detained migrants. There is continuing public concern about the safety of detained migrants, and of the immigration judges, attorneys, and court staff who must attend court to ensure their cases move forward. For example, NAIJ, the American Federation of Government Employees (which represents immigration prosecutors), and the American Immigration Lawyers Association have repeatedly called on EOIR to order the emergency closure of all immigration courts, as have members of Congress. As recently as June 23, 2020, senators wrote to EOIR's Director expressing concern about EOIR's decision to resume hearings involving non-detained migrants at several immigration courts across the country. As the senators explained, that decision "could affect the health of all people in the courts, as well as the fairness of the proceedings in those cases."

## II.     History of EOIR's Policies on Public Speaking and Writing

19.     Prior to 2017, immigration judges routinely spoke at local and national conferences, guest lectured at universities and law schools, and participated in immigration-law trainings—all in their personal capacities. While approval was required, immigration judges routinely received that approval. Judges would submit a request to their supervising Assistant Chief Immigration Judge ("ACIJ"). If the ACIJ approved the request, they would forward it to EOIR's Ethics office, which would then offer ethics guidance. Judges were generally permitted to use their official titles to identify themselves in connection with their speaking or writing, so long as they also included a disclaimer stating that the views presented were their own and not those of EOIR. EOIR described this kind of speech as "personal capacity with use of title and disclaimer" or "PTD."

20.     EOIR's 2017 Policy, however, strictly limited the ability of judges to speak at public events in their personal capacities, with or without a disclaimer. EOIR's 2020 Policy goes even further. The policy prohibits judges from publicly speaking or writing in their personal capacities about immigration and EOIR, and requires them to seek agency approval before publicly speaking or writing about any other matter of public concern. While the 2020 Policy appears to supersede the 2017 Policy, the 2020 Policy does not state this clearly, and in fact purports to reissue the 2017 one.

### A.     The 2017 Policy

21.     On September 1, 2017, the Director of EOIR issued a memorandum titled "Speaking Engagement Policy for EOIR Employees" (the "2017 Policy"), which prohibited Deputy Chief Immigration Judges ("DCIJs") and ACIJs from participating in speaking engagements in their personal capacities, and which required all other immigration judges to

receive approval before doing so.[3] The preapproval requirement applied regardless of whether an immigration judge intended to speak on topics related to immigration. Under the policy, immigration judges who wished to speak in their personal capacity were required to submit a request to their supervisor, who decided whether a speaking engagement would be undertaken in the judge's personal capacity (as defined by the policy) and whether to approve the request. Immigration judges who planned to speak on immigration-related topics or whose requests were reclassified as official capacity then had to seek approval from the Office of General Counsel and the Office of Communications and Legislative Affairs through a centralized "speaking engagement team" known as the "SET." The only judges exempted from this process were officers of NAIJ who under federal labor law are guaranteed the ability to engage in union speech related to working conditions.

22.     The 2017 Policy applied to requests "to speak at an event." Although the policy itself did not define the term "event," EOIR seemed to define it broadly. An email sent by EOIR's Director on September 13, 2017 observed that a "good metric" for whether a "speaking engagement" required review was "whether you will be speaking with more than one non-DOJ person about EOIR" or at an event for which "a group external to DOJ is sending out notice of the event." The email also stated that "any phone calls, emails, or visits from the news media or Congress should be directed to [the Office of Communications and Legislation Affairs]." Subsequent EOIR communications confirmed the agency's position that the policy applied to any contact with the press.

23.     Although the 2017 Policy included criteria for determining whether a speaking engagement was in an employee's official or personal capacity, the criteria were contradictory.

---

[3] A true and correct copy of the 2017 Policy is attached hereto as Attachment 1.

The policy stated that a speaking engagement would be in an employee's official capacity when they were "assigned to participate . . . or otherwise present information on behalf of the agency," and that the speaking engagement would be in an employee's personal capacity "when they are not appearing at an event as part of their official duties or on behalf of the agency." An attachment to the 2017 Policy, however, gave examples for which the determination of speaking-engagement capacity turned not on the capacity in which an employee would speak, but rather on the nature of the event they planned to attend. For example, the attachment provided that EOIR employees could speak at national and regional conferences only in their official capacities, effectively banning employees from speaking in their personal capacities at such events.

24.     The 2017 Policy did not specify objective criteria that would cabin the discretion of the officials who ruled on speaking-engagement requests. Under the terms of the policy, those officials could approve or deny speaking-engagement requests for any reason or no reason at all. Nor did the policy include deadlines for decision.

