## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

NATIONAL ASSOCIATION OF
IMMIGRATION JUDGES, affiliated with the
International Federation of Professional and
Technical Engineers,

       Plaintiff,

   v.

JAMES R. MCHENRY III, in his official
capacity as Director of the Executive Office
for Immigration Review,

       Defendant.

Civil Action No. 20-cv-731

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Victor M. Glasberg (VA 16184)
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
T: (703) 684-1100
F: (703) 684-1104
vmg@robinhoodesq.com

Ramya Krishnan*
Stephanie Krent*
Alex Abdo*
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
T: (646) 745-8500
F: (646) 661-3361
ramya.krishnan@knightcolumbia.org

*pro hac vice* application forthcoming

*Counsel for the Plaintiff*

**Table of Contents**

Table of Authorities ..................................................................................................... ii

Introduction ................................................................................................................. 1

Statement of Facts ....................................................................................................... 3

       A.     The 2017 Policy ........................................................................... 4

       B.     The 2018 Memorandum of Understanding Between NAIJ and EOIR ............ 5

       C.     The 2020 Policy ........................................................................... 6

Standard of Review ..................................................................................................... 7

Argument ..................................................................................................................... 7

    I.     NAIJ is likely to prevail on the merits of its claims. ..................................... 7

       A.     The 2020 Policy violates the First Amendment. ................................................ 7

            1.     Because the 2020 Policy is a prior restraint on the protected speech of public employees, it should be subject to exacting scrutiny under *NTEU*. ........................................................... 8

            2.     The 2020 Policy does not survive *NTEU*'s exacting scrutiny. ........... 12

                a.     The interests of immigration judges in speaking, and of the public in hearing what they have to say, are manifestly great. ...................................................................... 12

                b.     The 2020 Policy is not tailored to addressing any legitimate and actual interest the government may have in regulating the speech of immigration judges. ..................... 16

                c.     The 2020 Policy lacks the substantive and procedural safeguards generally required of prior restraints. ................... 19

       B.     The 2020 Policy is void for vagueness under the Fifth Amendment. ............. 23

    II.    Absent a preliminary injunction, NAIJ's members are likely to suffer irreparable harm due to the 2020 Policy. ................................................... 24

    III.    The balance of equities and the public interest support preliminary injunctive relief. ....................................................................................... 25

Conclusion ................................................................................................................. 26

i

## Table of Authorities

**Cases**

*Abdulrahman v. Ashcroft*, 330 F.3d 587 (3d Cir. 2003) ...................................... 14

*Am. Entertainers, L.L.C. v. City of Rocky Mount*, 888 F.3d 707 (4th Cir. 2018) ................. 20, 21

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175 (10th Cir. 2010)...................... 10

*Carey v. Wolnitzek*, 614 F.3d 189 (6th Cir. 2010) .......................................... 18

*Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184 (4th Cir. 2013) ........................... 25

*Chesapeake B & M, Inc. v. Harford Cty.*, 58 F.3d 1005 (4th Cir. 1995).............................. 21, 22

*Connick v. Myers*, 461 U.S. 138 (1983).................................................. 13

*Cromer v. Brown*, 88 F.3d 1315 (4th Cir. 1996)............................................ 14

*Crue v. Aiken*, 370 F.3d 668 (7th Cir. 2004)............................................. 9, 22

*Elrod v. Burns*, 427 U.S. 347 (1976) .................................................. 24

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)................................... 23

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002) ............................... 25

*Hunter v. Town of Mocksville*, 789 F.3d 389 (4th Cir. 2015) ................................. 11, 12

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448 (2018)............................................................................. 8

*Johnson v. Bergland*, 586 F.2d 993 (4th Cir. 1978) ........................................ 24

*Lane v. Franks*, 573 U.S. 228 (2014)............................................... 7, 8, 12

*Liverman v. City of Petersburg*, 844 F.3d 400 (4th Cir. 2016)............................. passim

*Lytle v. Doyle*, 197 F. Supp. 2d 481 (E.D. Va. 2001), *aff'd on other grounds* 326 F.3d 463 (4th Cir. 2003) ........................................................... 24

*Mansoor v. Trank*, 319 F.3d 133 (4th Cir. 2003)........................................... 9

*Moonin v. Tice*, 868 F.3d 853 (9th Cir. 2017) ...................................... 9, 19, 21

*Mountain Valley Pipeline, LLC v. W. Pocahontas Prop. Ltd. P'ship*, 918 F.3d 353 (4th Cir. 2019)......................................................................... 7

*Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) .................. 25

*Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019) ............................................................. 10

*Republican Party of Minnesota v. White*, 536 U.S. 765 (2002).................................... 18

*Sanjour v. E.P.A.*, 56 F.3d 85 (D.C. Cir. 1995) ............................................ 10, 14, 19

*Siefert v. Alexander*, 608 F.3d 974 (7th Cir. 2010) ...................................................... 18

*Snyder v. Phelps*, 562 U.S. 443 (2011) ......................................................................... 9

*Swartzwelder v. McNeilly*, 297 F.3d 228 (3d Cir. 2002) ................................... 9, 19, 21

*United States v. Nat'l Treas. Emps. Union,* 513 U.S. 454 (1995) ........................ passim

*Waters v. Churchill*, 511 U.S. 661 (1994) ................................................................... 25

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292
    (4th Cir. 2009)......................................................................................................... 24

**Statutes**

5 U.S.C. § 7102......................................................................................................... 4

8 U.S.C. § 1101(b)(4) ................................................................................................ 3

**Other Authorities**

Chief Justice John Roberts, *2019 Year-End Report on the Federal Judiciary*
    (2019), https://perma.cc/33LJ-PL6V ..................................................................... 14

Courts in Crisis: The State of Judicial Independence and Due Process in U.S.
    Immigration Courts: Hearing Before the H. Subcomm. on Immigration and
    Citizenship of the H. Comm. on the Judiciary (Jan. 29, 2020),
    https://perma.cc/3NUR-7WT7 ............................................................................... 10

Cristian Farias, *The Trump Administration is Gagging America's Immigration
    Judges*,  The Atlantic (Feb. 28, 2020), https://perma.cc/63VT-VYX7................... 15

James A. Wynn Jr., *As a Judge, I Have to Follow the Supreme Court. It Should
    Fix This Mistake*, Wash. Post (June 12, 2020), https://perma.cc/GQ9F-DV55..... 18

James Orenstein, *I'm a Judge. Here's How Surveillance Is Challenging Our
    Legal System*, N.Y. Times (June 13, 2019), https://perma.cc/TES7-KJ5R ........... 18

