# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

NATIONAL ASSOCIATION OF
IMMIGRATION JUDGES, affiliated with the
International Federation of Professional and
Technical Engineers,

        Plaintiff,

    v.

JAMES R. MCHENRY III, in his official
capacity as Director of the Executive Office
for Immigration Review,

        Defendant.

Civil Action No. 20 Civ. 731 (LO) (JFA)

## REPLY IN SUPPORT OF PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

Victor M. Glasberg (VA 16184)
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
T: (703) 684-1100
F: (703) 684-1104
vmg@robinhoodesq.com

Ramya Krishnan*
Stephanie Krent*
Alex Abdo*
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
T: (646) 745-8500
F: (646) 661-3361
ramya.krishnan@knightcolumbia.org

*pro hac vice* application pending

*Counsel for the Plaintiff*

**Table of Contents**

Table of Authorities ........................................................................................................ ii

Introduction.....................................................................................................................1

Argument ........................................................................................................................3

    I.      This Court has jurisdiction over NAIJ's claims...........................................3

          A.      NAIJ's claims are not precluded by the FSL-MRS or the CSRA.................... 3

          B.      NAIJ has standing to challenge EOIR's policies. ........................................... 7

    II.     NAIJ is likely to prevail on the merits of its First Amendment claim. .........................8

          A.      The Policy is subject to *NTEU* because it prohibits personal-capacity speech relating to immigration and EOIR and because it subjects all other such speech to an onerous preapproval requirement. ............................. 9

          B.      The Policy does not survive *NTEU*.................................................................. 11

              1.      The interests of immigration judges and the public in the speech restrained by the Policy are substantial.................................. 11

              2.      The hypothetical harms identified by EOIR cannot overcome the interests of immigration judges and the public in the speech restrained by the Policy....................................................................... 13

    III.    NAIJ is likely to prevail on the merits of its Fifth Amendment claim. ......................17

    IV.    NAIJ has shown irreparable harm..............................................................................18

    V.     NAIJ has shown that the balance of equities and public interest support preliminary injunctive relief. ......................................................................................20

Conclusion .....................................................................................................................20

i

## Table of Authorities

**Cases**

*AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019) .................................................. 4, 5, 6, 7

*Bennett v. SEC*, 844 F.3d 174 (4th Cir. 2016) ........................................................ 4, 7

*Capital Associated Indus., Inc. v. Cooper*, 129 F. Supp. 3d 281 (M.D.N.C. 2015) ..................... 19

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427 (6th Cir. 2004) ............................................................................. 19

*Crue v. Aiken*, 370 F.3d 668 (7th Cir. 2004) ............................................... 11, 13, 17

*Ctr. for Individual Freedom, Inc. v. Ireland*, 613 F. Supp. 2d 777 (S.D.W. Va. 2009) ................................................................................... 19

*Edmonds v. Gilmore*, 988 F. Supp. 948 (E.D. Va. 1997) ........................................... 19

*Fleming v. Spencer*, 718 F. App'x 185 (4th Cir. 2018) ............................................ 5, 7

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) ............................ 6

*Gen. Elec. Co. v. EPA*, 360 F.3d 188 (D.C. Cir. 2004) ............................................... 6

*Gen. Elec. Co. v. EPA*, 610 F.3d 110 (D.C. Cir. 2010) ............................................... 6

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002) .................................... 20

*Harman v. City of New York*, 140 F.3d 111 (2d Cir. 1998) .................................... 11, 17, 18

*Human Rights Def. Ctr. v. Sw. Virginia Reg'l Jail Auth.*, No. 1:18CV00013, 2018 WL 3239299 (W.D. Va. July 3, 2018) .................................................... 19

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448 (2018) .................................................................................... 8

*Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015) ......................................................... 6

*Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053 (7th Cir. 2016) .................................... 19

*Lane v. Franks*, 573 U.S. 228 (2014) ............................................................. 2, 10

*Larson v. Valente*, 456 U.S. 228 (1982) ............................................................. 8

*Liverman v. City of Petersburg*, 844 F.3d 400 (4th Cir. 2016) .................................... 9, 14

*Mansoor v. Trank*, 319 F.3d 133 (4th Cir. 2003) .................................................... 12

*McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998) ............................................................ 15

*Moonin v. Tice*, 868 F.3d 853 (9th Cir. 2017) ..................................................... passim

*Nat'l Treasury Emps. Union v. Devine*, 733 F.2d 114 (D.C. Cir. 1984) ....................... 5

*Nat'l Treasury Emps. Union v. Whipple*, 636 F. Supp. 2d 63 (D.D.C. 2009) .............. 5

*Ramirez v. U.S. Customs & Border Prot.*, 709 F. Supp. 2d 74 (D.D.C. 2010)............... 7

*Redner v. Dean*, 29 F.3d 1495 (11th Cir. 1994) ...................................................... 10

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002) ........................................ 16

*Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995) ................................................... 3, 12, 18

*Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260 (4th Cir. 2018) ...................... 8

*Steakhouse, Inc. v. City of Raleigh, N.C.*, 166 F.3d 634 (4th Cir. 1999).................... 19

*Swartzwelder v. McNeilly*, 297 F.3d 228 (3d Cir. 2002) ....................................... passim

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)............................................. 3

*United States v. Nat'l Treasury Emps. Union* (*NTEU*), 513 U.S. 454 (1995) ...................... passim

*Weaver v. U.S. Info. Agency*, 87 F.3d 1429 (D.C. Cir. 1996).................................. passim

*Wolfe v. Barnhart*, 446 F.3d 1096 (10th Cir. 2006)................................................. 3

