UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **NATIONAL ASSOCIATION OF** | ) | |
| **IMMIGRATION JUDGES,** | ) | |
| **AFFILIATED WITH THE** | ) | Civil Action |
| **INTERNATIONAL FEDERATION OF** | ) | No. 1:20-cv-731 |
| **PROFESSIONAL AND TECHNICAL** | ) | |
| **ENGINEERS,** | ) | Court of Appeals |
| | ) | No. 20-1868 |
| **Plaintiff,** | ) | |
| | ) | July 31, 2020 |
| **v.** | ) | 10:00 a.m. |
| | ) | |
| **JAMES R. McHENRY, III,** | ) | |
| | ) | |
| **Defendant.** | ) | |

*TRANSCRIPT OF MOTION HEARING PROCEEDINGS*
*(Via Teleconference)*
*BEFORE THE HONORABLE LIAM O'GRADY,*
*UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

  For the Plaintiff:       **Victor Michael Glasberg, Esq.**
                           Victor M. Glasberg & Associates
                           121 S. Columbus Street
                           Alexandria, VA 22314
                           (703) 684-1100
                           Email: Vmg@robinhoodesq.com

                           **Ramya Krishnan, Esq.**
                           **Stephanie Krent, Esq.**
                           **Alexander Abdo, Esq.**
                           Knight First Amendment Institute at
                           Columbia University
                           475 Riverside Drive,
                           Suite 302
                           New York, NY 10115
                           (646) 745-8500

APPEARANCES:   Cont.


For the Defendant:          **Catherine M. Yang, Assistant U.S.**
                            **Attorney**
                            **Kevin Hancock, Assistant U.S.**
                            **Attorney**
                            US Attorney's Office (Alexandria)
                            2100 Jamieson Avenue
                            Alexandria, VA 22314
                            703-299-3799
                            Email: Catherine.yang@usdoj.gov


Court Reporter:             **Scott L. Wallace, RDR, RMR, CRR**
                            Official Court Reporter
                            United States District Court
                            401 Courthouse Square
                            Alexandria, VA  2231-5798
                            703.549.4626
                            scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1          **<u>MORNING SESSION, JULY 31, 2020</u>**

2     (10:00 a.m.)

3          THE COURT:  Good morning.  This is Liam O'Grady.  Good

4     morning to all, and I hope everyone is safe today, and I

5     appreciate your making time available for this oral argument this

6     morning.

7          As we all know, the plaintiff, NAIJ, has just filed a

8     motion for a preliminary injunction against the official capacity

9     requirements in their daily speeches, and I would also add that

10    while we're all in different locations, there will be an official

11    transcript of this hearing made and made available, and so

12    personal recordings of this hearing are not official transcripts

13    and should not be used by -- shouldn't be made.  So, if you want

14    a transcript of the hearing, that should be arranged through our

15    court reporter.  All right.  Good morning.

16         Amanda, how are you today?

17         THE COURTROOM CLERK:  Good morning, Judge.  I'm good.  I

18    am hearing a lot of static, so anyone who is not speaking, please

19    make sure that you mute your microphone.

20         THE COURT:  I'm hearing it as well.  Let's see how it

21    goes, okay.  Let's first have the parties announce themselves.

22         THE COURTROOM CLERK:  Sure, I will call the case.

23         THE COURT:  Thank you.

24         THE COURTROOM CLERK:  The Court calls case 1:20-cv-731,

25    National Association of Immigration Judges, Affiliated With The

1   International Federation of Professional and Technical Engineers

2   versus James R. McHenry, III, for a motion hearing.

3          May I have the appearances, please, first for the

4   plaintiff.

5          MR. GLASBERG:  Good morning, Judge.  Vic Glasberg for the

6   plaintiff, and I'm accompanied by Ramya Krishnan, who will make

7   the argument, and also Alex Abdo and Stephanie Krent, co-counsel,

8   are present on the line.

9          THE COURT:  All right.  Good morning.  And for the

10  director?

11         MS. YANG:  Good morning, Your Honor.  This is Catherine

12  Yang from the U.S. Attorney's Office.  With me today are Kevin

13  Hancock, Christopher Hall and Greg Doe from the Department of

14  Justice, Federal Programs Branch.  Mr. Hancock will be arguing

15  today.

16         MR. HANCOCK:  Good morning, Your Honor.

17         THE COURT:  Well, I had a chance to go through the

18  pleadings and what I believe to be the important cases, and I'll

19  hear whatever you would like to say this morning within time

20  limits, but I'm particularly interested in the jurisdictional

21  argument and, as I read the Supreme Court and the Fourth Circuit

22  cases, and in particular the *Elgin versus Department of Treasury*

23  and the *Bennett versus U.S. Securities and Exchange Commission*,

24  and I think the *AFGE* case out of the D.C. Circuit is consistent.

25  They have come down pretty strongly on the side of finding that a

1   facial challenge to the constitutionality of prior restraint are

2   required to go through agency review prior to Court of Appeals

3   review, and each of the cases then goes through the *Thunder Basin*

4   test, although I'm not sure the *Elgin* case isn't broad enough to

5   preclude it as well.

6       So I'm not sure that anything prior to 2012 when *Elgin*

7   came out is really case law that has been cited by the other

8   cases.  I'm also interested in the second prong of the wholly

9   collateral test in *Thunder Basin* and the argument there.

10      I'm also interested in the government having identified a

11  pathway for immigration judges to follow to get review

12  administratively and then at the Fourth Circuit and whether that

13  exists today.

