**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION OF IMMIGRATION JUDGES, affiliated with the International Federation of Professional and Technical Engineers, | |
| Plaintiff, | Civil Action No. 20-cv-731 |
| v. | |
| DAVID L. NEAL, in his official capacity as Director of the Executive Office for Immigration Review, | |
| Defendant. | |

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**<u>Introduction</u>**

1.      This lawsuit challenges a policy of the Executive Office for Immigration Review ("EOIR") that imposes an unconstitutional prior restraint on immigration judges who wish to speak or write publicly in their personal capacities. The policy applies regardless of what immigration judges plan to speak about, their intended audience, or the forum in which they wish to share their views. Judges who violate the policy face a range of disciplinary sanctions, including reprimand, suspension, and even removal from the federal service.

2.      For years, EOIR permitted immigration judges to speak in their personal capacities on issues relating to immigration, so long as they provided a disclaimer that they were not speaking on behalf of the agency. Judges often spoke at schools, universities, and bar associations about the immigration courts and their function within them. Their efforts educated the public about the immigration courts and made the immigration system more transparent.

3.      In recent years, however, the agency has taken steps that severely limit the ability of immigration judges to speak publicly in their personal capacities. In 2017, EOIR issued a policy that established an onerous preapproval scheme for judges who wished to speak publicly in their personal capacities. In 2020, EOIR replaced this policy with a still more restrictive one that categorically prohibited judges from speaking publicly in their personal capacities about immigration law or policy, or about the agency that employs them. On all other topics, the policy required them to obtain the agency's prior approval. In 2021, during the pendency of this litigation, the agency again revisited its policy, but left its key restrictions intact. Under this new policy, which remains in force today (the "2021 Policy"), immigration judges remain banned from speaking as private citizens about immigration or the agency. On a broad range of other topics, they must continue to seek agency preapproval.

4.      EOIR's attempts to silence immigration judges come at a time of intense scrutiny of the nation's immigration system. Both President Trump and President Biden made immigration a central issue of their presidential campaigns, and their administrations have made sweeping changes to the immigration court system. During the Trump administration, for example, the Justice Department instituted case completion quotas for immigration judges, restricted the ability of immigration judges to close cases administratively or grant continuances, and reassigned judges from their home dockets to prioritize the disposition of cases involving migrants who apply for asylum from Mexico. The Biden administration has reversed many of these changes, while also launching significant new efforts to reform the immigration system. For example, in May 2022, the Biden administration began using an overhauled screening system for migrants seeking asylum at the southern border in an effort to speed up processing and alleviate backlogs in the immigration court system. There is significant public interest in understanding these reforms, and their effects

2

on the independence of immigration judges and the process afforded to migrants who appear before them. Immigration judges are uniquely positioned to satisfy this interest, but the 2021 Policy prevents them from doing so.

5.      The 2021 Policy imposes a prior restraint in violation of the First Amendment. As the Supreme Court has repeatedly held, people do not surrender their free-speech rights when they accept government employment. They retain their rights, as citizens, to speak on matters of public importance, and the government can silence them only if it can show that its interest in doing so outweighs the employees' interests in speaking and the public's interest in hearing what they have to say.

6.      The government cannot satisfy this test here. The interests of immigration judges in engaging in the speech restrained by the 2021 Policy is substantial, as is the public's interest in hearing it. There is an ongoing national debate about the wisdom and fairness of recent changes to immigration laws and policies and about the effect of those changes on the immigration court system. Immigration judges have unique insights to contribute to this discussion. While EOIR has a legitimate interest in promoting the efficiency of the services it performs through its employees, the 2021 Policy is not appropriately tailored to that interest. It imposes a sweeping prohibition on personal-capacity speech about immigration or the agency itself, as well as an onerous preapproval process on other personal-capacity speech. These restrictions apply even where the speech in question could not reasonably be expected to disrupt EOIR's operations. Moreover, the agency's preapproval requirement lacks the procedural safeguards generally required of prior restraints in the employee speech context. For example, it does not include criteria that would appropriately cabin the discretion of EOIR officials or a definite time limit for decision.

7.      NAIJ is a non-partisan, non-profit, voluntary association of immigration judges. It brings this challenge on behalf of its members, who are injured by the 2021 Policy. NAIJ respectfully requests that the Court declare that the 2021 Policy is unlawful and enjoin the government from enforcing it. Unless the Policy is enjoined, it will continue to prevent immigration judges from speaking publicly in their personal capacities about matters of immense public concern.

