## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

NATIONAL ASSOCIATION OF
IMMIGRATION JUDGES, affiliated with the
International Federation of Professional and
Technical Engineers,

       Plaintiff,

  v.

DAVID L. NEAL, in his official capacity as
Director of the Executive Office for
Immigration Review,

       Defendant.

Civil Action No. 20-cv-731 (LMB/JFA)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

Victor M. Glasberg (VA 16184)
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
T: (703) 684-1100
F: (703) 684-1104
vmg@robinhoodesq.com

Ramya Krishnan, *Pro Hac Vice*
Alex Abdo, *Pro Hac Vice*
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
T: (646) 745-8500
F: (646) 661-3361
ramya.krishnan@knightcolumbia.org

*Counsel for Plaintiff*

**Table of Contents**

Table of Authorities ........................................................................................................ ii

Introduction .................................................................................................................... 1

Statement of Facts .......................................................................................................... 3

       A.      EOIR's Speaking Engagement Process Prior to 2021 ..................................... 3

       B.      The 2021 Policy .............................................................................................. 5

       C.      This Action ...................................................................................................... 6

Argument ........................................................................................................................ 7

   I.     The Policy violates the Constitution. ................................................................... 7

       A.      The Policy violates the First Amendment........................................................ 7

           1.      Because the Policy is a prior restraint on the protected speech of public employees, it is subject to exacting scrutiny under *NTEU*. ............ 8

           2.      The Policy does not survive *NTEU*'s exacting scrutiny. ......................... 11

       B.      The Policy is void for vagueness under the Fifth Amendment...................... 16

  II.    NAIJ has associational standing. ....................................................................... 18

 III.   The Civil Service Reform Act does not impliedly divest this Court of jurisdiction over NAIJ's claims. ........................................................................ 19

       A.      NAIJ's claims would not receive meaningful judicial review through the CSRA. ..................................................................................................... 20

           1.      The CSRA does not apply to NAIJ's claims because NAIJ is challenging an employee speech policy—not a covered employment action................................................................................. 21

           2.      Even if NAIJ's claims fell within the CSRA, NAIJ still could not obtain meaningful judicial review through the statute.............................. 26

       B.      NAIJ's claims are wholly collateral to the CSRA because they do not seek to reverse a covered employment action................................................. 28

       C.      NAIJ's claims are beyond the Merit Systems Protection Board's expertise. ....................................................................................................... 29

Conclusion .................................................................................................................... 30

## Table of Authorities

**Cases**

*Able v. United States*, 88 F.3d 1280 (2d Cir. 1996) .................................................................... 28

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95 (3d Cir. 2022) ............................................................................................................................. 13

*Bennett v. SEC*, 844 F.3d 174 (4th Cir. 2016) ................................................................ 20, 27, 28

*Bing v. Brivo Sys., LLC*, 959 F.3d 605 (4th Cir. 2020) ............................................................... 10

*Borzilleri v. Mosby*, 874 F.3d 187 (4th Cir. 2017) ............................................................... 14, 15

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) ......................................... 18

*Conley v. Town of Elkton*, 381 F. Supp. 2d 514 (W.D. Va. 2005) .............................................. 14

*Cooksey v. Futrell*, 721 F.3d 226 (4th Cir. 2013) ....................................................................... 19

*Cornelio v. Connecticut*, 32 F.4th 160 (2d Cir. 2022) ............................................................... 13

*Crue v. Aiken*, 370 F.3d 668 (7th Cir. 2004) ................................................................................. 9

*Cuviello v. City of Vallejo*, 944 F.3d 816 (9th Cir. 2019) .......................................................... 27

*Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) .......................................................... 20, 21, 29, 30

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) .................................................. 16, 17

*Firenze v. Nat'l Lab. Rels. Bd.*, No. 12-CV-10880, 2013 WL 639151 (D. Mass. Jan. 10, 2013) ............................................................................................................................. 23

*Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005) ....................................................................... 29

*Fort Stewart Schs. v. FLRA*, 495 U.S. 641 (1990) ..................................................................... 25

*Free Enter. v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) ............................................ 27

*Freedman v. Maryland*, 380 U.S. 51 (1965) ............................................................................... 18

*Guffey v. Mauskopf*, 45 F.4th 442 (D.C. Cir. 2022) ....................................................... 12, 13, 14

*Hall v. Clinton*, 235 F.3d 202 (4th Cir. 2000) ........................................................................... 22

*Hall v. Ford*, 856 F.2d 255 (D.C. Cir. 1988) ............................................................................. 15

*Harman v. City of New York*, 140 F.3d 111 (2d Cir. 1998) ........................................................ 16

*Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 138 S. Ct. 2448 (2018) ............................................................................................................ 8

*Jenkins v. Medford*, 119 F.3d 1156 (4th Cir. 1997) ....................................... 15

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ....................... 9, 10

*Lane v. Franks*, 573 U.S. 228 (2014) ........................................ 7, 9, 12, 25

*Liverman v. City of Petersburg*, 844 F.3d 400 (4th Cir. 2016) ............ 8, 9, 13, 14

*Manivannan v. U.S. Dep't of Energy*, 42 F.4th 163 (3d. Cir. 2022) ................ 21, 25

*McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998) .................................... 14

*McVey v. Va. Highlands Airport Comm'n*, 44 F. App'x 630 (4th Cir. 2002) ............ 15

*Millbrook v. United States*, 569 U.S. 50 (2013) .................................. 21

*Moonin v. Tice*, 868 F.3d 853 (9th Cir. 2017) ............................... 9, 15, 16

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ........................ 18

*NAIJ v. McHenry*, 477 F. Supp. 3d 466 (E.D. Va. 2020) ......................... 6, 24

*NAIJ v. Neal*, No. 20-1868, 2022 WL 2045339 (4th Cir. June 7, 2022) ............ 7, 24

*NAIJ v. Neal*, No. 20-1868, 2022 WL 997223 (4th Cir. Apr. 4, 2022) ............... 6

*Nat'l Taxpayers Union v. Soc. Sec. Admin.*, 376 F.3d 239 (4th Cir. 2004) ............ 28

*Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ............................. 27

*Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445 (D.C. Cir. 2009) ............ 29

*Orsay v. DOJ*, 289 F.3d 1125 (9th Cir. 2002) .................................. 21

*Pinar v. Dole*, 747 F.2d 899 (4th Cir. 1984) .................................. 26

*Ramirez v. Customs and Border Prot.*, 709 F. Supp. 2d 74 (D.D.C. 2010) ........ 24, 25, 27, 28

*Republican Party of Minn, v. White*, 536 U.S. 765 (2002) ....................... 13

*Rydie v. Biden*, No. 21-2359, 2022 WL 1153249 (4th Cir. 2022) ............ 20, 24, 28, 29

*Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995) .............................. 19, 23

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ...................... 19

*Tabaddor v. Holder*, 156 F. Supp. 3d 1076 (C.D. Cal. 2015) ................... 23

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ..................................................... 19, 20

*Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333 (D.D.C. 2020) .............. 23, 24, 25

*U.S. Telecom Ass'n v. FCC*, 825 F.3d 675 (D.C. Cir. 2016) ........................................ 17

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) ................................... passim

*Weaver v. U.S. Info. Agency*, 87 F.3d 1429 (D.C. Cir. 1996) ................................................ passim

*Wernsing v. Thompson*, 423 F.3d 732 (7th Cir. 2005) .................................................. 18

*Wolfe v. Barnhart*, 446 F.3d 1096 (10th Cir. 2006) ...................................................... 19

*Yates v. United States*, 574 U.S. 528 (2015) ............................................................... 25

**Statutes**

5 U.S.C. § 1214 ............................................................................................................... 26, 27

5 U.S.C. § 2301 ............................................................................................................... 22

5 U.S.C. § 2302 ............................................................................................................... 22, 25

5 U.S.C. § 7503 ............................................................................................................... 24

5 U.S.C. § 7512 ............................................................................................................... 21, 27

5 U.S.C. § 7513 ............................................................................................................... 24, 26, 27

5 U.S.C. § 7703 ............................................................................................................... 26, 27

8 C.F.R. § 1003.10 (2021) .............................................................................................. 3

8 U.S.C. § 1101 ............................................................................................................... 3

