## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

|  |  |
|---|---|
| NATIONAL ASSOCIATION OF IMMIGRATION JUDGES, affiliated with the International Federation of Professional and Technical Engineers,<br><br>   Plaintiff,<br><br> v.<br><br>DAVID L. NEAL, in his official capacity as Director of the Executive Office for Immigration Review,<br><br>   Defendant. | Civil Action No. 20-cv-731 |

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

1.      This lawsuit challenges a policy of the Executive Office for Immigration Review ("EOIR") that imposes an unconstitutional prior restraint on the speech of federal immigration judges. The policy bans judges from sharing their private views on immigration law or policy issues, or about the agency that employs them. Judges who violate the policy face a range of disciplinary sanctions, including reprimand, suspension, and even removal from the federal service.

2.      For years, EOIR permitted immigration judges to speak in their private capacities on issues relating to immigration, so long as they provided a disclaimer that they were not speaking on behalf of the agency. Judges often spoke at schools, universities, and bar associations about the immigration courts and their function within them. Their efforts educated the public about the immigration courts and made the immigration system more transparent.

3.     Starting in 2017, the agency made a series of revisions to its speaking engagement policy to limit the ability of immigration judges to speak publicly in their private capacities. The agency initially instituted a more burdensome preapproval process for judges who wished to engage in private-capacity speech. In 2020, however, EOIR categorically prohibited judges from speaking publicly in their private capacities about immigration or the agency. And, in 2021, the agency retained this prohibition when it once again revised its policy—this time during NAIJ's appeal in this case to the Fourth Circuit.

4.     EOIR's attempts to silence immigration judges come at a time of intense scrutiny of the nation's immigration system. Both President Trump and President Biden made immigration a central issue of their presidential campaigns, and their administrations have made sweeping changes to the immigration court system. During the Trump administration, for example, the Justice Department instituted case completion quotas for immigration judges, restricted the ability of immigration judges to close cases administratively or grant continuances, and reassigned judges from their home dockets to prioritize the disposition of cases involving migrants who apply for asylum from Mexico. The Biden administration has sought to reverse many of these changes, while also launching significant new efforts to reform the immigration system. For example, in May 2022, the Biden administration began using an overhauled screening system for migrants seeking asylum at the southern border in an effort to speed up processing and alleviate backlogs in the immigration court system. There is significant public interest in understanding these reforms as well as their effects on the independence of immigration judges and the process afforded to migrants who appear before them. Immigration judges are uniquely positioned to satisfy this interest, but the agency's speaking engagement policy prevents them from doing so.

5.      The policy imposes a prior restraint in violation of the First Amendment. As the Supreme Court has repeatedly held, people do not surrender their free speech rights when they accept government employment. They retain their rights, as citizens, to speak on matters of public importance, and the government can silence them only if it can show that its interest in doing so outweighs the employees' interests in speaking and the public's interest in hearing what they have to say.

6.      The government cannot satisfy this test here. The interests of immigration judges in engaging in the speech restrained by the policy is substantial, as is the public's interest in hearing it. There is an ongoing national debate about the wisdom and fairness of recent changes to immigration laws and policies and about the effect of those changes on the immigration court system. Immigration judges have unique insights to contribute to this discussion. While EOIR has a legitimate interest in promoting the efficiency of the services it performs through its employees, the policy's categorical ban on private-capacity speech about immigration and the agency is not tailored to that interest. Nor is the policy's preapproval process, which continues to require immigration judges to submit to an onerous system of review before speaking publicly in their private capacities on topics unrelated to immigration and the agency.

7.      NAIJ is a non-partisan, non-profit, voluntary association of immigration judges. It brings this challenge on behalf of its members, who are injured by the policy. Many of NAIJ's members wish to speak publicly in their private capacities about immigration law and policy, but the policy prevents them from doing so. Members who used to seek preapproval to speak about immigration-related topics in their private capacities no longer do so because they believe their requests will be denied as a matter of course. Of the members that continue to seek preapproval, many feel constrained by the policy to seek approval to speak in their official capacities, or to

allow the agency to determine the appropriate capacity, simply to be able to continue speaking. The result is that the agency exercises tight control over what they can say. Many of these members remain in limbo months after submitting requests. Some never receive a decision at all. NAIJ respectfully requests that the Court declare that the policy is unlawful and enjoin the government from enforcing it. Unless the policy is enjoined, it will continue to prevent immigration judges from speaking publicly in their private capacities about matters of immense public concern.

## Jurisdiction and Venue

8.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and the U.S. Constitution.

