## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

|  |  |
|---|---|
| NATIONAL ASSOCIATION OF IMMIGRATION JUDGES, affiliated with the International Federation of Professional and Technical Engineers,<br><br>   Plaintiff,<br><br> v.<br><br>DAVID L. NEAL, in his official capacity as Director of the Executive Office for Immigration Review,<br><br>   Defendant. | Civil Action No. 20-cv-731 (LMB/JFA) |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Victor M. Glasberg (VA 16184)
Nickera S. Rodriguez (VA 95952)
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
T: (703) 684-1100
F: (703) 684-1104
vmg@robinhoodesq.com

Ramya Krishnan, *Pro Hac Vice*
Alexia Ramirez, *Pro Hac Vice*
Alex Abdo, *Pro Hac Vice*
Knight First Amendment Institute
 at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
T: (646) 745-8500
F: (646) 661-3361
ramya.krishnan@knightcolumbia.org

*Counsel for Plaintiff*

**Table of Contents**

Table of Authorities ................................................................................................................ iii

Introduction ............................................................................................................................ 1

Statement of Facts .................................................................................................................. 3

     A.    EOIR's Speaking Engagement Process Prior to 2021 ..................................... 3

     B.    The 2021 Policy ............................................................................................. 5

Argument ................................................................................................................................ 6

  I.    NAIJ has associational standing .................................................................................. 6

     A.    NAIJ has sufficiently alleged that its members are suffering an injury
          in fact. .......................................................................................................... 6

     B.    NAIJ has established causation and redressability ........................................ 11

  II.   The Policy violates the Constitution. ........................................................................ 11

     A.    The Policy violates the First Amendment. ................................................... 11

         1.    Because the Policy is a prior restraint on the protected speech of
             public employees, it is subject to exacting scrutiny under *NTEU*. ............ 12

         2.    The Policy does not survive *NTEU*'s exacting scrutiny ........................... 15

     B.    The Policy is void for vagueness under the Fifth Amendment. ..................... 19

  III.  The Civil Service Reform Act does not impliedly divest this Court of
      jurisdiction over NAIJ's claims ................................................................................. 21

     A.    NAIJ's claims would not receive meaningful judicial review through
          the CSRA ...................................................................................................... 22

         1.    The CSRA does not apply to NAIJ's claims because NAIJ is
             challenging an employee speech policy—not a covered
             employment action. .................................................................................. 23

         2.    Even if NAIJ's claims fell within the CSRA, NAIJ still could not
             obtain meaningful judicial review through the statute. ............................. 27

     B.    NAIJ's claims are wholly collateral to the CSRA because they do not
          seek to reverse a covered employment action. .............................................. 29

C.      NAIJ's claims are beyond the Merit Systems Protection Board's
         expertise. ....................................................................................................... 30

Conclusion................................................................................................................................... 30

## Table of Authorities

**Cases**

*Able v. United States*, 88 F.3d 1280 (2d Cir. 1996) .................................................................. 28

*Barone v. City of Springfield*, 902 F.3d 1091 (9th Cir. 2018) ...................................................... 15

*Benham v. City of Charlotte*, 635 F.3d 129 (4th Cir. 2011) .......................................................... 6

*Bennett v. SEC*, 844 F.3d 174 (4th Cir. 2016) ...................................................................... 22, 29

*Bing v. Brivo Sys., LLC*, 959 F.3d 605 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1376 (2021) ....................................................................................................................... 14

*Borzilleri v. Mosby*, 874 F.3d 187 (4th Cir. 2017) ................................................................. 17, 18

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) ............................................................ 16

*Cooksey v. Futrell*, 721 F.3d 226 (4th Cir. 2013) ............................................................. 6, 8, 10

*Cornelio v. Connecticut*, 32 F.4th 160 (2d Cir. 2022) ................................................................ 16

*Cuviello v. City of Vallejo*, 944 F.3d 816 (9th Cir. 2019) ............................................................ 28

*Edgar v. Haines*, 2 F.4th 298 (4th Cir. 2021) .................................................................... passim

*Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) .................................................... 22, 23, 29, 30

*Elrod v. Burns*, 427 U.S. 347 (1976) .................................................................................... 8

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ........................................................ 20

*Firenze v. NLRB*, No. 12-CV-10880, 2013 WL 639151 (D. Mass. Jan. 10, 2013) ...................... 25

*Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005) .................................................................... 29

*Fort Stewart Schs. v. FLRA*, 495 U.S. 641 (1990) .................................................................. 26

*Free Enter. v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) ............................................ 28

*Freedman v. Maryland*, 380 U.S. 51 (1965) ........................................................................... 10

*Guffey v. Mauskopf*, 45 F.4th 442 (D.C. Cir. 2022) .............................................................. 15, 17

*Hall v. Ford*, 856 F.2d 255 (D.C. Cir. 1988) ......................................................................... 18

*Harman v. City of New York*, 140 F.3d 111 (2d Cir. 1998) ...................................................... 18, 19

*Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 138 S. Ct. 2448 (2018) ................................................................................................................. 11

*Jenkins v. Medford*, 119 F.3d 1156 (4th Cir. 1997) ...................................................... 18

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ...................................... 13, 14

*Kenny v. Wilson*, 885 F.3d 280 (4th Cir. 2018) ......................................................... 9, 10

*Lane v. Franks*, 573 U.S. 228 (2014) .................................................... 11, 13, 15, 26

*Liverman v. City of Petersburg*, 844 F.3d 400 (4th Cir. 2016) .................................. 12, 16, 17, 28

*Manivannan v. U.S. Dep't of Energy*, 42 F.4th 163 (3d. Cir. 2022) ............................................ 23

*McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998) ............................................................ 17

*McVey v. Va. Highlands Airport Comm'n*, 44 F. App'x 630 (4th Cir. 2002) .............................. 18

*Moonin v. Tice*, 868 F.3d 853 (9th Cir. 2017) ......................................................... 18, 19

*NAIJ v. McHenry*, 477 F. Supp. 3d 466 (E.D. Va. 2020) ............................................ 25

*NAIJ v. Neal*, No. 20-1868, 2022 WL 2045339 (4th Cir. June 7, 2022) ............................ 25

*Nat'l Taxpayers Union v. Soc. Sec. Admin.*, 376 F.3d 239 (4th Cir. 2004) ................................ 29

*Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ....................................................... 28

*Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445 (D.C. Cir. 2009) ............................ 29

*Pinar v. Dole*, 747 F.2d 899 (4th Cir. 1984) ............................................................ 27

*Ramirez v. Customs and Border Prot.*, 709 F. Supp. 2d 74 (D.D.C. 2010) .................... 26, 27, 29

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002) ............................................ 16

*Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541 (4th Cir. 2010) .......................... 9

*Rydie v. Biden*, No. 21-2359, 2022 WL 1153249 (4th Cir. 2022) ................................. 25, 29

*Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995) ........................................................ 18, 21

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .......................................... 10

*Tabaddor v. Holder*, 156 F. Supp. 3d 1076 (C.D. Cal. 2015) ..................................... 25

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) .............................................. 22

*Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333 (D.D.C. 2020) ................ 24, 25, 26

*U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) ........................................ 20

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) .................................. passim

*Urofsky v. Gilmore*, 216 F.3d 401 (4th Cir. 2000) ......................................................... 13

*Weaver v. U.S. Info. Agency*, 87 F.3d 1429 (D.C. Cir. 1996) ................................. passim

*Wernsing v. Thompson*, 423 F.3d 732 (7th Cir. 2005) ................................................ 10

*Wolfe v. Barnhart*, 446 F.3d 1096 (10th Cir. 2006) ..................................................... 21

*Yates v. United States*, 574 U.S. 528 (2015) ................................................................. 26

**Statutes**

5 U.S.C. § 1214 .............................................................................................................. 27, 28

5 U.S.C. § 2301 .............................................................................................................. 23

5 U.S.C. § 2302 .............................................................................................................. 23, 26

5 U.S.C. § 7503 .............................................................................................................. 25

5 U.S.C. § 7512 .............................................................................................................. 23, 28

5 U.S.C. § 7513 .............................................................................................................. 25, 27, 28

5 U.S.C. § 7703 .............................................................................................................. 27, 28

8 C.F.R. § 1003.10 (2021) .............................................................................................. 3