### B.     The 2018 Memorandum of Understanding Between NAIJ and EOIR

25.     After the 2017 Policy was issued, NAIJ entered into negotiations with EOIR to clarify the specific procedures and considerations that would apply to immigration judges seeking preapproval to speak publicly. In May 2018, NAIJ and EOIR executed a memorandum of understanding (the "2018 MOU") which remains in effect.[4] The 2018 MOU was intended to offer immigration judges greater certainty regarding the preapproval process. It has failed, however, to do so.

26.     The 2018 MOU imposes nonbinding time limits for some steps in the preapproval process. It does not impose any time limit (even an aspirational one) for decisions by supervisors,

---

[4] A true and correct copy of the 2018 MOU is attached hereto as Attachment 2.

but it does require supervisors to "strive to" notify immigration judges within one day of approving a request and forwarding it to the centralized speaking engagement team. The MOU requires the speaking engagement team to then "strive to" respond to the request within five days. If the speaking engagement team expects its review to take longer than five days, it must notify the requesting judge "when feasible."

27.     The 2018 MOU requires EOIR to provide immigration judges with reasons for denials of requests. The MOU also requires EOIR to provide NAIJ with "a summary of Immigration Judge speaking engagement requests received by the [speaking engagement team]" every six months. The MOU provides that, for each request, the summary should include "the date the request was submitted, the requestor's supervisor, a description of the event, the date of the event, whether the request was approved or denied, and [the requestor's] speaking capacity."

28.     The 2018 MOU also stated that, by June 30, 2018, EOIR would provide NAIJ "a list of factors that [EOIR] considers in assessing Immigration Judge speaking engagement requests and/or representative examples of types of speaking engagement requests that fall into each speaking capacity."

29.     On June 28, 2018, EOIR sent NAIJ a draft "Guide to Speaking Engagement Requests," which included guidance related to speaking requests made by EOIR employees. Although EOIR informed NAIJ that the guide would soon be finalized and published to EOIR's intranet so that all employees (including immigration judges) could access it, neither a draft nor a final version of the document is available on the intranet.

30.     While EOIR has so far produced the biannual summary reports required by the MOU, it has routinely failed to meet the MOU's nonbinding time limit for speaking-engagement-team review. For example, on April 24, 2018, an immigration judge submitted a request to

participate in a Practicing Law Institute panel in her personal capacity. Hearing no response from the speaking engagement team, she resubmitted the request on May 14, 2018. An NAIJ representative contacted EOIR on the judge's behalf two weeks later. On June 19, the judge submitted the request for the third time, and finally, on June 22, 2018, the speaking engagement team acknowledged that it had received the request. One month later, and just three days before the panel was supposed to occur, the judge's request was denied. On February 6, 2019, another immigration judge sought permission to speak to a seventh-grade class about asylum on March 8, 2019. His ACIJ approved the request that day and forwarded it to the speaking engagement team. Hearing no response, on February 25, 2019, the judge followed up and learned that the request was still pending with the centralized speaking engagement team. He followed up again on March 6, and learned that the speaking engagement team was planning to deny the request. He cancelled the middle school visit but never received a final decision. The following month, he reached out to a member of the speaking engagement team, hoping that if he learned the reason for its denial, he could modify the presentation and reschedule the visit. To date, the judge has never heard back.

31.     Indeed, although EOIR is required to provide immigration judges with reasons for denials, in many instances it has not done so. As a result, immigration judges often do not learn the reasons why their requests have been denied, as in the instances above.

### C.     The 2020 Policy

32.     On December 6, 2019, the Knight First Amendment Institute at Columbia University (the "Knight Institute") received a copy of the 2017 Policy in response to a Freedom of Information Act request. On January 6, 2020, the Knight Institute wrote an open letter to EOIR's Director urging him to suspend the 2017 Policy. The Institute explained that the policy violated EOIR employees' First Amendment right to speak in their personal capacities on matters of public concern and the public's First Amendment right to hear them.

33.     EOIR did not respond to the Knight Institute's letter. On January 17, 2020, however, EOIR's Director issued a memorandum titled "Submission and Processing of Requests for Speaking Engagements" (the "2020 Policy").[5] The stated purpose of the 2020 Policy is "[t]o announce the establishment of a new automated speaking engagement request portal and to restate EOIR's established policy on speaking engagements." Although the 2020 Policy purports to "reissu[e]" without "substantively alter[ing]" the 2017 Policy, it is significantly more restrictive than its predecessor in several important ways.

34.     First, the 2020 Policy extends to written publications, and not just to public speaking. While the 2017 Policy defined "speaking engagement" as "speak[ing] at an event," the 2020 Policy defines it to include "written pieces intended for publication." As with the 2017 Policy, the 2020 Policy does not expressly state that it applies to press contacts, but EOIR continues to require immigration judges to seek preapproval before media interviews.