Jed S. Rakoff, *Covid & the Courts*, N.Y. Rev. of Books (May 28, 2020),
    https://perma.cc/64Y4-V7MW .............................................................................. 18

Kate Brumback et al., *AP Visits Immigration Courts Across US, Finds Nonstop Chaos*, Associated Press (Jan. 19, 2020), https://perma.cc/BLE8-NP2B ............................ 10

Laila L. Hlass et al., *Let Immigration Judges Speak*, Slate (Oct. 24, 2019), https://perma.cc/ZHG5-84SZ ................................................................................ 15

Laura Santhanam, *Trump's Immigration Policy Splits Americans in Half, Poll Says*, PBS NewsHour (Dec. 11, 2018), https://perma.cc/KU3G-VRYL ............................... 16

Lauren Villagran, *Despite COVID-19 Cases Inside, Immigration Court Continues in Detention Centers*, El Paso Times (May 1, 2020), https://perma.cc/PQ2R-673M ..................................................................................................................... 10

Michele Hackman & Alicia A. Caldwell, *Immigration Courts at Border Raise Due-Process Concerns*, Wall St. J. (Dec. 14, 2019), https://perma.cc/U2D8-TQCT ...................................................................................................................... 10

Oliver Laughland, *Inside Trump's Tent Immigration Courts That Turn Away Thousands of Asylum Seekers*, Guardian (Jan. 16, 2020), https://perma.cc/GXC6-4CT8 ................................................................................ 10

**Regulations**

8 C.F.R. § 1003.10 ................................................................................................. 3, 14

**Introduction**

This lawsuit challenges a sweeping prior restraint that the government has imposed on the speech of more than 460 immigration judges throughout the United States. On January 17, 2020, the Director of the Executive Office of Immigration Review ("EOIR") issued a policy that categorically prohibits immigration judges from speaking publicly in their personal capacities about immigration law or policy or about EOIR programs and policies, and that requires immigration judges to seek EOIR's approval before speaking publicly about any other topic (the "2020 Policy"). These restrictions apply to immigration judges who wish to speak at public events, such as bar association or law school events, or to the news media. The restrictions violate the First and Fifth Amendments to the U.S. Constitution, and the National Association of Immigration Judges ("NAIJ") now urges this Court to enter a preliminary injunction against EOIR's enforcement of the 2020 Policy.[1]

The 2020 Policy imposes a prior restraint in violation of the First Amendment. As the Supreme Court has repeatedly held, people do not surrender their free-speech rights when they accept government employment. They retain their rights, as citizens, to speak on matters of public importance, and the government can silence them only if it can show that its interest in doing so outweighs the employees' interests in speaking and the public's interest in hearing what they have to say. The government cannot satisfy this test here. The interests of immigration judges in engaging in the speech restrained by the 2020 Policy—and the interest of the public in hearing that speech—is substantial. The current administration has made sweeping changes to the immigration

---

[1] NAIJ's understanding is that the 2020 Policy supersedes an earlier EOIR policy dated September 1, 2017 ("2017 Policy"), which imposed a similar preapproval requirement on all immigration judges who wished to speak at public events in their personal capacities. To the extent the 2017 Policy remains operative, NAIJ seeks a preliminary injunction against EOIR's enforcement of this policy as well.

courts, and the public interest in understanding those changes—and whether and how they affect the ability of the immigration courts to operate independently and fairly—is manifest. Immigration judges are uniquely positioned to educate the public on these issues, but the 2020 Policy prevents them from doing so. The 2020 Policy has also prevented immigration judges from commenting on the impact of the COVID-19 pandemic on immigration courts and detained immigrants. Most of the nation's sixty-nine immigration courts and adjudication centers have remained open throughout the pandemic, and many immigration judges have privately expressed concern about that fact. With the exception of union representatives whose speech is protected by federal labor law, however, few of these judges have been free to express their concerns publicly.

While EOIR has a legitimate interest in promoting the efficiency of the services it performs through its employees, the 2020 Policy is not appropriately tailored to that interest. The 2020 Policy applies to *all* speech that immigration judges engage in in their personal capacities, whether or not that speech could reasonably be expected to interfere with EOIR's operations. Moreover, the policy lacks constitutionally required procedural safeguards, such as clear standards and a definite time limit for decision.

The 2020 Policy is also unconstitutionally vague under the Fifth Amendment because the policy invites arbitrary and discriminatory enforcement, and because it fails to give immigration judges fair notice of what standards will be applied in reviewing their requests for preapproval.

Respectfully, this Court should enter a preliminary injunction against EOIR's continued enforcement of the 2020 Policy. NAIJ is likely to succeed on the merits of its First and Fifth Amendment claims; absent a preliminary injunction, immigration judges will continue to suffer the irreparable injury of being silenced during a time of extraordinary public interest in immigration law and policy; and the balance of equities and the public interest favor an injunction.

## Statement of Facts

Immigration judges are administrative judges who exercise the authority of the United States Attorney General to adjudicate immigration proceedings. 8 U.S.C. § 1101(b)(4); 8 C.F.R. § 1003.10. In this role, they preside over immigration hearings and serve as neutral and impartial arbiters. Declaration of A. Ashley Tabaddor in Support of Plaintiff's Motion for a Preliminary Injunction ("Tabaddor Decl.") ¶ 3. Immigration judges undertake this work as employees of EOIR, a component of the Department of Justice ("DOJ"). *Id*.

In addition to serving as judicial officers, immigration judges are active members of civic and legal communities. Prior to 2017, they routinely spoke in their personal capacities at schools, universities, and bar associations. *Id.* ¶ 9. Although they required supervisory approval to do so, they usually received approval. Judges would submit speaking requests to their supervising Assistant Chief Immigration Judge ("ACIJ"). *Id.* ¶ 8. If the supervisor granted the request, the matter would be forwarded to EOIR's Ethics Office, which offered ethics guidance. *Id.* Judges were generally permitted to use their official titles to identify themselves in connection with their speaking, so long as they also included a disclaimer stating that they were appearing in their personal capacities and not as employees of EOIR. *Id.* In 2017, however, EOIR issued a policy that drastically limited the ability of judges to speak at public events in their personal capacities, with or without a disclaimer. EOIR's 2020 Policy goes even further. The policy categorically prohibits judges from speaking or writing publicly in their personal capacities about immigration and EOIR, and it requires them to seek agency approval before speaking or writing about any other matter of public concern. While the 2020 Policy appears to supersede the 2017 Policy, the 2020 Policy does not state this clearly, and in fact purports to reissue the 2017 one.