**Statutes**

5 U.S.C. § 2302............................................................................................................ 5

5 U.S.C. § 7105............................................................................................................ 4

**Other Authorities**

Code of Conduct for U.S. Judges (Judicial Conference 2019).................................... 16

*U.S. Dep't of Justice and National Association of Immigration Judges*, 56
    F.L.R.A. 616 (2000)............................................................................................. 15

**Introduction**

The National Association of Immigration Judges ("NAIJ") challenges a prior restraint that silences federal immigration judges on matters at the core of their expertise and of national public debate. As NAIJ explained in its opening brief, policies newly issued by the Executive Office for Immigration Review ("EOIR") categorically prohibit immigration judges from speaking publicly in their personal capacities about immigration law or policy or about EOIR programs and policies, and require that they obtain preapproval through an onerous process before speaking publicly in their private capacities on any other topic. This Policy violates the First and Fifth Amendments, and this Court should enter a preliminary injunction against its enforcement.[1]

The government argues that NAIJ's claims must be administratively exhausted under the Federal Service Labor-Management Relations Statute ("FSL-MRS") and the Civil Service Reform Act ("CSRA"), but this argument is misconceived. As the D.C. Circuit held in *Weaver v. U.S. Information Agency*, 87 F.3d 1429 (D.C. Cir. 1996), such statutes do not divest district courts of jurisdiction over "a simple pre-enforcement attack on a regulation restricting employee speech." *Id.* at 1434. Indeed, under the government's theory, the Supreme Court's seminal case on the free-speech rights of federal employees—which was filed in district court by another federal union—was wrongly decided. *United States v. Nat'l Treasury Emps. Union* (*NTEU*), 513 U.S. 454 (1995). The government's arguments about redressability similarly fail. A preliminary injunction would redress the discrete injuries caused by the Policy, which supersedes the 2011 Ethics Guide. NAIJ also has standing to raise its vagueness claims because, contrary to the government's assertion,

---

[1] In its brief, the government clarifies that the 2020 Policy reissued the 2017 Policy and accordingly that the 2017 Policy remains operative. NAIJ therefore seeks a preliminary injunction against EOIR's enforcement of both policies. For the sake of clarity, because the government uses the term "Policy" to refer to the 2017 Policy, as modified by the 2020 Policy, NAIJ will also use that term to refer to both policies.

NAIJ has identified several members who have been harmed and continue to be harmed by the Policy's review standards.

NAIJ is likely to succeed on the merits of its First Amendment claim because the Policy is subject to—but does not satisfy—the test set forth in *NTEU*. The government attempts to evade this test by arguing that the Policy does not prohibit speech, but the Policy's plain text clearly forbids immigration judges from publicly discussing immigration or EOIR in their personal capacities. In any event, *NTEU* applies to restrictions on employee speech—including the Policy's preapproval process—and not just to outright prohibitions. The government's attempt to cast all speech about immigration and EOIR as "official" is similarly unavailing. Many immigration judges want to educate the public about the immigration legal system by speaking at legal conferences or trainings or by explaining the impact of new or proposed policies on their ability to do their jobs. This speech is not part of their official duties, and it is not made official merely because it "concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014). Nor do any of the interests the government asserts outweigh immigration judges' interests in engaging in this speech, or the public's interest in hearing it. The government has failed to show any actual harm caused by judges' personal-capacity speech in the many years prior to 2017, let alone any harms that would support the Policy's sweep.

NAIJ is also likely to succeed on the merits of its Fifth Amendment claim. As explained below, the Policy is vague because it fails to cabin the discretion of decisionmakers. At every stage of review, officials are permitted to make decisions based on broad and subjective standards, such as consistency with agency policies and messaging. The government's assertions to the contrary are belied by the text of the Policy and by the agency's own declarations. In fact, the agency now candidly admits in one of its declarations that it applies the Policy in a viewpoint discriminatory

way, confessing that even for personal-capacity speaking events, supervisors will consider whether the content of the speech could (in their view) lead to negative publicity or scrutiny.

The government's arguments regarding the remaining preliminary injunction factors similarly miss their mark. NAIJ has not substantially delayed in challenging the Policy. To the contrary, the union filed suit mere months after EOIR's recent policy change. The balance of equities and the public interest also support preliminary injunctive relief. While the government asserts that the Policy serves important interests, the government has no legitimate interest in the enforcement of unconstitutional policies, and the public interest is served by protecting First Amendment rights.

## Argument

### I.  This Court has jurisdiction over NAIJ's claims.

#### A.  NAIJ's claims are not precluded by the FSL-MRS or the CSRA.

Time and again, federal courts considering constitutional challenges to employee-speech policies or regulations have either rejected or declined to address the jurisdictional argument that the government makes here. *See, e.g.*, *NTEU*, 513 U.S. 454; *Weaver*, 87 F.3d at 1433–35; *Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995) (en banc); *Wolfe v. Barnhart*, 446 F.3d 1096 (10th Cir. 2006). Even the Supreme Court, in its seminal decision in *NTEU*, invalidated employee-speech restrictions in a challenge brought originally in federal district court by a union that was subject to the same statutory scheme that the government claims divests this Court of jurisdiction. In doing so, the Court did not so much as mention the question of jurisdiction. This is not surprising: under the two-step framework announced in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212–15 (1994), this Court clearly has jurisdiction over a "simple pre-enforcement attack on a regulation restricting employee speech." *Weaver*, 87 F.3d at 1434.