14      And I guess, finally, why there hasn't been an "as

15  applied" pursued versus the facial challenge.  So those are some

16  of my concerns and focuses, and, Ms. Krishnan, if you want to

17  begin, go ahead.

18      MS. KRISHNAN:  Thank you, Your Honor.  This case is about

19  whether the government can prevent immigration judges from

20  speaking publicly in their private capacities about the system

21  they are called to administer.  In a policy issued in 2017 and

22  modified in January of this year, the government categorically

23  prohibits judges from speaking publicly in their private

24  capacities about immigration law rules and policy issues or the

25  agency that employs them.  On all other topics judges are

1    required to submit to an onerous pre-approval process.  The

2    policy is an unconstitutional prior restraint in violation of the

3    First Amendment.  It is also unconstitutionally vague under the

4    Fifth Amendment.  NAIJ now seeks a preliminary injunction against

5    the enforcement of the policy.

6         I will address three issues today.  First, why this Court

7    has jurisdiction; why NAIJ is likely to succeed on the merits of

8    its First and Fifth Amendment claims; and, finally, why the union

9    satisfies the balance of the preliminary injunction factors.

10         So, coming first to the question of jurisdiction, the

11   government argues that this Court's jurisdiction is precluded by

12   two statutes, which, for simplicity, I will refer to as the

13   Labor-Management Statute and the Civil Service Statute.  And I'll

14   address the *AFGE* case that the government primarily relies on in

15   a minute, but if I could start with the Supreme Court's decision

16   in *NTEU* and the D.C. Circuit's case in *Weaver*, which we think

17   bear strongly on this case.

18         If the government's theory were right, the Supreme Court's

19   seminal decision in *NTEU* would be wrongly decided.  That case was

20   in a similar posture to this one.  Two federal unions and several

21   individual federal employees filed suit in District Court

22   challenging the constitutionality of employee speech

23   restrictions.  The Court invalidated those restrictions without

24   so much as mentioning jurisdiction.

25         In *Weaver*, the D.C. Circuit addressed jurisdiction, but it

1  expressly rejected an argument similar to the one the government

2  makes here.  In that case, an employee challenged an agency

3  policy on First Amendment grounds arguing, like the union does

4  here, that the policy was an unconstitutional prior restraint.

5       Unlike this case, however, the plaintiff also challenged a

6  specific application of the policy, an admonishment she received

7  for not complying with the policy.  The Court dismissed the

8  admonishment claim because it was remediable through the civil

9  statute, but it refused to dismiss the constitutional claim

10  because it was a simple pre-enforcement attack on the validity of

11  an employee speech policy, and it stood independently of the

12  admonishments.  In doing so, the Court relied on *NTEU* and

13  *Sanjoura*, another employee speech case from the D.C. Circuit in

14  which the Court declined to address jurisdiction.

15       We argue that these cases clearly establish that the

16  union's claims here are not precluded by either the

17  Labor-Management Statute or the Civil Service Statute.

18       Addressing squarely the *AFGE* case, the recent D.C. Circuit

19  decision which the government relies on, the Court held that the

20  critical question in determining whether a claim is wholly

21  collateral to a statutory scheme is whether it is of the type

22  that is regularly adjudicated through the statutory scheme and

23  whether the relief the plaintiff seeks is of the type that is

24  routinely granted under the statute.  The Court took that test

25  from the Supreme Court's decision in *Elgin*, and in *AFGE* the Court

1    answered that question in the affirmative because the union

2    raised broad statutory claims under the Labor-Management Statute.

3    And although the union also raised constitutional claims, the

4    Court held that the union could obtain the same relief before the

5    Federal Labor Relations Authority.  This case is entirely

6    distinguishable.  NAIJ does not make any statutory claims, and

7    the relief it seeks, a permanent injunction against the agency's

8    enforcement of the policy, is not of the kind that is routinely

9    granted under the Labor-Management Statute.  The claim is also

10   similarly collateral under the Civil Service Statute because,

11   unlike in *Weaver*, there is no personnel action within the meaning

12   of the statute.  Personnel action, as we explained in our reply

13   brief, is an individual personnel decision, and here NAIJ does

14   not challenge any such decision.  So, for that reason, the

15   government can't satisfy the second step in *Thunder Basin* which

16   asks the Court to consider whether the claim is of the type that

17   Congress intended to be reviewed through the scheme, because here

18   NAIJ's purely constitutional claims are wholly collateral to the

19   scheme.

20        Would Your Honor like me to address the other two factors

21   in the *Thunder Basin* test or is that sufficient for now before I

22   move on to the merits?

23        THE COURT:  Ms. Krishnan, I don't need the argument on the

24   other two prongs.  I was focused on wholly collateral.  So thank

25   you.  I apologize.  Go ahead.

1          MS. KRISHNAN:  Thank you, Your Honor.  Well, turning,

2     then, to our First Amendment claim, we argue that NAIJ is likely

3     to succeed on its claim that the policy imposes an

4     unconstitutional prior restraint on the protected speech of

5     immigration judges.  Your Honor is familiar with the test that

6     applies from *NTEU*.  Under that test, the government must show

7     that the interests of employees and potential audiences in the

8     restrained speech is outweighed by the expression's necessary

9     impact on the operation -- on the actual operation of government.

10          The government also has to show that the harms it seeks to

11     address are real and that the regulation will alleviate those

12     harms in a direct and material way.