### Jurisdiction and Venue

8.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and the U.S. Constitution.

9.      This Court has authority to issue declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and this Court's inherent equitable jurisdiction. The Court also has authority to award costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (e)(1). A substantial part of the events giving rise to this claim occurred in this district, and the Defendant is an officer of the United States sued in his official capacity.

### Parties

11.     Plaintiff NAIJ is a voluntary association of United States immigration judges, formed to promote the independence, dignity, professionalism, and efficiency of the U.S. immigration courts. NAIJ was founded as a voluntary association of immigration judges in 1971 and, in 1979, it was designated as the collective bargaining representative for all non-supervisory immigration judges. In 2019, the Department of Justice filed a petition with the Federal Labor Relations Authority ("FLRA") to decertify NAIJ, leading to an FLRA decision determining that immigration judges are "management officials" who must be excluded from NAIJ's bargaining

unit. NAIJ's Certification of Representative was formally revoked on April 15, 2022, however, it remains a voluntary association of immigration judges and continues to have hundreds of dues-paying members, including seven officers. NAIJ also continues to be affiliated with the International Federation of Professional and Technical Engineers.

12.     Defendant David L. Neal is the Director of EOIR. EOIR is an agency of the federal government within the Department of Justice and is located in Falls Church, Virginia. Defendant Neal has authority over all EOIR policies and practices, including the policy challenged here. Plaintiff sues him in his official capacity only.

<u>Facts</u>

**I.      Immigration Judges and the Immigration Court System**

13.     Immigration judges are judicial officers who exercise the authority of the U.S. Attorney General. Their primary responsibility is to serve as neutral and impartial arbiters in the immigration court system. They are also active members of the legal and civic communities, and have for many years contributed to public understanding of immigration law and policy through speaking engagements, including at the invitation of bar associations, schools, universities, and other institutions.

14.     As a former president of NAIJ testified before the Senate Judiciary Committee in 2018, immigration judges play an important role in educating the public about the immigration court system. When immigration judges speak to their communities, they "help the community better understand [the] Immigration Courts and their function in the community, helping to demystify the system and bring transparency." This, in turn, helps "build the understanding and trust needed for the [court] system to function smoothly."

15.     Interest in the immigration court system has grown in recent years, as the Trump and Biden administrations have shaped and reshaped immigration enforcement policies and

priorities. Under the Trump administration, for example, the Justice Department subjected immigration judges to case completion quotas and other performance benchmarks; limited their ability to close cases administratively and grant continuances; gave EOIR's Director the authority to overrule their decisions; issued hiring policies that gave political appointees greater influence in the selection of new judges; and required certain judges to conduct hearings via videoconference at temporary tent facilities along the U.S.–Mexico border as part of the administration's "Remain in Mexico" program. Under the Biden administration, the Justice Department has sought to roll back many of these measures, while also introducing new reform efforts. For example, in May 2022, the administration began implementing an overhauled system for screening migrants seeking asylum at the southern border. According to Attorney General Merrick B. Garland, the new system is intended to "ensure that asylum claims are processed fairly [and] expeditiously," while also "reduc[ing] the burden on our immigration courts."

16.     These changes have received considerable congressional and news attention. For example, the *Associated Press* visited almost a dozen immigration courts in the fall of 2019 and reported "nonstop chaos." Journalists observed that "[f]requent changes in the law and rules for how judges manage their docket make it impossible to know what the future holds when immigrants finally have their day in court." In January 2020, the House Subcommittee on Immigration and Citizenship held a public hearing on the state of judicial independence and due process in the immigration courts, receiving extensive testimony of a system in crisis. More than two years later, a story published in the *Guardian* reported that the dysfunction continues, with immigration courts "struggling to function at the most basic level," and judges "overwhelmed by a growing backlog of more than 1.6 million cases." Congress continues to consider reforms to this day, with several House members having introduced H.R. 6577, a bill that would move the

immigration court system from the Department of Justice in an effort to make the courts more independent.

## II.     History of EOIR's Policies on Public Speaking and Writing

17.     Prior to 2017, immigration judges routinely spoke at local and national conferences, guest lectured at universities and law schools, and participated in immigration-law trainings—all in their personal capacities. While approval was required, immigration judges routinely received that approval. Judges would submit a request to their supervising Assistant Chief Immigration Judge ("supervisor"). If the supervisor approved the request, they would forward it to EOIR's Ethics office, which would then offer ethics guidance. Judges were generally permitted to use their official titles to identify themselves in connection with their speaking or writing, so long as they also included a disclaimer stating that the views presented were their own and not those of EOIR. EOIR described this kind of speech as "personal capacity with use of title and disclaimer" or "PTD." This process was memorialized in the 2011 Ethics and Professionalism Guide for Immigration Judges, and it remained in place until EOIR issued a new policy in 2017.