**Other Authorities**

71 F.L.R.A. 1046 (Nov. 2, 2020) ................................................................................. 7, 10, 15

72 F.L.R.A. 622 (Jan. 21, 2022) ..................................................................................... 7

72 F.L.R.A. 733 (Apr. 12, 2022) .................................................................................... 7

Code of Conduct for U.S. Judges Canon 4 (Judicial Conference 2019) ...................... 13

EOIR, *Model Hearing Program*, https://perma.cc/6FNQ-WFA2 ................................. 10

EOIR, *Operating Policies and Procedures Memorandum 08-01: Guidelines for Facilitating Pro Bono Legal Services*, https://perma.cc/YC57-H2RV ................................ 10

Ethics and Professionalism Guide for Immigration Judges § XXVI,
    https://perma.cc/M6LA-JUFZ ............................................................................................ 10

FRCP 12(d) ...................................................................................................................................... 10

WA-RP-19-0067 (Reg. Dir. Wash. Region FLRA July 31, 2020),
    https://perma.cc/79Uv-W2FX, *aff'd in part and rev'd in part* 71 F.L.R.A.
    1046.......................................................................................................................... 10, 15

**Introduction**

This case involves a challenge to a sweeping prior restraint the government has imposed on the nation's immigration judges. Under a policy issued in October 2021, the Executive Office for Immigration Review ("EOIR") categorically prohibits immigration judges from speaking publicly in their personal capacities about immigration law or policy or about EOIR programs and policies. On a broad range of other topics, it requires judges to submit to an onerous preapproval process. At a time of spirited public debate about the nation's immigration policies, the policy imposes a gag order on public servants in a unique position to educate the public about the immigration system and the effect of recent changes to immigration law and policy. This gag order violates the First and Fifth Amendments. The National Association of Immigration Judges ("NAIJ") seeks a declaration that the policy is unlawful and an injunction against EOIR's enforcement of it.

The policy imposes a prior restraint in violation of the First Amendment. The government may sustain a prior restraint on the speech of public employees only if it can show that "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of government." *United States v. Nat'l Treasury Emps. Union* (*NTEU*), 513 U.S. 454, 468 (1995) (cleaned up). The government has failed to carry this burden. The interests of immigration judges in engaging in the speech restrained by the policy—and the interest of the public in hearing that speech—are manifestly substantial. There is an ongoing debate about the wisdom and fairness of recent changes to the country's immigration laws and policies and the effect of those changes on the immigration court system. Immigration judges are uniquely positioned to contribute to this debate, but the policy prevents them from doing so. While EOIR

has a legitimate interest in promoting the efficiency of the services it performs through its employees, this interest cannot justify a *total ban* on personal capacity speech related to immigration or the agency. The government has failed to establish any real threat to the agency's interest arising from the speech judges wish to engage in, let alone any harms that would justify the policy's sweep.

The policy is also unconstitutionally vague under the Fifth Amendment because it invites arbitrary and discriminatory enforcement of the agency's preapproval process. The policy permits EOIR officials to approve or deny personal capacity speaking requests on whatever grounds they wish. It does nothing to cabin officials' discretion or to quell the concern that EOIR will use the preapproval process to suppress speech it does not like.

Recognizing the strength of NAIJ's claims, the government attempts to deflect this Court from reaching the merits. The government's attempts, however, fail to convince. The government argues that NAIJ lacks standing to challenge the policy on behalf of its members, but this is wrong. NAIJ has plausibly alleged that the policy imposes a prior restraint on the speech of its members in two ways: by banning certain personal capacity speech, and by subjecting other such speech to a burdensome prior review scheme. Under the Supreme Court's prior restraint cases, that is sufficient to confer standing. NAIJ need not point to specific members who have flouted the policy or who have sought permission to speak.

The government's argument that the Civil Service Reform Act ("CSRA") impliedly divests this Court of jurisdiction over NAIJ's claims similarly runs headlong into precedent. As the D.C. Circuit explained in *Weaver v. U.S. Information Agency*, 87 F.3d 1429 (D.C. Cir. 1996), although the CSRA channels judicial review of challenges to covered employment actions, it does not withdraw district court jurisdiction over "a simple pre-enforcement attack on a regulation

2

restricting employee speech." *Id.* at 1434. Indeed, under the government's theory, the Supreme Court's seminal case on the free speech rights of public employees—which was filed in district court by two unions and several federal employees—was wrongly decided. *NTEU*, 513 U.S. 454.

The Court should deny Defendant's motion to dismiss.

**Statement of Facts**

**A.      EOIR's Speaking Engagement Process Prior to 2021**

Immigration judges are administrative judges who exercise the authority of the United States Attorney General to adjudicate immigration proceedings. Am. Compl. ¶ 13; *see also* 8 U.S.C. § 1101(b)(4); 8 C.F.R. § 1003.10 (2021). In this role, they preside over immigration hearings and serve as neutral and impartial arbiters. Am. Compl. ¶ 13. Immigration judges undertake this work as employees of EOIR, an agency within the Department of Justice. *Id.* ¶ 12.

Prior to 2017, many immigration judges routinely spoke at local and national conferences, guest lectured at universities and law schools, and participated in immigration-law trainings—all in their personal capacities. *Id.* ¶ 17. While approval was required, immigration judges routinely received that approval. *Id.* Judges would submit a request to their supervising Assistant Chief Immigration Judge ("supervisor"). *Id.* If the supervisor approved the request, they would forward it to EOIR's Ethics Program, which would then offer ethics guidance. *Id.* Judges were generally permitted to use their official titles to identify themselves in connection with their speaking or writing, so long as they also included a disclaimer stating that the views presented were their own and not those of EOIR. *Id.* This process was memorialized in the 2011 Ethics and Professionalism Guide for Immigration Judges ("Ethics Guide"). *Id.*

Starting in 2017, however, EOIR issued a series of policies strictly limiting the ability of judges to engage in personal capacity speech, with or without a disclaimer. *Id.* ¶ 18. In 2017, the

3

agency issued a policy that established a new and more onerous preapproval process for public speaking requests ("2017 Policy"). *Id.* ¶ 19. Under this policy, immigration judges were required to seek preapproval any time they wished to speak at an "event." *Id.* Supervisors were charged with deciding whether a speaking engagement would be undertaken in a judge's "personal" or "official" capacity (as defined by the policy), and whether to approve the request. *Id.* ¶ 20. Immigration judges who wished to speak on "immigration-related topics" or whose requests were reclassified as "official capacity" were then required to seek a second level of approval from the centralized speaking engagement team (the "SET"). *Id.* The 2017 Policy did not specify any criteria for EOIR officials to consider in determining whether to approve personal capacity speaking requests, or require officials to make decisions within any particular time frame. *Id.* ¶ 21.

In 2020, the agency replaced this policy with a still more restrictive one that applied whenever an immigration judge wished to publicly speak or write ("2020 Policy"). *Id.* ¶ 24. Most significantly, the policy categorically prohibited judges from speaking publicly in their personal capacities about immigration or EOIR. *Id.* It did so by deeming "official" any speech relating to "immigration law or policy issues, the employee's official EOIR duties or position, or any agency programs and policies." *Id.* On all other topics, the policy continued to require judges to seek preapproval, *id.*, but now judges had to submit to four layers of review: by their supervisor, by the SET, by the Ethics Program, and by their supervisor for a second time for final review, *id.* Like the 2017 Policy, the 2020 Policy did not cabin the discretion of EOIR officials to grant or deny personal capacity speaking requests, and it did not impose any firm deadline for decision. *Id.* ¶ 25.

**B.     The 2021 Policy**

On October 12, 2021, EOIR Director David L. Neal issued a new speaking engagement policy, which retains the central flaws of its predecessor. *Id.* ¶ 26; Attach. to Gov't Br., ECF No. 50-1 ("Policy").