9.    This Court has authority to issue declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and this Court's inherent equitable jurisdiction. The Court also has authority to award costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

10.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (e)(1). A substantial part of the events giving rise to this claim occurred in this district, and Defendant is an officer of the United States sued in his official capacity.

## Parties

11.    Plaintiff NAIJ is a voluntary association of United States immigration judges, formed to promote the independence, dignity, professionalism, and efficiency of the U.S. immigration courts. NAIJ was founded as a voluntary association of immigration judges in 1971 and, in 1979, it was designated as the collective bargaining representative for all non-supervisory immigration judges. In 2019, the Department of Justice filed a petition with the Federal Labor Relations Authority ("FLRA") to decertify NAIJ, leading to an FLRA decision determining that immigration judges are "management officials" who must be excluded from NAIJ's bargaining

unit. NAIJ's Certification of Representative was formally revoked on April 15, 2022; however, it remains a voluntary association of immigration judges and continues to have hundreds of dues-paying members, including seven officers. NAIJ also continues to be affiliated with the International Federation of Professional and Technical Engineers.

12.    Defendant David L. Neal is the Director of EOIR. EOIR is an agency of the federal government within the Department of Justice and is located in Falls Church, Virginia. Defendant Neal has authority over all EOIR policies and practices, including the policy challenged here. Plaintiff sues him in his official capacity only.

<u>Facts</u>

I.    **Immigration Judges and the Immigration Court System**

13.    Immigration judges are judicial officers who exercise the authority of the U.S. Attorney General. Their primary responsibility is to serve as neutral and impartial arbiters in the immigration court system. They are also active members of the legal and civic communities, and have for many years contributed to public understanding of immigration law and policy through speaking engagements, including at the invitation of bar associations, schools, universities, and other institutions.

14.    As a former president of NAIJ testified before the Senate Judiciary Committee in 2018, immigration judges play an important role in educating the public about the immigration court system. When immigration judges speak to their communities, they "help the community better understand [the] Immigration Courts and their function in the community, helping to demystify the system and bring transparency." This, in turn, helps "build the understanding and trust needed for the [court] system to function smoothly."

15.    Interest in the immigration court system has grown in recent years, as the Trump and Biden administrations have shaped and reshaped immigration enforcement policies and

priorities. Under the Trump administration, for example, the Justice Department subjected immigration judges to case completion quotas and other performance benchmarks; limited their ability to close cases administratively and grant continuances; gave EOIR's Director the authority to overrule their decisions; issued hiring policies that gave political appointees greater influence in the selection of new judges; and required certain judges to conduct hearings via videoconference at temporary tent facilities along the U.S.–Mexico border as part of the administration's "Remain in Mexico" program. Under the Biden administration, the Justice Department has sought to roll back many of these measures, while also introducing new reform efforts. For example, in May 2022, the administration began implementing an overhauled system for screening migrants seeking asylum at the southern border. According to Attorney General Merrick B. Garland, the new system is intended to "ensure that asylum claims are processed fairly [and] expeditiously," while also "reduc[ing] the burden on our immigration courts."

16.    These changes have received considerable congressional and news attention. For example, the *Associated Press* visited almost a dozen immigration courts in the fall of 2019 and reported "nonstop chaos." Journalists observed that "[f]requent changes in the law and rules for how judges manage their docket make it impossible to know what the future holds when immigrants finally have their day in court." In January 2020, the House Subcommittee on Immigration and Citizenship held a public hearing on the state of judicial independence and due process in the immigration courts, receiving extensive testimony of a system in crisis. More than two years later, a story published in the *Guardian* reported that the dysfunction continues, with immigration courts "struggling to function at the most basic level," and judges "overwhelmed by a growing backlog of more than 1.6 million cases." Congress continues to consider reforms to this day, with several House members having introduced H.R. 6577, a bill that would move the

immigration court system from the Department of Justice in an effort to make the courts more independent.

## II.     EOIR's Speaking Engagement Policy

17.     Prior to 2017, immigration judges routinely spoke at local and national conferences, guest lectured at universities and law schools, participated in practical legal trainings, and published law review articles and other legal commentary—all in their private capacities. For example, they spoke on panels addressing the immigration consequences of criminal activity, the use and effect of international law on asylum claims, best practices for representing young people in immigration cases, and professional ethics in immigration law. They participated in pro bono trainings and mock trials where they taught attorneys the essentials of immigration court representation and how to avoid common mistakes. They also published articles in law reviews and legal magazines on topics ranging from the impact of criminal convictions under immigration law, to undocumented workers' entitlement to state workers' compensation, to projects and strategies to increase the representation of poor migrants before the immigration courts. EOIR never claimed that this speech caused harm to the agency's mission or operations.