8 U.S.C. § 1101 .............................................................................................................. 3

**Other Authorities**

71 F.L.R.A. 1048 ............................................................................................................ 17

Code of Conduct for U.S. Judges Canon 4 (Judicial Conference 2019) ...................... 16

Ethics and Professionalism Guide for Immigration Judges,
    https://perma.cc/M6LA-JUFZ ................................................................................. 4, 14

FRCP 12(d) .................................................................................................................... 14

WA-RP-19-0067 (Reg. Dir. Wash. Region FLRA July 31, 2020),
    https://perma.cc/79Uv-W2FX, *aff'd in part and rev'd in part* 71 F.L.R.A.
    1046 ........................................................................................................................... 14, 17

**Introduction**

This case involves a challenge to a sweeping prior restraint the government has imposed on the nation's immigration judges. Under a policy issued in 2021, the Executive Office for Immigration Review ("EOIR") categorically prohibits immigration judges from speaking publicly in their private capacities about immigration law or policy or about EOIR programs and policies. On a broad range of other topics, it requires judges to submit to an onerous preapproval process. At a time of spirited public debate about the nation's immigration policies, the policy imposes a gag order on public servants in a unique position to educate the public about the immigration system and the effect of recent changes to immigration law and policy. This gag order violates the First and Fifth Amendments. The National Association of Immigration Judges ("NAIJ") seeks a declaration that the policy is unlawful and an injunction against EOIR's enforcement of it.

NAIJ has associational standing to challenge the policy. NAIJ's second amended complaint plausibly alleges that the policy injures its members in a variety of ways: many members who wish to speak about immigration-related topics in their private capacities are chilled from doing so because they believe the policy forbids this speech; those members who continue to seek preapproval feel compelled to seek approval to speak in their official capacities, or to allow the agency to determine the appropriate capacity, even when they would prefer to speak on their own behalf with the use of a disclaimer; when members submit requests that the agency deems official capacity, they are frequently asked to modify the content of their proposed speech to receive approval; in some cases, they are told they cannot address certain issues at all; and many members fail to receive a timely decision if they receive any decision at all. The amended complaint also includes examples of specific members who have suffered these harms. 2d Am. Compl. ("SAC") ¶¶ 47–55. To the extent it was unclear before, these examples establish beyond doubt that NAIJ

has sufficiently alleged that its members are suffering an injury in fact, and that this injury is fairly traceable to the policy and redressable by the declaratory and injunctive relief that NAIJ seeks.

Outside of standing, the government's motion to dismiss largely repeats the arguments it made in its last brief. NAIJ's response is largely the same, with adjustments to address minor variations in the government's brief.

First, contrary to the government's assertion that the policy "encourages" speech, Mot. to Dismiss ("MTD") 3, the policy imposes a prior restraint in violation of the First Amendment. The government may sustain a prior restraint on the speech of public employees only if it can show that "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." *United States v. Nat'l Treasury Emps. Union* (*NTEU*), 513 U.S. 454, 468 (1995) (cleaned up). The government has failed to carry this burden.

Second, the government argues that NAIJ's void-for-vagueness claim fails because NAIJ has not alleged a "pattern of arbitrary enforcement." MTD 28. But this misunderstands NAIJ's complaint, which is that the policy *authorizes* arbitrary enforcement. The policy permits EOIR officials to deny "personal capacity" requests, or requests improperly deemed "official capacity," on any ground—including viewpoint. And while EOIR's counsel insists that there is no preapproval requirement for "personal capacity" speech unrelated to immigration, the text of the policy is sufficiently confused that the agency itself has previously expressed the contrary view.

Third, the government argues that the Civil Service Reform Act ("CSRA") impliedly divests this Court of jurisdiction over NAIJ's claims. MTD 3. This argument runs headlong into precedent. As the D.C. Circuit explained in *Weaver v. U.S. Information Agency*, 87 F.3d 1429 (D.C. Cir. 1996), although the CSRA channels judicial review of challenges to covered

employment actions, it does not withdraw district court jurisdiction over "a simple pre-enforcement attack on a regulation restricting employee speech." *Id.* at 1434. Indeed, under the government's theory, the Supreme Court's seminal case on the free speech rights of public employees—which was filed in district court by federal employees who were subject to the CSRA—was wrongly decided. *NTEU*, 513 U.S. 454.[1]

The Court should deny Defendant's motion to dismiss.

<strong>Statement of Facts</strong>

**A.    EOIR's Speaking Engagement Process Prior to 2021**

Immigration judges are administrative judges who exercise the authority of the United States Attorney General to adjudicate immigration proceedings. SAC ¶ 13; *see also* 8 U.S.C. § 1101(b)(4); 8 C.F.R. § 1003.10 (2021). In this role, they preside over immigration hearings and serve as neutral and impartial arbiters. SAC ¶ 13. Immigration judges undertake this work as employees of EOIR, an agency within the Department of Justice. *Id.* ¶ 12.

Prior to 2017, many immigration judges routinely spoke at local and national conferences, guest lectured at universities and law schools, and participated in immigration-law trainings—all in their private capacities. *Id.* ¶ 17. While approval was required, immigration judges routinely received that approval. *Id.* ¶ 18. Judges would submit a request to their supervising Assistant Chief Immigration Judge ("supervisor"). *Id.* If the supervisor approved the request, they would forward it to EOIR's Ethics Program, which would then offer ethics guidance. *Id.* Judges were generally permitted to use their official titles to identify themselves in connection with their speaking or writing, so long as they also included a disclaimer stating that the views presented were their own

---

[1] The government argues that NAIJ's claims would be precluded by a different statutory scheme if NAIJ is recertified. MTD 9 n.4. On February 3, 2023, however, NAIJ withdrew the petition for recertification it earlier filed with the FLRA.

and not those of EOIR. *Id.* This process was memorialized in the 2011 Ethics and Professionalism Guide for Immigration Judges ("Ethics Guide"). *Id.*

Starting in 2017, however, EOIR issued a series of policies strictly limiting the ability of judges to engage in private speech, with or without a disclaimer. *Id.* ¶ 19. In 2017, the agency issued a policy that established a new and more onerous preapproval process for public speaking requests. *Id.* ¶ 21; Attach. 1 to SAC ("2017 Policy"). Under this policy, immigration judges were required to seek preapproval any time they wished to speak at an event. *See* SAC ¶ 21. Supervisors were charged with deciding whether a speaking engagement would be undertaken in a judge's "personal" or "official" capacity (as defined by the policy), and whether to approve the request. *Id.* ¶ 22. Immigration judges who wished to speak on "immigration-related topics" or whose requests were reclassified as "official capacity" were then required to seek a second level of approval from the centralized speaking engagement team (the "SET"). *Id.* The 2017 Policy did not specify any criteria for EOIR officials to consider in determining whether to approve speaking requests or require officials to make decisions within any particular time frame. *Id.* ¶ 23.

In 2020, the agency replaced this policy with a still more restrictive one that applied whenever an immigration judge wished to publicly speak or write. *Id.* ¶ 26; Attach. 2 to SAC ("2020 Policy"). Most significantly, the policy categorically prohibited judges from speaking publicly in their private capacities about immigration or EOIR by deeming "official" any speech relating to those topics. SAC ¶ 26. On all other topics, the policy continued to require judges to seek preapproval, *id.*, but now judges had to submit to four layers of review: by their supervisor, by the SET, by the Ethics Program ("Ethics"), and by their supervisor for a second and final time, *id.* Like the 2017 Policy, the 2020 Policy did not cabin the discretion of EOIR officials to grant or deny speaking requests. It also did not impose any firm deadline for decision. *Id.* ¶ 27.

B.      **The 2021 Policy**

On October 12, 2021, EOIR Director David L. Neal issued a new speaking engagement policy, which retains the central flaws of its predecessor. *Id.* ¶ 28; Attach. 3 to SAC (the "Policy").

First, and most significantly, the Policy categorically prohibits immigration judges from speaking about immigration or EOIR in their private capacities by deeming "official capacity" all speech about "agency policies, programs, or a subject matter that directly relates to [immigration judges'] official duties." SAC ¶ 29; *see also* Policy at 2.