35.     Second, the 2020 Policy prohibits immigration judges from publicly speaking or writing in their personal capacities about immigration or EOIR. It does this by dramatically expanding EOIR's definition of "official capacity" speaking engagements. The 2020 Policy provides that a speaking engagement is in an employee's official capacity for purposes of the policy whenever it "relate[s] to immigration law or policy issues, the employee's official EOIR duties or position, or any agency programs and policies," or when the employee "has been invited [to speak] because of the[ir] official duties or position." The policy thus bars immigration judges from speaking in their personal capacities about any topic related to immigration law or policy or EOIR—regardless of who invited them to speak, the forum, and whether they intend to use their title.

_____

[5] A true and correct copy of the 2020 Policy is attached hereto as Attachment 3.

36.     Third, the 2020 Policy institutes additional layers of review and, therefore, creates further opportunities for delay. Under the 2017 Policy, immigration judges were required to seek supervisory approval for all speaking engagements, and to seek higher-level approval for official-capacity speaking engagements and personal-capacity speaking engagements related to immigration. By contrast, the 2020 Policy subjects all requests—regardless of speaking capacity or content—to four levels of review. Judges must initially seek approval from their supervisor. If the supervisor approves, the request is forwarded to the centralized speaking engagement team, which under the 2020 Policy consists of representatives from the Office of Policy, the Office of the General Counsel, and the Office of the Director. While that review is ongoing, the request is also reviewed by the EOIR's Ethics Program, a team that does not approve or reject requests but instead "offers guidance to ensure that speakers do not experience an ethical dilemma." If the speaking engagement team approves the request, their recommendation—along with any guidance from the Ethics Program—is sent back to the supervisor, who makes the final decision about whether the judge can speak or write. In cases involving speeches, written pieces, or other prepared material, the supervisor may condition approval on making certain changes.

37.     In all other respects, the 2020 Policy is similar to the 2017 one. The 2020 Policy requires immigration judges to obtain preapproval for all public speaking, including communications with the press, unless they are officers of NAIJ and plan to engage in union speech related to employee working conditions. The policy does not include narrow, objective, and definite criteria for deciding whether to approve personal-capacity speaking requests. For example, the policy provides that personal-capacity requests will be denied unless they are "genuinely personal capacity," but, as explained above, EOIR's policy is that all speech relating to immigration or the agency is official capacity. The policy also provides that personal-capacity

15

requests are reviewed for compliance with "applicable law and agency policies" and "consistency in EOIR's communications." In addition, the policy does not include a definite deadline for decision. The policy states that it does not "alter, or purport to alter," the 2018 MOU, and so it leaves in place the MOU's aspirational time limits for speaking-engagement-team review.

### III.   Harms to Immigration Judges and the Public

38.     Recent changes to immigration law and policy, the state of the immigration court system, and the role of immigration judges are all of immense public interest. After the 2017 Policy went into effect, however, immigration judges were routinely denied permission to speak publicly in their personal capacities about immigration and many were chilled from even seeking permission to do so. The 2020 Policy goes even further—it flat out prohibits immigration judges from speaking or writing publicly in their personal capacities about immigration or EOIR. This denies the public their unique insights into matters of urgent and ongoing public debate.

### A.   Immigration Judges Have Been Prevented from Speaking about Matters of Public Concern in their Personal Capacities

39.     As explained above, immigration judges often spoke at local and national conferences, guest lectured at universities and law schools, and participated in immigration-law trainings before 2017. While they were required to seek supervisory approval, they generally got it. After the 2017 Policy went into effect, however, immigration judges who wished to speak about immigration were required to seek two levels of approval rather than one, and those who sought approval often did not get it or else failed to receive a timely decision.

40.     Requests relating to speaking engagements that immigration judges had undertaken for years in their personal capacities were suddenly denied. For example, in March 2018, an immigration judge submitted a request to speak at the immigration law clinic at his alma mater, something he had done annually, with EOIR's approval, since the clinic's inception. In an email

forwarding the request to the speaking engagement team, the judge's supervisor described him as "an outstanding candidate to conduct the speaking engagement." The team denied the immigration judge's request, eventually explaining that "[b]ecause your topic concerned immigration court matters, and you were invited to speak because of your position as an immigration judge, personal capacity is not allowable." According to them, speaking engagements related to immigration were official capacity and had to be handled by EOIR "management officials" to ensure consistency in the agency's messaging: "[I]mmigration is always a topic of great interest and debate, and many employees are understandably unprepared to present the Department's official view when presented with thorny questions and topics." By contrast, "[m]anagement officials, as part of their official duties, are routinely briefed on ongoing litigation and the Department's position on sensitive topics."