### A.  The 2017 Policy

On September 1, 2017, the Director of EOIR issued a memorandum titled "Speaking Engagement Policy for EOIR Employees." Tabaddor Decl. ¶ 11 Ex. B (the "2017 Policy"). The 2017 Policy required all immigration judges who wished to speak "at an event" to submit a request to their supervising ACIJ. *Id*. This requirement applied regardless of whether an immigration judge intended to speak on an immigration-related topic. Although the policy did not define the term "event," a subsequent email from EOIR's Director to EOIR employees stated that a "good metric" for whether to seek review was "whether you will be speaking with more than one non-DOJ person about EOIR" or at an event for which "a group external to DOJ is sending out notice of the event." *Id*. ¶ 13 Ex. C. Subsequent communications from EOIR confirmed the agency's position that the policy also applied to press contacts. *Id.* ¶ 14.

Under the 2017 Policy, supervising ACIJs were charged with deciding whether a speaking engagement would be undertaken in the judge's personal capacity (as defined by the policy) and whether to approve the request. 2017 Policy at 2. Immigration judges who wished to speak on immigration-related topics or whose requests were reclassified as official were then required to seek approval from a centralized speaking engagement team known as the "SET." *Id.* The only judges exempted from this process were NAIJ representatives who, under federal labor law, are guaranteed the ability to engage in union speech related to employee working conditions. Tabaddor Decl. ¶ 5; *see also* 5 U.S.C. § 7102.

The 2017 Policy did not set out any criteria for officials to consider in determining whether to approve or reject speaking-engagement requests. Nor did the policy include a deadline for decision.

### B.  The 2018 Memorandum of Understanding Between NAIJ and EOIR

After the 2017 Policy was issued, NAIJ entered into negotiations with EOIR regarding the policy's application to immigration judges. The parties ultimately executed a Memorandum of Understanding, which remains in effect. Tabaddor Decl. ¶ 16 Ex. D (the "2018 MOU").

The 2018 MOU sets forth specific procedures and considerations that apply to requests by immigration judges to speak publicly. For example, the MOU includes aspirational time limits for certain steps in the preapproval process. Although the MOU does not include any time limit for review by supervisors, it requires supervisors to "strive to" notify immigration judges within one day of forwarding a request to the SET. *Id.* ¶ 2. The MOU also requires the SET to "strive to" respond to a request within five days, and, if the SET anticipates that review will take longer, to inform a judge "when feasible." *Id.* The MOU states that EOIR will provide immigration judges with reasons for denials of requests, *id.* ¶ 4, that immigration judges may ask an official designated by EOIR to reconsider denials of requests, *id.* ¶ 5, and that the designated official will "strive to" make a decision on reconsideration within ten business days, *id.* Finally, the MOU states that EOIR must provide NAIJ a list of factors that EOIR will consider "in assessing Immigration Judge speaking engagement requests" by June 30, 2018, *id.* ¶ 6, and that EOIR must provide NAIJ a summary of speaking-engagement requests received by the SET every six months, *id.* ¶ 8.

EOIR has provided NAIJ the biannual summary reports required by the 2018 MOU, and on June 28, 2018 sent NAIJ a draft list of questions EOIR considers when reviewing speaking requests made by EOIR employees. EOIR informed NAIJ that it would soon finalize the guidelines and make them available on EOIR's intranet; however, neither the draft nor final version of this document is available on EOIR's intranet. Tabaddor Decl. ¶ 20. Immigration judges frequently report delayed decision times, and in several instances have not received a decision at all. *Id.* ¶ 26.

### C.  The 2020 Policy

On January 17, 2020, EOIR's Director issued a new memorandum purporting to "reissu[e]" without "substantively alter[ing]" the 2017 Policy. Tabaddor Decl. ¶ 21 Ex. G (the "2020 Policy") at 1. In actuality, the 2020 Policy differs from the 2017 one in several important ways.

First, the 2020 Policy extends to "written pieces intended for publication," *id*. at 2 n.2, not just public speaking and contacts with the press. Tabaddor Decl. ¶ 23 (observing that although the policy does not expressly mention press contacts, EOIR has continued to require immigration judges to seek approval before communicating with the press).

Second, the 2020 Policy imposes an outright prohibition on immigration judges speaking publicly in their personal capacities about immigration or EOIR. Under the terms of the policy, speech is deemed "official" if it "relate[s] to immigration law or policy issues, the employee's official EOIR duties or position, or any agency programs and policies." 2020 Policy at 2. The policy thus bars immigration judges from speaking in their personal capacities about any topic related to immigration law or policy or EOIR—regardless of who invited them to speak, the forum, and whether they intend to use their title.

Third, the 2020 Policy institutes additional layers of review and, in so doing, creates further opportunities for delay. Under the new policy, immigration judges are required to submit all requests—regardless of speaking capacity or content—to four levels of review. *Id.* at 3. Judges must initially seek approval from their supervisors. *Id.* If the supervisor approves the request, the supervisor forwards the request to the SET. *Id.* While that review is ongoing, the request is also reviewed by EOIR's Ethics Program, which neither approves nor denies requests but instead "offers guidance to ensure that speakers do not experience an ethical dilemma." *Id.* If the SET approves the request, its recommendation—along with any guidance from the Ethics Program—is

sent back to the supervisor, who makes the final decision about whether the judge can speak or write. *Id.* In cases involving speeches, written pieces, or other prepared material, the supervisor may condition approval on making certain changes. Tabaddor Decl. ¶ 36.

In all other respects, the 2020 Policy is similar to the 2017 one. The 2020 Policy applies to *all* speaking engagements in an immigration judge's personal capacity. The policy does not include narrow and objective criteria for deciding whether to approve personal-capacity speaking requests. In addition, the policy does not include a deadline for decision, although it leaves intact the MOU's aspirational time limits.

### Standard of Review

In order to obtain a preliminary injunction, the moving party must establish that: "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without the preliminary injunction; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest." *Mountain Valley Pipeline, LLC v. W. Pocahontas Prop. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). As explained below, NAIJ satisfies each of these requirements.

### Argument

**I. NAIJ is likely to prevail on the merits of its claims.**

**A. The 2020 Policy violates the First Amendment.**

NAIJ is likely to prevail on its First Amendment claim that the 2020 Policy imposes an unconstitutional prior restraint on immigration judges who wish to speak or write publicly in their personal capacities.