Relevant in this case is the second step of the *Thunder Basin* framework, under which the Court must determine "whether plaintiffs' 'claims are of the type Congress intended to be reviewed within [the relevant] statutory structure.'" *Bennett v. SEC*, 844 F.3d 174, 181 (4th Cir. 2016) (quoting *Thunder Basin*, 510 U.S. at 212). Factors relevant to this inquiry include "(1) whether the statutory scheme foreclose[s] all meaningful judicial review," "(2) the extent to which the plaintiff's claims are wholly collateral to the statute's review provisions," and "(3) whether agency expertise could be brought to bear on the . . . questions presented." *Id*. (internal quotation marks omitted).

The government argues that NAIJ's constitutional claims fall within two statutory schemes—the FSL-MRS and the CSRA—but as explained below, they do not, and they are not "of the type" Congress intended to be reviewed through these administrative schemes.

First, NAIJ's claims are "wholly collateral" to the provisions of these statutory schemes. The FSL-MRS establishes an exclusive scheme of administrative and judicial review for certain labor-related disputes, including negotiability and unfair labor practice disputes. 5 U.S.C. § 7105(a). NAIJ's claims, however, do not raise any such dispute, and the government fails to explain at all how they could. The government relies on the D.C. Circuit's recent decision in *AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019), but that case is inapposite. *See* Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction ("Def.'s Br.") at 8, ECF No. 27. The unions there challenged executive orders regarding federal labor–management relations, making broad statutory claims in addition to constitutional ones. The D.C. Circuit held that the challenge was not wholly collateral because it was "of the type that is regularly adjudicated through the FSLMRS's scheme"—"disputes over whether the Statute has been violated"—and the unions had "ask[ed] the district court for the same relief that they could ultimately obtain through the statutory

4

scheme[.]" *AFGE*, 929 F.3d at 760. Neither premise of that court's holding is present here. NAIJ does not advance any statutory claims, let alone a claim that the FSL-MRS has been violated. Nor does it seek relief which it could obtain through the statutory scheme. NAIJ seeks a declaration that EOIR's policies are unconstitutional and an order enjoining their enforcement, not for the pendency of a bargaining dispute, but on a permanent basis. *See Nat'l Treasury Emps. Union v. Devine*, 733 F.2d 114, 117 n.8 (D.C. Cir. 1984) (exclusive FSL-MRS review is "quite different" from "preenforcement judicial review of rules").

NAIJ's claims are similarly collateral to the provisions of the CSRA. The CSRA governs challenges to "prohibited personnel practice[s]," but NAIJ does not challenge any such "practice." The government suggests otherwise, *see* Def.'s Br. at 9, but the term "personnel action" clearly refers to individual personnel decisions, not general regulations or policies. *See* 5 U.S.C. § 2302(a)(2); *see also Nat'l Treasury Emps. Union v. Whipple*, 636 F. Supp. 2d 63, 69–71 (D.D.C. 2009) (complaint did not fall within the CSRA's purview because it did not seek to address "adverse personnel actions regarding specific employees").[2]

The D.C. Circuit's decision in *Weaver* is directly on point. There, a federal agency employee challenged the constitutionality of a speech policy requiring the submission of certain materials for prepublication review, as well as an admonishment she received for failing to comply with that requirement. 87 F.3d at 1432. The D.C. Circuit dismissed the employee's challenge to her admonishment, explaining that it was remediable through the CSRA as a "prohibited personnel practice." *Id.* at 1434. But, citing *NTEU* and *Sanjour*, the court recognized jurisdiction over the constitutional claim as "a simple pre-enforcement attack on a regulation restricting employee

---

[2] The government cites the Fourth Circuit's decision in *Fleming v. Spencer*, 718 F. App'x 185 (4th Cir. 2018), Def.'s Br. at 9, but that case proves NAIJ's point. *Fleming* involved a constitutional challenge to a letter of reprimand—undoubtedly an individual personnel decision.

speech" that "st[ood] independently of the admonishment." *Id.* NAIJ's suit is essentially identical to the suits permitted to proceed in *NTEU*, *Weaver*, and *Sanjour. Cf. Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 490 (2010) (holding that plaintiffs' constitutional challenge to the existence of an agency was wholly collateral to any agency orders or rules from which review might be sought); *Gen. Elec. Co. v. EPA*, 360 F.3d 188, 192 (D.C. Cir. 2004) (recognizing "precedent distinguishing between facial, or 'systemic,' and as-applied, or particularized challenges"); *accord Gen. Elec. Co. v. EPA*, 610 F.3d 110, 125–127 (D.C. Cir. 2010).

Second, the FSL-MRS and the CSRA schemes do not provide for meaningful judicial review of NAIJ's constitutional claims. NAIJ does not challenge a particular application of the Policy or even EOIR's method of implementing the Policy. NAIJ challenges the existence of the Policy itself, alleging that it chills protected speech and deprives the public of speech it is entitled to hear. This type of claim is simply not cognizable under either the FSL-MRS or the CSRA. The government seems to argue that NAIJ should instead bring a different claim and challenge a particular application of the Policy. *See* Def.'s Br. at 8–9. But NAIJ is not required to recast its constitutional claims in this way. *See Jarkesy v. SEC*, 803 F.3d 9, 20 (D.C. Cir. 2015) (requiring plaintiffs "to manufacture a dispute or provoke a sanction" is not a "meaningful" avenue of relief (citing *Free Enter. Fund*, 561 U.S. at 492)). Even if NAIJ could be required to do so, it *still* could not obtain meaningful judicial review of its constitutional claims. First, because NAIJ is not challenging EOIR's failure to negotiate and is not challenging an unfair labor practice within the meaning of the FSL-MRS, it cannot recast its constitutional claims in a way that would lead to judicial review. *Cf. AFGE v. Trump*, 929 F.3d at 757. Second, even if the union could challenge an application of the Policy as a prohibited personnel practice under the CSRA, judicial review