13          THE COURT:  I'm sorry, let me interrupt.  The government

14     spends a great deal of time in their papers discussing the

15     different issues that make their position that they knew that the

16     more formal requirements for the official capacity designations

17     and the fact that the pre-2013 [sic] mechanical -- pre-2013

18     [sic], I think the agencies, many of the agencies, not just here,

19     but the immigration judges, allowed judges to speak or employees

20     to speak in their personal capacity, although they allowed them

21     to be speaking as -- in their position with the government, and

22     that that, according to Mr. McHenry, caused confusion and so they

23     changed the policy in 2013 [sic] and then modified it in 2017 and

24     2018 and, perhaps, 2020, but the point I'm trying to make is

25     that, you know, we're dealing with employees, but here we're

1   dealing with immigration judges who are -- who take an oath to

2   follow the Constitution, follow the laws that they have before

3   them, and so that it's a very individual deliberation as to how

4   far they should be allowed to write or speak in their official

5   capacity.  Do you disagree with that?

6        MS. KRISHNAN:  So, no, we don't disagree with the

7   proposition that there can be unique considerations at play when

8   you're talking about judicial officers, but at the very minimum,

9   under the test that falls under *NTEU*, what the government needs

10  to show is that the policy is reasonably necessary to redress an

11  actual harm, and here the government has failed to show any

12  actual harm to its asserted interests in protecting the actual

13  and perceived impartiality, and all judges -- and also in

14  avoiding public confusion and disruption of the kind that would

15  undermine confidence in the agency.  So to --

16       THE COURT:  How does a judge go about determining that in

17  a situation like this one where requests are coming in from

18  immigration judges for permission to speak or to write and are

19  then, you know -- the EOIR and, I guess, the SET is responding to

20  those inquiries.  Without the abilities to substantively review

21  the decisions that EOIR is making about those requests, how does

22  the Court determine whether these restrictions are prior

23  restraint under *NTEU*?

24       MS. KRISHNAN:  So, the -- the Court itself in *NTEU* made

25  very clear that a restriction on employee speech that constitutes

1    a prior restraint of the kind that is subject to the exacting

2    scrutiny outlined in that case.  It impedes a broad category of

3    speech; that is, it chose potential speech before it happens, and

4    so a number of Court of Appeals, including the Fourth Circuit,

5    for example in *Liverman*, had held that not only, you know,

6    outright prohibitions on personal capacity speech, but also

7    pre-approval policies and requirements of the kind at issue here

8    constitute prior restraints within the meaning of *NTEU*.

9        There's no question here that the *NTEU* test applies

10   because here the policy not only prohibits judges from speaking

11   in their personal capacities about immigration and EOIR-related

12   topics, but it also requires judges to submit to this

13   pre-approval process.  And to the extent that the government

14   asserts an interest in distinguishing between personal and

15   official capacity speech because it says that, you know, absent

16   such a process, judges engaging in personal capacity speech, when

17   it is in reality official speech, could lead to public confusion,

18   it needs to be able to show actual harm to its interest.  You

19   know, if pointing to an interest in distinguishing between

20   personal and official capacity speech was sufficient, any agency

21   could justify imposing a prior restraint on their employees'

22   speech.

23       So, in the absence of any showing of concrete harm from

24   judges deciding for themselves whether they're speaking in their

25   personal capacities, there's no reason why these judges who are

1    charged with making life-altering decisions on a daily basis

2    can't draw the line between personal and official capacity

3    speech.

4         And, in fact, it appears from the policy that it's the

5    government that can't appropriately draw this line because it has

6    adopted this overbroad definition of official capacity speech

7    that sweeps in, not only speech that ordinarily falls within the

8    scope of their duties, which is the test set forth by the Supreme

9    Court in *Lane*, but also speech that merely concerns those duties,

10   and the Court in *Lane* was very clear that the distinction --

11        (Noise interference.)

12        MS. KRISHNAN:  I'm sorry, Your Honor, my -- were you

13   trying to say something, or I might have just not heard you.

14        THE COURT:  No, it was static.  I'm listening, and I've

15   gone over the *Lane* case carefully, and it speaks volumes about

16   your argument, but go ahead.

17        MS. KRISHNAN:  Thank you.  So, there's no doubt that the

18   speech the immigration judges want to engage in falls on the

19   personal capacity side of the distinction that the Supreme Court

20   outlined in *Lane*, and that's consistent with the formal position

21   description for immigration judges -- that the agency created

22   itself, which can be found at Exhibit O to Judge Tabbaddor's

23   supplementary declaration, but that description makes no mention

24   of public speaking or writing outside of judges' adjudicating

25   responsibilities, and that position is also consistent with the

1   agency's recent statements to immigration judges, a sample of

2   which can be found at Exhibits H to K of Judge Tabaddor's initial

3   declaration.   In the e-mails exhibited, EOIR in denying judges'

4   request to speak in their personal capacities about immigration

5   laws and policies, repeatedly stated that such engagements are

6   not an official responsibility of regular immigration judges and

7   that they should, instead, be handled by agency management

8   officials in order to ensure consistency in the agency's

9   messaging.   So here, NTEU applies, and the government can't

10  satisfy it.   And as Your Honor knows, the government does raise a

11  variety of interests, including ensuring compliance with the

12  ethics laws, meeting staffing needs, preserving confidence in the

13  agency, and promoting judicial integrity, but, as we explained in

14  our papers, none of those interests can sustain the policies.   As

15  an initial matter, as the agency has produced no evidence of real

16  harm to any of the interests from judges engaging in personal

17  capacity speech in the years prior to the 2017 policy, and this

18  alone is fatal as the Fourth Circuit recognized in *Liverman*, but,

19  in fact, the problem here is much bigger than lack of actual harm

20  because the harm asserted seems to be a pretext for viewpoint

21  discrimination.