18.     Starting in 2017, EOIR issued a series of policies strictly limiting the ability of judges to engage in personal-capacity speech, with or without a disclaimer. Under EOIR's current policy, immigration judges are categorically banned from speaking publicly in their personal capacities about immigration or EOIR, and must go through an onerous preapproval process before speaking publicly in their personal capacities on a broad range of other topics.

### A.     The 2017 Policy

19.     On September 1, 2017, former EOIR Director James R. McHenry III issued a memorandum titled "Speaking Engagement Policy for EOIR Employees" (the "2017 Policy"), which required all immigration judges who wished to speak at an "event" to submit a request to

their supervisor.[1] Subsequent communications from the agency confirmed that the policy also applied to contacts with the press.

20.    Under the 2017 Policy, supervisors were charged with deciding whether a speaking engagement would be undertaken in a judge's "personal" or "official" capacity (as defined by the policy), and whether to approve the request. Immigration judges who wished to speak on "immigration-related topics" or whose requests were reclassified as "official capacity" were then required to seek a second level of approval from the centralized speaking engagement team (the "SET").

21.    The 2017 Policy did not specify any criteria for EOIR officials to consider in determining whether to approve personal-capacity speaking requests. Nor did the policy require them to make decisions within any particular time frame.

22.    After the 2017 Policy was issued, NAIJ initiated collective bargaining over the policy's implementation. The parties' negotiations yielded a two-page Memorandum of Understanding (the "2018 MOU"), which set out certain procedures relating to the application of the 2017 Policy to immigration judges. Because NAIJ has been formally decertified, these procedures are no longer in effect.

    **B.    The 2020 Policy**

23.    On January 17, 2020, Director McHenry issued a memorandum titled "Submission and Processing of Requests for Speaking Engagements" (the "2020 Policy").[2] Although the 2020 Policy purported to "reissu[e]" without "substantively alter[ing]" the 2017 Policy, it was significantly more restrictive than its predecessor in several important ways.

---

[1] A true and correct copy of the 2017 Policy is attached hereto as Attachment 1.

[2] A true and correct copy of the 2020 Policy is attached hereto as Attachment 2.

24.     First, the 2020 Policy extended to all "written pieces intended for publication," not only to public speaking and press contacts. Second, the 2020 Policy categorically prohibited immigration judges from publicly speaking in their personal capacities about immigration or EOIR. It did so by deeming "official" any speech relating to "immigration law or policy issues, the employee's official EOIR duties or position, or any agency programs and policies." Third, the 2020 Policy instituted additional layers of review, creating further opportunities for delay. Under the 2020 Policy, immigration judges were required to submit all speaking requests—regardless of speaking capacity or content—to four levels of review: by their supervisor, by the SET, by the Ethics Program, and by their supervisor a second time for final decision. In cases involving speeches, written pieces, or other prepared materials, the supervisor could condition approval on making certain changes.

25.     The 2020 Policy also shared many of the 2017 Policy's defects. It applied to *all* speaking engagements in an immigration judge's personal capacity; it did not include narrow or objective criteria for deciding whether to approve personal-capacity speaking requests; and it did not impose any firm deadline for decision.

### C.     The 2021 Policy

26.     On October 12, 2021, EOIR Director David L. Neal issued a new speaking engagement policy (the "2021 Policy"),[3] which canceled the 2020 Policy. The 2021 Policy was issued after EOIR sought a stay of NAIJ's appeal in this case, to allow new agency leadership an opportunity to consider revisiting the policy. The policy, however, retains the central flaws of its predecessor.

---

[3] A true and correct copy of the 2021 Policy is attached hereto as Attachment 3.

27.     First, the 2021 Policy categorically prohibits immigration judges from speaking about immigration or EOIR in their personal capacities by deeming "official capacity" all speech that discusses "agency policies, programs, or a subject matter that directly relates to [immigration judges'] official duties." An attachment to the 2021 Policy confirms that, in the agency's view, the entire subject matter of immigration "directly relates" to an immigration judge's duties and thus may not be discussed publicly by immigration judges in their personal capacities.