First, the Policy categorically prohibits immigration judges from speaking about immigration or EOIR in their personal capacities by deeming "official capacity" all speech about "agency policies, programs, or a subject matter that directly relates to [immigration judges'] official duties." Am. Compl. ¶ 27. The attached guidance to the Policy confirms that, in the agency's view, the entire subject matter of immigration "directly relates" to an immigration judge's duties and, accordingly, may not be discussed publicly by immigration judges in their personal capacities. *Id.*

Second, the Policy, like its predecessor, subjects broad categories of personal capacity speech unrelated to immigration or EOIR to a burdensome prior review scheme. *Id.* ¶ 28. As explained in detail below, although the Policy purportedly eliminates the preapproval requirement for personal capacity speech "unrelated to [an immigration judge's] official duties," it creates three exceptions that effectively swallow this new rule. *See infra* Part I.A.1.

As under the 2020 Policy, requests submitted for preapproval must undergo multiple layers of review. *Id.* ¶ 29. A judge's request to speak in their personal capacity will be reviewed by their supervisor in the first instance. *Id.* If the supervisor determines that the request relates to the judge's official duties, the supervisor must submit the request to SET for guidance regardless of the judge's proposed capacity. *Id.* The Ethics Program will also "receive and review" all requests that relate to a judge's official duties. *Id.* Although Ethics "does not approve or deny requests to speak, it offers guidance to avoid speakers' ethical dilemmas." *Id.* After a supervisor completes "the final

review" of a judge's request, "including consideration of any guidance received from the SET," the supervisor will approve or deny the request and will inform the judge of their decision. *Id.*

This preapproval process does not include any meaningful safeguards. The Policy does not impose limits on the discretion of supervisors to grant or deny requests. *Id.* ¶ 30. Nor does the Policy impose any limits on the discretion of the SET, which is broadly charged with "ensuring compliance with both the law and agency policy while also promoting consistency in all of EOIR's communications." *Id.* Finally, the Policy does not impose any firm deadline for decision. *Id.*

### C.    This Action

NAIJ is a voluntary association of immigration judges formed to promote the independence, dignity, professionalism, and efficiency of the U.S. immigration courts. *Id.* ¶ 11. When NAIJ filed this lawsuit in 2020, it raised First and Fifth Amendment claims against the 2017 and 2020 Policies. It also moved for a preliminary injunction. On August 6, 2020, the district court denied that motion, holding that the Federal Service Labor-Management Relations Statute ("FSLMRS") impliedly divested it of jurisdiction over NAIJ claims. *NAIJ v. McHenry*, 477 F. Supp. 3d 466, 471–72 (E.D. Va. 2020). The court reached this conclusion because NAIJ was, at that time, a certified bargaining representative that could raise bargaining disputes through the administrative process provided by the FSLMRS. *Id.*

NAIJ appealed the district court's decision to the Fourth Circuit on August 7, 2020. The appeal was initially stayed to give EOIR's new leadership an opportunity to consider revising the 2020 Policy. This stay resulted in the current Policy. Am. Compl. ¶ 26. On April 4, 2022, the Court issued an unpublished per curiam opinion affirming the district court's judgment and remanding with instructions to dismiss the case without prejudice. *NAIJ v. Neal*, No. 20-1868, 2022 WL 997223, at \*2 (4th Cir. Apr. 4, 2022).

On April 15, 2022, NAIJ was formally decertified after the Federal Labor Relations Authority ("FLRA") declined to reconsider an earlier determination that immigration judges are "management officials" who must be excluded from NAIJ's bargaining unit. Am. Compl. ¶ 11; *see also* 71 F.L.R.A. 1046, 1048 (Nov. 2, 2020), *reconsideration denied*, 72 F.L.R.A. 622 (Jan. 21, 2022), *second reconsideration denied*, 72 F.L.R.A. 733 (Apr. 12, 2022). In response to this development, NAIJ filed a petition for rehearing. The panel granted this petition, vacated its per curiam decision and the district court's denial of NAIJ's preliminary injunction motion, and remanded for further proceedings as appropriate. *NAIJ v. Neal*, No. 20-1868, 2022 WL 2045339, at *1 (4th Cir. June 7, 2022).

On August 18, 2022, NAIJ filed an amended complaint describing the Policy and NAIJ's changed bargaining status. As explained in that document, NAIJ remains a voluntary association of hundreds of dues-paying immigration judges even after its decertification.[1] Am. Compl. ¶ 11.

## Argument

### I.       The Policy violates the Constitution.

#### A.       The Policy violates the First Amendment.

As the Supreme Court held over fifty years ago, "citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 573 U.S. 228, 231 (2014) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Rather, they retain their rights, as citizens, to comment on matters of public concern. *Id.* at 235–36. Under the test set forth in *NTEU*, any government policy that constitutes a prior restraint on this speech must survive "exacting

---

[1] NAIJ has petitioned for re-certification, but that petition has no bearing on these proceedings. Even if successful, NAIJ's petition would not result in its recertification for several months at a minimum. In the meantime, NAIJ's members will remain subject to a prior restraint on their speech as private citizens on matters of immense public concern.

scrutiny." *Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2472 (2018). "The Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571). It must also "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id*. at 475 (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994)).

The government has not satisfied the test imposed by *NTEU* in this case.

### 1.  Because the Policy is a prior restraint on the protected speech of public employees, it is subject to exacting scrutiny under *NTEU*.

*NTEU* applies whenever "a generally applicable statute or regulation (as opposed to a post-hoc disciplinary action) operates as a prior restraint" on personal capacity speech by public employees on matters of public concern. *Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016). The Policy is precisely this sort of prior restraint: it categorically prohibits judges from speaking publicly in their personal capacities about immigration or EOIR, and it requires them to seek agency preapproval before speaking publicly in their personal capacities about a broad range of other topics. The Policy must, therefore, survive *NTEU*'s exacting scrutiny. The government's arguments to the contrary fail to persuade.

First, the government asserts that the Policy "does not forbid any speech," Gov't Br. 16, but this is false. The Policy categorically prohibits immigration judges from speaking publicly about immigration or EOIR in their personal capacities. It does so by deeming "official capacity" all speech that discusses "agency policies, programs, or a subject matter that directly relates to [employees'] official duties." *See* Policy at 2. And an attachment to the Policy makes plain that EOIR considers immigration "a subject matter that directly relates" to an immigration judge's

duties. *See id.* at 7. For example, the attachment designates as "official capacity" participation at "immigration conferences or similar events where the subject is immigration," while designating a commencement speech as "personal capacity" only if the topic is "unrelated to immigration or official duties." *Id.* Likewise, it classifies speech made to "community, religious, youth, or small social groups" as "personal capacity" only if it is "not directly related to immigration law or advocacy."[2] *Id.*

Second, the government argues that speech about immigration or EOIR is *necessarily* official capacity speech because it relates to immigration judges' job duties. Gov't Br. 17. But the Supreme Court has already rejected this argument, explaining that speech may be in an employee's personal capacity even when it "relates to public employment or concerns information learned in the course of public employment." *Lane*, 573 U.S. at 239. Indeed, *Lane* holds that employee speech is unprotected only if it is "ordinarily within the scope of an employee's duties." *Id.* at 240. And the Court recently affirmed the reasoning of *Lane*, holding that an employee spoke in his personal capacity where he "did not speak pursuant to government policy," was "not seeking to convey a government-created message," and was not engaged in any speech his employer "paid him to produce."[3] *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2424 (2022).

---

[2] The government is wrong to suggest that the Policy can qualify as a prior restraint only if NAIJ is able to point to specific "instances in which speaking requests were denied under the . . . Policy." *Cf.* Gov't Br. 17. In evaluating prior restraints, the text of the policy controls. *See, e.g., Moonin v. Tice*, 868 F.3d 853, 861 (9th Cir. 2017). Here, there can be no doubt that the "explicit terms" of the Policy forbid broad categories of speech. *Liverman*, 844 F.3d at 407–08. In any event, courts also analyze other restrictions on employee speech—like the Policy's preapproval process—under *NTEU*. *See, e.g., Crue v. Aiken*, 370 F.3d 668, 679 (7th Cir. 2004).

[3] The government argues that "[t]he 'critical' determination, instead, 'is whether the speech is made primarily in the employee's role as citizen or primarily in his role as employee.'" Gov't Br. 18 (quoting *Urofsky v. Gilmore*, 216 F.3d 401, 407 (4th Cir. 2000)). But *Urofsky* predates *Lane*, and the test it set forth was premised on an assumption that *Lane* rejects: that First Amendment protection of employee speech turns on "the unrelatedness of the speech at issue to the speaker's employment duties." *Urofsky*, 216 F.3d at 407.