18.     While approval was required for this speech prior to 2017, immigration judges routinely received that approval. Judges would submit a request to their supervising Assistant Chief Immigration Judge ("supervisor"). If the supervisor approved the request, they would forward it to EOIR's Ethics office, which would then offer ethics guidance. Judges were generally permitted to use their official titles to identify themselves in connection with their speaking or writing, so long as they also included a disclaimer stating that the views presented were their own and not those of EOIR. EOIR described this kind of speech as "personal capacity with use of title and disclaimer" or "PTD." This process was memorialized in the 2011 Ethics and Professionalism Guide for Immigration Judges, and it remained in place until EOIR issued a new policy in 2017.

19.     Starting in 2017, EOIR made a series of revisions to its speaking engagement policy that strictly limited the ability of judges to engage in private-capacity speech, with or without a disclaimer. Under EOIR's current policy, immigration judges are categorically banned from speaking publicly in their private capacities about immigration or EOIR, and must continue to go through an onerous preapproval process before speaking publicly in their private capacities on other topics.

20.     EOIR has warned judges that failure to comply with its speaking engagement policy may result in disciplinary action, including reprimand, suspension, and even removal from the federal service.

### A.     The 2017 Policy

21.     On September 1, 2017, former EOIR Director James R. McHenry III issued a memorandum titled "Speaking Engagement Policy for EOIR Employees" (the "2017 Policy"), which required all immigration judges who wished to speak publicly to submit a request to their supervisor.[1]

22.     Under the 2017 Policy, supervisors were charged with deciding whether a speaking engagement would be undertaken in a judge's "personal" or "official" capacity (as defined by the policy), and whether to approve the request. Immigration judges who wished to speak on "immigration-related topics" or whose requests were reclassified as "official capacity" were then required to seek a second level of approval from the centralized speaking engagement team (the "SET").

---

[1] A true and correct copy of the 2017 Policy is attached hereto as Attachment 1.

23.     The 2017 Policy did not specify any criteria for EOIR officials to consider in determining whether to approve "personal capacity" speaking requests. Nor did the policy require them to make decisions within any particular time frame.

24.     After the 2017 Policy was issued, NAIJ initiated collective bargaining over the policy's implementation. The parties' negotiations yielded a two-page Memorandum of Understanding (the "2018 MOU"), which set out certain procedures relating to the application of the 2017 Policy to immigration judges. Because NAIJ has been formally decertified, these procedures are no longer in effect.

### B.     The 2020 Policy

25.     On January 17, 2020, Director McHenry issued a memorandum titled "Submission and Processing of Requests for Speaking Engagements" (the "2020 Policy").[2] Although the 2020 Policy purported to "reissu[e]" without "substantively alter[ing]" the 2017 Policy, it was significantly more restrictive than its predecessor in several important ways.

26.     First, the 2020 Policy extended to all "written pieces intended for publication," not only to public speaking. Second, the 2020 Policy categorically prohibited immigration judges from publicly speaking in their private capacities about immigration or EOIR. It did so by deeming "official" any speech relating to "immigration law or policy issues, the employee's official EOIR duties or position, or any agency programs and policies." Third, the 2020 Policy instituted additional layers of review, creating further opportunities for delay. Under the 2020 Policy, immigration judges were required to submit all speaking requests—regardless of speaking capacity or content—to four levels of review: by their supervisor, by the SET, by the Ethics Program ("Ethics"), and by their supervisor a second time for final decision. In cases involving speeches,

---

[2] A true and correct copy of the 2020 Policy is attached hereto as Attachment 2.

written pieces, or other prepared materials, the supervisor could condition approval on making certain changes.

27.    The 2020 Policy also shared many of the 2017 Policy's defects. It did not include narrow or objective criteria for deciding whether to approve speaking requests the agency deemed "personal capacity"; and it did not impose any firm deadline for a decision.

### C.    The 2021 Policy

28.    On October 12, 2021, EOIR Director David L. Neal issued a new speaking engagement policy (the "2021 Policy" or "Policy"),[3] which canceled the 2020 Policy. The 2021 Policy was issued after EOIR sought a stay of NAIJ's appeal in this case, to allow new agency leadership an opportunity to revise the policy. The new policy, however, retains the central flaws of its predecessor.