Second, although the Policy purportedly eliminates the preapproval requirement for private-capacity speech unrelated to immigration or EOIR, it continues to subject at least some such speech to a burdensome prior review scheme. SAC ¶ 30; *see infra* Part II.A.1 at 14–15.

Third, this preapproval scheme lacks adequate safeguards. Requests to speak in a private capacity must undergo multiple layers of review. SAC ¶ 34. A judge's request to speak in their "personal capacity" will be reviewed by their supervisor in the first instance. *Id.* If the supervisor determines that the request relates to the judge's official duties, the supervisor must submit the request to the SET for guidance regardless of the judge's proposed capacity. *Id.* Ethics will also "receive and review" all requests that relate to a judge's official duties. Policy at 3. Although Ethics "does not approve or deny requests to speak, it offers guidance to avoid speakers' ethical dilemmas." *Id.* After a supervisor completes "the final review" of a judge's request, "including consideration of any guidance received from the SET," the supervisor will approve or deny the request and will inform the judge of their decision and of any guidance offered by Ethics. SAC ¶ 34. A judge who wants to speak about immigration-related issues in their private capacity but who is forced by the Policy to seek preapproval in their official capacity faces an identical process.

*Id.* ¶ 35. The preapproval scheme does not cabin the discretion of agency officials to grant or deny requests. *Id.* ¶¶ 36–37. Nor does it impose any firm deadline for decision. *Id.* ¶ 38.

**Argument**

**I.     NAIJ has associational standing.**

As a voluntary association of non-supervisory immigration judges, *id.* ¶ 11, NAIJ has standing to vindicate the rights of its members because they have been injured by the Policy. At the last hearing, the Court dismissed NAIJ's amended complaint without prejudice to allow NAIJ to provide specific examples of the harms its members have suffered as a result of the Policy. NAIJ has now done so. Its second amended complaint describes in detail the ways in which specific NAIJ members have been and continue to be harmed by the Policy. *See id.* ¶¶ 47–54. These allegations are more than sufficient to establish NAIJ's standing.

**A.     NAIJ has sufficiently alleged that its members are suffering an injury in fact.**

As the Fourth Circuit has recognized, standing requirements are "'somewhat relaxed in First Amendment cases,' given that even the *risk* of punishment could 'chill[]' speech." *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021) (quoting *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013)). Thus, "the injury-in-fact element is commonly satisfied by a sufficient showing of 'self-censorship, which occurs when a claimant is chilled from exercising [their] right to free expression.'" *Cooksey*, 721 F.3d at 235 (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)). This chilling effect must be "objectively reasonable." *Benham*, 635 F.3d at 135. To satisfy this requirement, the claimant need not show that they have ceased speaking "altogether," but they must show that the challenged regulation "is likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.*

NAIJ has satisfied this test. NAIJ alleges that its members have been chilled in a range of ways. First, many members who wish to speak about immigration law or policy in their private capacities have been chilled from doing so because they believe the Policy forbids this speech. SAC ¶¶ 47, 55. For example, Judge Tsankov used to speak and write extensively in her private capacity about topics such as mental competency and juvenile docket hearings, court practice and procedure, and "crimmigration." *Id.* ¶ 47. She no longer seeks approval to do so, however, because she understands the Policy to prohibit her from speaking about these topics in her private capacity. *Id.* ¶ 48; *see also Edgar*, 2 F.4th at 310 (holding that the decision "not to write about certain topics" is "self-censorship [] enough 'for an injury-in-fact to lie'" (quoting *Cooksey*, 721 F.3d at 236)).

Second, those members who continue to seek preapproval feel compelled to seek approval to speak in their official capacities, or to allow the agency to determine the appropriate capacity, even when they would prefer to speak on their own behalf with the use of a disclaimer. *See* SAC ¶¶ 49, 52, 54. For example, one NAIJ member wished to publish an article on immigration policy in her private capacity with a disclaimer, but she did not specify the speaking capacity when she sought approval "to maximize the chance approval would be granted." *Id.* ¶ 52. Many of these members understand that, if granted approval to speak in their official capacities, the agency will retain control over the content of their speech. However, they believe that any request to speak about immigration-related topics in a "personal capacity" will inevitably be rejected, and they "would rather [speak] than not at all." *Id.* ¶ 49.

Third, members who seek approval to speak about immigration are often asked to edit or modify their proposed speech to receive approval. *See id.* ¶¶ 49–52. For example, when Judge Cole sought approval to publish an article about immigration court bond hearings, EOIR's Office of Policy made "several edits to the tone and substance of the piece" and "stated that certain

observations . . . were not appropriate because they were not the official view of the agency." *Id.* ¶ 51; *see also Cooksey*, 721 F.3d at 233, 235–39 (finding chill where a governmental authority issued the claimant a "red-pen review" of his website identifying "areas of concern"). In other cases, members are told that they may not address certain topics at all. For example, when Judge Straus sought approval to speak about immigration court practice at a local immigration bar meeting, he was told that he could not address agency programs and policies—even on his own behalf with the use of a disclaimer—because those were topics only Assistant Chief Immigration Judges and Court Administrators could speak about publicly. *See* SAC ¶ 54; *Edgar*, 2 F.4th at 310.

Fourth, members who seek approval to speak encounter severe delays, *see* SAC ¶¶ 50, 53–54, further chilling their speech, *id.* ¶ 55. For example, in October 2022, Judge Loprest requested approval to teach a Spring 2023 immigration law course at St. John's University School of Law, but to date, the agency has neither approved nor denied the request. *Id.* ¶ 53. In some cases, the agency's response is so delayed that the judge can no longer participate in the proposed speaking engagement. *Id.* ¶ 54. For example, Judge Straus was approved to speak at the above-mentioned bar meeting only on the day of the meeting—and only in an "official capacity." Because of this delay, the meeting's organizers had already changed their plans, and Judge Straus was not able to speak. *Id.*; *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

The government is wrong, therefore, to assert that NAIJ has alleged only that a "single" immigration judge is chilled by the Policy. MTD 13. NAIJ has alleged that multiple members are chilled in multiple ways. *See* SAC ¶¶ 47–55.

The government's suggestion that NAIJ has only shown subjective—not objective—chill fares no better. *See* MTD 13–14. Citing *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541 (4th

Cir. 2010), the government argues that NAIJ has not demonstrated a "credible threat of sanctions," but that case is inapposite. In *Rock for Life,* the Fourth Circuit held that there was no credible risk of enforcement because the plaintiff's proposed speech did not violate the challenged code of conduct, and because the plaintiff had not "faced threatened or actual disciplinary action" despite having engaged in the speech before. *Id.* at 548–49. Here, the speech that NAIJ's members wish to engage in is unquestionably prohibited by the Policy. Moreover, the absence of any disciplinary action is unsurprising because the Policy has effectively silenced NAIJ's members. Nothing in *Rock for Life*, or any other case, requires NAIJ's members to violate the Policy to challenge it. *See Kenny v. Wilson*, 885 F.3d 280, 288–89 (4th Cir. 2018) (plaintiff need not first expose themselves to sanction to challenge a statute that deters the exercise of First Amendment rights).

The government also argues that NAIJ has failed to support its allegation that delays in preapproval chill its members from speaking. *See* MTD 14–15. But that is false. *See* SAC ¶ 52 (delay of several months meant that judge may not be able to publish article in the publication that solicited it); *id.* ¶ 54 (delay prevented judge from speaking at a planned event). In any event, the critical question is whether the delays would chill a person of ordinary firmness from speaking, and here, they would. Substantial delays prevent judges from being able to timely commit to speaking engagements or to publication deadlines. Time-sensitive requests are especially likely to seem futile because delay is tantamount to denial. Many judges may reasonably abstain from seeking preapproval to spare those who invite them to speak from indeterminate delay, and to spare themselves from professional embarrassment. *See Edgar*, 2 F.4th at 310 (finding the test met in similar circumstances). Meanwhile, organizations that do not receive timely responses from judges are less likely to extend invitations in the future.