41.     EOIR repeatedly confirmed that position in rejecting requests by immigration judges to speak in their personal capacities about immigration. For example, in April 2018, the speaking engagement team denied an immigration judge's request to speak to a Harvard Law School class "due to the nature of the topic (asylum claims involving children)."

42.     That same month, a different immigration judge submitted a request to participate in her personal capacity on a Practicing Law Institute panel on immigration and recent developments in asylum law. Months later, and only three days before the panel was scheduled to take place, the speaking engagement team rejected her request because "the nature of the event calls for official capacity and supervisory immigration judges should represent EOIR at events such as this one." EOIR rejected the request even though the judge had participated in her personal capacity on the same panel the previous year.

43.     In September 2019, another immigration judge sought approval to speak in her personal capacity to an immigration class at her former law school via Skype. Her supervisor approved the request. One day before she was scheduled to attend class, however, the speaking engagement team denied the request, explaining that the topic was "too closely related to [the judge's] official duties to permit participation in her personal capacity." The team also explained that appearing in an official capacity was not appropriate because it was not clear "[the judge's] participation would advance [EOIR]'s interests."

44.     In other cases, EOIR delayed its decision or failed to provide one, effectively denying the request to speak. For example, as described above, in February 2019, an immigration judge asked for permission to speak in a personal capacity to a seventh-grade class about immigration and asylum law. Although he received supervisory approval, he did not receive a response from the speaking engagement team for a full month. Finally, two days before the event, the judge's supervisor told him informally that the team was planning to deny the request. The judge cancelled the visit, but the speaking engagement team never sent a formal denial or explained its decision. The judge followed up in April, and again in May, explaining that he was "still hopeful to do the talk, even if it means changing my presentation to address whatever concerns exist." To date, the judge has not received a response.

45.     Although EOIR sometimes granted approval to speak in a personal capacity about immigration-related issues, its approach was seemingly inconsistent and arbitrary. For example, EOIR approved a May 2018 request from an immigration judge who wished to speak about immigration and removal proceedings before the Missouri Catholic Conference, but in February 2019 it denied a request to speak about immigration at a synagogue. EOIR approved an October

2018 request to participate in a moot court at Tulane Law School, but denied a September 2018 request to preside over a mock removal hearing at Columbia Law school.

46. For those reasons, even before the 2020 Policy was enacted, many immigration judges came to believe that it was futile to submit requests to speak publicly about immigration in their personal capacities. Under the 2020 Policy, immigration judges are simply prohibited from speaking or writing publicly in their personal capacities about issues related to immigration law or policy or EOIR's policies and programs. The only avenue for judges to speak publicly about immigration or EOIR is to do so in their official capacities, but those who speak in their official capacities are constrained to recite the agency's talking points.

47. EOIR has warned judges that failure to comply with its speaking-engagement policies may result in disciplinary action, including reprimand, suspension, and even removal from the federal service. In trainings, EOIR emphasizes that judges must seek approval before speaking to any kind of group, in any forum, on any topic. Further, EOIR tracks compliance with this requirement. For example, one judge was emailed by an EOIR official after the official found a conference schedule that announced the judge's participation in a panel; the official told the judge that she was required to submit a request for preapproval.

### B. The Public Has Been Denied the Opportunity to Hear from Immigration Judges Who Would Have Otherwise Spoken in their Personal Capacities

48. There is an important public debate about recent changes to immigration law and policy and their effects on immigration courts and the migrants who appear before them. Many immigration judges wish to contribute to this debate, but the public has been deprived of their unique insights. Professional associations, law school clinics, and other organizations that used to routinely host immigration judges at their events are generally no longer able to do so. Many recognize the futility of inviting judges who are not representatives of NAIJ. Others have stopped

inviting immigration judges to speak altogether. The effect is to deny the public access to insights about how recent changes to immigration law and policy are working in practice, and to create the perception that EOIR employees uniformly support the administration's policies.

49.     In October 2019, four clinical legal professors wrote an article in *Slate* describing the impact of the 2017 Policy on their ability to get immigration judges to speak to their students. The professors—Laila L. Hlass of Tulane Law School, Elora Mukherjee of Columbia Law School, Carrie L. Rosenbaum of the Golden Gate University School of Law, and Maureen Sweeney of the University of Maryland Francis King Carey School of Law—noted that in past years judges had routinely visited their classes to speak about immigration law and policy, but that recently things had changed:

> [A]lmost all have declined [invitations]. They've told us they can't speak with our classes even on their days off, even in their personal capacities, without prior clearance and approval from high-level supervisors—approval that is increasingly difficult to obtain.