As the Supreme Court held over fifty years ago, "citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 573 U.S. 228, 231 (2014)

(citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Rather, the First Amendment protection of a public employee's speech turns on "a careful balance." *Id.* Where an employee challenges a post-hoc disciplinary action, courts balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016) (quoting *Pickering*, 391 U.S. at 568). But where, as here, the challenge is to a prior restraint on protected speech, the government's burden is "greater." *Id.* (quoting *United States v. Nat'l Treasury Emps. Union* (*NTEU*), 513 U.S. 454, 468 (1995)). "[T]he government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 455 (quoting *Pickering*, 391 U.S. at 571). Further, "[i]t must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 475 (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994)). This higher burden "more closely resembles exacting scrutiny than the traditional *Pickering* analysis," *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2472 (2018), and reflects the fact that prior restraints "give[] rise to far more serious concerns than could any single supervisory decision,'" *id*. (quoting *NTEU*, 513 U.S. at 468).

The government cannot satisfy the test imposed by *NTEU* in this case.

1. **Because the 2020 Policy is a prior restraint on the protected speech of public employees, it should be subject to exacting scrutiny under *NTEU*.**

As the Fourth Circuit has explained, *NTEU* applies "when a generally applicable statute or regulation (as opposed to a post-hoc disciplinary action) operates as a prior restraint" on speech

by public employees on matters of public concern. *Liverman*, 844 F.3d at 407. The 2020 Policy is precisely this sort of prior restraint, and, accordingly, is subject to *NTEU*'s exacting scrutiny.

The 2020 Policy operates as a prior restraint on the personal-capacity speech of immigration judges in two ways. First, the policy categorically prohibits all immigration judges from speaking or writing publicly in their personal capacities about immigration law or policy, their role as judicial officers, or EOIR programs and policies. As explained above, the policy does so by deeming "official" any public speech by EOIR employees on matters "relat[ing] to immigration law or policy issues, the employee's official EOIR duties or position, or any agency programs and policies." 2020 Policy at 2. Second, the policy requires that all immigration judges seek EOIR's approval before speaking or writing in their personal capacities on any other topic. *Id.* Both restrictions are prior restraints in that they prohibit or "chill[] potential speech before it happens." *NTEU*, 513 U.S. at 468; *see also Liverman*, 844 F.3d at 407–08 (holding that an outright prohibition on public-employee speech is a prior restraint); *Mansoor v. Trank*, 319 F.3d 133, 137 (4th Cir. 2003) (same); *Moonin v. Tice*, 868 F.3d 853, 874 (9th Cir. 2017) (same); *Crue v. Aiken*, 370 F.3d 668, 679 (7th Cir. 2004) (holding that a policy requiring public employees to obtain the government's approval before speaking is a prior restraint); *Swartzwelder v. McNeilly*, 297 F.3d 228, 235–36 (3d Cir. 2002) (same); *Harman v. City of New York*, 140 F.3d 111, 119 (2d Cir. 1998) (same).

The 2020 Policy applies to speech on matters of public concern. Most obviously, the policy expressly prohibits all personal-capacity speech about immigration law and policy issues, the role of immigration judges as judicial officers, and the agency that employs them. These subjects are quintessential matters of public concern, *see Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (defining matter of public concern as "a subject of general interest and of value and concern to the public"),

and the public's interest in them today is especially pronounced. President Trump's administration has made sweeping changes to the immigration legal system, and there is an ongoing national debate regarding the wisdom and fairness of these changes.2 *Cf. Ragbir v. Homan*, 923 F.3d 53, 69–70 (2d Cir. 2019) ("[The plaintiff's] advocacy for reform of immigration policies and practices is at the heart of current political debate among American citizens and other residents."). As described below, many immigration judges wish to contribute to this discussion by, for example, educating the public about the immigration court system, describing how recent policy changes affect their ability to do their jobs, and supporting or criticizing proposed reforms.3 *See infra* Part I.A.2.a; *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 247 (4th Cir. 1999) (holding that instructional speech about handgun safety was "of obvious concern to citizens on both sides of the often hotly debated issue[]" and accordingly a matter of public concern); *Sanjour v. E.P.A.*, 56 F.3d 85, 91 (D.C. Cir. 1995) (stating that speech "addressing current government policies" is "perhaps the paradigmatic matter of public concern" (internal quotation marks omitted)); *Liverman*, 844 F.3d at 407–08 (4th Cir. 2016) (same with respect to "speech critical of the government employer").

---

2 *See* Courts in Crisis: The State of Judicial Independence and Due Process in U.S. Immigration Courts: Hearing Before the Subcomm. on Immigration and Citizenship of the H. Comm. on the Judiciary, 116th Cong. (2020), https://perma.cc/3NUR-7WT7. For recent news stories, see, for example, Kate Brumback et al., *AP Visits Immigration Courts Across US, Finds Nonstop Chaos*, Associated Press (Jan. 19, 2020), https://perma.cc/BLE8-NP2B; Michele Hackman & Alicia A. Caldwell, *Immigration Courts at Border Raise Due-Process Concerns*, Wall St. J. (Dec. 14, 2019), https://perma.cc/U2D8-TQCT; Oliver Laughland, *Inside Trump's Tent Immigration Courts That Turn Away Thousands of Asylum Seekers*, Guardian (Jan. 16, 2020), https://perma.cc/GXC6-4CT8; Lauren Villagran, *Despite COVID-19 Cases Inside, Immigration Court Continues in Detention Centers*, El Paso Times (May 1, 2020), https://perma.cc/PQ2R-673M/.

3 Because this case involves a sweeping prior restraint on speech, NAIJ need only show that the policies "*potentially* stifle[] speech of public concern." *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1186 (10th Cir. 2010) (quotations omitted).

The 2020 Policy also restrains speech that has nothing to do with immigration but that is clearly of public concern. In *NTEU*, the plaintiffs who successfully challenged the federal government's restrictions on accepting honoraria included a mail handler who "had given lectures on the Quaker religion," an aerospace engineer who "had lectured on black history," and a microbiologist who reviewed dance performances. 513 U.S. at 461. The Supreme Court concluded that this speech "f[e]ll within the protected category of citizen comment on matters of public concern," *id.* at 466, pointing out that Nathaniel Hawthorne, Herman Melville, and Walt Whitman were all once federal employees who "wr[o]te for publication in their spare time," *id.* at 464–65. Similarly, under the 2020 Policy, an immigration judge who wishes to publish a book of poetry, an immigration judge who wants to share her views about law school debt with a reporter, and an immigration judge who wants to give a speech about public service at a synagogue are all required to seek EOIR's approval before doing so. Although none of this speech relates to immigration, it is plainly speech on matters of public concern.