would be available only if the Office of Special Counsel determined—in its sole and unreviewable discretion—to take action on the challenge. *See Fleming v. Spencer*, 718 F. App'x 185, 187 (4th Cir. 2018). Third, any eventual judicial review in this case would not be "meaningful" because NAIJ's members would suffer "'additional and irremediable harm beyond the burdens associated with the dispute resolutions process.'" *Bennett*, 844 F.3d at 186 n.13 (quoting *Tilton v. SEC*, 824 F.3d 276, 286 (2d Cir. 2016)). Specifically, they would suffer the ongoing and irreparable violation of their First Amendment rights. *See Ramirez v. U.S. Customs & Border Prot.*, 709 F. Supp. 2d 74, 83–84 (D.D.C. 2010).

Finally, NAIJ's claims are beyond the expertise of the agencies charged with administering the FSL-MRS and the CSRA because they are purely constitutional claims involving the right of immigration judges to speak in their personal capacities and the right of the public to hear what they have to say. This is not a case in which the agencies' expertise in other areas could "obviate the need to address" the constitutional claims by resolving the case on other grounds. *AFGE v. Trump*, 929 F.3d at 761 (quoting *Jarkesy*, 803 F.3d at 29). Here, NAIJ's only claims are constitutional ones, and those are quintessentially within the expertise of Article III courts.

## B. NAIJ has standing to challenge EOIR's policies.

The government argues that NAIJ's injuries are not redressable because an injunction against the Policy would not eliminate the preapproval requirement contained in the 2011 Ethics Guide. *See* Def.'s Br. at 10. This argument fails for any number of reasons. At the threshold, NAIJ's injuries are attributable solely to the Policy, because the 2011 Guide explains that if there are other relevant EOIR policies, those policies (rather than the Guide) control. *See* Supplemental Declaration of A. Ashley Tabaddor ("Supp. Tabaddor Decl.") ¶ 3 Ex. N ("The provisions in this Guide do not supersede the . . . management policies[] of the Executive Office for Immigration

Review[.]"). In addition, the Policy causes injuries independent of the Guide, and, as the Supreme Court has repeatedly held, a plaintiff "need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). As further explained below, the Policy (unlike the Ethics Guide) categorically prohibits immigration judges from speaking or writing publicly in their personal capacities about immigration law or policy issues, and the programs and policies of EOIR. *See infra* Part II.A. It also institutes an onerous preapproval process for *all* speech, not only "written work and speeches." *Compare* Supp. Tabaddor Decl. ¶ 3 Ex. N ¶ 21 *with* Declaration of A. Ashley Tabaddor dated July 1, 2020 ("Tabaddor Decl.") ¶ 11 Ex. B at 1 (the "2017 Policy"), ECF No. 12; *id.* ¶ 12 Ex. G at 2 (the "2020 Policy"). For these reasons, an injunction against enforcement of the Policy would provide redress. *See Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 285 (4th Cir. 2018) (plaintiffs' injuries were redressable "because granting the requested relief would at least mitigate, if not eliminate, the alleged harm").

The government also argues that NAIJ cannot establish standing to challenge the Policy on vagueness grounds "because it has failed to identify a single *specific* member whose speech was chilled" by the Policy's overly broad standards of review. Def.'s Br. at 10–11. This chill flows from the text of the Policy, however, and so harms all immigration judges. In any event, NAIJ has submitted an affidavit identifying several members who have been harmed by the Policy's imprecise standards. *See, e.g.*, Tabaddor Decl. ¶¶ 27–31 Exs. H–L.

## II. NAIJ is likely to prevail on the merits of its First Amendment claim.

The Policy imposes a sweeping prior restraint on 470 rank-and-file immigration judges and on 1,500 other EOIR employees. That prior restraint must survive "exacting scrutiny." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2472 (2018). Under the test set forth in *NTEU*, "the Government must show that the interests of both potential audiences and

a vast group of present and future employees in a broad range of present and future expression is outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 571 (1968)).[3] For the reasons that follow, the Policy does not satisfy that test.

### A. The Policy is subject to *NTEU* because it prohibits personal-capacity speech relating to immigration and EOIR and because it subjects all other such speech to an onerous preapproval requirement.

As NAIJ explained in its opening brief, the Policy operates as a prior restraint in two ways: it categorically prohibits immigration judges from speaking publicly in their personal capacities about immigration and EOIR, and it requires immigration judges to seek preapproval before speaking publicly in their personal capacities on any other topic. *See* Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction ("Pl.'s Br.") at 9, ECF. No. 10. In response, the government argues that the Policy does not in fact impose a prohibition and, in any event, that the prohibited speech is not protected. Def.'s Br. at 13–15. The government also attempts to argue that the Policy establishes only a prenotification process rather than an onerous preapproval requirement. *Id.* at 15. It is wrong on all counts.