22        The agency candidly admits that the policies were issued

23  in response to increased public interest in immigration, and one

24  of the declarants, Ms. Owen Cirse, in describing how she

25  undertakes supervisory review, states that in evaluating personal

1   capacity requests, she considers whether an employee's

2   participation would result in any negative publicity or scrutiny

3   to the agency and to the federal government.  That is precisely

4   the kind of viewpoint discrimination that the First Amendment

5   prohibits.  But were that not a sufficient problem, as I noted,

6   the policy isn't appropriately tailored to serve any of the

7   agency's asserted interests.

8        In some instances, the policy seems redundant because

9   there are preexisting policies and laws that achieve the agency's

10  ends.  For example, the government states the policy is necessary

11  to ensure compliance with ethics laws, but it doesn't explain why

12  the laws themselves aren't adequate to serve that end.  The

13  agency says the policy is necessary to ensure consistent

14  staffing, but the agency already has a policy requiring

15  immigration judges to request leave, and, unsurprisingly, that

16  policy doesn't permit the agency to review the content of

17  proposed speech.

18       And finally, the agency says that the policy is necessary

19  to remind IJs of their duties of independence and impartiality,

20  but judges are well-aware of this obligation, which is at the

21  heart of what they do every day, and these duties are already

22  imposed by federal regulation and the 2011 Ethics guide.

23       Finally, the government points to this interest in public

24  confusion -- avoiding public confusion and disruption that

25  undermines public confidence in the agency, but those interests

1    rely on a false premise that immigration judges are high-level

2    policy making officials equivalent to an agency head.

3    Immigration judges don't set policies for the agency.  Their

4    decisions are reviewable by the Board of Immigration Appeals, and

5    they aren't even precedential, and their obligations of

6    impartiality and independence also make it extremely unlikely

7    that the public would assume that judges act as a mouthpiece for

8    the agency.

9         And finally, even if the judges were policy-making

10   officials, the policy fails because it doesn't fit the agency's

11   interests.  It applies indiscriminately to all speech, not just

12   speech related to judges' duties, and the policy's review

13   criteria fail to distinguish between speech that could reasonably

14   be expected to be disruptive enough to undermine public

15   confidence in the agency and speech that clearly would not.

16        The policy also fails for the additional reason that it

17   lacks the safeguards ordinarily required of prior restraints.

18   The government says that this lack of safeguards isn't relevant

19   in the public employee speech context, but that is belied by the

20   decisions of numerous courts of appeal, including the Fourth

21   Circuit in *Marchetti*, which clearly states that the absence of

22   substantive and procedural safeguards is an additional thumb on

23   the employee's side of the scales in *NTEU* balancing.

24        And here the policy lacks two critical safeguards.  It

25   lacks narrow and objective standards.  The policy's review

1   criteria provides that all speaking requests will be reviewed for

2   consistency with agency policies and communications, and this

3   standard seems to require immigration judges to tow the agency's

4   official position in all personal capacity speech, which would

5   plainly facilitate viewpoint- and content-based discrimination.

6        And finally, the policy lacks a definite time limit for

7   review.  The 2018 Memorandum of Understanding doesn't cure this

8   deficiency because it includes aspirational time limits.  Those

9   time limits are only aspirational and they only cover some steps

10  of the pre-approval process.  The government also doesn't contend

11  that those time limits are actually met in practice.  The record

12  establishes that they often are not met.

13       So, for all those reasons, NAIJ is likely to succeed on

14  its claim that the policy is subject to *NTEU* scrutiny, but that

15  it fails to meet it.  Turning to the union's Fifth Amendment

16  claim.  In that case --

17       THE COURT:  Yeah, I don't -- I understand your argument on

18  the Fifth Amendment claim and I don't need further argument on

19  that.  Perhaps, if it's raised by the government, you can address

20  it in your reply, but I think I understand well your argument

21  there, Ms. Krishnan, and if you want to go to the irreparable

22  harm, I'll hear you briefly on that.

23       MS. KRISHNAN:  Thank you, Your Honor.  On irreparable

24  harm, the Fourth Circuit has held that plaintiffs demonstrate

25  irreparable injury by establishing a likelihood of success on

1    their First Amendment claim, and here NAIJ has done that, but it

2    also establishes irreparable injury independently.  Here the

3    record establishes that numerous judges would be denied approval

4    to share their personal views on immigration laws and policy, and

5    the policy now includes this outright prohibition on judges

6    engaging in exactly that sort of speech.  Conference organizers

7    no longer invite immigration judges to speak to members of the

8    public at their events because they believe it would be futile to

9    do so, and the lack of clear deadlines and standards is resulting

10   in arbitrary and delayed decisions.  So, absent a preliminary

11   injunction, immigration judges will continue to suffer

12   irreparable harm from these injuries.

13          And finally, the public interest and balance of equities

14   also weigh in NAIJ's favor.  These factors, like irreparable

15   harm, are established whenever there's a likely First Amendment

16   violation, and here we have established that there is one.  The

17   government has no interest in enforcing a policy that is

18   unconstitutional, and the public interest is clearly served by

19   protecting First Amendment rights.

20          So, for those reasons, NAIJ satisfies the requirements for

21   a preliminary injunction to be issued, and we respectfully

22   request the Court to enter one.

23          THE COURT:  All right.  Thank you, Ms. Krishnan.  All

24   right.  Does the government want to respond?

25          MR. HANCOCK:  Yes.  Good morning, Your Honor.  This is

1   Kevin Hancock for the Executive Office For Immigration Review.

2   The plaintiff's motion for a preliminary injunction should be

3   denied because NAIJ has not demonstrated it will suffer

4   irreparable harm, jurisdiction is lacking in this court, and

5   their constitutional claims are unlikely to succeed on their

6   merits.