28.     Second, the 2021 Policy, like the 2020 Policy, subjects broad categories of personal-capacity speech unrelated to immigration or EOIR to a burdensome prior review scheme. Though the policy purportedly eliminates the preapproval requirement for personal-capacity speech "unrelated to [an immigration judge's] official duties," it creates three exceptions that effectively swallow this new rule.

   a. If a speaking engagement occurs during working hours, the judge must submit a leave request, and the supervisor is then entitled to "inquire how [the judge] intends to use the time," and must "approve[]" not only the leave request, but also the "engagement" itself.

   b. Additionally, "whether or not [a judge] opted to seek supervisory approval" for a proposed speaking engagement in the first instance, "if the circumstances surrounding the [engagement] change"—as the details of planned engagements often do—the judge must "convey such changes to the supervisor to consider the advisability of the [judge]'s continued participation."

   c. Finally, a supervisor may control the content of a judge's proposed speech whenever it is possible that a planned engagement "may result in the perception that the engagement relates to the [judge]'s official duties or employment with EOIR." The policy provides that where such "potential" exists, a judge should "discuss the engagement with their supervisor, who will assist in determining if approval is required." Regardless of whether approval is required, however, the supervisor may "provide direction to the [judge] on the appropriateness of material to be shared and on the substance of information conveyed during the engagement to avoid the perception that the employee is speaking in an official capacity or with EOIR's imprimatur."

29.     Requests submitted for preapproval must undergo multiple layers of review by EOIR officials. A judge's request to speak in their personal capacity will be reviewed by their

10

supervisor in the first instance. If the supervisor determines that the request relates to the judge's official duties, the supervisor must submit the request to the SET for guidance—"regardless of the [judge's] proposed capacity." The supervisor may also seek the SET's guidance in determining whether an employee who wishes to speak in a personal capacity should, instead, be directed to speak in an official capacity. In addition, the Ethics program will "receive and review" all supervisor-approved requests that relate to an employee's official duties, regardless of proposed capacity. Although the Ethics program "does not approve or deny requests to speak, it offers guidance to avoid speakers' ethical dilemmas." After the supervisor completes "the final review" of a judge's request, "including consideration of any guidance received from the SET," the supervisor will make a final determination concerning approval or denial of the request and will inform the judge of their decision. The supervisor may also advise the judge of any guidance offered by the SET and will provide any guidance offered by the Ethics program.

30.     This preapproval process does not include adequate safeguards. The process does not include narrow or objective criteria for deciding whether to approve personal-capacity requests. The Policy does not impose any limits on the discretion of supervisors to grant or deny requests. Nor does the Policy impose any limits on the discretion of the SET, which is broadly charged with "ensuring compliance with both the law and agency policy while also promoting consistency in all of EOIR's communications." Finally, the Policy does not impose any firm deadline for decision.

### III.     Harms to Immigration Judges and the Public

31.     Recent changes to immigration law and policy, the state of the immigration court system, and the role of immigration judges are all of immense public interest. After the 2017 Policy went into effect, however, immigration judges were routinely denied permission to speak publicly in their personal capacities about immigration and many were chilled from even seeking

permission to do so. Then, in 2020, EOIR categorically banned judges from speaking publicly in their personal capacities about immigration or the agency. This ban remains in place under the 2021 Policy, depriving the public of judges' expertise and insights on matters of urgent public interest.

### A. Immigration Judges Have Been Prevented from Speaking about Matters of Public Concern in their Personal Capacities

32.     As explained above, immigration judges often spoke at local and national conferences, guest lectured at universities and law schools, and participated in immigration-law trainings before 2017. While they were required to seek supervisory approval, they generally got it. After the 2017 Policy went into effect, however, immigration judges who wished to speak about immigration were required to seek two levels of approval rather than one, and those who sought approval often did not get it or else failed to receive a timely decision.

33.     Requests relating to speaking engagements that immigration judges had undertaken for years in their personal capacities were suddenly denied. For example, in March 2018, an immigration judge submitted a request to speak at the immigration law clinic at his alma mater, something he had done annually, with EOIR's approval, since the clinic's inception. In an email forwarding the request to the speaking engagement team, the judge's supervisor described him as "an outstanding candidate to conduct the speaking engagement." The team denied the immigration judge's request, eventually explaining that "[b]ecause your topic concerned immigration court matters, and you were invited to speak because of your position as an immigration judge, personal capacity is not allowable." According to them, speaking engagements related to immigration were official capacity and had to be handled by EOIR "management officials" to ensure consistency in the agency's messaging: "[I]mmigration is always a topic of great interest and debate, and many employees are understandably unprepared to present the Department's official view when

12

presented with thorny questions and topics." By contrast, "[m]anagement officials, as part of their official duties, are routinely briefed on ongoing litigation and the Department's position on sensitive topics."