The speech at issue in this case is not within the scope of immigration judges' ordinary duties. Many judges wish to educate the public about immigration law and policy by speaking at local and national conferences, guest lecturing at universities and law schools, and contributing to legal trainings. Am. Compl. ¶¶ 17, 32, 41. Some judges wish to be able to address how new or proposed immigration policies affect (or would affect) their ability to do their jobs. *Id.* ¶ 47. These activities are not part of their routine duties, which involve the adjudication of immigration cases. *Id.* ¶ 13; *see also* WA-RP-19-0067, at 5–7 (Reg. Dir. Wash. Region FLRA July 31, 2020), https://perma.cc/79Uv-W2FX, *aff'd in part and rev'd in part* 71 F.L.R.A. 1046 (leaving factual determinations undisturbed). The Policy's overbroad definition of "official capacity" speech does not establish otherwise. *See Kennedy*, 142 S. Ct. at 2424 (rejecting the ability of public employers to "use 'excessively broad job descriptions' to subvert the Constitution's protections" (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006)). To the extent the government contests NAIJ's factual allegations concerning the scope of immigration judges' duties, this is not a proper matter for resolution on a motion to dismiss.[4] *See Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1376 (2021); *see also* FRCP 12(d).

---

[4] In any event, none of the documents the government points to establishes that speech about immigration or EOIR is necessarily "official." *See* Gov't Br. 17–18. The Ethics Guide merely provides that "[w]hen immigration judges are participating in their official capacity as speakers or panel members at a conference or other event, they may accept an offer of free attendance . . . on the day of their presentation." Ethics Guide § XXVI, https://perma.cc/M6LA-JUFZ. It does not establish that speaking at panels or other events is *ordinarily* within the scope of judges' duties. Nor do the other documents the government points to. This case does not concern events to which immigration judges are "assigned" to speak "on behalf of the agency." *Cf.* Policy at 2. Nor does it concern model hearings and pro bono trainings hosted and sponsored by EOIR. *Cf.* EOIR, *Model Hearing Program*, https://perma.cc/6FNQ-WFA2; EOIR, *Operating Policies and Procedures Memorandum 08-01: Guidelines for Facilitating Pro Bono Legal Services*, https://perma.cc/YC57-H2RV. To the extent the government argues that *all* model hearings and trainings are part of judges' job duties, this finds no support in the caselaw or the record.

Third, the government argues that the Policy does not restrain speech unrelated to immigration or EOIR because the Policy purportedly "eliminates" the requirement to seek approval before speaking on topics "unrelated to a person's official duties." Gov't Br. 20 (quoting Policy at 1). But contrary to the government's assertion, this exclusion is anything but "unequivocal." *Id.* The Policy includes three carve outs that swallow the new rule. First, if a judge's proposed speaking engagement occurs during working hours, they must submit a leave request; the supervisor is then entitled to "inquire how [the immigration judge] intends to use the time," and must "approve[]" not only the leave request, but also the "engagement" itself. Policy at 2. Second, "whether or not [a judge] opted to seek supervisory approval" for a proposed speaking engagement in the first instance, "if the circumstances surrounding the [engagement] change," they are encouraged to "convey such changes to the[ir] supervisor to consider the advisability of [their] continued participation." *Id.* at 3. Finally, if "there is potential that a speaking engagement may result in the perception . . . that the engagement relates to [a judge]'s official duties or employment with EOIR," supervisors are empowered to "provide direction" on the content of the judge's proposed speech, regardless of whether supervisory approval is in fact required. *Id.* at 2–3. The government's attempts to read out these carve outs require ignoring the Policy's plain text.

### 2.      The Policy does not survive *NTEU*'s exacting scrutiny.

The Policy fails to satisfy *NTEU*'s exacting scrutiny because the government cannot show that the interests of immigration judges and their potential audiences in the restrained speech are outweighed by the expression's necessary impact on the actual operation of government. Immigration judges have a strong interest in speaking about matters of public concern, and the public has an especially strong interest in hearing what they have to say. On the other hand, the government asserts only a generic interest in "promoting the efficiency of the service [the agency]

11

performs through its employees." Gov't Br. 20. The Policy is not "reasonably necessary" to address any actual harms, *NTEU*, 513 U.S. at 474, and it lacks the safeguards courts ordinarily require of prior restraints on speech by public employees. Accordingly, the Policy fails to satisfy *NTEU*'s exacting scrutiny.

The Policy imposes an immense burden on the interests of immigration judges in speaking, and of the public in hearing what they have to say. Most critically, the Policy categorically prohibits immigration judges from speaking in their personal capacities about immigration law or policy, or the policies and programs of EOIR. As the Supreme Court recognized in *Lane*, "speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Lane*, 573 U.S. at 240. The Policy deprives the public of this speech of "special value," and prevents immigration judges from participating in public debates on matters involving their areas of expertise. The Policy also restrains speech on topics unrelated to immigration and EOIR, and while there is "no way to measure the true cost of that burden," the Supreme Court has made clear that the interests favoring such speech should not be underestimated. *NTEU*, 513 U.S. at 470.

Because the interests of immigration judges and the public in the restrained speech are substantial, the government bears a "heavy" burden. *Id.* at 466. It "must identify a commensurate threat to its operations" that justifies the Policy's restrictions, *Guffey v. Mauskopf*, 45 F.4th 442, 447 (D.C. Cir. 2022)—one that is "real, not merely conjectural," *id.* (quoting *NTEU*, 513 U.S. at 475). And even after it has identified such a threat, it must demonstrate that the Policy's restrictions are "'reasonably necessary to protect the efficiency of the public service' against the threat." *Id.* (quoting *NTEU*, 513 U.S. at 474).

The government cannot satisfy this burden. To the extent the government identifies a threat at all, it is that immigration judges' personal capacity speech "can have real effects on the agency's overall mission." Gov't Br. 1. But as the Fourth Circuit explained in *Liverman*, "generalized allegations" of harms to an agency's operations are not sufficient. 844 F.3d at 408. The government must produce actual "evidence of any material disruption arising from [the employees' speech]." *Id.*; *see also Guffey*, 45 F.4th at 447 (explaining that evidence is required where the risk is not "self-evident"); *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 105 (3d Cir. 2022) (similar). This the government has failed to do, and it is fatal to the government's motion to dismiss. *See, e.g.*, *Cornelio v. Connecticut*, 32 F.4th 160, 173–74 (2d Cir. 2022) (declining to dismiss First Amendment challenge to a regulation under Rule 12(b)(6) where the government failed to adduce evidence that the regulation "materially advance[d]" its interest).

In a single sentence in its factual recitation the government suggests that EOIR instituted its speaking engagement process to "promote[] public confidence in [immigration judges'] impartiality." Gov't Br. 5 (quoting Ethics Guide pmbl.). The government has failed, however, to demonstrate that the speech immigration judges wish to engage in poses any harm to that interest. As the Supreme Court recognized in *Republican Party of Minnesota v. White*, impartiality in the judicial context has a narrow meaning: "the lack of bias for or against either party to the proceeding." 536 U.S. 765, 775 (2002). Neither protecting impartiality nor the appearance thereof requires judges to avoid sharing their legal and political views. *Id.* at 788 (holding unconstitutional canon of judicial conduct preventing judicial candidates from announcing their views "on disputed legal and political issues"); *see also* Code of Conduct for U.S. Judges Canon 4 (Judicial Conference 2019) (encouraging federal judges to "speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice"). In the

years EOIR permitted immigration judges to speak in their personal capacities on issues relating to immigration or EOIR with a disclaimer, *see* Am. Compl. ¶ 2, the government has failed to identify even a single instance of personal capacity speech by a sitting judge that undermined public confidence in judges' impartiality. "That silent record is strong evidence that [judges] can speak on matters of public concern without tarnishing the reputation of the [courts]." *Guffey*, 45 F.4th at 448.