29.    First, and most significantly, the 2021 Policy categorically prohibits immigration judges from speaking publicly about immigration or EOIR in their private capacities by deeming "official capacity" all speech that discusses "agency policies, programs, or a subject matter that directly relates to [immigration judges'] official duties." An attachment to the 2021 Policy confirms that, in the agency's view, the entire subject matter of immigration "directly relates" to an immigration judge's duties and thus may not be discussed publicly by immigration judges in their private capacities.

30.    Second, the 2021 Policy continues to subject private-capacity speech unrelated to immigration or EOIR to a burdensome prior review scheme. Though the Policy purportedly eliminates the preapproval requirement for "personal capacity" speech "unrelated to [an immigration judge's] official duties," it includes a significant carve out to this rule. If a speaking

---

[3] A true and correct copy of the 2021 Policy is attached hereto as Attachment 3.

engagement occurs during working hours, a requesting judge must submit a leave request; the supervisor is then entitled to "inquire how [the judge] intends to use the time," and must "approve[]" not only the leave request, but also the "engagement" itself. As explained further below, the Policy does not include any criteria to guide this decision. The Policy thus leaves a supervisor free to question a judge about the content of their proposed "personal capacity" speech and deny approval for any reason, including the judge's viewpoint.

31.    The 2021 Policy also allows agency officials to control judges' "personal capacity" speech even where formal preapproval may not be required. For example, "whether or not [a judge] opted to seek supervisory approval" for a proposed speaking engagement in the first instance, "if the circumstances surrounding the [engagement] change"—as the details of planned engagements often do—the Policy states that the judge "should convey such changes to the supervisor to consider the advisability of the [judge]'s continued participation." The Policy also states that a supervisor may "provide direction" on the content of a judge's proposed speech whenever it is possible that a planned engagement "may result in the perception by the public that the engagement relates to the [judge]'s official duties or employment with EOIR."

32.    Although EOIR's counsel in this case has maintained that preapproval is never required for "personal capacity" speech unrelated to immigration or the agency, the agency itself has demonstrated confusion on this point. For example, in October 2022, the Office of General Counsel ("OGC") advised one NAIJ member that although she did not require preapproval to publish a work of fiction that was unrelated to immigration, she was required to inform the office if asked to give an interview or talk about the book "so that both Ethics and [the Communications and Legislative Affairs Division] could clear [the speaking engagement]."

33.     Third, the prior review scheme maintained by the 2021 Policy lacks adequate safeguards.

34.     The 2021 Policy provides that requests for preapproval to speak in a private capacity must undergo multiple layers of review. A judge's request to speak in their "personal capacity" will be reviewed by their supervisor in the first instance. If the supervisor determines that a "personal capacity" request relates to the judge's official duties, the supervisor must submit the request to the SET for guidance—"regardless of the [judge's] proposed capacity." The supervisor may also seek the SET's guidance in determining whether an employee who wishes to speak in a "personal capacity" should, instead, be directed to speak in an "official capacity." If the supervisor approves the engagement, the supervisor next obtains guidance from Ethics about any ethical obligations that may impact the judge's decision to participate. The supervisor then conducts a "final review" of a judge's request, "including consideration of any guidance received from the SET." After the supervisor completes this review, they must inform the judge of their decision. The supervisor may also advise the judge of any guidance offered by the SET and will provide any guidance offered by Ethics.

35.     Judges who wish to speak about immigration-related topics in their private capacities but are forced by the Policy to seek preapproval to do so in their official capacities face an identical process. Under the 2021 Policy, these judges must continue to submit their requests to their supervisor. The request is then reviewed by the SET and Ethics before the supervisor makes a final determination as to whether to approve or deny the request.

36.     The 2021 Policy's prior review scheme does not include narrow or objective criteria for resolving requests by judges who wish to speak in their private capacities. The Policy does not impose any limit on the discretion of supervisors to grant or deny "personal capacity" requests or

requests that are improperly deemed "official capacity" merely because a judge wishes to speak about immigration-related topics. Nor does the Policy impose any limit on the discretion of the SET, which is broadly charged with "ensuring compliance with both the law and agency policy while also promoting consistency in all of EOIR's communications." The sum total of the Policy's guidance to EOIR officials is to "grant appropriate requests."

37.    In practice, the agency uses this process to ensure that judges who speak publicly about immigration stick to the agency's talking points. When an immigration judge's supervisor seeks "guidance" about the appropriate capacity for a speaking engagement request, the OGC "determines" the appropriate capacity. If it determines that a request is "official capacity"—as it is required to do when the request is to speak about immigration—it forwards the request to the Office of Policy's Communications and Legislative Affairs Division, which EOIR's website states is tasked with "present[ing] a unified voice for EOIR and . . . ensur[ing] consistency with the Attorney General's messages." Requests to publish writing go through additional layers of review by senior officials from the OGC, the Office of Policy, and the Office of Director to ensure that approval is granted only if a proposed publication conforms to the agency's official views.[4]

38.    The Policy also does not impose any firm deadline for decision. As a result, final decisions are often delayed for months or, sometimes, never issued at all.