While NAIJ's allegations of chill are adequate to establish an injury in fact, NAIJ has also demonstrated an injury in fact on two separate bases. First, NAIJ has plausibly alleged that the Policy imposes a prior restraint on the speech of its members in two ways: by banning certain speech, and by subjecting other speech to a burdensome prior review scheme. *See* SAC ¶¶ 29–37, 47–49, 55; *see also* Pl.'s First Opp. 18. Under the Supreme Court's prior restraint cases, that is sufficient to confer standing. NAIJ need not point to specific members who have flouted the policy or been denied permission to speak. *See, e.g.*, *Freedman v. Maryland*, 380 U.S. 51, 56 (1965); *see also Wernsing v. Thompson*, 423 F.3d 732, 743–44 (7th Cir. 2005) (collecting cases).

Second, NAIJ has plausibly alleged that its members would like to engage in conduct at least arguably protected by the First Amendment but also proscribed by the Policy, and that there is a credible threat of enforcement under the Policy if those members do so. *See* SAC ¶¶ 20, 40, 47–55; *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). In this circuit, there is a "presumption" that a "non-moribund [regulation] that facially restricts expressive activity by the class to which the plaintiff belongs presents such a credible threat." *Cooksey*, 721 F.3d at 237 (quoting *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999)). Here, far from being moribund, the Policy was issued in 2021, and far from disclaiming the agency's authority to punish non-compliance, the Policy confirms it. *See* Policy at 3; *Kenny*, 885 F.3d at 288 ("Threat of prosecution is especially credible when defendants have not 'disavowed enforcement.'").[2]

---

[2] The government suggests that NAIJ must plead an independent Fifth Amendment injury to raise its void-for-vagueness claim, MTD 11–12, but this is incorrect, *see Edgar*, 2 F.4th at 310 (finding standing to challenge preapproval scheme on First *and* Fifth Amendment grounds based on the plaintiffs' allegations of chill). The government also fundamentally misunderstands the nature of NAIJ's void-for-vagueness claim. NAIJ claims that the Policy is vague on its face—not in its enforcement. *See infra* II.B. Accordingly, NAIJ need not allege specific instances of "arbitrary application." *Cf.* MTD 11. It is enough to show the Policy is "so standardless that it authorizes [such application]." *See Edgar*, 2 F.4th at 316 (cleaned up). This it has done.

### B.       NAIJ has established causation and redressability.

The government does not seriously dispute NAIJ's allegations of causation and redressability; rather, it makes the narrow point that NAIJ's allegations regarding teaching requests are not fairly traceable to the Policy or redressable by a favorable decision in this action because the relevant section of the Policy is "virtually identical" to the Ethics Guide. MTD 12–13. This is incorrect. Unlike the Ethics Guide, under which teaching requests were essentially rubber-stamped, SAC ¶¶ 18, 53, the Policy recommends that supervisors forward teaching requests to the SET. *See* Policy at § VI. As a result, teaching requests are usually routed through the SET and often receive no decision. SAC ¶ 53. For example, Judge Tsankov submitted a request to teach an international law course at Fordham Law School in Spring 2023—a course she has received approval to teach in past years—but the request has remained pending for over three months. *Id.* This harm is clearly traceable to the Policy, and it is redressable by an order in this action.

## II.   The Policy violates the Constitution.

### A.       The Policy violates the First Amendment.

As the Supreme Court held over fifty years ago, "citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 573 U.S. 228, 231 (2014) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Rather, they retain their rights, as citizens, to comment on matters of public concern. *Id.* at 235–36. Under the test set forth in *NTEU*, any government policy that imposes a prior restraint on this speech must survive "exacting scrutiny." *Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2472 (2018). "The Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513

U.S. at 468 (quoting *Pickering*, 391 U.S. at 571). It must also "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id*. at 475 (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994)).

The government has not satisfied the test imposed by *NTEU* in this case.

> **1.      Because the Policy is a prior restraint on the protected speech of public employees, it is subject to exacting scrutiny under *NTEU*.**

*NTEU* applies whenever "a generally applicable statute or regulation (as opposed to a post-hoc disciplinary action) operates as a prior restraint" on private speech by public employees on matters of public concern. *Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016). The Policy is precisely this sort of prior restraint: it categorically prohibits judges from speaking publicly in their private capacities about immigration or EOIR, and it requires them to seek agency preapproval before speaking publicly in their private capacities about a broad range of other topics. The government's arguments to the contrary fail to persuade.

First, the government asserts that the Policy "does not forbid any speech," MTD 20, but this is false. The Policy categorically prohibits immigration judges from speaking publicly about immigration or EOIR in their private capacities. It does so by deeming "official capacity" all speech that discusses "agency policies, programs, or a subject matter that directly relates to [employees'] official duties." *See* Policy at 2. And an attachment to the Policy makes plain that EOIR considers immigration "a subject matter that directly relates" to a judge's duties. *Id.* at 7.

The government's only answer is that the Policy permits judges to seek preapproval to speak about immigration in their *official capacities*, but official-capacity speech is emphatically not a substitute for private-capacity speech. When a judge speaks in their official capacity, they speak as the agency's representative—not on their own behalf. The agency retains tight control over what they can say. SAC ¶¶ 51, 54–55. And it uses this power to ensure that judges stick to

the agency's talking points. *Id.* ¶ 37. The effect is to deny the public access to judges' private views on immigration-related issues, and to create the perception that EOIR employees uniformly support the agency's policies. *Id.* ¶ 57.

Second, the government argues that speech about immigration or EOIR is *necessarily* official-capacity speech because it relates to immigration judges' job duties. MTD 21. But the Supreme Court has already rejected this argument, explaining that speech may be in an employee's private capacity even when it "relates to public employment or concerns information learned in the course of public employment." *Lane*, 573 U.S. at 239. Indeed, *Lane* holds that employee speech is unprotected only if it is "ordinarily within the scope of an employee's duties." *Id.* at 240. And the Court recently affirmed the reasoning of *Lane*, holding that an employee spoke in his private capacity where he "did not speak pursuant to government policy," was "not seeking to convey a government-created message," and was not engaged in any speech his employer "paid him to produce."[3] *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2424 (2022).

The speech at issue in this case is not within the scope of NAIJ's members' ordinary duties. NAIJ's members wish to educate the public about immigration law and policy by speaking at local and national conferences, lecturing at universities and law schools, and publishing law review and other legal commentary. SAC ¶¶ 7, 47–55. These activities are not part of their routine duties, which involve the adjudication of immigration cases. *Id.* ¶ 13; *see also* WA-RP-19-0067, at 5–7 (Reg. Dir. Wash. Region FLRA July 31, 2020), https://perma.cc/79Uv-W2FX, *aff'd in part and*

---

[3] The government's reliance on *Urofsky v. Gilmore*, 216 F.3d 401, 407 (4th Cir. 2000), is misplaced. *See* MTD 22 (contending that test is "whether the speech is made primarily in the employee's role as citizen or primarily in his role as employee"). *Urofsky* predates *Lane*, and it was premised on an assumption that *Lane* rejects: that First Amendment protection of employee speech turns on "the unrelatedness of the speech at issue to the speaker's employment duties." *Urofsky*, 216 F.3d at 407.

*rev'd in part* 71 F.L.R.A. 1046 (leaving factual determinations undisturbed). The Policy's overbroad definition of "official" speech does not make them so. *See Kennedy*, 142 S. Ct. at 2424 (rejecting the ability of public employers to "use 'excessively broad job descriptions' to subvert the Constitution's protections" (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006)). To the extent the government contests NAIJ's factual allegations concerning the scope of members' duties, this is not a proper matter for resolution on a motion to dismiss.[4] *See Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1376 (2021); *see also* FRCP 12(d).

Third, the government argues that the Policy "eliminates" the requirement to seek approval for "personal capacity" speech "unrelated to a person's official duties." MTD 24 (quoting Policy at 1). But the Policy includes a clear carve out to this supposed rule: if a judge's proposed speaking engagement occurs during working hours, the Policy requires the judge to submit a leave request; the judge's supervisor is then entitled to "inquire how [the judge] intends to use the time," and must "approve[]" not only the leave request, but also the "engagement" itself. Policy at 2. The Policy includes no criteria to cabin the agency's discretion to grant or deny "personal capacity" speaking requests. Supervisors may, therefore, question judges about the content of their proposed "personal capacity" speech and deny approval for any reason, including the judge's viewpoint.