50.     Advocacy and professional organizations that once hosted immigration judges at events have also been affected. For example, organizations like the Federal Bar Association, the American Immigration Lawyers Association ("AILA"), the Practicing Law Institute, and Human Rights First report no longer being able to rely on the expertise of immigration judges at their events or trainings. Some of these organizations have simply given up on inviting active immigration judges, and have instead turned to retired ones.

51.     AILA and its thirty-nine local chapters routinely hold a range of events, including conferences and continuing legal education classes. Many of these events are open to the public. In past years, immigration judges frequently spoke at these events. Since EOIR issued the 2017 Policy, however, immigration judges have generally declined requests to attend. Many chapters have simply stopped extending invitations.

52.     The experience of AILA's South Florida chapter is illustrative. Prior to 2017, immigration judges met with members of the community at chapter events at least four or five times a year—judges sat on panels at the chapter's annual conference, participated in the chapter's monthly CLE training events for its members, and joined pro bono training programs for corporate attorneys. But in 2017, immigration judges began rejecting invitations or else stopped responding to them altogether. Immigration judges have not attended any chapter events since 2017.

53.     In an effort to fill the void left by active immigration judges, AILA and some of its local chapters have relied on retired immigration judges to participate in educational conferences and other events. In April 2020, for example, AILA organized an online panel discussion on recent developments in immigration litigation. The staff member responsible for the event had hoped to invite active immigration judges but, believing that extending an invitation would be futile, she invited only retired judges.

54.     News reports about issues relating to immigration courts similarly include only the perspectives of retired immigration judges, immigration judges who can speak by virtue of their union positions, or immigration judges representing the official positions of EOIR. Active immigration judges who may have different perspectives cannot speak to members of the press. Even in the midst of the COVID-19 crisis, immigration judges cannot conduct press interviews about their personal experiences. Some judges have expressed their views to NAIJ officers, but have declined to speak publicly for fear of retaliation.

**First Cause of Action**

55.     The 2020 Policy violates the First Amendment because it imposes a system of prior restraint on the speech of immigration judges, because it is not appropriately tailored to any legitimate government interest, and because it fails to include adequate procedural safeguards.

21

**Second Cause of Action**

56.     To the extent it remains operative, the 2017 Policy also violates the First Amendment because it imposes a system of prior restraint on the speech of immigration judges, because it is not appropriately tailored to any legitimate government interest, and because it fails to include adequate procedural safeguards.

**Third Cause of Action**

57.     The 2020 Policy is void for vagueness under the First and Fifth Amendments because it invites arbitrary and discriminatory enforcement, and because it fails to give immigration judges fair notice of what standards will be applied in reviewing their requests for preapproval.

**Fourth Cause of Action**

58.     To the extent it remains operative, the 2017 Policy is also void for vagueness under the First and Fifth Amendments because it invites arbitrary and discriminatory enforcement, and because it fails to give immigration judges fair notice of what standards will be applied in reviewing their requests for preapproval.

**Prayer for Relief**

Plaintiff respectfully requests that this Court:

1.      Declare that the 2020 Policy violates the First and Fifth Amendments to the Constitution;

2.      To the extent the 2017 Policy remains operative, declare that the 2017 Policy violates the First and Fifth Amendments to the Constitution;

3.      Enjoin Defendant and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from continuing to enforce the 2020 Policy;

4.      To the extent the 2017 Policy remains operative, enjoin Defendant and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from continuing to enforce the 2017 Policy;

5.      Award Plaintiff its reasonable costs and attorneys' fees in this action; and

6.      Grant Plaintiff such other relief as this Court may deem just and proper.

Dated: July 1, 2020                              Respectfully submitted,

 /s/ *Victor M. Glasberg*                          /s/ *Ramya Krishnan*
Victor M. Glasberg (VA 16184)           Ramya Krishnan*
Victor M. Glasberg & Associates         Stephanie Krent*
121 S. Columbus Street                       Alex Abdo*
Alexandria, VA 22314                          Knight First Amendment Institute
T: (703) 684-1100                                  at Columbia University
F: (703) 684-1104                               475 Riverside Drive, Suite 302
VMG@robinhoodesq.com                  New York, NY 10115
                                                          T: (646) 745-8500
                                                          F: (646) 661-3361
                                                          ramya.krishnan@knightcolumbia.org

*pro hac vice* application forthcoming     *Counsel for the Plaintiff*