It is equally clear that the 2020 Policy regulates speech by immigration judges *in their personal capacities*. The 2020 Policy attempts to define all speech "related to immigration law or policy issues, the employee's official EOIR duties or position, or any agency programs and policies" as "official" speech that can be undertaken only in an immigration judge's capacity as a representative of EOIR. 2020 Policy at 2. But EOIR's characterization of speech as "official" or "personal" is not constitutionally determinative. *Cf. Hunter v. Town of Mocksville*, 789 F.3d 389, 397 (4th Cir. 2015) (explaining that the employers cannot "restrict employees' rights by creating excessively broad job descriptions" (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006)). As the Supreme Court has explained, the "critical question" in determining whether speech is in an official capacity is "whether the speech at issue is itself ordinarily within the scope of an

employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at 240. Commenting on immigration-related issues or EOIR policies in their personal time and away from the immigration courts is not ordinarily within the scope of immigration judges' duties. *See Edwards*, 178 F.3d at 248 (explaining that an officer was speaking in his personal capacity when he spoke "off-duty, at a location unrelated to the City, and in an instructional manner" and did not "claim to be speaking for or in any way on behalf of the Department"); *see also Hunter*, 789 F.3d at 399 (concluding that officers who called the Governor's office to report suspected wrongdoing were not acting within the scope of their job duties). The same is true with respect to speech by immigration judges on public issues having nothing to do with immigration or EOIR.

For these reasons, the 2020 Policy is subject to *NTEU*'s exacting scrutiny.

## 2.      The 2020 Policy does not survive *NTEU*'s exacting scrutiny.

The 2020 Policy fails to satisfy *NTEU*'s exacting scrutiny because the government cannot show that the interests of immigration judges and their potential audiences in "the broad range of present and future expression" restrained by the policy "are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571). The interests of immigration judges in speaking, and of the public in hearing what they have to say, are manifestly great. On the other hand, the policy is not tailored to addressing any legitimate interest the government may have in regulating the speech of immigration judges, and it lacks the substantive and procedural safeguards courts have generally required when assessing public employee speech restrictions.

### a.      The interests of immigration judges in speaking, and of the public in hearing what they have to say, are manifestly great.

The 2020 Policy implicates the core political speech of present and future immigration judges. It applies any time an immigration judge wishes to publicly discuss matters of public

concern in their personal capacities. As the Supreme Court has repeatedly explained, "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values.'" *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)). By preventing immigration judges from publicly discussing any issue related to immigration and EOIR, and by severely restricting their ability to publicly discuss any other issue, the 2020 Policy affects interests that "go to the core of the freedoms the First Amendment was designed to protect." *Harman*, 140 F.3d at 118.

Immigration policy is a near-daily fixture in our national dialogue, and immigration judges are uniquely positioned to inform that dialogue in "any number of ways." *Liverman*, 844 F.3d at 408. Many judges wish to play a role in educating the public about the immigration legal system and their position within it. They would like to speak at local and national conferences, guest lecture at universities and law schools, and contribute to legal trainings about these topics. Tabaddor Decl. ¶ 34. Some immigration judges also wish to be able to address how new or proposed immigration policies affect (or would affect) their ability to do their jobs. *Id.* ¶ 35. For example, some judges wish to express their concern about EOIR's decision to leave open the immigration courts in the midst of the current pandemic or to explain whether and how the current administration's immigration policies—including its imposition of case-completion quotas, its reassignment of judges to prioritize the disposition of asylum claims by migrants in Mexico, or its limitation of the judges' administrative control over their dockets—affect their judicial independence or the process they are able to afford the migrants who appear before them. *Id.*

The public's interest in hearing this speech is obvious. In his last year-end report to Congress, Chief Justice John Roberts emphasized the importance of judicial outreach to the public, imploring the nation's judges "to continue their efforts to promote public confidence in the

judiciary, both through their rulings and through civic outreach."[4] Although immigration judges are not Article III judges, they are still judicial officers. *See Abdulrahman v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003) ("As judicial officers, [immigration judges] have a 'responsibility to function as neutral and impartial arbiters'" (quoting *Aguilar–Solis v. INS*, 168 F.3d 565, 569 (1st Cir. 1999))); *see also* 8 C.F.R. § 1003.10(b). Yet the 2020 Policy prevents them from doing what the Chief Justice expects all judges do—help the public better understand the courts.

This has implications not only for public confidence in the immigration courts, but also for public debate about the court system. "[A]s numerous courts and commentators have observed, government employees are in a position to offer the public unique insights into the workings of government generally and their areas of specialization in particular." *Sanjour*, 56 F.3d at 94; *see also Cromer v. Brown*, 88 F.3d 1315, 1327 (4th Cir. 1996) (explaining that when the speech involves the effectiveness of government agencies, the speaker's interests "merge in a real sense with those of the community at large"). By denying immigration judges the opportunity to share their insights into the immigration legal system and the agency charged with running it, the 2020 Policy deprives the public of their "novel and valuable perspective," as recent experience with the policy and its predecessor, the 2017 Policy, demonstrates. *See Sanjour*, 56 F.3d at 94.[5]

Law school clinics, professional associations, and other organizations that used to host immigration judges at their events are generally no longer able to do so. Many recognize the futility

---

[4] Chief Justice John Roberts, *2019 Year-End Report on the Federal Judiciary* 2, 4 (2019), https://perma.cc/33LJ-PL6V.

[5] Immigration judges and their audiences also have substantial interests in speech of public concern *unrelated* to immigration or EOIR. *See NTEU*, 513 U.S. at 470 ("The large-scale disincentive to Government employees' expression also imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said. We have no way to measure the true cost of that burden, but we cannot ignore the risk that it might deprive us of the work of a future Melville or Hawthorne." (citation omitted)).

of inviting judges who are not retired or who are not union representatives. Others have stopped inviting immigration judges to speak altogether. In October 2019, four clinical legal professors published an article observing that immigration judges who in past years had routinely visited their classes to speak about immigration law and policy were no longer able to do so—"even on their days off."[6] Advocacy and professional organizations that once hosted immigration judges at events have also been affected by the inability of judges to accept invitations to participate in legal trainings and conferences.[7] For example, the American Immigration Lawyers Association ("AILA") and its thirty-nine local chapters hold a range of events on issues relating to immigration law, policy, and practice. *See* Declaration of Laura Lynch in Support of Plaintiff's Motion for a Preliminary Injunction ¶ 7. For years, immigration judges participated in these events. *Id.* ¶ 8. Following the issuance of the 2017 Policy, however, judges have generally rejected invitations to do so. *Id.* ¶¶ 9–12. Many chapters have simply given up on extending invitations to sitting judges, and have instead turned to retired ones. *Id.* ¶ 13.