First, the Policy unquestionably prohibits immigration judges from speaking publicly in their personal capacities about immigration or EOIR. The Policy does this by defining as "official capacity" any speech "relat[ing] to immigration law or policy issues, the employee's official EOIR duties or position, or any agency programs and policies." 2020 Policy at 2. By prohibiting

---

[3] The government half-heartedly argues that *NTEU* should not apply because the Policy does not (in its view) directly prohibit speech, the agency has had some form of a preapproval requirement for years, and because it has asserted an interest in judicial integrity. *See* Def.'s Br. at 18 n.8. None of the cases the government relies upon supports its argument. Simply put, *NTEU* applies whenever a public employer sets a policy or regulation that "impede[s] a 'broad category of expression' and 'chills potential speech before it happens.'" *Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016) (quoting *NTEU*, 513 U.S. at 467, 468).

employees from speaking about these topics in their personal capacities, EOIR forces all employees who speak about immigration or EOIR to speak as emissaries of the agency who must share the agency's views rather than their own.

Recognizing its definition of official-capacity speech fails to comply with the First Amendment, EOIR suggests that it is not applied rigidly in practice. Def.'s Br. at 13. The record refutes that suggestion, making clear that EOIR officials do in fact deem speech related to immigration and the agency's policies to be official. *See* Declaration of Lauren Alder Reid ¶ 36, ECF No. 27-4; Declaration of Sirce E. Owen ("Owen Decl.") ¶ 9, ECF No. 27-5; *see also* Tabaddor Decl. ¶¶ 22, 25. But even if the government's suggestion were accurate, it would be irrelevant. It is the text of a prior restraint, not the public employer's "subjective inten[t]," that controls. *Moonin v. Tice*, 868 F.3d 853, 861 & n.5 (9th Cir. 2017); *accord Redner v. Dean*, 29 F.3d 1495, 1501 (11th Cir. 1994).

Second, much of the speech prohibited by the Policy is protected. As the Supreme Court has explained, "the critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at 240. The government asserts that speaking at engagements related to immigration is "[a]n 'accepted and understood' part of IJs' duties," Def.'s Br. at 13, but this is not true. As Judge Tabaddor has explained, immigration judges have no official duty to speak publicly. Supp. Tabaddor Decl. ¶¶ 7–9. And EOIR's formal position description for immigration judges, *id.* ¶ 8 Ex. O, and past statements belie the government's current claim. In denying immigration judges approval to speak at engagements related to immigration, the agency has repeatedly made clear that speaking at such engagements is not an official responsibility of rank-and-file immigration

judges and, for that reason, that the engagements should be handled by EOIR "management officials."[4] *E.g.*, Tabaddor Decl. ¶ 27 Ex. H.

Third, irrespective of whether the Policy directly prohibits speech, it institutes an onerous preapproval regime. As several courts of appeal have held, preapproval regimes are equally suspect under *NTEU. See Crue v. Aiken*, 370 F.3d 668, 679 (7th Cir. 2004); *Swartzwelder v. McNeilly*, 297 F.3d 228, 233, 235–37 (3d Cir. 2002); *Harman v. City of New York*, 140 F.3d 111, 119 (2d Cir. 1998). Because the Policy allows the agency to approve or disapprove requests, the government's reliance on *Weaver*, Def.'s Br. at 15, is inapposite. That case involved a prior *notification* process rather than a preapproval policy. *See Weaver*, 87 F.3d at 1435; *see also Harman*, 140 F.3d at 120 (distinguishing *Weaver* on those grounds).

### B. The Policy does not survive *NTEU*.

#### 1. The interests of immigration judges and the public in the speech restrained by the Policy are substantial.

As explained at length in NAIJ's opening brief, the speech restrained by the Policy is of the utmost public concern. Pl.'s Br. at 9–11. The government does not dispute this, but claims that the Policy isn't actually as restrictive as its plain text suggests. Those assertions are incorrect (and in any event irrelevant) for the reasons mentioned above. The government's other attempts to downplay the significance of the interests implicated by the Policy are also unpersuasive.

---

[4] EOIR notes that immigration judges sometimes participate in stakeholder meetings, model hearings, and pro bono trainings run by the agency itself, *see* Declaration of James R. McHenry III ("McHenry Decl.") ¶ 28, ECF No. 27-1, but whether or not participation in a small number of events sponsored by EOIR could be considered part of an immigration judge's duties has no bearing on EOIR's claim that *all* speech by immigration judges on immigration- or EOIR-related topics is official. EOIR also points to a public statement by NAIJ's President that "[p]art of the job of an immigration judge is to educate the public about the immigration courts and the role they play in society." Def.'s Br. at 13. But EOIR misinterprets that statement, which reflects the belief (widespread among immigration and Article III judges) that they should engage in public education out of civic obligation. *See* Supp. Tabaddor Decl. ¶¶ 7, 10.

First, the government argues that the Policy imposes a "minimal burden" on speech because it applies to "only" 470 immigration judges and approximately 1,500 other employees. Def.'s Br. at 16. The government ignores, however, that the Policy silences employees with a unique perspective on a topic of immense public interest and that it impacts a "broad category of expression." *NTEU*, 513 U.S. at 467–68. Indeed, courts routinely apply *NTEU* to invalidate restrictions on employees of small municipal or state departments. *See Mansoor v. Trank*, 319 F.3d 133 (4th Cir. 2003); *Moonin*, 868 F.3d 853.