7          Recognizing that the speech of its immigration judges can

8   greatly affect the agency's overall mission, the EOIR has worked

9   closely with the union to incrementally develop and to improve

10  with policies governing the outside speaking and writing of its

11  employees.

12         In 2011, the agency and the union jointly issued an Ethics

13  Guide, and that guide specifies the workplace ethics and

14  personnel law policies that would apply to immigration judges,

15  and they also memorialize the preexisting requirement that

16  immigration judges seek agency review of whether public speaking

17  or writing engagements would comply with those laws.

18         Now, that Ethics Guide in 2011 did not specify a process,

19  however, and so in 2017 the agency implemented a standardized

20  process by which the agency would review such requests, and that

21  is the policy now being challenged.

22         Your Honor, I will go directly to your concern about

23  jurisdiction.  As we've argued, the plaintiffs in this case, as

24  the certified bargaining representative for most immigration

25  judges, they only have one proper route to bring their challenge

1    to the policy, and that is through the scheme of the Federal

2    Service Labor Management Relations Statute, which I'll refer to

3    as "the statute."  Through that scheme, they can bring their

4    dispute with the policy to the Federal Labor Relations Authority,

5    which could hear that dispute, and then the Fourth Circuit would

6    thereafter have jurisdiction over that claim, but this is the

7    exclusive path that Congress has determined must be followed in

8    order for remedies to be exhausted before resorting to Article

9    III review.  Instead, the plaintiffs have rushed right to the

10   District Court despite the fact that the --

11        THE COURT:  I'm sorry, is that avenue of review still

12   available to NAIJ now?  Are there time limits on when that action

13   could be brought?

14        MR. HANCOCK:  Your Honor, I'm not aware of any expired

15   time limit.  If that were the case, I think it would only serve

16   to highlight the delay that plaintiff has had in bringing this

17   dispute.  The policy is now three years old.  It was first issued

18   in 2017.  Even if the Court were to accept plaintiffs' claim that

19   the policy actually was only issued with the 2020 Memorandum,

20   that occurred in January, and so it's now been six months since

21   that time, and plaintiffs have no explanation for why they have

22   not sought the emergency relief they claim to need in this motion

23   earlier, rather than delaying it for that time.  But I am not

24   aware of a time bar on that, and the union has previously

25   demonstrated that it could resort to the dispute mechanisms of

1    their CBA with the agency in order to handle grievances over this

2    particular policy.  They did just that in 2018.  After the 2017

3    memo was issued, the union had some issues with that Memorandum,

4    invoked collective bargaining, and those issues were resolved,

5    and it resulted in a Memorandum of Understanding in 2018 that

6    resolved those issues.

7         Plaintiffs could have done the same thing here and

8    resorted to the CBA's grievance procedures that could have gone

9    to arbitration and, thereafter, the FLRA would have had the

10   ability to hear that dispute with subsequent Fourth Circuit

11   review.

12        The *Thunder Basin* factors could all be -- are all

13   satisfied here and do not pose any impediment to the claim at

14   issue in this case being brought or being channeled pursuant to

15   the statute.

16        The plaintiffs cite the fact that this is a

17   pre-enforcement challenge, but the courts have repeatedly held

18   that a pre-enforcement challenge doesn't prevent or excuse a

19   plaintiff from resorting to the statute's channeling.  *Thunder*

20   *Basin* itself was a pre-enforcement challenge.  The same for the

21   *AFGE* versus Trumpcare, and as the *AFGE* case highlighted, *Thunder*

22   *Basin* said that there's no entitlement to bring a pre-enforcement

23   claim when the provisions of the Federal Service Labor Management

24   Relations Statute apply, as they do here.

25        The plaintiffs primarily rely upon *NTEU* and the *Weaver*

1    case.  As Your Honor highlighted, the *Elgin* case is a
2    particularly seminal case in this area.  That case dates from
3    2012.  The *NTEU* and the *Weaver* decisions both predate the *Elgin*
4    ruling.  It doesn't appear that the Supreme Court in NTEU -- it
5    did not even address or consider this issue, and there's no
6    indication that the issue of channeling under the statute was
7    ever raised in that case, and so it should not overcome later,
8    more relevant precedent like *Elgin* or the *AFGE* ruling.
9         And the reason for that is that if a plaintiff could just
10   circumvent the channeling requirement of the statute just by
11   bringing up a pre-enforcement claim instead of an after-the-fact
12   post-hoc enforcement claim, they could circumvent the statute
13   almost at will, and I believe the *AFGE* ruling made that point as
14   well.
15        The fact that this claim involves a constitutional
16   challenge also does not excuse plaintiff from not resorting to
17   the statute channelling requirements.  Many of the cases that
18   were just discussed involved constitutional claims.  The *Elgin*
19   case involved the constitutional claim.  *AFGE* involved
20   constitutional claims, and, nevertheless, those courts held that
21   that channelling and exhaustion under the statute was required.
22        Your Honor, to your concern about the wholly collateral
23   prong, I think that is concerned, and so relief -- the union
24   could receive the relief it seeks, even if it follows the
25   mandatory procedures of the statute.  The Supreme Court in *Elgin*

1    stated that an appellate court reviewing an FLRA decision can

2    consider constitutional law issues raised by the plaintiff, even

3    if the FLRA itself said it could not.  And so, even if that

4    authority said, you know, we're not going to decide the

5    constitutional claim, the Fourth Circuit would still have

6    jurisdiction to do so, and the *AFGE* case also reinforced that

7    principle.