34.     EOIR repeatedly confirmed that position in rejecting requests by immigration judges to speak in their personal capacities about immigration. For example, in April 2018, the speaking engagement team denied an immigration judge's request to speak to a Harvard Law School class "due to the nature of the topic (asylum claims involving children)."

35.     That same month, a different immigration judge submitted a request to participate in her personal capacity on a Practicing Law Institute panel on immigration and recent developments in asylum law. Months later, and only three days before the panel was scheduled to take place, the speaking engagement team rejected her request because "the nature of the event calls for official capacity and supervisory immigration judges should represent EOIR at events such as this one." EOIR rejected the request even though the judge had participated in her personal capacity on the same panel the previous year.

36.     In September 2019, another immigration judge sought approval to speak in her personal capacity to an immigration class at her former law school via Skype. Her supervisor approved the request. One day before she was scheduled to attend class, however, the speaking engagement team denied the request, explaining that the topic was "too closely related to [the judge's] official duties to permit participation in her personal capacity." The team also explained that appearing in an official capacity was not appropriate because it was not clear "[the judge's] participation would advance [EOIR]'s interests."

37.     In other cases, EOIR delayed its decision or failed to provide one, effectively denying the request to speak. For example, in February 2019, an immigration judge asked for

permission to speak in a personal capacity to a seventh-grade class about immigration and asylum law. Although he received supervisory approval, he did not receive a response from the speaking engagement team for a full month. Finally, two days before the event, the judge's supervisor told him informally that the team was planning to deny the request. The judge canceled the visit, but the speaking engagement team never sent a formal denial or explained its decision. The judge followed up in April, and again in May, explaining that he was "still hopeful to do the talk, even if it means changing my presentation to address whatever concerns exist." The judge never received a response.

38.     Although EOIR sometimes granted approval to speak in a personal capacity about immigration-related issues, its approach was seemingly inconsistent and arbitrary. For example, EOIR approved a May 2018 request from an immigration judge who wished to speak about immigration and removal proceedings before the Missouri Catholic Conference, but in February 2019 it denied a request to speak about immigration at a synagogue. EOIR approved an October 2018 request to participate in a moot court at Tulane Law School, but denied a September 2018 request to preside over a mock removal hearing at Columbia Law School.

39.     For those reasons, even before the 2020 Policy and the 2021 Policy were enacted, many immigration judges came to believe that it was futile to submit requests to speak publicly about immigration in their personal capacities. Under the 2020 Policy, immigration judges were simply prohibited from speaking publicly in their personal capacities about issues related to immigration law or policy or EOIR's policies and programs. That prohibition continues under the 2021 Policy. Accordingly, the only avenue for judges to speak publicly about immigration or EOIR is to do so in their official capacities, but those who speak in their official capacities speak on

14

behalf of the agency—not on behalf of themselves—and are constrained to recite the agency's talking points.

40.     EOIR has warned judges that failure to comply with its speaking-engagement policies may result in disciplinary action, including reprimand, suspension, and even removal from the federal service. Judges are informed that they must seek approval before speaking to any group, in any forum, on any topic. Further, EOIR tracks compliance with this requirement. For example, one judge was emailed by an EOIR official after the official found a conference schedule that announced the judge's participation in a panel; the official told the judge that she was required to submit a request for preapproval.

### B.     The Public Has Been Denied the Opportunity to Hear from Immigration Judges Who Would Have Otherwise Spoken in their Personal Capacities

41.     There is an important public debate about recent changes to immigration law and policy and their effects on immigration courts and the migrants who appear before them. Many immigration judges wish to contribute to this debate, but the public has been deprived of their unique insights. Professional associations, law school clinics, and other organizations that used to routinely host immigration judges at their events are generally no longer able to do so. Many recognize the futility of inviting active judges. Others have stopped inviting immigration judges to speak altogether. The effect is to deny the public access to insights about how recent changes to immigration law and policy are working in practice, and to create the perception that EOIR employees uniformly support the administration's policies.