The government asserts that EOIR has wide latitude to control immigration judges' speech because they are "high-ranking, public-facing officials," Gov't Br. 19, but this argument is doubly wrong. While the Fourth Circuit has considered the policymaking role of employees in the context of individual challenges to dismissal or other punishments based on speech, *see, e.g.*, *Borzilleri v. Mosby*, 874 F.3d 187, 194 (4th Cir. 2017), it has generally not done so in challenges to prior restraints subject to *NTEU*. The reason is simple: policymaking employees are entitled to less First Amendment protection only when they "speak[] out in a manner that interferes with or undermines the operation of the agency." *McVey v. Stacy*, 157 F.3d 271, 278 (4th Cir. 1998). And whereas adverse actions respond to "actual speech," prior restraints "chill[] potential speech before it happens," *NTEU*, 513 U.S. at 468, leading to the suppression of more speech than could be constitutionally punished after the fact.[5]

In any event, immigration judges are *not* "high-ranking, public-facing officials" within the meaning of First Amendment precedent. Immigration judges adjudicate cases based on binding

---

[5] The government cites *Conley v. Town of Elkton*, 381 F. Supp. 2d 514 (W.D. Va. 2005), but that case simply proves NAIJ's point. In *Conley*, the court held that a police officer's termination did not violate the First Amendment because he had "act[ed] in a hostile way toward his employer." *Id.* at 522. By contrast, in *Liverman*, the Fourth Circuit applied *NTEU* to a social media policy prohibiting police officers from making negative comments about the department. 844 F.3d at 407. In holding the policy unconstitutional, the Court described the interests of officers and the public in the restrained speech as "manifestly significant." *Id.* at 408.

law and precedent. *See* WA-RP-19-0067, at 5–7 (Reg. Dir. Wash. Region FLRA July 31, 2020),

https://perma.cc/79Uv-W2FX, *aff'd in part and rev'd in part* 71 F.L.R.A. 1046 (leaving factual

determinations undisturbed). Their decisions are non-precedential and subject to review by the

Board of Immigration Appeals. *Id.* Rank-and-file judges also have "no supervisory responsibility

or authority." *Id.* at 3. Even if the FLRA were correct that immigration judges "influence" EOIR

policies by adjudicating cases, *see* 71 F.L.R.A. at 1048, this would not be enough to show that

immigration judges are high-level policymakers. Immigration judges neither "control" their

employer's "day-to-day operations," *McVey v. Va. Highlands Airport Comm'n*, 44 F. App'x 630,

636 (4th Cir. 2002), nor set departmental goals and policies, *Hall v. Ford*, 856 F.2d 255, 264 (D.C.

Cir. 1988). Indeed, immigration judges' obligations of independence and impartiality make them

categorically unlike the high-ranking officials whose expected loyalty to superiors—in other

words, their expected *partiality*—has been the basis for sanctioning speech. *See, e.g.*, *Borzilleri*,

874 F.3d at 191 (holding that assistant state prosecutors are policymakers because their

responsibilities "are laden with ideological content"); *Jenkins v. Medford*, 119 F.3d 1156, 1164

(4th Cir. 1997) (holding that deputy sheriffs are policymakers because they are the "alter ego" of

the elected sheriff).

Even if the government had some interest in limiting the personal capacity speech of

immigration judges, it could not possibly show that its interest justifies the Policy's *total*

*prohibition* on personal capacity speech concerning immigration. This ban "makes no distinction

between speech about [immigration] that reasonably could be expected to disrupt [the agency's]

operations and speech that plainly would not, or that would do so only inasmuch as it engendered

legitimate public debate about the [immigration system]." *Moonin*, 868 F.3d at 867. The ban is not

targeted to messages that would undermine public confidence in judges' impartiality. It sweeps

broadly to cover all speech about immigration law or policy issues, regardless of its effect on the agency's operations or mission. Accordingly, there is no fit between the government's purported interest and the reach of the Policy's prohibition on personal capacity speech.

Immigration judges are entitled to "an additional thumb on the employees' side of [the] scales" because the Policy lacks adequate procedural safeguards. *Harman v. City of New York*, 140 F.3d 111, 1120 (2d Cir. 1998) (quoting *Sanjour v. EPA*, 56 F.3d 85, 97 (D.C. Cir. 1995) (en banc)). Specifically, the Policy's preapproval scheme fails to include narrow, objective, and definite criteria to guide decisionmakers or definite time limits for review. The Policy vests supervisors with unbridled discretion to grant or deny personal capacity speaking requests. Policy at 4 (stating only that "[s]upervisor[s] will make the final decision concerning approval or denial"). It fails to appropriately cabin SET review, which is at least partially concerned with "promoting consistency in all of EOIR's communications," *id.* at 1, and accordingly "raises the specter of arbitrary or viewpoint-discriminatory enforcement." [6] *Moonin*, 868 F.3d at 867; *see also Harman*, 140 F.3d at 120–21. The Policy also fails to set firm deadlines for review of personal capacity speaking requests.

## B.    The Policy is void for vagueness under the Fifth Amendment.

The void for vagueness doctrine requires that regulations provide sufficient "precision and guidance" to ensure that those subject to the regulations "know what is required of them" and "that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "[R]igorous adherence to those requirements is necessary

---

[6] The risk of abuse is not hypothetical. *See* Owen Decl. ¶ 17, ECF No. 27-5 (agency declarant admitting that, in evaluating personal capacity speaking requests, she considers whether the planned engagement could result in "any negative publicity or scrutiny to EOIR or the Federal Government").

to ensure that ambiguity does not chill protected speech." *Id.* at 253–54. The Policy, however, fails to provide clear guidance concerning the standards EOIR applies to personal capacity speaking requests. As noted above, the Policy gives complete discretion to supervisors to approve or deny personal capacity speaking requests on whatever grounds they consider relevant. The Policy also empowers the SET to review such requests for consistency not only with "the law and agency policy," but also "all of EOIR's communications." Policy at 1. The text of the Policy does nothing, therefore, to meaningfully cabin agency discretion.

The government argues that the Policy does set forth "the substantive standards that govern outside speaking engagements," namely, "the Hatch Act, ethics and professionalism guides and rules, and the Justice Manual." Gov't Br. 23. But the so-called standards it refers to are not mentioned in any of the sections of the Policy that describe the agency's speaking engagement procedures, *see, e.g.,* Policy at 2–3 (sections titled "Official Capacity" and "Personal Capacity"); *id.* at 3–4 (section titled "Supervisor's Decision"). Instead, they are recited at the very end of the Policy as part of a general directive that "employees speaking to a public group" must, regardless of speaking capacity, "comply with applicable law and agency policies." *Id.* at 6 (section titled "Conclusion"). Accordingly, nothing in the Policy suggests that supervisory and SET review is limited to these "standards," and indeed there is much to suggest otherwise. *See supra* at 17.[7]

The government also misstates NAIJ's claim. NAIJ alleges that the Policy is vague on its face, not that it is vague in its enforcement. *Compare* Am. Compl. ¶ 49 (claiming that the Policy's

_____

[7] The availability of agency guidance concerning the Policy cannot cure the Policy's vagueness, and the government cites no case to the contrary. *Cf.* Gov't Br. 23–24; *see also U.S. Telecom Ass'n v. FCC*, 825 F.3d 675, 736–37 (D.C. Cir. 2016) (finding the availability of prospective guidance about a rule relevant only because the agency had otherwise articulated the rule's goals, specified factors that would inform the rule's application, and included a description of how each factor would be interpreted and applied—that is, the rule itself was not fundamentally vague).

terms "*invite*[] arbitrary and discriminatory enforcement" (emphasis added)), *with* Gov't Br. at 24 (suggesting that NAIJ alleges arbitrary enforcement). Accordingly, NAIJ is not required to allege a "pattern of unlawful favoritism" to succeed on its void for vagueness claim. *Cf.* Gov't Br. 24 (quoting *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359, 372 (4th Cir. 2012)).