**III.    Harms to Immigration Judges and the Public**

39.    Recent changes to immigration law and policy, the state of the immigration court system, and the role of immigration judges are of immense public interest. After the 2017 Policy went into effect, however, immigration judges were routinely denied permission to speak publicly

---

[4] While the 2021 Policy describes the SET's input as "guidance," in reality, supervisors treat this input as determinative both as to the appropriate capacity for a speaking engagement request and as to whether the request should be approved or denied.

in their private capacities about immigration, and many were chilled from even seeking permission to do so. Then, in 2020, EOIR categorically banned judges from speaking publicly in their private capacities about immigration or the agency. This ban remains in place under the 2021 Policy, depriving the public of judges' expertise and insights on matters of urgent public interest. The experiences of specific NAIJ members injured by the Policy are described at paragraphs 47 to 54.

### A.   Immigration Judges Have Been Prevented from Speaking about Matters of Public Concern in their Private Capacities

40.    As explained above, immigration judges often spoke at local and national conferences, guest lectured at universities and law schools, and participated in immigration law trainings before 2017—all in their private capacities. While they were required to seek supervisory approval, they generally got it. After the 2017 Policy went into effect, however, immigration judges who wished to speak about immigration were required to seek two levels of approval rather than one, and those who sought approval often did not get it or failed to receive a timely decision.

41.    Requests relating to speaking engagements that immigration judges had undertaken for years in their private capacities were suddenly denied. For example, in March 2018, an immigration judge submitted a request to speak at the immigration law clinic at his alma mater, something he had done annually, with EOIR's approval, since the clinic's inception. In an email forwarding the request to the SET, the judge's supervisor described him as "an outstanding candidate to conduct the speaking engagement." The SET denied the immigration judge's request, eventually explaining that "[b]ecause your topic concerned immigration court matters, and you were invited to speak because of your position as an immigration judge, personal capacity is not allowable." According to the SET, speaking engagements related to immigration were official capacity and had to be handled by EOIR "management officials" to ensure consistency in the agency's messaging: "[I]mmigration is always a topic of great interest and debate, and many

employees are understandably unprepared to present the Department's official view when presented with thorny questions and topics." By contrast, "[m]anagement officials, as part of their official duties, are routinely briefed on ongoing litigation and the Department's position on sensitive topics."

42.    EOIR repeatedly confirmed that position in rejecting requests by immigration judges to speak in their private capacities about immigration. For example, in April 2018, the SET denied an immigration judge's request to speak to a Harvard Law School class "due to the nature of the topic (asylum claims involving children)."

43.    The same month, a different immigration judge submitted a request to participate in her "personal capacity" on a Practising Law Institute panel on immigration and recent developments in asylum law. Months later, and only three days before the panel was scheduled to take place, the SET rejected her request because "the nature of the event calls for official capacity and supervisory immigration judges should represent EOIR at events such as this one." EOIR rejected the request even though the judge had been approved to participate in her "personal capacity" on the same panel the previous year.

44.    In September 2019, another immigration judge sought approval to speak in her "personal capacity" to an immigration class at her former law school via Skype. Her supervisor approved the request. One day before she was scheduled to attend the class, however, the SET denied the request, explaining that the topic was "too closely related to [the judge's] official duties to permit participation in her personal capacity." The SET also explained that appearing in an official capacity was not appropriate because it was not clear "[the judge's] participation would advance [EOIR]'s interests."

45.    In other cases, EOIR delayed its decision or failed to provide one, effectively denying the request to speak. For example, in February 2019, an immigration judge asked for permission to speak in his "personal capacity" to a seventh-grade class about immigration and asylum law. Although he received supervisory approval, he did not receive a response from the SET for a full month. Finally, two days before the event, the judge's supervisor told him informally that the SET was planning to deny the request. The judge canceled the visit, but the SET never sent a formal denial or explained its decision. The judge followed up in April 2019, and again in May 2019, explaining that he was "still hopeful to do the talk, even if it means changing my presentation to address whatever concerns exist." The judge never received a response.

46.    Thus, even before the 2020 Policy and the 2021 Policy were enacted, many immigration judges came to believe that it was futile to submit requests to speak publicly about immigration in their private capacities. Under the 2020 Policy, immigration judges were simply prohibited from speaking publicly in their private capacities about issues related to immigration law or policy or EOIR's policies and programs.