Although counsel for EOIR insists that preapproval is *never* required for "personal capacity" speech unrelated to immigration, MTD 24, the agency itself has demonstrated confusion

---

[4] In any event, the documents the government points to do not establish that speech about immigration or EOIR is necessarily "official." *See* MTD 21. The Ethics Guide merely provides that "[w]hen immigration judges are participating in their official capacity as speakers or panel members at a conference or other event, they may accept an offer of free attendance . . . on the day of their presentation." Ethics Guide § XXVI, https://perma.cc/M6LA-JUFZ (emphasis added). This case does not concern events to which immigration judges are "assigned" to speak on behalf of the agency, or model hearings and trainings hosted by EOIR itself.

14

on this point. SAC ¶ 32. Moreover, the text of the policy is controlling, not the agency's litigation position in this case. *See, e.g.*, *Barone v. City of Springfield*, 902 F.3d 1091, 1104 (9th Cir. 2018).

### 2.    The Policy does not survive *NTEU*'s exacting scrutiny.

The Policy fails to satisfy *NTEU*'s exacting scrutiny because the government cannot show that the interests of immigration judges and their potential audiences in the restrained speech are outweighed by the expression's necessary impact on the actual operation of government.

To begin, the Policy imposes an immense burden on the interests of immigration judges in speaking, and of the public in hearing what they have to say. Most critically, the Policy categorically prohibits immigration judges from speaking in their private capacities about immigration or the agency. As the Supreme Court recognized in *Lane*, "speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Lane*, 573 U.S. at 240. The Policy deprives the public of this speech of "special value," and prevents judges from participating in public debates on matters involving their areas of expertise. The Policy also restrains speech on topics unrelated to immigration and EOIR. *See NTEU*, 513 U.S. at 470.

Because the interests of immigration judges and the public in the restrained speech are substantial, the government bears the "heavy" burden, *id.* at 466, of "identify[ing] a commensurate threat to its operations" that justifies the Policy's restrictions, *Guffey v. Mauskopf*, 45 F.4th 442, 447 (D.C. Cir. 2022). That threat must be "real, not merely conjectural." *Id.* (quoting *NTEU*, 513 U.S. at 475). And the government must demonstrate that the Policy's restrictions are "'reasonably necessary'" to address the threat. *Id.* (quoting *NTEU*, 513 U.S. at 474).

The government cannot satisfy this burden. To the extent the government identifies a threat at all, it is that immigration judges' outside speech "can have real effects on the agency's overall

mission." MTD at 1. But as the Fourth Circuit explained in *Liverman*, "generalized allegations" of harms to an agency's operations are not sufficient. 844 F.3d at 408. The government must produce actual "evidence of any material disruption arising from [the employees' speech]." *Id.* That the government cannot do so on its Rule 12(b)(6) motion is no answer. As courts have recognized, it is "rarely, if ever, appropriate" to dismiss a First Amendment challenge at the pleading stage. *Bruni v. City of Pittsburgh*, 824 F.3d 353, 357 (3d Cir. 2016); *see also Cornelio v. Connecticut*, 32 F.4th 160, 173–74 (2d Cir. 2022) (denying Rule 12(b)(6) motion for lack of evidence that speech restrictions "materially advance[d]" the state's interest).

In a single sentence in its factual recitation the government suggests that EOIR instituted its speaking engagement process to "promote[] public confidence in [immigration judges'] impartiality." MTD 5 (quoting Ethics Guide pmbl.). The government has failed, however, to demonstrate that the speech immigration judges wish to engage in poses any harm to that interest. As the Supreme Court recognized in *Republican Party of Minnesota v. White*, impartiality in the judicial context has a narrow meaning: "the lack of bias for or against either *party* to the proceeding." 536 U.S. 765, 775 (2002). Neither protecting impartiality nor the appearance thereof requires judges to avoid sharing their legal and political views. *Id*. at 788 (holding unconstitutional canon of judicial conduct preventing judicial candidates from expressing their views "on disputed legal and political issues"); *see also* Code of Conduct for U.S. Judges Canon 4 (Judicial Conference 2019) (encouraging federal judges to "speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice"). In the many years that EOIR permitted immigration judges to speak in their private capacities, with a disclaimer, on issues relating to immigration or EOIR, *see* SAC ¶ 18, the government has failed to identify even a single instance of speech by a sitting judge that undermined public confidence in

16

judges' impartiality. "That silent record is strong evidence that [judges] can speak on matters of public concern without tarnishing the reputation of the [courts]." *Guffey*, 45 F.4th at 448.

The government asserts that EOIR has wide latitude to control immigration judges' speech because they are "high-ranking, public-facing officials," MTD 22, but this argument is doubly wrong. While the Fourth Circuit has considered the policymaking role of employees in the context of individual challenges to dismissal or other punishments based on speech, *see, e.g.*, *Borzilleri v. Mosby*, 874 F.3d 187, 194 (4th Cir. 2017), it has generally not done so in challenges to prior restraints subject to *NTEU*, *see, e.g.*, *Liverman*, 844 F.3d at 407. The reason is simple: policymaking employees are entitled to less First Amendment protection only when they "speak[] out in a manner that interferes with or undermines the operation of the agency." *McVey v. Stacy*, 157 F.3d 271, 278 (4th Cir. 1998). And whereas adverse actions respond to "actual speech," prior restraints "chill[] potential speech before it happens," *NTEU*, 513 U.S. at 468, leading to the suppression of more speech than could be constitutionally punished after the fact.

In any event, immigration judges are *not* "high-ranking, public-facing officials" within the meaning of First Amendment precedent. Immigration judges adjudicate cases based on binding law and precedent. *See* WA-RP-19-0067, at 5–7 (Reg. Dir. Wash. Region FLRA July 31, 2020), https://perma.cc/79Uv-W2FX, *aff'd in part and rev'd in part* 71 F.L.R.A. 1046 (leaving factual determinations undisturbed). Their decisions are non-precedential and subject to review by the Board of Immigration Appeals. *Id.* Rank-and-file judges also have "no supervisory responsibility or authority." *Id.* at 3. Even if the FLRA were correct that immigration judges "influence" EOIR policies by adjudicating cases, *see* 71 F.L.R.A. at 1048—a position NAIJ vigorously disputes— this would not be enough to show that immigration judges are high-level policymakers. Judges neither "control" EOIR's "day-to-day operations," *McVey v. Va. Highlands Airport Comm'n*, 44

17

F. App'x 630, 636 (4th Cir. 2002), nor set the agency's goals and policies, *Hall v. Ford*, 856 F.2d 255, 264 (D.C. Cir. 1988). Indeed, their obligations of independence and impartiality make them categorically unlike the high-ranking officials whose expected loyalty to superiors—in other words, their expected *partiality*—has been the basis for sanctioning speech. *See, e.g.*, *Borzilleri*, 874 F.3d at 191 (assistant state prosecutors are policymakers because their duties "are laden with ideological content"); *Jenkins v. Medford*, 119 F.3d 1156, 1164 (4th Cir. 1997) (deputy sheriffs are policymakers because they are the "alter ego" of the elected sheriff).

Even if the government had some interest in limiting the private-capacity speech of immigration judges, it could not possibly show that its interest justifies the Policy's *total prohibition* on private-capacity speech concerning immigration or the agency. This ban "makes no distinction between speech about [immigration] that reasonably could be expected to disrupt [the agency's] operations and speech that plainly would not, or that would do so only inasmuch as it engendered legitimate public debate about the [immigration system]." *Moonin v. Tice*, 868 F.3d 853, 867 (9th Cir. 2017). The ban is not targeted to messages that would undermine public confidence in judges' impartiality. It sweeps broadly to cover all speech about immigration law or policy issues, regardless of its effect on the agency's operations or mission. There is no fit between the government's purported interests and the reach of the Policy's prohibition on speech.

Immigration judges are entitled to "an additional thumb on the employees' side of [the] scales" because the Policy's preapproval scheme lacks adequate procedural safeguards. *Harman v. City of New York*, 140 F.3d 111, 120 (2d Cir. 1998) (quoting *Sanjour v. EPA*, 56 F.3d 85, 97 (D.C. Cir. 1995) (en banc)). Specifically, the scheme fails to include narrow, objective, and definite criteria to guide decisionmakers or definite time limits for review. The Policy vests supervisors with unbridled discretion to deny "personal capacity" requests and requests that have been

improperly deemed "official capacity" merely because a judge wishes to speak about immigration-related topics. Policy at 4 (stating only that "supervisor[s] will make the final decision" on requests). It fails to appropriately cabin SET review, which is concerned in part with "promoting consistency in all of EOIR's communications," *id.* at 1, and accordingly "raises the specter of arbitrary or viewpoint-discriminatory enforcement."[5] *Moonin*, 868 F.3d at 867; *see also Harman*, 140 F.3d at 120–21. The Policy also fails to set firm deadlines for review of requests.