News reports about the immigration courts have been similarly limited to the perspectives of immigration judges who are retired, who can speak by virtue of their union positions, or who represent the official positions of EOIR. Active immigration judges who may have personal perspectives that differ from those of EOIR (or even those of the union) cannot speak to members of the press. Even in the midst of the COVID-19 crisis, immigration judges cannot conduct press interviews about their personal experiences. Some judges have expressed their views to NAIJ officers, but have declined to speak publicly for fear of retaliation. Tabaddor Decl. ¶ 35.

---

[6] Laila L. Hlass et al., *Let Immigration Judges Speak*, Slate (Oct. 24, 2019), https://perma.cc/ZHG5-84SZl.

[7] Cristian Farias, *The Trump Administration is Gagging America's Immigration Judges*, The Atlantic (Feb. 28, 2020), https://perma.cc/63VT-VYX7.

In *Liverman*, the Fourth Circuit held unconstitutional a social media policy prohibiting police officers from criticizing their department's policies. Applying *NTEU*, the Fourth Circuit held that "[t]he interests of 'present and future employees' and their 'potential audiences' in such speech is manifestly significant," *Liverman*, 844 F.3d at 408 (quoting *NTEU*, 513 U.S. at 468), because the department's policies "could well become a matter of constructive public debate and dialogue between [the] officers and those whose safety they are sworn to protect," *id*. The 2020 Policy is even broader than the one at issue in *Liverman*. It prohibits not only personal-capacity speech critical of EOIR, but all personal-capacity speech related to "immigration law or policy issues, the employee's official EOIR duties or position, or any agency programs and policies." 2020 Policy at 2. Moreover, it applies to *all* public speaking and writing (not just posts on social media) and affects speech on issues that presently (rather than potentially) are matters of public debate.8 There can be no doubt that the interests of current and future employees and their potential audiences in the speech restrained by the 2020 Policy are similarly manifest.

> **b.    The 2020 Policy is not tailored to addressing any legitimate and actual interest the government may have in regulating the speech of immigration judges.**

To justify the burden on immigration judges and the public, the government must show that the 2020 Policy's restrictions are tailored to a legitimate and actual government interest. As the Supreme Court explained in *NTEU*, where the government defends a prior restraint "as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.'" *NTEU*, 513 U.S. at 475 (quoting *Turner Broad. Sys.*, 512 U.S. at 664). "It must demonstrate that the recited harms are real, not merely conjectural, and that the

---

8 *See* Laura Santhanam, *Trump's Immigration Policy Splits Americans in Half, Poll Says*, PBS NewsHour (Dec. 11, 2018), https://perma.cc/KU3G-VRYL.

regulation will in fact alleviate these harms in a direct and material way." *Id.* The government cannot do so.

As an initial matter, the government cannot establish that speech by immigration judges in their personal capacities has caused any "real" harms. As far as NAIJ is aware, the government has never identified any instance in which personal-capacity speech by an immigration judge has harmed a legitimate government interest. Neither the 2020 Policy nor its predecessor suggests that personal-capacity speech by immigration judges has resulted in harm to EOIR's operations. Nor did EOIR assert in the course of negotiations with NAIJ over the 2018 MOU that speech by immigration judges had interfered with EOIR's operations. Tabaddor Decl. ¶ 15. On the contrary, the record shows that immigration judges have spoken publicly—deepening public understanding of the work of the immigration courts—without any harm to EOIR. *Id.* ¶ 10. The lack of any concrete need for the 2020 Policy is fatal to it. Unless and until speech by immigration judges causes (or could reasonably be anticipated to cause) harm that EOIR has an interest in preventing, the government simply cannot justify a sweeping prior restraint on their speech. *See Liverman*, 844 F.3d at 408–09 ("[S]peculative ills . . . are not sufficient to justify such sweeping restrictions on [employees'] freedom to debate matters of public concern"); *id.* ("A stronger showing of public interest in the speech requires a concomitantly stronger showing of government-employer interest to overcome it." (quoting *McVey v. Stacy*, 157 F.3d 271, 279 (4th Cir. 1998) (Murnaghan, J., concurring)).

The government may argue that EOIR has an interest in maintaining the appearance of impartiality of immigration judges, but that interest would not sustain the policy. Courts have repeatedly held that impartiality does not require judges to abstain from sharing their views on legal and political issues. For example, in *Republican Party of Minnesota v. White*, the Supreme

Court held unconstitutional a state canon of judicial conduct that prevented judicial candidates, including incumbent judges, from announcing their views "on disputed legal or political issues." 536 U.S. 765, 768 (2002). The state had a system of non-partisan judicial elections, and in defending the restriction, the state relied on its interest in preserving judicial impartiality. As the Court explained, however, "impartiality" in the judicial context generally means "the lack of bias for or against either party to the proceeding." *Id.* at 775–76. The Court held that the state's restriction was "barely tailored to serve that interest *at all*, inasmuch as it d[id] not restrict speech for or against particular *parties*, but rather speech for or against particular *issues.*" *Id.* The Court also rejected any interest in maintaining "lack of preconception in favor of or against a particular *legal view*," reasoning that because "avoiding judicial preconceptions on legal issues is neither possible nor desirable, pretending otherwise by attempting to preserve the 'appearance' of that type of impartiality can hardly be a compelling state interest either." *Id.* at 766, 778.[9]

Since then, several appellate courts have also concluded that regulations prohibiting judges from sharing their legal or political opinions are unconstitutional. *See Carey v. Wolnitzek*, 614 F.3d 189, 201–04 (6th Cir. 2010) (holding unconstitutional a rule prohibiting judges and judicial candidates from disclosing their party affiliation when speaking "to a gathering"); *Siefert v. Alexander*, 608 F.3d 974, 981–83 (7th Cir. 2010) (holding unconstitutional a rule prohibiting judges and judicial candidates from becoming members of a political party). Underlying these

---

[9] In fact, judges routinely opine publicly on topics of public concern, especially those that touch on the administration of justice. For recent examples, see James A. Wynn Jr., *As a Judge, I Have to Follow the Supreme Court. It Should Fix This Mistake*, Wash. Post (June 12, 2020), https://perma.cc/GQ9F-DV55; Jed S. Rakoff, *Covid & the Courts*, N.Y. Rev. of Books (May 28, 2020), https://perma.cc/64Y4-V7MW; James Orenstein, *I'm a Judge. Here's How Surveillance Is Challenging Our Legal System*, N.Y. Times (June 13, 2019), https://perma.cc/TES7-KJ5R.

cases is the recognition that the state's interest in preserving judicial impartiality is narrow: it is limited to avoiding bias for or against parties to a particular case, and the appearance of that bias.