Second, the government observes that speakers who are not subject to the Policy—union representatives and former immigration judges—can still discuss immigration. Def.'s Br. at 16–17. If this argument had any merit at all, there would be no *NTEU* or *Pickering* claims, because an agency could always point to former employees or outsiders who were able to speak on the same general subjects. But these cases protect the free speech rights of public employees precisely because of the unique and important insights those employees can provide to the public. *See Sanjour*, 56 F.3d at 94. Nor does the speech of union representatives, who are able to discuss only the union's position on working conditions, substitute for the speech of hundreds of immigration judges and employees who wish to speak, including on issues unrelated to working conditions. *Cf.* Declaration of James R. McHenry III ("McHenry Decl.") ¶ 37, ECF No. 27-1 ("[N]ot all bargaining unit members agree with NAIJ's positions on immigration matters[.]").[5]

Third, the government argues that most speaking engagement requests are approved and that EOIR has agreed to *aspirational* time limits in the 2018 Memorandum of Understanding. Def.'s Br. at 16. These arguments miss the point. As outlined above, in reviewing NAIJ's challenge

---

[5] If the Department of Justice's effort to decertify NAIJ is successful, then even this limited avenue for union speech will be extinguished. Tabaddor Decl. ¶ 7.

under *NTEU*, this Court must "focus on the text of the policy" rather than its current application, *Moonin*, 868 F.3d at 861, since it must weigh the interests of both present and future employees. That EOIR has approved some speaking requests is no defense of its outright prohibition of an entire category of protected expression. Moreover, its assertions tell only half the story, given that many immigration judges have stopped submitting speaking requests and many conference organizers have stopped extending invitations, recognizing that doing so initiates an onerous— even futile—process. *See* Tabaddor Decl. ¶ 32; Declaration of Laura Lynch ("Lynch Decl.") ¶¶ 9– 12, ECF No. 11. Notably, while the agency points to aspirational time limits, it does not claim to meet them—indeed, the evidence shows otherwise, Tabaddor Decl. ¶¶ 17, 26, 29, 31.

> ## 2. The hypothetical harms identified by EOIR cannot overcome the interests of immigration judges and the public in the speech restrained by the Policy.

To tip the scales in its favor, EOIR must show that its asserted interests outweigh the free-speech interests of current and future immigration judges and their potential audiences. EOIR must also demonstrate that the recited harms are "real, not merely conjectural" and that the Policy "alleviate[s] those harms in a direct and material way." *NTEU*, 513 U.S. at 475 (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994)). The government has failed to carry this burden.

The government asserts an interest in ensuring compliance with ethics and professionalism laws, Def.'s Br. at 18–19, but fails to show why the Policy is necessary to protect that interest. The government puts forward no evidence suggesting that absent the Policy, immigration judges would flout these laws. *See Swartzwelder*, 297 F.3d at 239 (holding that police department's interest in protecting confidential information did not sustain a preapproval policy where department had not produced any evidence that its preexisting code of conduct "was insufficient to deal with the problem"); *Crue*, 370 F.3d at 680 (invalidating preapproval policy where university could pursue

post-hoc disciplinary action if employee said something "actionable in and of itself"). The government also fails to demonstrate why an intermediate step, such as allowing employees to seek clarification of ethics rules, would not address the agency's interest. *See* Declaration of Chris Cox ¶ 3, ECF. No. 27-2 (describing other ways the Ethics Program can and does provide ethical guidance to employees of EOIR). Nor does the government explain how the Policy's review process and standards are tailored to its interest. *See* 2020 Policy at 3 (describing four layers of review, only one of which is carried out by EOIR's ethics program); *id.* at 2–3 (permitting EOIR to deny requests for a host of reasons unconnected to any ethical violations).

The government argues that the Policy is necessary to ensure that speaking engagements do not interfere with EOIR's work, Def.'s Br. at 19–20, but for similar reasons, its argument fails. EOIR already has a policy in place requiring that employees clear the use of annual leave with their supervisors. *See* 2020 Policy at 2 n.3. The agency cites no evidence that this policy is inadequate to protect its interest in consistent staffing. And the Policy is not framed to address this problem. It applies to all speaking events, regardless of whether they will take place during the workday, as well as to the publication of written material, regardless of when it is drafted. It also permits EOIR to review the content of an immigration judge's proposed speech, even though this is unnecessary to determine whether a judge's absence would require EOIR to "re-allocat[e] . . . work to other personnel." McHenry Decl. ¶ 42; *cf. Swartzwelder*, 297 F.3d at 238.

Next, the government argues that the Policy is necessary to avoid public confusion and to preserve confidence in EOIR, Def.'s Br. at 20, but here too the government fails to point to any evidence that this is so. *See Liverman v. City of Petersburg*, 844 F.3d 400, 408 (4th Cir. 2016) (invalidating police department speech policy where department "presented no evidence of any material disruption" arising from officers' speech). The government points to a narrow set of cases

that allows public employers to discipline or terminate the employment of certain "agency heads or high-ranking agency personnel" if the employee's speech is reasonably likely to disrupt its ability to effectively and efficiently manage its operations. *See McVey v. Stacy*, 157 F.3d 271, 279 (4th Cir. 1998). Those cases are inapt. Immigration judges are not the type of high-level policymaking employees contemplated by cases like *McVey*, because they neither set policy nor manage agency operations. Rather, they adjudicate cases based on well-established precedent, and their decisions are subject to review by the Board of Immigration Appeals. *See U.S. Dep't of Justice and National Association of Immigration Judges*, 56 F.L.R.A. 616 (2000) (upholding a regional director's decision that immigration judges are not management officials because they do not make policy); McHenry Decl. ¶¶ 18–19, 23; *see also Moonin*, 868 F.3d at 865–66 (finding likelihood of any confusion diminished where policy applied to "rank-and-file [employees], not the sort of high-level, policy-making employees whom the public would be likely to assume speak for the [agency]."). Nor should this framework apply to administrative judges, whose obligations of independence and impartiality make them categorically unlike the high-ranking officials whose expected loyalty to their superiors has been the basis for restrictions on their public dissent.