8         So, there are no relevant roadblocks here to plaintiff's

9    ability, indeed mandatory duty, to exhaust under the Federal

10   Service Labor Management Relations Statute.

11        Your Honor, some of the issues that are raised here also

12   highlight the lack of irreparable harm in this case.  Plaintiffs

13   almost exclusively rely upon their claim that there's a valid

14   First Amendment claim here.  We'll address that, but other

15   factors should also be considered.  The union was very involved

16   in the development of this very policy, and that undermines any

17   claims of urgency they may have in needing emergency relief.

18   Again, they jointly issued that 2011 Ethics Guide with the

19   agency, and they authored the application of the 2017 Memorandum

20   to immigration judges with their collective bargaining and

21   agreement with the agency in 2018 on that Memorandum of

22   Understanding.

23        The delay I just mentioned also undermines any claim of

24   urgency.  There is a court that has held that time delays of less

25   than six months have also undermined claims for injunction to

1    hear, at a minimum, the delay was six months, if not three years
2    since 2017.
3         And finally, Your Honor, there's no demonstrated harm to
4    plaintiff arising from this policy.  The policy is a process.  It
5    is a process for implementing a pre-existing requirement that
6    requires immigration judges to seek approval for outside speaking
7    and writing.  That pre-approval requirement exists independently
8    in that 2011 Ethics Guide, and so to the extent they argue chill
9    from those requirements, that really exists in an independent
10   document that's not challenged here.
11        The ethics rules and personnel rules that apply to outside
12   speaking and writing, they all exist in the policy process as
13   well.
14        And finally, I want to directly address the allegation
15   that a policy is a prohibition on the ability of immigration
16   judges to speak about immigration issues and about the EOIR.  To
17   the contrary, that's not the case.
18        So, immigration judges are still permitted to speak about
19   immigration topics and about the agency, but subject to the
20   applicable ethics and personnel rules and policies that have
21   always applied to their outside speaking.  What the policy did
22   was it recognized the reality that when an immigration judge
23   speaks publicly about immigration topics and about the agency and
24   about core issues that are relevant to the mission of this
25   agency, they do so in an official capacity as representatives of

1    that agency regardless of the label they would subjectively apply

2    to that speech, and that recognition in the policy in 2017

3    brought EOIR's practice in line with the Supreme Court caselaw on

4    this topic.  Simply because the agency has previously allowed

5    immigration judges to say they were speaking in a personal

6    capacity about the topics that are central to the agency's

7    mission, while using their official titles, doesn't mean the

8    First Amendment requires that result.  And so what the policy did

9    was it recognizes that reality, that really that type of speech

10   on behalf of the agency is truly official capacity speech, and

11   the agency's interests in what is said on its behalf are greatly

12   heightened.  It doesn't actually prevent any speech, though,

13   because when an immigration judge submits a personal capacity

14   request to the agency, if that's denied because the agency says,

15   Well, we think this is actually official capacity because you're

16   speaking about the very things you do in your job, that request

17   could be resubmitted to the agency as an official capacity

18   request, and so the process here is not just an outright, you

19   know, suppression of speech like plaintiffs want to cast it as,

20   and the agency's interests in ensuring the accuracy and

21   consistency of speech that is publicly made on its behalf are

22   great, and the *Garsetti* line of cases has, you know, gone as far

23   as to say that the First Amendment extends no protection to

24   speech that is made pursuant to an executive, personnel --

25   pursuant to their official duties, and such speech rightfully

1   includes an immigration speech about immigration topics and the

2   functioning of the agency for which they work.

3        The Fourth Circuit and the Supreme Court have both said

4   that the test for whether someone is speaking pursuant to their

5   job duties is a practical inquiry.  It's not a formal one, it's a

6   practical one.  You look into what the employee's daily

7   professional activities actually are.  And plaintiff cites to the

8   fact that the formal job description for immigration judges

9   doesn't explicitly include speaking publicly on behalf of the

10  agency, but that's not the test under the Fourth Circuit and

11  Supreme Court case law.  Specifically, I would point the Court to

12  the *Crouse* decision in the Fourth Circuit.

13       On the contrary, speaking publicly to educate the public

14  about the immigration courts and the role they play in society,

15  has been acknowledged by the union itself as, quote-unquote,

16  "part of the job."

17       Now, in their reply they say, well, they weren't speaking

18  about the official duties, but again, under the practical

19  flexible test for what that is, the fact that immigration judges

20  have a, quote-unquote, "widespread belief" that engaging in such

21  speech is important is an indication itself that it is an

22  understood part of their job duties.  You know, many invitations

23  for speaking are extended to immigration judges due to the very

24  fact that they are immigration judges.  The use of their title

25  lends a sense of officialness, an imprimatur of officialness to

1  an event that is addressing immigration issues.  Having an

2  immigration judge there, you know, they are being invited for

3  that very reason, because it is part of their job.

4       Your Honor, to the extent that the policy applies to

5  speech in an immigration judge's private capacity, genuinely

6  private capacity, the Supreme Court has also said that the

7  government has great leeway to regulate pursuant to its interests

8  because, again, this is a context in which the government is

9  acting as an employer, not acting as a sovereign regulating the

10 general public.  And so, on the one hand there are very minimal

11 burdens placed by this policy on private capacity speech of

12 immigration judges.

13      The universe of speech at issue here is pretty small.  The

14 statistics show that in three years there have been 59 approvals

15 and 16 denials of personal capacity speaking requests.

16      You know, personal capacity requests are pretty routinely

17 granted.  The agency has said, as long as they're personal

18 capacity and there are no ethics issues and no work conflicts,

19 we'll grant the requests, and the fact that only 16 denials have

20 occurred for personal capacity requests during that three-year

21 period, I think, illustrates that point.