42.     In October 2019, four clinical legal professors wrote an article in *Slate* describing the impact of the 2017 Policy on their ability to get immigration judges to speak to their students. The professors—Laila L. Hlass of Tulane Law School, Elora Mukherjee of Columbia Law School, Carrie L. Rosenbaum of the Golden Gate University School of Law, and Maureen Sweeney of the

15

University of Maryland Francis King Carey School of Law—noted that in past years judges had routinely visited their classes to speak about immigration law and policy, but that recently things had changed:

> [A]lmost all have declined [invitations]. They've told us they can't speak with our classes even on their days off, even in their personal capacities, without prior clearance and approval from high-level supervisors—approval that is increasingly difficult to obtain.

43.     Advocacy and professional organizations that once hosted immigration judges at events have also been affected. For example, organizations like the Federal Bar Association, the American Immigration Lawyers Association ("AILA"), the Practicing Law Institute, and Human Rights First have reported no longer being able to rely on the expertise of immigration judges at their events or trainings. Some of these organizations have simply given up on inviting active immigration judges, and have instead turned to retired ones.

44.     AILA and its thirty-nine local chapters routinely hold a range of events, including conferences and continuing legal education classes. Many of these events are open to the public. In past years, immigration judges frequently spoke at these events. Following the issuance of the 2017 Policy, however, immigration judges generally declined requests to attend. Many chapters simply stopped extending invitations.

45.     The experience of AILA's South Florida chapter is illustrative. Prior to 2017, immigration judges met with members of the community at chapter events at least four or five times a year—judges sat on panels at the chapter's annual conference, participated in the chapter's monthly CLE training events for its members, and joined pro bono training programs for corporate attorneys. But in 2017, immigration judges began rejecting invitations or else stopped responding to them altogether.

46.     In an effort to fill the void left by active immigration judges, AILA and some of its local chapters began relying on retired immigration judges to participate in educational conferences and other events. In April 2020, for example, AILA organized an online panel discussion on recent developments in immigration litigation. The staff member responsible for the event had hoped to invite active immigration judges but, believing that extending an invitation would be futile, she invited only retired judges.

47.     News reports about issues relating to immigration courts similarly include the perspectives of retired immigration judges or immigration judges representing the official positions of EOIR, while omitting the personal views of active immigration judges. Even in the midst of the COVID-19 crisis, immigration judges cannot discuss their personal experiences. Some judges have expressed their views to NAIJ officers, but have declined to speak publicly for fear of retaliation.

### First Cause of Action

48.     The 2021 Policy violates the First Amendment because it imposes a system of prior restraint on the speech of immigration judges, because it is not appropriately tailored to any legitimate government interest, and because it fails to include adequate procedural safeguards.

### Second Cause of Action

49.     The 2021 Policy is void for vagueness under the First and Fifth Amendments because it invites arbitrary and discriminatory enforcement, and because it fails to give immigration judges fair notice of what standards will be applied in reviewing their requests for preapproval.

### Prayer for Relief

Plaintiff respectfully requests that this Court:

1.      Declare that the 2021 Policy violates the First and Fifth Amendments to the Constitution;

2.      Enjoin Defendant and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from continuing to enforce the 2021 Policy;

3.      Award Plaintiff its reasonable costs and attorneys' fees in this action; and

4.      Grant Plaintiff such other relief as this Court may deem just and proper.

Dated: August 18, 2022                    Respectfully submitted,

 /s/ *Victor M. Glasberg*                       /s/ *Ramya Krishnan*
Victor M. Glasberg (VA 16184)           Ramya Krishnan*
Victor M. Glasberg & Associates         Alyssa Morones**
121 S. Columbus Street                  Alex Abdo*
Alexandria, VA 22314                    Knight First Amendment Institute
T: (703) 684-1100                         at Columbia University
F: (703) 684-1104                       475 Riverside Drive, Suite 302
VMG@robinhoodesq.com                    New York, NY 10115
                                        T: (646) 745-8500
                                        F: (646) 661-3561
                                        ramya.krishnan@knightcolumbia.org

*pro hac vice* application pending
**pro hac vice* application forthcoming   *Counsel for the Plaintiff*

<u>Certificate of Service</u>

I, Victor M. Glasberg, hereby certify that on this 18th day of August 2022, I electronically filed the foregoing Amended Complaint for Declaratory and Injunctive Relief with the clerk of the court.

<div style="margin-left: 50%;">

<u>//s// Victor M. Glasberg</u>

Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com

Counsel for Plaintiff

</div>