## II.    NAIJ has associational standing.

As a voluntary association of immigration judges, Am. Compl. ¶ 11, NAIJ has standing to vindicate the rights of its members because they have been injured by the Policy. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 458–60 (1958) (holding that the NAACP had standing to assert the First Amendment rights of its members). The government argues that NAIJ has failed to show that any of its members have experienced an "injury in fact" caused by the Policy, Gov't Br. 10, but that is false. As discussed above, the Policy imposes a prior restraint on NAIJ's members in two ways. First, it categorically prohibits them from speaking in their private capacities about immigration or EOIR. Am. Compl. ¶ 27. Second, for all other speech, it requires them to obtain the functional equivalent of a license to speak. *Id.* ¶ 28–29. The Supreme Court has made clear on many occasions that individuals subject to prior restraints have standing to sue— whether or not they have sought permission to speak. *See, e.g.*, *Freedman v. Maryland*, 380 U.S. 51, 56 (1965); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988); *see also Wernsing v. Thompson*, 423 F.3d 732, 743–44 (7th Cir. 2005) (collecting cases and noting that "government employees whose speech is limited by an internal policy or a pre-clearance directive . . . need not seek permission to speak or violate the directive in order to challenge the directive in court"). NAIJ has plausibly alleged that the Policy imposes a prior restraint on NAIJ's members. *See* Am. Compl. ¶ 1 (Policy applies to all immigration judges); *id.* ¶ 11 (NAIJ represents hundreds of immigration judges). This is sufficient to confer standing.

NAIJ also has associational standing for two other reasons. First, NAIJ has plausibly alleged that the Policy objectively chills speech through its categorical ban on certain personal capacity speech, and preapproval process for other such speech. *Id.* ¶¶ 31, 39 (alleging self-censorship by judges); *see also Cooksey v. Futrell*, 721 F.3d 226, 236 (4th Cir. 2013). Second, NAIJ has plausibly alleged that its members face a credible threat of sanctions—including suspension or even removal—if they ignore the Policy's restrictions. Am. Compl. ¶ 40; *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

## III.   The Civil Service Reform Act does not impliedly divest this Court of jurisdiction over NAIJ's claims.

Perhaps recognizing the clear constitutional infirmities in the Policy, the government attempts to short circuit judicial review of NAIJ's claims. The government argues that immigration judges must abide a prior restraint on their speech for months of futile administrative proceedings before obtaining judicial review that could redress their claims. But time and again, federal courts considering First Amendment challenges to employee speech regulations have either rejected or declined to address the jurisdictional argument that the government makes here. *See, e.g.*, *NTEU*, 513 U.S. 454; *Weaver*, 87 F.3d at 1433–35; *Sanjour*, 56 F.3d 85; *Wolfe v. Barnhart*, 446 F.3d 1096 (10th Cir. 2006). Even the Supreme Court, in its seminal decision in *NTEU*, invalidated employee speech restrictions in a challenge brought originally in federal district court by federal employees that were subject to the same statutory scheme at issue here. *NTEU*, 513 U.S. 454. In doing so, the Court did not so much as mention the question of jurisdiction. This is not surprising: under the framework announced in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), it is clear that the CSRA does not withdraw district court jurisdiction over a "simple pre-enforcement attack on a regulation restricting employee speech." *Weaver*, 87 F.3d at 1434.

In *Thunder Basin*, the Supreme Court established a two-step test for determining whether a remedial scheme enacted by Congress impliedly divests district court jurisdiction over a plaintiff's claims. Under the first step, courts must ask "whether Congress's intent to preclude district court jurisdiction is 'fairly discernible in the statutory scheme.'" *Bennett v. SEC*, 844 F.3d 174, 181 (4th Cir. 2016) (quoting *Thunder Basin*, 510 U.S. at 207). The Supreme Court has already held that such intent is manifest in the CSRA, *see Elgin v. Dep't of Treasury*, 567 U.S. 1, 12 (2012), and so only the second step of the *Thunder Basin* inquiry is at issue here. Under this second step, courts must assess whether a plaintiff's claims are "of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin*, 510 U.S. at 212. Three factors in particular bear on this inquiry: (1) whether the statutory scheme could "foreclose all meaningful judicial review;" (2) whether the plaintiff's claims are "wholly collateral" to the scheme; and (3) whether "agency expertise could be brought to bear" on the questions presented. *Bennett*, 844 F.3d at 181 (quoting *Thunder Basin*, 510 U.S. at 212–13). As the Fourth Circuit has recognized, the first factor is the most important. *Id.* at 183 n.7.

Here, all three factors weigh heavily against the conclusion that Congress intended the CSRA to withdraw district court jurisdiction over NAIJ's claims.[8]

### A.   NAIJ's claims would not receive meaningful judicial review through the CSRA.

As discussed further below, NAIJ's constitutional claims would not receive meaningful judicial review through the CSRA for two reasons. First, the CSRA does not apply to NAIJ's

---

[8] The government attempts to skirt the second step of *Thunder Basin* entirely by asserting that the CSRA withdraws jurisdiction over *all* claims arising out of the federal employment relationship. Gov't Br. 13. This is not the law. The government cites *Rydie v. Biden*, No. 21-2359, 2022 WL 1153249 (4th Cir. 2022), but *Rydie* itself is clear on this point. *Id.* at *4 (correctly applying the *Thunder Basin* factors to determine "whether the CSRA applies to [the plaintiffs'] claims").

claims because NAIJ is challenging an employee speech policy—not a covered employment action. Second, even if the CSRA did apply to NAIJ's claims, it would still not provide meaningful judicial review. Proceeding administratively would needlessly delay judicial review of NAIJ's claims—if it led to judicial review at all—and it would cause irreparable harm to the First Amendment rights of immigration judges and the public in the interim.

> **1.     The CSRA does not apply to NAIJ's claims because NAIJ is challenging an employee speech policy—not a covered employment action.**

The CSRA does not "sweep[] so wide" as to preclude jurisdiction over "*any* claim arising in the federal employment context." *Manivannan v. U.S. Dep't of Energy*, 42 F.4th 163, 170 (3d. Cir. 2022) (cleaned up); *see also Orsay v. DOJ*, 289 F.3d 1125, 1131 (9th Cir. 2002) (similar), *abrogated on other grounds by Millbrook v. United States*, 569 U.S. 50 (2013). As the Supreme Court explained in *Elgin*, the CSRA can provide meaningful judicial review of a plaintiff's claims only if the plaintiff is challenging a "covered employment action." *Elgin*, 567 U.S. at 14; *see also Manivannan*, 42 F.4th at 170. If the plaintiff is *not* challenging a covered employment action, the Merit Systems Protection Board ("MSPB") will not have jurisdiction, and "the suit must proceed in a different forum." *Manivannan*, 42 F.4th at 172; *cf. Elgin*, 567 U.S. at 21.

NAIJ is not challenging a covered employment action.

To begin, the text of the CSRA is clear that the prior restraint NAIJ challenges here is not a covered employment action. In general, the CSRA allows federal employees to seek administrative review of two kinds of employment actions. First, the CSRA covers "adverse actions," which are the most serious actions the government can take against employees. Adverse actions include "removal," "suspension for more than 14 days," "reduction in grade," "reduction in pay," and "furlough of 30 days or less." 5 U.S.C. § 7512(1)–(5). Second, the CSRA covers

"prohibited personnel practices," which are less serious than adverse actions. *Id.* §§ 2302(a)(1) & (b). As relevant to the government's argument, prohibited personnel practices include "tak[ing] or fail[ing] to take" a "personnel action" if doing so violates an employee's constitutional rights. *Id.* §§ 2302(b)(12), 2301(b)(2); *see also Weaver*, 87 F.3d at 1432. "Personnel action" is defined as one of twelve employment actions taken "with respect to an employee." *Id.* § 2302(a)(2)(A). Thus, it is clear from the CSRA's text that it applies to individual personnel decisions. But NAIJ is not challenging any individual personnel decision. Instead, it is challenging a policy that imposes a prior restraint on the personal capacity speech of *all* immigration judges.[9]

Precedent confirms that NAIJ's claims fall outside of the CSRA's scheme. Though courts have broadly defined "personnel actions," they have limited its scope to adverse employment actions against specific employees, and have specifically held that challenges to employee speech policies do not qualify. The D.C. Circuit's decision in *Weaver* is illustrative. There, a federal employee challenged the constitutionality of a speech policy requiring the submission of certain materials for prepublication review, as well as an admonishment she received for failing to comply with that requirement. *Weaver*, 87 F.3d at 1432. The D.C. Circuit dismissed the employee's challenge to her admonishment, explaining that it was remediable through the CSRA as a "prohibited personnel practice." *Id.* at 1433. But the court recognized jurisdiction over the constitutional claim as a "simple pre-enforcement attack on a regulation restricting employee speech" that "st[ood] independently of the admonishment." *Id* at 1434. In doing so, the court cited *NTEU* and *Sanjour*, *id.*, which similarly involved employees challenging speech regulations before

---

[9] *Hall v. Clinton*, 235 F.3d 202 (4th Cir. 2000), is not the contrary. *Cf.* Gov't Br. 13. Although the Fourth Circuit there observed that "the CSRA constitutes the exclusive remedy for claims arising out of federal employment," 235 F.3d at 203, the reference to "claims arising out of federal employment" was clearly a shorthand. As the Court explained later in its opinion, the CSRA only preempts challenges to "federal personnel decisions," that is, CSRA-covered actions. *Id.* at 206.

any personnel action had been taken against them for non-compliance. *See NTEU*, 513 U.S. 454 (pre-enforcement challenge to statute banning federal employees from accepting compensation for outside speaking); *Sanjour*, 56 F.3d 85 (pre-enforcement challenge to regulations prohibiting EPA employees from receiving travel expense reimbursement for unofficial speech).