47.    The prohibition against speaking publicly in a private capacity about immigration law or policy continues under the 2021 Policy. Accordingly, many judges who wish to share their private views on substantive questions of immigration law or policy no longer do so. For example, NAIJ President Judge Mimi Tsankov used to speak and write extensively in her private capacity about issues and developments in immigration law, but she understands the 2021 Policy to forbid her from doing so. For instance, in the years prior to 2017, Judge Tsankov was a frequent panelist at regional, national, and international law conferences, presenting on a wide variety of immigration law topics including mental competency and juvenile docket hearings, to court practice and procedure, and "crimmigration" matters. She also published articles in law journals

16

and magazines on topics ranging from the delegation of immigration authority to law enforcement under Section 287(g) of the Immigration and Nationality Act to immigration benefits for victims of domestic violence in the United States and the European Union. She was permitted to engage in this speech in her "personal capacity" with the use of a title and disclaimer.

48.    Although Judge Tsankov continues to speak publicly about issues relating to immigration judges' working conditions in her union capacity as President of NAIJ, the 2021 Policy has deterred her from seeking approval to discuss substantive questions of immigration law in her private capacity. For example, she would like to participate in panel presentations addressing the recent evolution of asylum relief for vulnerable groups such as domestic violence victims and juveniles, and state and local immigration enforcement under the Section 287(g) program. She would also like to write follow-up articles on topics such as mental competency in immigration court proceedings, and domestic violence-related protections for unauthorized migrants in the United States and the European Union. She has not sought preapproval to do so, however, because she understands the Policy to prohibit her from speaking about these issues in her private capacity, and because speaking instead in an "official capacity" would require her to recite the agency's talking points.

49.    Other judges have continued to seek preapproval to speak about immigration, but have felt compelled to seek approval to speak in an "official capacity," or else allow the agency to determine the appropriate capacity, even when they would prefer to speak in their private capacities with the use of a disclaimer. These judges wish to share their private views on immigration law and policy issues—not the official views of the agency. However, they believe that under the 2021 Policy any request to speak about these issues in a "personal capacity" will automatically be rejected. For example, on September 2, 2022, NAIJ Vice President Judge Samuel

17

Cole emailed his supervisor a request to publish an article on immigration court bond hearings in Law360, a service that publishes legal news and analysis. Although he did not wish to speak on behalf of the agency, he requested approval to speak in his "personal" *or* "official capacity" because he believed that the agency would deny him approval to speak in his personal capacity, and he would rather publish the article than not at all.

50.    Judges who seek approval to speak about immigration under the 2021 Policy often encounter severe delays, and some receive no formal response at all. For example, Judge Cole's request remains pending, more than four months after he submitted it. On October 4, 2022, Judge Cole's supervisor informed him that the OGC had determined that his request was "official capacity," and consequently that "approval and clearance from the [Communications and Legislative Affairs Division] and [Office of the Director]" was necessary. When Judge Cole wrote to the SET the same day requesting a timeline, the Chief of Communications and Legislative Affairs Division said that he could not provide one. On October 17, 2022, Judge Cole again followed up, with no response. However, he was later informed by his supervisor that because he was seeking preapproval for a written publication (rather than an oral statement), his request must "go[] through two extra reviews: first to the OGC Immigration Law Division, and then to the [Office of Policy] Front Office." On October 20, 2022, Judge Cole's supervisor sent Judge Cole a revised version of his article with edits and comments from the SET. The supervisor noted that the piece had been reviewed by the OGC and the Communications and Legislative Division, but it did not appear to have been reviewed by the Office of the Director. On November 1, 2022, Judge Cole sent his supervisor revisions in response to the comments from the SET. He has not heard anything about his request since.

51.    The revisions sent to Judge Cole demonstrate the control that the agency exercises over immigration-related speech that the agency deems "official capacity." Judge Cole's article seeks to give practitioners practical advice on how to approach immigration court bond hearings based on his experience as an immigration judge. The Assistant Director of EOIR's Office of Policy made several edits to the tone and substance of the piece. She also stated that certain observations made in the piece were not appropriate because they were not the official view of the agency. For example, in response to one observation, she asked: "In an official capacity, is this a 'sanctioned' EOIR practice tip?" In response to another couched as the "author's opinion," she wrote: "Again, is this an EOIR tip? If so, should not be expressed as author's opinion. If not, evaluation must be done as to whether appropriate in official capacity." Even after making many of the advised changes, Judge Cole's request remains in limbo.