Notably, Social Security Administrative Law Judges ("ALJs") and Administrative Patent Judges ("APJs") are not subject to similar restrictions on their speech. SAC ¶ 56; MTD 9–10. ALJs are encouraged to seek preapproval before speaking publicly, but they are not required to do so. SAC ¶ 56. And while APJs may be required to submit "writing[s]" about "agency programs and operations that are related to [their] duties" to their supervisors for "prior review," MTD 10 (quoting U.S. Dep't of Commerce Summary of Ethics Rules, https://perma.cc/7SEQ-MCHG), they do not appear to be required to submit any speech unrelated to their job duties.[6] Moreover, even with respect to writings they must submit, it is unclear whether APJs must also wait for supervisory approval. *See Weaver*, 87 F.3d at 1435 (noting that a pre-notification requirement is substantially less burdensome than a preapproval obligation); *Harman*, 140 F.3d at 120 (same).

### B.    The Policy is void for vagueness under the Fifth Amendment.

The void for vagueness doctrine requires that regulations provide sufficient "precision and guidance" to ensure that those subject to the regulations "know what is required of them" and "that

---

[5] The risk of abuse is not hypothetical. *See* Owen Decl. ¶ 17, ECF No. 27-5 (agency declarant admitting that, in evaluating "personal capacity" requests, she considers whether an engagement could result in "any negative publicity or scrutiny to EOIR or the Federal Government").

[6] The government states only that it "understands" Department of Commerce ethics rules to apply to APJs, not that the rules do apply. MTD 9–10. Moreover, it does not quote from the rules themselves, only from a document that purports to summarize them. It is therefore unclear whether the requirement to submit certain writings for supervisory review even applies to APJs.

those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "[R]igorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–54. The Policy fails to do so, however, for two reasons.

First, the Policy fails to provide clear guidance concerning the standards EOIR applies to "personal capacity" speaking requests or to speaking requests the agency wrongly deems "official capacity" merely because they pertain to immigration. As noted above, the Policy gives complete discretion to supervisors to approve or deny such requests on whatever grounds they consider relevant. The Policy also empowers the SET to review such requests for consistency not only with "the law and agency policy," but also "all of EOIR's communications." Policy at 1. The text of the Policy does nothing to meaningfully cabin agency discretion.

The government argues that the Policy does set forth "substantive standards," namely, "the Hatch Act, ethics and professionalism guides and rules, and the Justice Manual." MTD 27. But these are not mentioned in any of the sections of the Policy that describe the agency's speaking engagement procedures. *See, e.g.*, Policy at 2–3 (sections titled "Official Capacity" and "Personal Capacity"); *id.* at 3–4 (section titled "Supervisor's Decision"). Instead, they are recited at the very end of the Policy as part of a general directive that "employees speaking to a public group" must, regardless of speaking capacity, "comply with applicable law and agency policies." *Id.* at 6 (section titled "Conclusion"). Accordingly, nothing in the Policy suggests that supervisory and SET review is limited to these "standards," and indeed there is much to suggest otherwise. *See supra* Part II.A.2 at 18–19.[7]

---

[7] The availability of agency guidance concerning the Policy cannot cure the Policy's vagueness. *Cf.* MTD 27–28; *see also U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 736–37 (D.C. Cir. 2016) (finding the availability of prospective guidance about a rule relevant only because the agency had

The government also misstates NAIJ's claim. NAIJ alleges that the Policy is vague on its face, not that it is vague in its enforcement. *Compare* SAC ¶ 64 (alleging that the Policy's terms "invite[] arbitrary and discriminatory enforcement"), *with* MTD 28. Accordingly, NAIJ is not required to allege a pattern of arbitrary enforcement to succeed on its void for vagueness claim.

Second, the Policy purports to eliminate the preapproval requirement for speech unrelated to immigration, but the text is sufficiently unclear that the agency itself is confused about the extent to which preapproval for such speech continues to be required. *Compare* MTD 24 (EOIR counsel insisting that preapproval is never required), *with* SAC ¶ 32 (EOIR advising judge that preapproval would be required for interviews relating to a work of fiction unrelated to immigration).

## III.   The Civil Service Reform Act does not impliedly divest this Court of jurisdiction over NAIJ's claims.

Perhaps recognizing the clear constitutional infirmities in the Policy, the government attempts to short circuit judicial review of NAIJ's claims. The government argues that NAIJ's members must abide a prior restraint on their speech for months of futile administrative proceedings before obtaining judicial review that could redress their claims. But time and again, federal courts considering First Amendment challenges to employee speech regulations have either rejected or declined to address the jurisdictional argument that the government makes here. *See, e.g.*, *NTEU*, 513 U.S 454; *Weaver*, 87 F.3d at 1433–35; *Sanjour*, 56 F.3d 85; *Wolfe v. Barnhart*, 446 F.3d 1096 (10th Cir. 2006). Even the Supreme Court, in its seminal decision in *NTEU*, invalidated employee speech restrictions in a challenge brought originally in federal district court by federal employees that were subject to the same statutory scheme at issue here. *NTEU*, 513 U.S. 454. In doing so, the Court did not so much as mention the question of jurisdiction. This is not

---

otherwise articulated the rule's goals, specified factors that would inform the rule's application, and included a description of how each factor would be interpreted and applied).

surprising: under the framework announced in *Thunder Basin Coal Company v. Reich*, 510 U.S. 200 (1994), it is clear that the CSRA does not withdraw district court jurisdiction over a "simple pre-enforcement attack on a regulation restricting employee speech." *Weaver*, 87 F.3d at 1434.

In *Thunder Basin*, the Supreme Court established a two-step test for determining whether a remedial scheme enacted by Congress impliedly divests district court jurisdiction over a plaintiff's claims. Under the first step, courts must ask "whether Congress's intent to preclude district-court jurisdiction is 'fairly discernible in the statutory scheme.'" *Bennett v. SEC*, 844 F.3d 174, 181 (4th Cir. 2016) (quoting *Thunder Basin*, 510 U.S. at 207). The Supreme Court has already held that such intent is manifest in the CSRA, *see Elgin v. Dep't of Treasury*, 567 U.S. 1, 12 (2012), and so only the second step of the *Thunder Basin* inquiry is at issue here. Under this second step, courts must assess whether a plaintiff's claims are "of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin*, 510 U.S at 212. Three factors in particular bear on this inquiry: (1) whether the statutory scheme could "foreclose all meaningful judicial review;" (2) whether the plaintiff's claims are "wholly collateral" to the scheme; and (3) whether "agency expertise could be brought to bear" on the questions presented. *Bennett*, 844 F.3d at 181 (quoting *Thunder Basin*, 510 U.S. at 212–13). The first factor is the most important. *Id.* at 183 n.7.

Here, all three factors weigh heavily against the conclusion that Congress intended the CSRA to withdraw district court jurisdiction over NAIJ's claims.

### A.    NAIJ's claims would not receive meaningful judicial review through the CSRA.

NAIJ's constitutional claims would not receive meaningful judicial review through the CSRA for two reasons. First, the CSRA does not apply to NAIJ's claims because NAIJ is challenging an employee speech policy—not a covered employment action. Second, even if the CSRA did apply to NAIJ's claims, it would still not provide meaningful judicial review.

Proceeding administratively would needlessly delay judicial review of NAIJ's claims—if it led to judicial review at all—and it would cause irreparable harm to the First Amendment rights of immigration judges and the public in the interim.