Even if EOIR had a legitimate interest in restricting the personal-capacity speech of immigration judges, the 2020 Policy sweeps far too broadly. The restrictions in the 2020 Policy utterly fail to distinguish between speech "that reasonably could be expected to disrupt [the agency's] operations and speech that plainly would not," and therefore cannot "bear a close and rational relationship" to any legitimate interests the government may assert. *Moonin*, 868 F.3d at 867 (holding policy unconstitutional); *see also Swartzwelder*, 297 F.3d at 238 (same with respect to a policy that was "not carefully crafted to serve" the interests asserted by the government); *Sanjour*, 56 F.3d at 95 (same due to "the obvious lack of 'fit' between the government's purported interest and the sweep of its restrictions"). Instead, they apply indiscriminately to all public speaking and writing in an immigration judge's personal capacity. They prohibit all personal-capacity speech on immigration-related issues, and subject personal-capacity speech on other public issues to an onerous preapproval process. There is no interest that could justify EOIR's regulation of such a broad swath of protected speech.

> ### c. The 2020 Policy lacks the substantive and procedural safeguards generally required of prior restraints.

In applying *NTEU*, courts have turned to traditional prior restraint doctrine to determine whether the restraint at issue incorporates substantive and procedural safeguards designed to minimize the risk of unconstitutional censorship. Where a restraint lacks those safeguards, "courts have found that the potential for censorship in a regulation 'justifies an additional thumb on the employees' side of [the] scales.'" *Harman*, 140 F.3d at 120 (alteration in original) (quoting *Sanjour*, 56 F.3d at 97). The 2020 Policy lacks the substantive and procedural safeguards generally

required of prior restraints, providing an additional reason why the 2020 Policy fails *NTEU*'s exacting scrutiny.

First, the 2020 Policy lacks narrow, objective, and definite standards for the preapproval of speaking requests. As the Fourth Circuit recently explained, administrative pre-clearance schemes must include "narrow, objective, and definite standards" to guide decisionmakers if they are "to survive constitutional scrutiny." *Am. Entertainers, L.L.C. v. City of Rocky Mount*, 888 F.3d 707, 721 (4th Cir. 2018) (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969)); *see also Harman*, 140 F.3d at 120–21 (applying *Shuttlesworth*'s requirement of "narrow, objective, and definite standards" to a public employee speech policy under *NTEU*). Without such standards, prior restraints "plac[e] 'unbridled discretion in the hands of a government official or agency,' thus potentially 'result[ing] in censorship.'" *Am. Entertainers*, 888 F.3d at 720 (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225–26 (1990) (O'Connor, J.) (plurality opinion) (second alteration in original)).

The preapproval regime established by the 2020 Policy suffers from this "evil." *Id.* at 720. As explained above, the 2020 Policy classifies all requests to speak on topics relating to immigration or EOIR as official capacity, effectively prohibiting broad categories of speech that would be considered personal capacity under the First Amendment and, therefore, are protected. *See supra* Part I.A.1. Moreover, the 2020 Policy provides that all requests to speak publicly will be reviewed for compliance "with applicable law and agency policies," as well as "consistency with EOIR's communications." *See* 2020 Policy at 2 ("All requests, regardless of capacity, must comply with applicable law and agency policies."); *see also id.* at 3 (stating that requests are reviewed by the SET for "compliance with both the law and agency policy and consistency in EOIR's communications"). These standards are exceedingly broad and indefinite. As the Fourth

20

Circuit held in *American Entertainers*, a licensing regime that conditions approval on compliance with "all applicable laws" imbues officials with "a constitutionally impermissible amount of discretion" by sweeping so broadly as to risk selective or discriminatory enforcement. 888 F.3d at 722. Similarly, the 2020 Policy's requirement of consistency with "agency policies" and "EOIR communications" "raises the specter of arbitrary or viewpoint-discriminatory enforcement." *Moonin*, 868 F.3d at 867 (striking down a police department's policy prohibiting communications about its canine interdiction unit). Courts have consistently rejected similarly subjective and ill-defined standards. For example, in *Harman*, the policy in question allowed an agency's media relations office to "determine the appropriate manner in which to handle media contacts . . . consistent with the efficient and effective operation of the Agency and the achievement of its objectives." 140 F.3d at 116. The Second Circuit determined that this standard was not "sufficiently definite to limit the possibility for content or viewpoint censorship," because it "inherently disfavor[ed] speech that is critical of agency operations." *Id.* at 120–21; *see also id.* at 119 ("[V]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." (quoting *Rankin v. McPherson*, 483 U.S. 378, 384 (1987))); *Swartzwelder*, 297 F.3d at 240 (describing a policy that ordered decisionmakers to determine if an officer's planned opinion testimony was "valid" as "so open-ended that it create[d] a danger of improper application").

Second, the 2020 Policy lacks definite time limits for decision. As the Fourth Circuit has explained, time limits are an "essential procedural safeguard" for preapproval regimes. *Chesapeake B & M, Inc. v. Harford Cty.*, 58 F.3d 1005, 1011 (4th Cir. 1995); *see also Harman*, 140 F.3d at 121 (noting that without a time limit, requests could be "rendered moot by delay"

under a city agency's press policy); *see also Crue*, 370 F.3d at 679 (striking down a policy requiring preclearance before university affiliates could contact athletic recruits in part because the policy did not create "a schedule for the review of proposed communications"). The 2020 Policy lacks this essential safeguard. As explained above, the 2018 MOU between NAIJ and EOIR sets only aspirational deadlines, and it does so for only some parts of the preapproval process. The MOU provides that after a supervisor has made an initial decision, the SET will "strive to respond to the request within five (5) business days." 2018 MOU ¶ 2. The MOU says nothing, however, about the timing of a supervisor's initial or final decision on a request. Even if the aspirational deadlines set out in the MOU were extended to the full approval process, aspirational time limits are no substitute for binding ones. Preapproval regimes must "ensure a prompt administrative decision." *Chesapeake B & M*, 58 F.3d at 1011; *see id.* (when a preclearance scheme "poses the risk that protected expression will be suppressed for an indefinite time before an administrative decision," it is not enough that officials *might* issue a decision "within a reasonably brief time.").