In any event, the Policy fails because it lacks a "close and rational" relationship with EOIR's asserted interest. *Moonin*, 868 F.3d at 867 (quoting *Gibson v. Office of Att'y Gen.*, 561 F.3d 920, 928 (9th Cir. 2009)). For example, the Policy "makes no distinction between speech about the [EOIR policies and programs] that reasonably could be expected to disrupt [the agency's] operations and speech that plainly would not, or that would only do so inasmuch as it engendered legitimate public debate about the [agency]." *Id.* The Policy applies indiscriminately to all speech by EOIR employees, including speech having nothing to do with EOIR operations. It also authorizes EOIR to review speaking requests for consistency with agency policies and

communications, *see* 2020 Policy at 3, not merely for the potential to "undermine public confidence in the agency." Def.'s Br. at 21; *cf. Swartzwelder*, 297 F.3d at 239.[6]

Finally, the government argues that the Policy is justified by the agency's interest in promoting judicial integrity, *see* Def.'s Br. at 22–23, but the Policy is not tailored to this interest either. As explained in NAIJ's opening brief, *see* Pl.'s Br. at 17–19, courts have recognized a narrow interest in judicial impartiality: the interest in protecting against the appearance of bias for or against parties to any proceeding. *Republican Party of Minn. v. White*, 536 U.S. 765, 768 (2002). But the Policy is not targeted to this interest. The Policy requires that employees seek preapproval for all speaking engagements, not merely those that create a risk of the appearance of bias for or against a party, and it imposes a categorical ban on employees speaking publicly in their personal capacities about immigration and EOIR. Neither restriction is justified by the government's interests in maintaining judicial impartiality.[7]

The government's various asserted interests appear to be a pretext for suppressing public criticism of the agency. In a declaration submitted by the government, EOIR now freely admits that in deciding requests by employees to speak in their personal capacities, the agency considers whether the employee's participation would cause "any negative publicity or scrutiny to EOIR or the Federal Government." *See* Owen Decl. ¶ 17. In combination with the lack of any concrete

---

[6] To the extent EOIR frames its interest as one in ensuring consistency *within* official statements, this interest cannot justify the Policy's sweeping restrictions on the personal-capacity speech of immigration judges and other employees. EOIR seems to argue that it cannot trust immigration judges to determine when they are speaking as private citizens and when they are speaking as representatives of EOIR. This fear, however, is entirely speculative, and the agency cites no evidence to support it.

[7] Federal judges, for example, routinely opine on legal and other issues outside of their judicial opinions. *See id.*; *see also* Code of Conduct for U.S. Judges § 4 (Judicial Conference 2019) (encouraging judges to "speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice").

examples of harm EOIR has suffered—or even harms the agency is reasonably likely to suffer—its prior restraint cannot stand. As the Ninth Circuit has explained:

> Although it could be true that [public agencies] would operate more efficiently absent inquiry into their practices by the public and the legislature, efficiency grounded in the avoidance of accountability is not, in a democracy, a supervening value. Avoiding accountability by reason of persuasive speech to other governmental officials and the public is not an interest than can justify curtailing [employees'] speech as citizens on matters of public concern.

*Moonin*, 868 F.3d at 866. Because the government has failed to satisfy *NTEU*'s "exacting scrutiny," NAIJ is likely to succeed on the merits of its First Amendment claim.[8]

### III. NAIJ is likely to prevail on the merits of its Fifth Amendment claim.

NAIJ is also likely to prevail on the merits of its claim that the Policy is void for vagueness. Under that doctrine, a policy or regulation must provide sufficient clarity and guidance to ensure that it is applied in a consistent, non-discriminatory manner. *See* Pl.'s Br. at 23. The Policy, however, *invites* arbitrary and discriminatory enforcement.

The Policy explicitly allows supervisors and the SET to make decisions based on EOIR's preferred message. *See* 2020 Policy at 3; Tabaddor Decl. ¶ 28 Ex. I at 4 (asking judges to confirm whether their proposed speech "align[s] with EOIR messaging"); Declaration of Daniel Swanwick ¶ 18 Ex. B at 3, ECF No. 27-3 (stating that, if the topic is immigration, the SET considers whether the requested event "align[s] with EOIR's mission" and whether the speaker's message will

---

[8] NAIJ explained in its opening brief that it was also entitled to an additional "thumb on the scale" because the Policy lacks key safeguards. Pl.'s Br. at 19–22. The government argues that this fact is not relevant in the context of public employee speech restrictions, Def.'s Br. at 24, but it is wrong. *See Moonin*, 868 F.3d at 867 (striking down a communications policy where standards were not objective and accordingly "raise[d] the specter of arbitrary or viewpoint-discriminatory enforcement"); *Crue*, 370 F.3d at 679 (striking down a policy that failed to "create a schedule for the review of proposed communications"); *Swartzwelder*, 297 F.3d at 240 (striking down a policy on expert testimony where the standard was "so open-ended that it create[d] a danger of improper application"); *Harman*, 140 F.3d at 120–21 (striking down a communications policy that lacked "narrow, objective, and definite standards" and a definite time limit for review).

"advance EOIR's mission"); Owen Decl. ¶ 17. The Policy thus enables and encourages viewpoint discrimination in the speaking-engagement review process. *Cf. Harman*, 140 F.3d at 120; *Sanjour*, 56 F.3d at 97.