22      The timelines provided are relatively short, and just a

23 couple of examples that plaintiffs point to, I don't think,

24 disprove that.  There have been, you know, hundreds of requests.

25 Two examples of, you know, perhaps some tardiness don't kind of

1   condemn the entire regime, and the policy furthers the agency's

2   interests.  So, without the policy, it would be operationally

3   difficult, if not impossible, to provide appropriate assistance

4   and advice to immigration judges and other EOIR personnel

5   regarding compliance on ethics, personnel laws, and policies.

6   You would have a greater risk of inconsistent treatment, a

7   greater likelihood of ethics violations, violations of

8   professionalism rules.  You would have a greater number of issues

9   with the operations of the Court being disrupted.  That interest

10  is particularly important now, given that there are approximately

11  1.2 million cases pending before the immigration courts, a

12  workload that more than doubles that which existed before 2017.

13        And, you know, the agency has an interest, especially when

14  it comes to official capacity speech, to ensure the accuracy and

15  consistency of what is being said on behalf of the agency.  These

16  interests on behalf of the agency are heightened when it comes to

17  personnel who are high-level policy-making and public-facing

18  officials.

19        The Fourth Circuit in *McVey* is very clear about this.  If

20  an official is policy-making or public-facing, the government's

21  interests are at their apex, and that is true of immigration

22  judges in this case.  Plaintiffs don't dispute that immigration

23  judges are public-facing officials.  They are appointed by the

24  Attorney General.  They are paid according to a higher standard.

25  Their rulings can, indeed, set policy.  In the case where the

1    Board of Immigration Appeals affirms that opinion, the ruling of

2    an immigration judge, that sets agency policy.  And, again, they

3    have, you know, admitted that public speaking is a part of the

4    job.  Even if not officially, they view it as a very important

5    aspect of what they do.  So, these are high-level employees, and

6    the agency has a very strong interest in what is said on behalf

7    of the agency.

8          The tailoring of the policy is appropriate.  The sweep

9    need only be reasonably necessary to protect the agency's

10   interests.  Plaintiffs raise a number of lesser restrictive means

11   that they claim would further the interests of the so-called

12   intermediate steps that they point to, but the test here is not

13   whether a lesser restrictive means exists, it's whether the means

14   chosen by the agency would be reasonable under the circumstances,

15   and that is true here.

16         Your Honor, in our view, the Fifth Amendment claim is also

17   unlikely to succeed.  Unless Your Honor has any specific

18   questions on that, I will move on to the balance of the equities.

19         THE COURT:  Yeah.  I don't have any questions --

20         MR. HANCOCK:  -- sorry --

21         THE COURT:  -- on the Fifth Amendment, so please move on

22   to your closing remarks.

23         MR. HANCOCK:  The public interest in the effective

24   operations of the nation's immigration courts is significant,

25   particularly at this time, and in our view that interest weighs

1  strongly against the injunction here, particularly when the union

2  has failed to demonstrate any harm that arises from the process

3  implemented by this policy.  So we would respectfully request

4  that the Court deny the injunction.  Thank you, Your Honor.

5      THE COURT:  Thank you, Mr. Hancock.  Ms. Krishnan, do you

6  want to respond?

7      MS. KRISHNAN:  Thank you, Your Honor.  If I could take a

8  few minutes to respond to some of the issues raised.

9      THE COURT:  Yes, go ahead.

10     MS. KRISHNAN:  I would like to first address the issue of

11  jurisdiction.  The government argues that NAIJ's constitutional

12  claims satisfy the second step of *Thunder Basin* because here they

13  assured meaningful judicial review of their claims under the

14  Labor-Management Statute, but the government has still refused to

15  identify any claim that NAIJ could raise through the

16  administrative review process to get to this meaningful judicial

17  review of the claims that it raises here.

18     Here the union challenges the existence of a policy, not

19  its negotiability or any particular application of it, and this

20  harm simply isn't cognizable under the Labor-Management Statute.

21  That statute puts in place a complicated scheme, but the only

22  real opportunity for judicial review here is if the union could

23  recast its claim as an unfair labor practice.  An unfair labor

24  practice usually involves, you know, a failure to bargain over a

25  certain subject or to negotiate in good faith or a failure to

1   otherwise comply with the Labor-Management Statute, and here NAIJ

2   doesn't argue that the agency has violated the statute in any

3   way.  Its claim isn't over the agency's failure to bargain over

4   the policy but over the policy's very existence, and the

5   government hasn't actually articulated any theory for how the

6   union could seek meaningful judicial review of this claim, and

7   that's because there isn't any.

8           The government argues that the union could have used the

9   grievance and arbitration procedures under the collective

10  bargaining agreement, but under the Labor-Management Statute, a

11  grievance that goes through those procedures is only reviewable

12  if it involves an unfair labor practice, and for the reasons that

13  I've already explained, the union couldn't recast its challenge

14  here as an unfair labor practice.

15          The D.C. Circuit has also held that grievance procedures

16  are not an appropriate forum for resolving constitutional claims,

17  and I point the Court to the Court's decision in *Andrade v. Lauer*

18  at 729 F.3d 1475 for that proposition.

19          So, here there is no assurance that NAIJ could get

20  meaningful judicial review of its claims were it to go through

21  the administrative review process provided in the

22  Labor-Management Statute, and even if the union could get

23  judicial review, it still wouldn't be meaningful for two reasons.