In the years following *Weaver*, multiple courts have endorsed this logic. For example, in *Turner*, the D.C. district court held that the program director for Voice of America could challenge employee policies and procedures that restricted her First Amendment rights because that challenge was "distinct from and antecedent to her experiencing a covered personnel action." *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 369 (D.D.C. 2020). Similarly, in *Firenze v. National Labor Relations Board*, the district court for the District of Massachusetts held that the CSRA did not preempt a First Amendment challenge to a rule preventing employees from publicizing grievances at work because "the promulgation . . . of such a rule" was not a "personnel action" under the statute and "there [was] no allegation that a prohibited 'personnel action' has taken place *vis-à-vis* the First Amendment claim." No. 12-CV-10880, 2013 WL 639151, at *8 (D. Mass. Jan. 10, 2013). By contrast, in *Tabaddor v. Holder*, the district court for the Central District of California held that *Weaver* did not apply because the plaintiff's constitutional claims were "infused and intertwined with [a] recusal order issued to her," and were "based *entirely* on actions taken with respect to her, not on some guidance or other expression of the challenged recusal-regulation interpretation." 156 F. Supp. 3d 1076, 1083 (C.D. Cal. 2015). This case, however, is like *Weaver*, *Turner*, and *Firenze*—not like *Tabaddor*. NAIJ is challenging an

employee speech policy "distinct from and antecedent to" any of its members experiencing a covered personnel action.[10] *Turner*, 502 F. Supp. 3d at 369.

The government attempts to sidestep this clear text and precedent, arguing that NAIJ could obtain CSRA review by reframing its claims "as a challenge to hypothetical future discipline for non-compliance with the [Policy]," or to "an alleged significant change in . . . working conditions." Gov't Br. 14 (cleaned up). But neither suggestion is consistent with the statute. To start, although a covered employee may challenge a "proposed" removal or other adverse action under the statute, 5 U.S.C. §§ 7503(b), 7513(b); *see also Rydie*, 2022 WL 1153249, at *6, no such action has been proposed. Accordingly, although the CSRA may "provide[] an adequate vehicle to mount a pre-enforcement challenge" to a suspension or termination, where such action has been proposed, *see Rydie*, 2022 WL 1153249, at *6–7 (finding that employees' termination had been "proposed" because "enforcement ha[d] begun"), it does not provide recourse here, where no concrete enforcement action has been either taken or proposed.[11]

The suggestion that NAIJ can challenge the Policy as "a significant change in . . . working conditions," Gov't Br. 14, fares no better, because the term "working conditions" does not include

---

[10] Earlier in this suit, Judge O'Grady concluded that *Weaver* is "inapplicable today" in light of *Elgin*, *NAIJ v. McHenry*, 477 F. Supp. 3d at 476, but that decision has been vacated, *NAIJ v. Neal*, 2022 WL 2045339, and it is, in any event, wrong. As noted above, numerous lower courts have correctly held that *Weaver*'s reasoning survives *Elgin*. *See, e.g.*, *Turner*, 502 F. Supp. 3d at 369 n. 20 (noting that "the D.C. Circuit has not rejected *Weaver* in *Elgin*'s wake").

[11] The suggestion that NAIJ challenge a hypothetical future disciplinary action as a "prohibited personnel practice," Gov't Br. 14 (citing 5 U.S.C § 2302(a)(2)(A)(iii)), suffers from a similar problem. The CSRA's remedial scheme for prohibited personnel practices does not contemplate challenging disciplinary action in advance. Indeed, the OSC has previously opined that "Section 2302(b)(12) requires *taking* a personnel action . . . ; threatened personnel actions are not sufficient to meet the statutory requirements." Letter from OSC to Robert Shriver, Feb. 22, 2007, Ex. B to Reply Brief for Petitioner at *3, *Ramirez v. Customs and Border Prot.*, 709 F. Supp. 2d 74, 80 (D.D.C. 2010) (No. 07-cv-00065), ECF No. 5-2; *see also Weaver*, 87 F.3d at 1433 (noting that agency interpretations of the CSRA are "entitled to deference").

the *private*, off-the-job speech of employees. The Supreme Court has said, in interpreting Title VII of the CSRA, that "working conditions" "more naturally refers, in isolation, only to the 'circumstances' or 'state of affairs' attendant to one's performance of a job." *Fort Stewart Schs. v. FLRA*, 495 U.S. 641, 645 (1990). Thus, courts have generally interpreted "working conditions" to refer to "the daily, concrete parameters of a job," such as "hours, discrete assignments, and the provision of necessary equipment and resources," and not to circumstances more loosely connected with an employee's performance of their job. *Turner*, 502 F. Supp. 3d at 367 (finding that "major shifts" to the background assumptions behind doing journalism at VOA was not a change in working conditions); *see also Manivannan*, 42 F.4th at 173–74 (finding that an agency's disclosure of an employee's records to state prosecutors and refusal to return an employee's personal property was not a change in working conditions). Here, NAIJ challenges restrictions on immigration judges' personal capacity speech, which necessarily excludes any speech that is "ordinarily within the scope" of their duties. *Lane*, 573 U.S. at 240; *see also Ramirez*, 709 F. Supp. 2d at 80 (holding that CBP's decision not to authorize an employee's outside political activities was not a significant change in working conditions); *supra* Part I.A.1.

The canon of *ejusdem generis* also counsels against the government's reading of "change in . . . working conditions." *Ejusdem generis* provides that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015) (cleaned up). Here, the "personnel actions" enumerated before "any other significant change in . . . working conditions" include such actions as "appointment," "promotion," "transfer," and "decision[s] concerning pay, benefits, or awards." See 5 U.S.C. § 2302(a)(2)(A)(i), (ii), (iv), (ix). All of these more specific personnel actions bear two features in common. They

involve actions directed at individual employees, and they are "relatively minor" as compared with adverse actions.[12] *See Weaver*, 87 F.3d at 1434; *see also Pinar v. Dole*, 747 F.2d 899, 912 (4th Cir. 1984). Here, by contrast, NAIJ challenges a broadly applicable prior restraint—one that both limits and chills the private speech of hundreds of government employees. Such a policy can hardly be characterized as "so minor in nature." *Pinar*, 747 F.2d at 912.

For these reasons, CSRA simply does not apply to NAIJ's claims and so cannot provide meaningful judicial review of them.

### 2.    Even if NAIJ's claims fell within the CSRA, NAIJ still could not obtain meaningful judicial review through the statute.

The CSRA's review scheme would not guarantee meaningful judicial review of NAIJ's constitutional claims, even if those claims fell within the scheme's ambit.