52.    A different judge encountered similar delays after submitting a request to publish an article on immigration policy in Law360.[5] On September 6, 2022, the judge emailed the draft article titled "Five Perspectives on Immigration Law and Policy" to her supervisor, requesting that the supervisor forward her request to the SET, and explaining that she hoped to send the article to the publisher by the end of the week. Although the judge wished to publish the article in her private capacity with the use of a disclaimer, she did not specify the capacity for which she sought approval to maximize the chance approval would be granted. The request was forwarded to the SET the next day. On October 5, 2022, after the judge followed up on the status of the request, the judge's supervisor asked the SET for an update. The SET responded that because the request "involves a publication review, it is going to need an extra step and will be reviewed by the [Office of General

---

[5] This judge, who is a member of NAIJ, does not wish to be identified at this stage because her request remains pending.

Counsel] and [Office of the Director] (in addition to the normal SET process)." On October 11, 2022, the judge's supervisor again followed up, after the judge indicated that their publisher was ready to publish, and was told that review could take a "few more weeks." The judge's supervisor followed up again on October 21, November 4, November 17, and December 8. The SET did not provide an anticipated date of completion in response to any of these inquiries, although it confirmed that the article was "getting an additional layer of review among senior officials because of the article's subject matter and the fact that the author is an [immigration judge]." The judge's request remains pending. It is unclear whether Law360 will remain interested in publishing the article if the judge ever receives approval.

53.     Although the 2021 Policy provides that immigration judges interested in teaching immigration law courses require only supervisory approval, in practice requests to teach are routed to the SET, and judges who have sought approval often receive no decision. For example, on November 3, 2022, Judge Tsankov requested approval to teach in her "personal capacity" an International Law and Justice practicum at Fordham Law School in the Spring 2023 semester. Despite having received approval to teach the same class in past years, her request remains pending. Similarly, NAIJ member Judge Frank James Loprest requested approval to teach a Spring 2023 immigration law course at St John's University School of Law on October 20, 2022. To date, the agency has neither approved nor denied the request. Both judges are concerned about placing the law schools that have invited them to teach in a difficult position should the agency deny their requests at the last moment.

54.     In some cases, the agency's response is so delayed that the judge is no longer able to participate in the proposed speaking engagement. For example, on October 3, 2022, NAIJ member Judge Michael Straus sought approval to speak at the November 17, 2022 meeting of the

Connecticut chapter of the American Immigration Lawyers Association ("AILA") about immigration court practice. Judge Straus wished to speak at this event on his own behalf—not on behalf of the agency. He requested approval to speak in his "official capacity," however, because he believed that this is what the Policy required him to do. On November 1, Judge Straus's supervisor asked the judge to submit talking points for the event that he could forward to the SET for their consideration. He explained that the judge would not be permitted to speak about EOIR and court "initiatives, updates, and policies because those are topics that only the [Assistant Chief Immigration Judge] and [Court Administrator] can generally speak about to outside groups." However, if the judge wished to "speak about particular practices and preferences in [his] specific courtroom, then [the SET] may consider that." Judge Straus submitted talking points the next day, which indicated that he would confine his remarks to his docket and that he would include a disclaimer that his remarks did not "reflect[] the views of other immigration judges or EOIR." He did not hear back until November 17, the day of the meeting. Although he was approved to speak in his "official capacity," his supervisor reiterated that he could not speak about agency or court programs and policies. And when he told the event organizers that he could attend the meeting, they informed him that they had changed their plans for the meeting because they assumed the agency's silence meant that he would not be able to attend.

55.     As these examples demonstrate, the 2021 Policy injures NAIJ's members in a wide variety of ways. Members who wish to speak about immigration law or policy issues in their private capacities are chilled from doing so because they believe the Policy prohibits this speech. Although some members have continued to seek approval to speak about these issues in their "official" capacities, speaking in this capacity limits what they can say. As non-supervisory judges, they are constrained in the topics they can speak about in their official capacities. And even when

approved to speak on an issue, the agency retains tight control over what they say. Moreover, members who seek approval to speak in a "personal" *or* "official" capacity do not receive timely decisions, if they receive any decisions at all. This also chills members from seeking approval to speak.

56.     Notably, the Social Security Administration's more than 1,500 Administrative Law Judges ("ALJs") are not subject to any similar restrictions. Under Social Security Administration policy, ALJs are permitted to speak publicly in their private capacities about issues relating to social security law and policy and the Social Security Administration itself, so long as they comply with ethics requirements. Although they are encouraged to seek preapproval from their supervisors, they are not required to do so. The Social Security Administration relies upon ALJs to use their judgment to avoid speaking engagements that may create a conflict or apparent conflict of interest.