> **1.    The CSRA does not apply to NAIJ's claims because NAIJ is challenging an employee speech policy—not a covered employment action.**

The CSRA does not "sweep[] so wide" as to preclude jurisdiction over "any claim arising in the federal employment context." *Manivannan v. U.S. Dep't of Energy*, 42 F.4th 163, 169 (3d. Cir. 2022) (cleaned up); *cf.* MTD 16. As the Supreme Court explained in *Elgin*, the CSRA can provide meaningful judicial review of a plaintiff's claims only if the plaintiff is challenging a "covered employment action." *Elgin*, 567 U.S at 14; *see also Manivannan*, 42 F.4th at 170. If the plaintiff is *not* challenging a covered employment action, neither the Merit Systems Protection Board ("MSPB") nor Federal Circuit would have jurisdiction, and "the suit must proceed in a different forum." *Manivannan*, 42 F.4th at 172, 173 n.5; *cf. Elgin*, 567 U.S. at 21.

NAIJ is not challenging a covered employment action. To begin, the text of the CSRA is clear that the prior restraint NAIJ challenges here is not a covered employment action. In general, the CSRA allows federal employees to seek administrative review of two kinds of employment actions. First, the CSRA covers "adverse actions," which include "removal," "suspension for more than 14 days," "reduction in grade," "reduction in pay," and "furlough of 30 days or less." 5 U.S.C. § 7512(1)–(5). Second, the CSRA covers "prohibited personnel practices," which are less serious than adverse actions. *Id.* § 2302(a)(1) & (b). As relevant to the government's argument, prohibited personnel practices include "tak[ing] or fail[ing] to take" a "personnel action" if doing so violates an employee's constitutional rights. *Id.* §§ 2302(b)(12), 2301(b)(2); *see also Weaver*, 87 F.3d at 1432. "Personnel action" is defined as one of twelve employment actions taken "with respect to an employee." *Id.* § 2302(a)(2)(A). Thus, it is clear from the CSRA's text that it applies to

individual personnel decisions. But NAIJ is not challenging any individual personnel decision; it is challenging a policy that imposes a prior restraint on the speech of *all* immigration judges.

Precedent confirms that NAIJ's claims fall outside of the CSRA's scheme. Though courts have broadly defined "personnel actions," they have limited its scope to adverse employment actions against specific employees, and have specifically held that challenges to employee speech policies do not qualify. The D.C. Circuit's decision in *Weaver* is illustrative. There, a federal employee challenged the constitutionality of a speech policy requiring the submission of certain materials for prepublication review, as well as an admonishment she received for failing to comply with that requirement. *Weaver*, 87 F.3d at 1432. The D.C. Circuit dismissed the employee's challenge to her admonishment, explaining that it was remediable through the CSRA as a "prohibited personnel practice." *Id.* at 1433. But the court exercised jurisdiction over the constitutional claim as a "simple pre-enforcement attack on a regulation restricting employee speech" that "st[ood] independently of the admonishment." *Id* at 1434. In doing so, the court cited *NTEU* and *Sanjour*, *id.*, which similarly involved employees challenging speech regulations before any personnel action had been taken against them for non-compliance.

In the years following *Weaver*, multiple courts have endorsed this logic. For example, in *Turner*, a district court held that the program director for Voice of America could challenge employee policies and procedures that restricted her First Amendment rights because that challenge was "distinct from and antecedent to her experiencing a covered personnel action." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 369 (D.D.C. 2020). Similarly, in *Firenze v. National Labor Relations Board*, a district court held that the CSRA did not preempt a First Amendment challenge to a rule preventing employees from publicizing grievances at work because "the promulgation . . . of such a rule" was not a "personnel action" under the statute and

24

"there [was] no allegation that a prohibited 'personnel action' has taken place *vis-à-vis* the First Amendment claim." No. 12-CV-10880, 2013 WL 639151, at *8 (D. Mass. Jan. 10, 2013). By contrast, in *Tabaddor v. Holder*, a district court held that *Weaver* did not apply because the plaintiff's constitutional claims were "infused and intertwined with [a] recusal order issued to her," and were "based *entirely* on actions taken with respect to her, not on some guidance or other expression of the challenged recusal-regulation interpretation." 156 F. Supp. 3d 1076, 1083 (C.D. Cal. 2015). This case is like *Weaver*, *Turner*, and *Firenze*—not like *Tabaddor*—because NAIJ is challenging an employee speech policy "distinct from and antecedent to" any of its members experiencing a covered personnel action.[8] *Turner*, 502 F. Supp. 3d at 369.

The government attempts to sidestep this clear text and precedent, arguing that NAIJ could obtain CSRA review by reframing its claims "as a challenge to hypothetical future discipline for non-compliance with the [Policy]," or to "an alleged significant change in . . . working conditions." MTD 17 (cleaned up). But neither suggestion is consistent with the statute. To start, although a covered employee may challenge a "proposed" removal or other adverse action under the statute, 5 U.S.C. §§ 7503(b), 7513(b), no such action has been proposed here. *Cf. Rydie v. Biden*, No. 21-2359, 2022 WL 1153249, at *6–7 (4th Cir. 2022) (finding that employees' termination had been "proposed" because "enforcement ha[d] begun"). Nor could an employee challenge "hypothetical future" discipline as a "prohibited personnel practice." As the OSC has previously recognized, to challenge a prohibited personnel practice, a personnel action must have been taken; "threatened personnel actions are not sufficient to meet the statutory requirements." Letter from OSC to Robert

---

[8] Earlier in this suit, Judge O'Grady concluded that *Weaver* is "inapplicable today" in light of *Elgin*, *NAIJ v. McHenry*, 477 F. Supp. 3d 466, 476 (E.D. Va. 2020), but that decision has been vacated, *NAIJ v. Neal*, No. 20-1868, 2022 WL 2045339 (4th Cir. June 7, 2022), and in any event it is wrong. *See, e.g.*, *Turner*, 502 F. Supp. 3d at 369 n.20.

Shriver, Feb. 22, 2007, Ex. B to Reply Brief for Petitioner at *3, *Ramirez v. Customs and Border Prot.*, 709 F. Supp. 2d 74, 80 (D.D.C. 2010), ECF No. 5-2.

The suggestion that NAIJ can challenge the Policy as "a significant change in . . . working conditions," MTD 17, fares no better, because the term "working conditions" does not include the *private*, off-the-job speech of employees. The Supreme Court has said, in interpreting Title VII of the CSRA, that "working conditions" "more naturally refers, in isolation, only to the 'circumstances' or 'state of affairs' attendant to one's performance of a job." *Fort Stewart Schs. v. FLRA*, 495 U.S. 641, 645 (1990). Thus, courts have generally interpreted "working conditions" to refer to "the daily, concrete parameters of a job," such as "hours, discrete assignments, and the provision of necessary equipment and resources." *Turner*, 502 F. Supp. 3d at 367. Here, NAIJ challenges restrictions on immigration judges' private speech, which necessarily excludes any speech that is "ordinarily within the scope" of their duties. *Lane*, 573 U.S. at 240; *see also Ramirez*, 709 F. Supp. 2d at 80 (holding that CBP's decision not to authorize an employee's outside political activities was not a significant change in working conditions); *supra* Part II.A.1 at 13–14.

The canon of *ejusdem generis* also counsels against the government's reading of "change in . . . working conditions." *Ejusdem generis* provides that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015) (cleaned up). Here, the "personnel actions" enumerated before "change in . . . working conditions" include such actions as "appointment," "promotion," "transfer," and "decision[s] concerning pay, benefits, or awards." See 5 U.S.C. § 2302 (a)(2)(A)(i), (ii), (iv), (ix). All of these more specific personnel actions bear two features in common. They are individual

personnel decisions, and they are "relatively minor" as compared with adverse actions.[9] *See Weaver*, 87 F.3d at 1434. Here, by contrast, NAIJ challenges a broadly applicable prior restraint—one that limits and chills the speech of hundreds of government employees. Such a policy can hardly be characterized as "so minor in nature." *Pinar v. Dole*, 747 F.2d 899, 912 (4th Cir. 1984).

For these reasons, the CSRA simply does not apply to NAIJ's claims and so cannot provide meaningful judicial review of them.

### 2. Even if NAIJ's claims fell within the CSRA, NAIJ still could not obtain meaningful judicial review through the statute.

The CSRA's review scheme would not guarantee meaningful judicial review of NAIJ's constitutional claims, even if those claims fell within the scheme's ambit.