The concern that EOIR officials will delay decisions under the 2020 Policy is not hypothetical. In July 2018, after failing to respond to an outstanding request for three months, EOIR denied an immigration judge's request to speak at a continuing legal education event just three days before the event was supposed to take place. Tabaddor Decl. ¶ 29 Ex. J. In March 2019, after failing to respond to an outstanding request for weeks, EOIR informed an immigration judge's supervisor that it would deny the judge's request to speak to a seventh-grade class two days before the event was supposed to occur. EOIR never sent an official denial to the immigration judge, even after the immigration judge reached out to EOIR in the hope that the event could be rescheduled. Tabaddor Decl. ¶ 31 Ex. L.

## B.  The 2020 Policy is void for vagueness under the Fifth Amendment.

NAIJ is also likely to succeed on its claim that the 2020 Policy is unconstitutionally vague under the Fifth Amendment. The void for vagueness doctrine requires that parties "know what is required of them so they may act accordingly" and requires that regulations provide sufficient "precision and guidance" to ensure "that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "[R]igorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id*. at 253–54. The 2020 Policy fails to satisfy these requirements.

First, the 2020 Policy states that all requests—regardless of capacity or content—will be reviewed for compliance with applicable law and agency policy, and consistency with EOIR's communications. *See* 2020 Policy at 2; *see also id.* at 3. As explained above, *see* Part I.A.2.c *supra*, these standards are ill-defined and subjective in application. They provide no assurance that "those enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television Stations*, 567 U.S. at 253.

Second, it is unclear whether supervisors' discretion (in initially reviewing a request, and in making a final decision following review by the SET) is even bound by these standards. While review by the SET team is described as "ensur[ing] compliance with both the law and agency policy and consistency of EOIR's communications," there are no similar guidelines found in the policy's description of "[s]upervisor review." 2020 Policy at 3. The 2020 Policy provides only that supervisors will "determine whether the request should move forward in the review process." *Id*. Under one reading, then, supervisors are vested with unbridled discretion to deny requests for any reason, or for no reason at all.

When First Amendment freedoms are implicated, "[j]udicial scrutiny under the vagueness doctrine is most rigorous." *Lytle v. Doyle*, 197 F. Supp. 2d 481, 489 (E.D. Va. 2001), *aff'd on other grounds* 326 F.3d 463 (4th Cir. 2003). The 2020 Policy falls far short of the "precision and guidance" required of regulations and agency enactments. NAIJ is therefore likely to succeed on the merits of its Fifth Amendment claim.

## II.    Absent a preliminary injunction, NAIJ's members are likely to suffer irreparable harm due to the 2020 Policy.

It is well-established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *see also Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978) ("Violations of [F]irst [A]mendment rights constitute per se irreparable injury."). For that reason, the Fourth Circuit has recognized that a plaintiff demonstrates irreparable injury by establishing a likelihood of success on a First Amendment claim. *See WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). NAIJ has done so, as explained above. *See supra* Part I.

The irreparable harm NAIJ's members face is clear. The 2020 Policy prohibits immigration judges from publicly speaking or writing in their personal capacities about immigration or EOIR. On all other topics, immigration judges must seek EOIR's preapproval. As recent experience with the 2020 Policy and its predecessor, the 2017 Policy, demonstrates, the process for seeking preapproval is onerous. Tabaddor Decl. ¶¶ 24–32. Judges who have submitted requests to speak or write publicly have frequently been denied permission to do so. *Id*. Many have failed to receive a timely decision or any decision whatsoever. Still others have been chilled from even submitting requests to speak publicly. *Id*.

**III.    The balance of equities and the public interest support preliminary injunctive relief.**

The balance of equities and the public interest also weigh in favor of a preliminary injunction. The Fourth Circuit has held that these factors are deemed to be "established when there is a likely First Amendment violation." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013). This reflects the Fourth Circuit's recognition that the government has no legitimate interest in "enforcing restrictions likely to be found unconstitutional," and that "upholding constitutional rights surely serves the public interest," *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002); *accord Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("[W]e believe that the public interest is better served by following binding Supreme Court precedent and protecting the core First Amendment right of political expression." (quoting *Homans v. Albuquerque*, 264 F.3d 1240, 1244 (10th Cir.2001))).

Even absent this presumption, the balance of equities and the public interest would favor the relief NAIJ seeks. As explained above, the public interest in hearing from immigration judges is substantial. *See supra* Part I.A.2.a. There is an ongoing national debate about recent changes to immigration policies and their effect on the immigration legal system. Immigration judges have unique insights to share on these matters. *See Waters v. Churchill*, 511 U.S. 661, 674 (1994) (plurality opinion) ("Government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions."). On the other hand, the government has no legitimate interest in the sweeping restraint imposed by the 2020 Policy on the personal-capacity speech of immigration judges. *See supra* Part I.A.2.b. There is no evidence that this speech has caused (or could reasonably be anticipated to cause) any disruption to EOIR's operations. Tabaddor Decl. ¶¶ 10, 15; *cf. Liverman*, 844 F.3d at 408–09

("[T]he speculative ills targeted by the [speaking] policy are not sufficient to justify such sweeping restrictions on [employees'] freedom to debate matters of public concern.").

### Conclusion

For the foregoing reasons, the Court should issue a preliminary injunction against EOIR's enforcement of the 2020 Policy, and, to the extent it is still operative, the 2017 Policy as well.

July 1, 2020                                    Respectfully submitted,

/s/ *Victor M. Glasberg*                         /s/ *Ramya Krishnan*

Victor M. Glasberg (VA 16184)                    Ramya Krishnan*
Victor M. Glasberg & Associates                  Stephanie Krent*
121 S. Columbus Street                           Alex Abdo*
Alexandria, VA 22314                             Knight First Amendment Institute
T: (703) 684-1100                                  at Columbia University
F: (703) 684-1104                                475 Riverside Drive, Suite 302
vmg@robinhoodesq.com                             New York, NY 10115
                                                 T: (646) 745-8500
                                                 F: (646) 661-3361
                                                 ramya.krishnan@knightcolumbia.org

*Pro hac vice* application forthcoming           *Counsel for the Plaintiff*

26