EOIR's assertion that the Policy meaningfully binds supervisory review is equally unavailing. EOIR cannot rely on the Policy, because the Policy does not, on its face, limit a supervisor's discretion to deny a request in any way. *See* 2020 Policy at 3. EOIR points to the declaration of a single supervisor explaining how she personally makes decisions when speaking engagement requests are submitted to her. *See* Def's Br. at 26. But that declaration only underscores the fact that supervisors can conduct their review in any way they see fit, without meaningful guidance. Because the Policy is impermissibly vague, NAIJ is likely to succeed on the merits of its Fifth Amendment claim.

### IV. NAIJ has shown irreparable harm.

NAIJ has shown irreparable harm in at least three ways. First, it has shown a likelihood of success on the merits, *see supra* Parts II–III, and as the government itself acknowledges, "a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits" in a First Amendment case. Def.'s Br. at 27 (quoting *W.V. Ass'n of Club Owners & Fraternal Servs. Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009)). Second, NAIJ has shown that the Policy is currently harming immigration judges because it categorically prohibits them from speaking publicly in their personal capacities about immigration and suppresses their speech through a new and onerous preapproval process. *See* Tabaddor Decl. ¶¶ 24–37. The government denies these irreparable harms in conclusory fashion, Def.'s Br. at 28, but the harms are substantiated at length in the record through affidavits showing, among other things: that immigration judges are no longer permitted to voice their personal views on immigration law and

policy, *see* Tabaddor Decl. ¶¶ 25, 27–31, that conference organizers are no longer inviting sitting

immigration judges to speak because of the futility of doing so, *see* Lynch Decl. ¶¶ 9–12, and that

the lack of clear deadlines or standards in the Policy invites arbitrary and protracted

decisionmaking, *see* Tabaddor Decl. ¶¶ 26, 29, 31.

The government argues that any urgency for the relief NAIJ seeks is "belied" by the union's

"substantial delay" in seeking a preliminary injunction. Def.'s Br. at 28. To the contrary: NAIJ

filed suit within months of the issuance of EOIR's 2020 Policy.[9] Even if it had delayed, NAIJ's

"likelihood of succeed on the merits and the seriousness of any infringement upon First

Amendment rights" would be sufficient to establish irreparable harm. *Chabad of S. Ohio &*

*Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004); *see also Ctr. for*

*Individual Freedom, Inc. v. Ireland*, 613 F. Supp. 2d 777, 806–07 (S.D.W. Va. 2009); *accord*

*Human Rights Def. Ctr. v. Sw. Va. Reg'l Jail Auth.*, No. 1:18CV00013, 2018 WL 3239299, at \*6

(W.D. Va. July 3, 2018).[10]

---

[9] The government argues that the 2020 Policy does not substantially revise the 2017 Policy, Def. Br. at 29 n.15, but that is incorrect for the reasons NAIJ set out in its opening brief. Pl.'s Br. at 6–7.

[10] The cases relied on by the government are inapposite. *Capital Associated* involved a challenge to an eighty-year-old law by a fifty-year-old organization. *Capital Associated Indus., Inc. v. Cooper*, 129 F. Supp. 3d 281, 288 (M.D.N.C. 2015). In *Jones*, the court found that the plaintiffs would soon have another opportunity to submit their desired referendum proposition. *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1060 (7th Cir. 2016). In *Steakhouse*, the court found no irreparable harm because the plaintiff had contributed to the city's delay in issuing the sought-after permit. *Steakhouse, Inc. v. City of Raleigh*, 166 F.3d 634, 637–38 (4th Cir. 1999). And in *Edmonds*, the court actually found a "substantial likelihood of irreparable harm to the plaintiff." *Edmonds v. Gilmore*, 988 F. Supp. 948, 956 (E.D. Va. 1997).

V. **NAIJ has shown that the balance of equities and public interest support preliminary injunctive relief.**

As NAIJ's opening brief explained, the balance of equities and the public interest are deemed "established when there is a First Amendment violation." Pl.'s Br. at 25 (quoting *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013)). The government's attempts to rebut this presumption are unconvincing. The government argues that the public interest in hearing from immigration judges is satisfied because union representatives and retired judges remain free to contribute to public discourse. But, as described above, the speech of immigration judges and other EOIR employees is not fungible. *See* Part II.B.1. Sitting immigration judges have unique insights to share with the public, and the public has an interest in hearing them.

The government argues that the balance of equities tips in its favor because enjoining the Policy may impinge on allegedly significant agency interests, namely "preserving EOIR's ability to have sitting IJs speak on behalf of the agency in one voice and to preserve judicial integrity." Def.'s Br. at 30. But EOIR has no interest in enforcing unconstitutional policies, *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002), and would be free to attempt to draft a new policy that is "better tailored to serve" any legitimate interests it has in restricting the speech of immigration judges made in a personal capacity, *Swartzwelder*, 297 F.3d at 242. On the other hand, if a preliminary injunction is denied, immigration judges will continue to suffer the irreparable loss of First Amendment rights. Thus, these factors favor the issuance of an injunction.

## Conclusion

For the foregoing reasons, the Court should issue a preliminary injunction against EOIR's enforcement of the Policy.

July 27, 2020

/s/ *Victor Glasberg*
_____
Victor M. Glasberg (VA 16184)
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
T: (703) 684-1100
F: (703) 684-1104
vmg@robinhoodesq.com


\*_Pro hac vice_ application pending

Respectfully submitted,

 /s/ *Ramya Krishnan*
_____
Ramya Krishnan\*
Stephanie Krent\*
Alex Abdo\*
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
T: (646) 745-8500
F: (646) 661-3361
ramya.krishnan@knightcolumbia.org

*Counsel for the Plaintiff*