24  First, the Supreme Court made clear in its decision in *Free*

25  *Enterprise* that a plaintiff shouldn't have to concoct a dispute

1    under a statutory scheme in order to raise a simple

2    pre-enforcement challenge.  And second, as the Fourth Circuit

3    made clear in *Bennett*, review isn't meaningful if plaintiffs will

4    be forced to suffer irreparable harm as a result of having to go

5    through the administrative review process.  And here, NAIJ's

6    members would suffer irreparable harm in the form of the ongoing

7    violation of their First Amendment rights.

8            Finally, the government argued that the fact that we bring

9    a pre-enforcement challenge here is not dispositive, and they

10   mentioned a number of cases that involved constitutional claims

11   where the plaintiff was required to go through the administrative

12   review process, but none of those cases are apposite.  They

13   either involved statutory claims, as in *AFGE*, or else they

14   involved an administrative action that was taken pursuant to the

15   statute or regulation that was said to be unconstitutional, as in

16   *Elgin*, or else they involved an intent by the plaintiff to

17   preempt an administrative action that was about to happen, as in

18   *Thunder Basin*, so none of those cases are apposite.  And the

19   government has not been able to find a single case involving

20   simple pre-enforcement attack to an employee speech policy of the

21   kind raised here, and the cases that are directly on point all

22   suggest that these are not claims that should be routed through

23   the Labor-Management Statute or the other statute relied on by

24   the government.

25           If I could quickly address the irreparable harm and

1    redressability.  On irreparable harm, the government argues that

2    there is no harm because the Ethics Guide was jointly issued by

3    NAIJ and the union.  First of all, the Ethics Guide is not at all

4    before the Court.  That Guide is superseded by the 2017 and 2020

5    policies because the Guide clearly states that, to the extent

6    that there are other EOIR policies on an issue, those policies,

7    rather than the Guide, controls.  Secondly, the government argues

8    that, you know, the union agreed to the 2017 policies, so there

9    can be no harm, but I want to be very clear here.  NAIJ did not

10   agree to the 2017 policy.  While it tried to negotiate after the

11   policy was issued to mitigate its problems, these negotiations

12   focused on the policy's implementation, not the policy itself.

13   And then this year the agency made the policy even more

14   restrictive.  So, in this lawsuit, what NAIJ objects to is,

15   again, the policy's very existence; not any specific issue

16   related to its implementation.  And for the reasons -- as I

17   mentioned before, there's no question that they suffered

18   irreparable harm from the policy's prohibition on a broad swath

19   of their personal capacity speech and also the onerous

20   pre-approval process.  There's also no delay, substantial delay

21   in bringing this challenge here.  You know, the 2020 policy made

22   a significant revision to the agency's pre-existing policy on

23   speaking engagements, and the union has filed suit many months

24   after that significant change in policy.  There's no delay here,

25   and, even if there were, there are numerous courts that have held

1   that the concerns over delay are overcome when there is a

2   significant infringement of First Amendment rights, and here

3   there is that infringement.

4        The last point I wanted to address was redressability.

5   The government argues that the union's injuries are not

6   redressable because, even if the Court were to issue a

7   preliminary injunction against the 2017 and 2020 policies, that

8   the pre-approval requirements in the Ethics Guide would still be

9   in place, but here the injuries are attributable solely to the

10  policies for the reasons that I mentioned; that is, that here the

11  pre-existing pre-approval requirement in the Guide has been

12  superseded.

13       But it's also well-settled that to establish

14  redressability, you don't need to show a favorable decision would

15  relieve every injury, and here the policy caused several injuries

16  independent of the Guide.

17       As an initial matter, the policy, unlike the Guide,

18  imposes this outright prohibition on judges who speak publicly in

19  their personal capacities about immigration and EOIR-related

20  topics, and it also enacts a far more onerous pre-approval

21  process.  So here, under the policy, judges have to submit any

22  speaking engagement and any contact with the press, whereas the

23  Guide's requirement only requires submission of written works and

24  speeches, and here the process involves four layers of review,

25  not merely the supervisory approval that was required under the

1   guide.  So, there are several injuries independent of -- I'm

2   sorry.  There are several injuries that the policies impose

3   independent of the Guide, and for those reasons NAIJ has

4   established redressability here.

5        THE COURT:  All right.  Well, thank you, Ms. Krishnan, and

6   thank you, Mr. Hancock, for the arguments.  Both of you responded

7   to the questions that I have, and I appreciate very much the

8   briefing that was done.  It was very thorough.  And we've, as

9   I've said, we've been looking at it, and we will continue to look

10  at it.  We'll try and get you something out next week.  I don't

11  promise it, but I think we'll be able to do that.  And, you know,

12  it is a significant issue and one that I think the immigration

13  judges have properly brought before the Court, their concerns,

14  and I'm, you know, I'm not involved in the bargaining power

15  between the EOIR and the NAIJ, and certainly there has been a

16  history of negotiations, and regardless of how this lawsuit turns

17  out, I would hope that those conversations, whether under the CBA

18  or under other provisions in existence, that the parties will

19  continue to address this very important issue moving forward and

20  in a more informal context, if necessary.  But we will get you

21  out a decision as soon as we can and, again, I appreciate the

22  arguments of counsel today, and I hope you all have a good

23  weekend and stay safe.  Thank you, all.

24        (Proceedings adjourned at 11:00 a.m.)

25

1              **C E R T I F I C A T E**

2

3                  I, Scott L. Wallace, RDR-CRR, certify that
         the foregoing is a correct transcript from the record of
         proceedings in the above-entitled matter.

4

5           /s/ Scott L. Wallace                8/14/20
            ----------------------------        ----------------
6           **Scott L. Wallace, RDR, CRR            Date**
              **Official Court Reporter**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25