First, even assuming an immigration judge could challenge the Policy as a prohibited personnel practice, they would not be assured judicial review. Judicial review would lie only if the Special Counsel determined, in their sole and unreviewable discretion, to petition the MSPB for corrective action. 5 U.S.C. § 1214 (b)(2)(C). In other words, a complaint filed with the OSC may never reach a federal court because the Special Counsel's decisions are not judicially reviewable. And here the most likely outcome is that the Special Counsel would reject a complaint because no

---

[12] Thus, while adverse actions entitle affected employees to a formal hearing before the MSPB and judicial review in the Federal Circuit, 5 U.S.C. §§ 7513(d) & 7703, personnel actions challenged as a prohibited personnel practice do not. An employee who suffers a prohibited personnel practice must first complain to the Office of Special Counsel ("OSC"). 5 U.S.C. § 1214(a)(1)(A). If the Special Counsel determines that "there are reasonable grounds to believe [the practice] has occurred," they must report that determination to the agency. 5 U.S.C. § 1214(b)(2)(B). If, "after a reasonable period of time," the agency does not correct the practice, the Special Counsel may petition the MSPB for corrective action. *Id.* § 1214(b)(2)(C). Final decisions of the Board are appealable to the Federal Circuit, but if the Special Counsel declines to pursue a complaint, the CSRA provides for no further administrative or judicial review, *id.* §§ 1214(c), 7703(b).

personnel action has been taken against a specific employee. *See Ramirez*, 709 F. Supp. 2d at 79 (noting that the OSC dismissed the plaintiff's complaint on the ground that no "personnel action" had been taken).

Second, an individual immigration judge should not be required to provoke disciplinary action under the Policy merely to seek judicial review. As the Supreme Court explained in *Free Enterprise v. Public Company Accounting Oversight Board*, a statutory scheme does not provide meaningful judicial review if it requires a person to "bet the farm by taking [a] violative action before testing the validity of [a] law." 561 U.S. 477, 490 (2010); *see also Bennett*, 844 F.3d at 186. To ensure judicial review under the CSRA, an immigration judge would have to ignore the Policy to such an extent that they prompt at least a "proposed" adverse action, namely, a removal, suspension of greater than 14 days, a reduction in pay or grade, or a furlough of fewer than thirty days. *See* 5 U.S.C. § 7512; *see also id.* §§ 7513(d) & 7703. Forcing an immigration judge to risk such severe sanctions merely to obtain judicial review is the definition of "bet[ting] the farm."

Third, and most significantly, any judicial review that could be obtained through the CSRA would not be meaningful because it would come far too late, imposing "irremediable harm beyond the burdens associated with the dispute resolutions process." *Bennett*, 844 F.3d at 186 n.13 (cleaned up). The Policy is an unconstitutional prior restraint on speech—"the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Accordingly, courts have recognized that the imposition of a prior restraint, even for short periods of time, causes irreparable harm. *See, e.g.*, *Cuviello v. City of Vallejo*, 944 F.3d 816, 831–32 (9th Cir. 2019). Here, the risk of delay is especially acute because the Special Counsel has up to 240 days to respond to any allegation of a prohibited personnel practice. *See* 5 U.S.C. §1214 (b)(2)(A). Moreover, at the end of such period, the Special Counsel may simply decline to

petition the MSPB, in which case NAIJ's members would simply be out of luck. NAIJ's members should not be required to pursue OSC review in such circumstances. *Cf. Able v. United States*, 88 F.3d 1280, 1288 (2d Cir. 1996) (holding that plaintiffs challenging the Don't Ask, Don't Tell law were not required to exhaust administrative remedies in separation proceedings because they "alleg[ed] violations of their First Amendment right to free speech" and "even minimal impairments on this right create irreparable injury"); *Ramirez*, 709 F. Supp. 2d at 83–84 (holding that a CBP employee challenging CBP's decision to deny him authorization to serve on a city council was not required to exhaust administrative remedies under the CSRA for the same reason).[13]

## B.   NAIJ's claims are wholly collateral to the CSRA because they do not seek to reverse a covered employment action.

To determine whether a claim is "wholly collateral" to a statutory scheme, the Fourth Circuit assesses whether the claim is "the vehicle" by which claimants seek "to reverse" agency action covered by the scheme. *Bennett*, 844 F.3d at 186–87 (cleaned up). NAIJ's constitutional claims do not meet this description. This fact distinguishes the mine run of cases, including those cited by the government, where plaintiffs have been barred from bringing pre-enforcement challenges. *Cf.* Gov't Br. 15. For example, in *Elgin*, the Supreme Court asked whether the plaintiffs' challenge sought the same relief they could seek in an MSPB proceeding. *Elgin*, 567

---

[13] *Rydie* is therefore distinguishable for two reasons. First, because "enforcement [there] had [already] begun," it was clear that an adverse action had been "proposed," and that the plaintiffs could seek review without having to "bet the farm." *Rydie*, 2022 WL 1153249 *5, 7. Second, that case did not involve a First Amendment challenge to a prior restraint on time-sensitive political speech. Accordingly, there was no concern that channeling the plaintiffs' claims would cause irreparable harm. Indeed, where the Fourth Circuit has held that jurisdiction is precluded over a First Amendment claim, it has specifically emphasized that it was not facing a prior restraint on political speech. *Nat'l Taxpayers Union v. Soc. Sec. Admin.*, 376 F.3d 239, 241 n.1 (4th Cir. 2004); *id.* at 244 (Wilkinson, J., concurring).

U.S. at 22. The Court found that it did and thus that the plaintiffs' challenge was a "vehicle by which they seek to reverse" adverse actions covered by the CSRA. *Id.*; *see also Rydie*, 2022 WL 1153249, at *7 (challenge was "vehicle" by which plaintiffs sought to preempt removal); *Fornaro v. James*, 416 F.3d 63, 68 (D.C. Cir. 2005) (challenge to retirement benefits policy would necessarily decide the merits of plaintiffs' individual benefit claims); *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 448–49 (D.C. Cir. 2009) (challenge to guidelines on promotion by employee passed over for promotion). By contrast, NAIJ brings "a general challenge" to an employee speech policy—not "[a] challenge to [a] particular personnel action" taken against a specific employee. *Weaver*, 87 F.3d at 1434 n. 2. Like the plaintiff in *Weaver*, NAIJ does not seek "reversal" of any specific disciplinary sanction, but instead "a general invalidation of the [policy]." *Id.* This makes NAIJ's constitutional claims wholly collateral to the CSRA's review scheme.

### C.     NAIJ's claims are beyond the Merit Systems Protection Board's expertise.

NAIJ's claims are also beyond the MSPB's expertise because they are purely constitutional claims involving the right of immigration judges to speak in their personal capacities and the right of the public to hear what they have to say. The MSPB resolves highly specific disputes concerning individual personnel actions—like terminations, suspensions, reductions in work hours, and the like—not pre-enforcement constitutional challenges to prior restraints. Of course, in individual enforcement actions, the Board may consider whether an agency has engaged in a prohibited personnel practice by "tak[ing] a personnel action that unconstitutionally burdens an employee's speech." *Weaver*, 87 F.3d at 1432. But as explained above, the term "personnel action" does not encompass a generally applicable rule or policy. *See supra* Part III.A.1. As a result, the Board has *never* had occasion to evaluate the constitutionality of a broad prior restraint like the Policy. Nor is it equipped to meaningfully assess a prior restraint's impact on the free speech interests of

hundreds of present and future employees and the listening public. Moreover, this is not a case in which the Board's expertise in other areas could "obviate the need to address" NAIJ's constitutional claims. *Elgin*, 567 U.S. at 22–23. NAIJ's only claims are constitutional ones, and those are quintessentially within the expertise of Article III courts.

### Conclusion

For the foregoing reasons, this Court should deny Defendant's motion to dismiss.


October 31, 2022                                            Respectfully submitted,

 /s/ *Victor M. Glasberg*                                    /s/ *Ramya Krishnan*
Victor M. Glasberg (VA 16184)              Ramya Krishnan (*Pro Hac Vice*)
Victor M. Glasberg & Associates            Alex Abdo (*Pro Hac Vice*)
121 S. Columbus Street                          Knight First Amendment Institute
Alexandria, VA 22314                              at Columbia University
T: (703) 684-1100                                    475 Riverside Drive, Suite 302
F: (703) 684-1104                                    New York, NY 10115
VMG@robinhoodesq.com                      T: (646) 745-8500
                                                             F: (646) 661-3361
                                                             ramya.krishnan@knightcolumbia.org

                                                             *Counsel for the Plaintiff*