   **B.     The Public Has Been Denied the Opportunity to Hear from Immigration Judges Who Would Have Otherwise Spoken in their Private Capacities**

57.     Given the new restrictions on speech by immigration judges, those who once invited them to speak have been deterred from doing so. The effect is to deny the public access to insights about how recent changes to immigration law and policy are working in practice, and to create the perception that EOIR employees uniformly support the administration's policies.

58.     In October 2019, four clinical legal professors wrote an article in *Slate* describing the impact of the 2017 Policy on their ability to get immigration judges to speak to their students. The professors—Laila L. Hlass of Tulane Law School, Elora Mukherjee of Columbia Law School, Carrie L. Rosenbaum of the Golden Gate University School of Law, and Maureen Sweeney of the University of Maryland Francis King Carey School of Law—noted that in past years judges had

routinely visited their classes to speak about immigration law and policy, but that recently things had changed:

> [A]lmost all have declined [invitations]. They've told us they can't speak with our classes even on their days off, even in their personal capacities, without prior clearance and approval from high-level supervisors—approval that is increasingly difficult to obtain.

59.    Advocacy and professional organizations that once hosted immigration judges at events have also been affected. For example, organizations like the Federal Bar Association, AILA, the Practicing Law Institute, and Human Rights First have reported no longer being able to rely on the expertise of immigration judges at their events or trainings. Some of these organizations have simply given up on inviting active immigration judges, and have instead turned to retired ones.

60.    AILA and its thirty-nine local chapters routinely hold a range of events, including conferences and continuing legal education classes. Many of these events are open to the public. In past years, immigration judges frequently spoke at these events. Following the issuance of the 2017 Policy, however, immigration judges generally declined requests to attend. Many chapters simply stopped extending invitations.

61.    The experience of AILA's South Florida chapter is illustrative. Prior to 2017, immigration judges met with members of the community at chapter events at least four or five times a year—judges sat on panels at the chapter's annual conference, participated in the chapter's monthly CLE training events for its members, and joined pro bono training programs for corporate attorneys. But in 2017, immigration judges began rejecting invitations or stopped responding to them altogether.

62.    In an effort to fill the void left by active immigration judges, AILA and some of its local chapters began relying on retired immigration judges to participate in educational

23

conferences and other events. In April 2020, for example, AILA organized an online panel discussion on recent developments in immigration litigation. The staff member responsible for the event had hoped to invite active immigration judges, but, believing that extending an invitation would be futile, she invited only retired judges.

### First Cause of Action

63.     The 2021 Policy violates the First Amendment because it imposes a system of prior restraint on the speech of immigration judges, because it is not appropriately tailored to any legitimate government interest, and because it fails to include adequate procedural safeguards.

### Second Cause of Action

64.     The 2021 Policy is void for vagueness under the First and Fifth Amendments because it invites arbitrary and discriminatory enforcement, and because it fails to give immigration judges fair notice of what standards will be applied in reviewing their requests for preapproval.

### Prayer for Relief

Plaintiff respectfully requests that this Court:

1.     Declare that the 2021 Policy violates the First and Fifth Amendments to the Constitution;

2.     Enjoin Defendant and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from continuing to enforce the 2021 Policy;

3.     Award Plaintiff its reasonable costs and attorneys' fees in this action; and

4.     Grant Plaintiff such other relief as this Court may deem just and proper.

Dated: January 9, 2023

Respectfully submitted,

 /s/ *Victor M. Glasberg*
_____
Victor M. Glasberg (VA 16184)
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
T: (703) 684-1100
F: (703) 684-1104
VMG@robinhoodesq.com

 /s/ *Ramya Krishnan*
_____
Ramya Krishnan (*Pro Hac Vice*)
Alexia Ramirez (*Pro Hac Vice*)
Alex Abdo (*Pro Hac Vice*)
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
T: (646) 745-8500
F: (646) 661-3361
ramya.krishnan@knightcolumbia.org

*Counsel for the Plaintiff*

## CERTIFICATE OF SERVICE

I, Victor M. Glasberg, hereby certify that on January 9, 2023, the forgoing Second

Amended Complaint for Declaratory and Injunctive Relief was filed using the Court's CM/ECF

system, through which counsel for all parties will be served.

 /s/ *Victor M. Glasberg*
Victor M. Glasberg (VA 16184)
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
T: (703) 684-1100
F: (703) 684-1104
VMG@robinhoodesq.com