First, even assuming a judge could challenge the Policy as a prohibited personnel practice, they would not be assured judicial review. Judicial review would lie only if the Special Counsel determined, in their sole and unreviewable discretion, to petition the MSPB for corrective action. 5 U.S.C. § 1214 (b)(2)(C). In other words, a complaint filed with the OSC may never reach a federal court because the Special Counsel's decisions are not judicially reviewable. And here the most likely outcome is that the Special Counsel would reject a complaint because no personnel action has been taken against a specific employee. *See Ramirez*, 709 F. Supp. 2d at 79 (noting that the OSC dismissed the plaintiff's complaint because no "personnel action" had been taken).

---

[9] Because these personnel actions are "relatively minor," unlike adverse actions, they do not entitle affected employees to judicial review. *Cf.* 5 U.S.C. §§ 7513 (d) & 7703. An employee challenging a personnel action as a prohibited personnel practice must first complain to the Office of Special Counsel ("OSC"). 5 U.S.C. § 1214(a)(1)(A). If the Special Counsel determines that "there are reasonable grounds to believe [the practice] has occurred," they must report that determination to the agency. 5 U.S.C. § 1214 (b)(2)(B). If, "after a reasonable period of time," the agency does not correct the practice, the Special Counsel may petition the MSPB for corrective action. *Id.* § 1214 (b)(2)(C). Final decisions of the Board are appealable to the Federal Circuit, but if the Special Counsel declines to pursue a complaint, the CSRA provides for no further administrative or judicial review, *id.* §§ 1214 (c), 7703 (b).

Second, an individual judge should not be required to provoke disciplinary action under the Policy merely to seek judicial review. As the Supreme Court explained in *Free Enterprise v. Public Company Accounting Oversight Board*, a statutory scheme does not provide meaningful judicial review if it requires a person to "bet the farm by taking [a] violative action before testing the validity of [a] law." 561 U.S. 477, 490 (2010); *see also Bennett*, 844 F.3d at 186. To ensure judicial review under the CSRA, an immigration judge would have to ignore the Policy to such an extent that they prompt at least a "proposed" adverse action, namely, a removal, suspension of greater than 14 days, a reduction in pay or grade, or a furlough of fewer than thirty days. *See* 5 U.S.C. § 7512; *see also id.* §§ 7513 (d) & 7703. Forcing an immigration judge to risk such severe sanctions merely to obtain judicial review is the definition of "bet[ting] the farm."

Third, and most significantly, any judicial review that could be obtained through the CSRA would not be meaningful because it would come far too late, imposing "irremediable harm beyond the burdens associated with the dispute resolution process." *Bennett*, 844 F.3d at 186 n.13 (cleaned up). The Policy is an unconstitutional prior restraint on speech—"the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Accordingly, courts have recognized that the imposition of a prior restraint, even for short periods of time, causes irreparable harm. *See, e.g.*, *Cuviello v. City of Vallejo*, 944 F.3d 816, 831–32 (9th Cir. 2019). Here, the risk of delay is especially acute because the Special Counsel has up to 240 days to respond to any allegation of a prohibited personnel practice. *See* 5 U.S.C. § 1214 (b)(2)(A). Moreover, at the end of such period, the Special Counsel may simply decline to petition the MSPB, in which case NAIJ's members would simply be out of luck. NAIJ's members should not be required to pursue OSC review in such circumstances. *Cf. Able v. United States*, 88 F.3d 1280, 1288 (2d Cir. 1996) (holding that plaintiffs challenging the Don't Ask, Don't Tell law were

not required to exhaust administrative remedies in separation proceedings because they "alleg[ed] violations of their First Amendment right to free speech" and "even minimal impairments on this right create irreparable injury"); *Ramirez*, 709 F. Supp. 2d at 83–84 (similar with respect to CBP employee challenging denial of authorization to serve on a city council).[10]

**B.    NAIJ's claims are wholly collateral to the CSRA because they do not seek to reverse a covered employment action.**

To determine whether a claim is "wholly collateral" to a statutory scheme, the Fourth Circuit assesses whether the claim is "the vehicle" by which claimants seek "to reverse" agency action covered by the scheme. *Bennett*, 844 F.3d at 186–87 (cleaned up). NAIJ's claims do not meet this description. This fact distinguishes the mine run of cases, including those cited by the government, where plaintiffs have been barred from bringing pre-enforcement challenges. *Cf.* MTD 17–18. In *Elgin*, for example, the Supreme Court held that the plaintiffs' claims were not wholly collateral to the CSRA because they were the "vehicle" by which the plaintiffs sought "to reverse" a CSRA-covered action—removal. *Elgin*, 567 U.S. at 22; *see also Rydie*, 2022 WL 1153249, at *7 (challenge was "vehicle" by which plaintiffs sought to preempt removal); *Fornaro v. James*, 416 F.3d 63, 68 (D.C. Cir. 2005) (challenge to retirement benefits policy would necessarily decide the merits of plaintiffs' individual benefit claims); *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 448–49 (D.C. Cir. 2009) (challenge to guidelines on promotion by employee passed over for promotion). By contrast, NAIJ brings "a general challenge" to an employee speech policy—not "[a] challenge to [a] particular personnel action" taken against a

---

[10] *Rydie* is therefore distinguishable. First, because "enforcement [there] had [already] begun," it was clear that an adverse action had been "proposed," and that the plaintiffs could seek review without having to "bet the farm." *Rydie*, 2022 WL 1153249 at *5, *7. Second, that case did not involve a challenge to a prior restraint on time-sensitive political speech. *Cf. Nat'l Taxpayers Union v. Soc. Sec. Admin.*, 376 F.3d 239, 241 n.1 (4th Cir. 2004); *id.* at 244 (Wilkinson, J., concurring).

specific employee. *Weaver*, 87 F.3d at 1434 n. 2. Like the plaintiff in *Weaver*, NAIJ does not seek

"reversal" of any specific disciplinary sanction, but instead "a general invalidation of the [policy]."

*Id.* This makes NAIJ's constitutional claims wholly collateral to the statutory scheme.

### C.    NAIJ's claims are beyond the Merit Systems Protection Board's expertise.

NAIJ's claims are also beyond the MSPB's expertise because they are purely constitutional

claims involving the right of immigration judges to speak in their private capacities and the right

of the public to hear what they have to say. The MSPB resolves highly specific disputes concerning

individual personnel actions—like terminations, suspensions, reductions in hours, and the like—

not broad prior-restraint challenges. Of course, in individual enforcement actions, the Board may

consider whether an agency has engaged in a prohibited personnel practice by "tak[ing] a personnel

action that unconstitutionally burdens an employee's speech." *Id.* at 1432. But as explained above,

the term "personnel action" does not encompass a generally applicable rule or policy. *See supra*

Part III.A.1. As a result, the Board has *never* had occasion to evaluate the constitutionality of a

broad prior restraint like the Policy. Nor is it equipped to meaningfully assess a prior restraint's

impact on the free speech interests of hundreds of present and future employees and the listening

public. Moreover, this is not a case in which the Board's expertise in other areas could "obviate

the need to address" NAIJ's constitutional claims. *Elgin*, 567 U.S. at 22–23.

### Conclusion

For the foregoing reasons, this Court should deny Defendant's motion to dismiss.

February 15, 2023                                        Respectfully submitted,

 /s/ *Victor M. Glasberg*                                 /s/ *Ramya Krishnan*
Victor M. Glasberg (VA 16184)                            Ramya Krishnan (*Pro Hac Vice*)
Nickera S. Rodriguez (VA 95952)                          Alexia Ramirez (*Pro Hac Vice*)
Victor M. Glasberg & Associates                          Alex Abdo (*Pro Hac Vice*)
121 S. Columbus Street                                   Knight First Amendment Institute
Alexandria, VA 22314                                       at Columbia University
T: (703) 684-1100                                        475 Riverside Drive, Suite 302
F: (703) 684-1104                                        New York, NY 10115
VMG@robinhoodesq.com                                     T: (646) 745-8500
                                                         F: (646) 661-3361
                                                         ramya.krishnan@knightcolumbia.org

                                                         *Counsel for the Plaintiff*

<u>Certificate of Service</u>

I, Victor M. Glasberg, hereby certify that on this 15th day of February 2023, I electronically filed the foregoing Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss with the clerk of the court.

//s// Victor M. Glasberg
Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com

Counsel for Plaintiff

32