IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

NATIONAL ASSOCIATION OF            )
   IMMIGRATION JUDGES, affiliated with the  )
   International Federation of Professional and  )
   Technical Engineers,               )
                             )    1:20-cv-731 (LMB/JFA)
       Plaintiff,                      )
                             )
   v.                               )
                             )
DAVID L. NEAL, in his official capacity as  )
   Director of the Executive Office for  )
   Immigration Review,               )
                             )
       Defendant.                       )

MEMORANDUM OPINION

     Plaintiff, the National Association of Immigration Judges ("plaintiff" or "NAIJ"), a voluntary association of immigration judges, [Dkt. No. 65] at ¶ 7,[1] challenges the 2021 "Speaking Engagements" policy ("2021 policy") of the Executive Office for Immigration Review ("EOIR") on the grounds that it constitutes a prior restraint on the speech of immigration judges in violation of the First Amendment and that it is void for vagueness under the First and Fifth Amendments because it effectively prohibits immigration judges from speaking in their personal capacities about immigration law or policy and EOIR. [Dkt. No. 65] at ¶¶ 1, 63–64; [Dkt. No. 65-3]. Defendant, David L. Neal ("defendant" or "EOIR") has filed a Motion to Dismiss plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief ("SAC"), arguing that plaintiff lacks Article III standing, that its claims are jurisdictionally barred by the Civil Service Reform Act of 1978 ("CSRA"),[2] and that it has failed to state a claim upon which

---

[1] Until April 15, 2022, NAIJ was a labor union representing immigration judges.

[2] Pub. L. No. 95–454, 92 Stat. 1111 (codified as amended throughout 5 U.S.C.).

relief can be granted.  For the reasons that follow, the Court finds that, although plaintiff has sufficiently alleged Article III standing, the CSRA strips the Court of jurisdiction over plaintiff's claims.  As such, the Court will not reach the merits of the parties' other arguments, and will grant defendant's Motion to Dismiss.

## I. BACKGROUND

### A. **Factual Background**

#### 1.  History of EOIR's Speaking Engagement Policies

Before 2017, immigration judges' speaking engagements and publications were subject to supervisory approval, but approval was "routinely" granted, and judges were frequently able to speak in their personal capacities about immigration and EOIR at conferences, schools, and in law review articles.  [Dkt. No. 65] at ¶ 17–18.  Judges were permitted to use their official titles to identify themselves to their audience, as long as they also included a disclaimer that the views represented were their own.  Id. at ¶ 18.  To receive approval to speak or write publicly, a judge would submit a request to a supervising Assistant Chief Immigration Judge ("supervisor").  If a request were approved by the supervisor, it would be forwarded to a department official to provide ethical guidance.  Id.  The Ethics and Professionalism Guide for Immigration Judges ("Ethics Guide"), enacted in 2011 and signed by both the EOIR and NAIJ, when it served as a union for immigration judges, approved this process and memorialized the Ethics Guide.  [Dkt. No. 65] at ¶ 18; Ethics Guide, 8–9, 17.[3]

---

[3] Ethics and Professionalism Guide for Immigration Judges, Executive Office for Immigration Review, (Jan. 26, 2011), https://www.justice.gov/sites/default/files/eoir/legacy/2013/05/23/EthicsandProfessionalismGuideforIJs.pdf [https://perma.cc/M6LA-JUFZ].  The Ethics Guide is incorporated in the SAC, defendant has linked to it in the Motion to Dismiss, and plaintiff does not contest its authenticity.  As such, the Court can properly consider it.  In re KBR, Inc., Burn Pit Litig., 744 F.3d 326, 333 (4th Cir. 2014) (stating standard for 12(b)(1) motion); Lokhova v.

Beginning in 2017, EOIR's approach to how immigration judges could speak about immigration or EOIR in their private capacities began to change.  On September 1, 2017, EOIR promulgated a memorandum titled "Speaking Engagement Policy for EOIR Employees" ("2017 policy"), which required judges who were invited to speak at an event[4] "about immigration-related topics" to receive not only supervisory approval for the engagement, but also to seek review of the request by the Office of General Counsel ("OGC") and the Office of Communications and Legislative Affairs ("OCLA") through the "headquarters speaking engagement team." ("SET").  [Dkt. No. 65-1] at 3, 6.  The 2017 policy did not outline criteria for approval of these speaking engagement requests and lacked a timeline for decisions, although it encouraged requests to be submitted to the SET within seven days of the event at which the judge wanted to speak.  Id. at 3.  The 2017 policy stated that the goal of the SET review was to "allow[] OCLA to ensure that EOIR's messaging is consistent across official engagements."  Id. In 2018, NAIJ engaged in collective bargaining over the 2017 policy, resulting in the 2018 Memorandum of Understanding between EOIR and the NAIJ.  [Dkt. No. 65] at ¶ 24.  This Memorandum imposed deadlines on the approval process that supervisors and the SET aimed to meet, and committed EOIR to providing NAIJ with a list of factors that EOIR would consider when approving speaking engagement requests.  [Dkt. No. 3].

In January 2020, EOIR issued a new memorandum titled "Submission and Processing of Requests for Speaking Engagements" ("2020 policy").  [Dkt. No. 65] at ¶ 25; [Dkt. No. 65-2]. Although the 2020 policy only purported to reissue the 2017 policy and "clarify some points that

---

Halper, 441 F. Supp. 3d 238, 252 (E.D. Va. 2020) (quoting Sec'y of State for Defense v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007)) (stating standard for 12(b)(6) motion).

[4] The 2017 policy only applied to speaking engagements, rather than written publications.  [Dkt. No. 65-1].

have occasionally caused confusion," [Dkt. No. 65-2] at 2, plaintiff alleges that the 2020 policy

was "significantly more restrictive than its predecessor," [Dkt. No. 65] at ¶ 25.  The 2020 policy

prohibited immigration judges from speaking or writing[5] about immigration or EOIR in their

personal capacities by labeling any speech or writing about "immigration law or policy issues,

the employee's official EOIR duties or position, or any agency programs and policies" as

"official" speech.  [Dkt. No. 65-2] at 3; [Dkt. No. 65] at ¶ 29.  The 2020 policy also required

SET review of requests to speak in a personal capacity about any topic so that EOIR could

"determine whether [the requests] involve genuinely personal capacity events, whether there are

any ethics concerns with the engagement, and whether the engagement will disrupt EOIR

operations by requiring the employees to miss work."  [Dkt. No. 65-2] at 3.

　　　The 2020 policy specifically outlined the multiple layers of review for all requests by

immigration judges and other EOIR employees to participate in a speaking engagement or to

publish a piece of writing.[6]  Id.  It required judges to submit a request including any

"presentation slides and hand out materials if applicable and complete talking points at a

minimum" through EOIR's portal.  Id. at 3.  In the first step, the judge's supervisor would

determine if the request should move forward in the approval process.  Id. at 4.  If the supervisor

did not reject the request, the SET would review the request and make a recommendation to the

supervisor.  Id.  The Office of General Counsel's Ethics Program ("Ethics Program") would also

review the request for any ethical concerns, but would not make a recommendation as to whether

---

[5] The 2020 policy applied to all "written pieces intended for publication," rather than just speaking engagements.  [Dkt. No. 65-2] at 3 n.2; [Dkt. No. 65] at ¶ 26.

[6] Plaintiff alleges that this multi-step review process was "instituted" by the 2021 policy; however, the policy itself, attached to the SAC, states that it "does not change the approval process" but, rather, only changes "the mechanism by which approval is sought," i.e., through a new online portal.  [Dkt. No. 65-2] at 3.

the supervisor should approve or deny the request.  Id.  Finally, the supervisor would consider

the recommendation provided by the SET and the guidance provided by Ethics, and make a final

determination.  Id.  Plaintiff alleges that, if the engagement involved prepared materials, the

supervisor could condition approval on the judge making changes.  [Dkt. No. 65] at ¶ 26.

Like the 2017 policy, the 2020 policy did not contain specific criteria for supervisors or

the SET to consider when reviewing and approving or denying requests, other than indicating

that "[a]ll requests, regardless of capacity, must comply with applicable law and agency

policies," and that "all employees, especially all non-supervisory adjudicators," such as

plaintiff's members, "seeking approval of a speaking engagement request in either capacity are

reminded of the importance of maintaining impartiality and avoiding the appearance of

impropriety, favoritism, or preferential treatment."  Id. at 3–4; [Dkt. No. 65] at ¶ 27.  The 2020

policy also did not include a timeline by which the approval process would be completed, other

than specifying that requests should be submitted no later than two weeks before an engagement.

[Dkt. No. 65-2] at 3.

2. 2021 Speaking Engagement Policy

The EOIR policy at issue in this litigation became operational in October 2021 ("2021

policy").  [Dkt. No. 65-3] at 2.  It effectively continues to prohibit immigration judges from

speaking or writing in their personal capacities about immigration or EOIR, although it does not

do so as explicitly as the 2020 policy.  Under the 2021 policy, EOIR employees speak in their

official capacity "[w]hen an employee is invited to participate in an event because of their

official position, is expected to discuss agency policies, programs, or a subject matter that

directly relates to their official duties, or otherwise appear on behalf of the agency."[7]  Id. at 3.

---

[7] Largely consistent with the 2017 and 2020 policies, the 2021 policy also defines official
capacity speech as "[w]hen an EOIR employee is assigned to participate as a speaker or panel

5

"Attachment A" to the 2021 policy gives examples of official capacity engagements, including "[i]mmigration conferences or similar events where the subject is immigration (including litigation)," "[m]eetings with [s]takeholders," "[p]ro bono training related to immigration," and the "EOIR Model Hearing Program." Id. at 8.  Attachment A's examples of personal capacity engagements confirm that the 2021 policy continues the 2020 policy's prohibition on personal capacity speech about immigration, as it explicitly excludes speaking about immigration from many of the following examples of personal capacity speech: "[m]oot court judge - not immigration related," "[c]ommencement speaker when topic is unrelated to immigration or official duties," "[c]areer day/[a]lumni career panel - to discuss full career path and experience," "[i]nterview based on book written in appropriate personal capacity," "[s]peaking at community, religious, youth, or small social groups (e.g., book club) and meetings, not directly related to immigration law or advocacy." Id. at 8.

Under the 2021 policy, requests to speak or write in an official capacity, which includes any speech about immigration or EOIR, must undergo a multi-step review process, which is largely similar to the approval process outlined in the 2020 policy. Id. at 4–5.  It requires supervisors to submit requests for review by the SET and by the Ethics Program, and permits supervisors to make the final decision as to whether a judge must speak or write in his or her official or personal capacity and whether to approve official capacity requests.[8] Id.  The 2021

---

participant or otherwise present information on behalf of the agency at a conference or other event, or requests to do so," and states that "any EOIR employee speaking at an event hosted by a Federal Department, Office, or Agency, or at an event featuring representatives from other Departments, Offices, Agencies or members of Congress" will be presumed to be speaking in an official capacity." [Dkt. No. 65-3] at 3.

[8] The 2021 policy does not require the SET to review requests by judges to teach classes on immigration, although it does recommend that supervisors submit these requests to the SET for guidance. [Dkt. No. 65-3] at 6.

policy does not list extensive criteria for supervisors to use in determining whether a judge's speech is in the judge's official or personal capacity. Other than the broad definition of official capacity speech and the examples given in Attachment A, the 2021 policy only specifies that a supervisor "must consider the nature and purpose of the engagement, the host(s) and sponsor(s) of the event, and whether the event provides an appropriate forum for the dissemination of the information to be presented" when determining the proper capacity of a judge's speech for an engagement. [Dkt. No. 65-3] at 3. Supervisors may also seek guidance from the SET as to how to classify an engagement. Plaintiff alleges that "supervisors treat [the SET's] input as determinative." [Dkt. No. 65] at 13 n.4.

Like the 2017 and 2020 policies, the 2021 policy does not provide supervisors with criteria to consider when approving or denying a request by a judge to speak or write in his or her official capacity. It merely states that "[s]upervisors are encouraged to grant appropriate requests." [Dkt. No. 65-3] at 3. The 2021 policy continues to lack a timeline for the approval process, but supervisors are encouraged to submit requests relating to a judge's official duties at least ten days before the event at which the judge wants to speak or the date by which a writing is due. [Dkt. No. 65-3] at 5.

Under the 2021 policy, judges generally are not required to seek approval for any personal capacity speaking engagements or writing, a change from the 2020 policy which required approval for any personal capacity event. [Dkt. No. 65-3] at 3; [Dkt. No. 65-2] at 3. But plaintiff alleges that the 2021 policy keeps supervisors, the SET, and Ethics involved in reviewing and approving personal capacity requests in one "significant carveout." [Dkt. No. 65] at ¶ 30. If an event takes place during working hours, a leave request must be submitted to the judge's supervisor, and the supervisor may "inquire how the employee intends to use the time

before approving the leave request." [Dkt. No. 65-3] at 3. If the supervisor "approves an engagement," the supervisor would then solicit ethics guidance and pass this along to the employee. Id. The SAC alleges that the 2021 policy permits EOIR to exert control over personal capacity speech even when formal approval is not required. For example, even if a judge did not initially seek approval to speak at an event because the judge was appearing in a personal capacity outside of working hours, the 2021 policy specifies that, "if the circumstances surrounding the speaking event change, the requesting employee should convey such changes to the supervisor to consider the advisability of the employee's continued participation." Id. at 4. Additionally, the 2021 policy encourages judges to consult with their supervisors if they believe "that there is a potential that a speaking engagement may result in the perception by the public that the engagement relates to the employee's official duties or employment with EOIR." Id. at 3. To enforce compliance with all of the described procedures, the 2021 policy states that a judge "who participates in an event that requires official capacity, or improperly presents the appearance of official capacity, without first obtaining supervisory approval may be subject to discipline." Id. at 4.

   3.   Individual Judges' Experiences with the 2021 Policy

   The SAC contains a number of allegations as to how the 2021 policy has stymied the ability of judges to speak about immigration in their personal capacities, claiming that "many judges who wish to share their private views on substantive questions of immigration law or policy no longer do so." [Dkt. No. 65] at ¶ 47. For example, before 2017, NAIJ President Judge Mimi Tsankov frequently participated in her personal capacity on conference panels, speaking about immigration-related issues such as mental competency and juvenile hearings, court practice and procedure, and "crimmigration" issues. Id. She also published articles in her personal capacity on topics related to immigration law. Id. The SAC alleges that, although

8

Judge Tsankov would like to continue to speak in her personal capacity on panels or publish writing about immigration law, she has not sought approval to do so "because she understands the [2021] [p]olicy to prohibit her from speaking about these issues in her private capacity," and because speaking in her official capacity "would require her to recite the agency's talking points." Id. at ¶ 48. Despite her reluctance to seek approval to speak at events or publish writing about immigration, Judge Tsankov has requested approval to teach a course on immigration law at Fordham Law School in her personal capacity. Id. at ¶ 53. Plaintiff alleges that, although the 2021 policy provides that a judge only needs to receive supervisory approval to teach an immigration law course, "in practice, requests to teach are routed to the SET, and judges who have sought approval often receive no decision." Id. In Judge Tsankov's case, although she submitted her request on November 3, 2022 to teach a course in the Spring 2023 semester, the request remained pending at the time the SAC was filed on January 9, 2023. Id.

NAIJ Vice President Judge Samuel Cole has similarly experienced delays in the approval process, and the SAC alleges that he has been encouraged by EOIR to make changes to his written work about immigration. On September 2, 2022, Judge Cole emailed his supervisor requesting to publish an article about immigration court bond hearings. Id. at ¶ 49. Although he wanted to publish the article in his personal capacity, he requested authorization in either his personal or official capacity because he did not believe a personal capacity request would be approved for an article on this topic. Id. Judge Cole's article was determined to be official capacity speech, and, because of this, a member of EOIR's Office of Policy "made several edits to the tone and substance of the piece," which the SAC alleges "demonstrate the control that the agency exercises over immigration-related speech that the agency deems 'official capacity.'" Id. at ¶¶ 50–51. The article "seeks to give practitioners practical advice on how to approach

immigration court bond hearings," and the SAC alleges that certain comments made by a reviewing official indicated her view that "certain observations made in the piece were not appropriate because they were not the official view of the agency." Id. at ¶ 51. For example, in response to one observation made by Judge Cole in the article, the reviewing official asked whether it constituted a "'sanctioned' EOIR practice tip," because Judge Cole was writing in his official capacity. Id. In response to another observation, which was described as the "author's opinion," the reviewing official asked again if it was an "EOIR tip" and, if it was, it "should not be expressed as [the] author's opinion." Id. If it was not, an "evaluation must be done as to whether [it was] appropriate in [his] official capacity." Id. Even after making revisions to his article in response to these comments by the SET, Judge Cole's request had not been approved by January 9, 2023. Id.

A judge who wished to remain unnamed similarly experienced a delay in receiving approval to publish an article under the 2021 policy. She intended to publish an article titled "Five Perspectives on Immigration Law and Policy," and, although she would have preferred to publish the article in her personal capacity, she submitted the article for approval without specifying the capacity for which she sought approval "to maximize the chance approval would be granted." Id. at ¶ 52. She submitted this request to her supervisor on September 6, 2022, and the supervisor forwarded this request to the SET the next day. Id. Even though the supervisor followed up with the SET six separate times, as of January 9, 2023, the request had not been granted. Id.

Delays caused by the approval process have presented issues for two other judges as well. Judge Frank Loprest requested to teach an immigration law course for Spring 2023 at St. John's University School of Law. Id. at ¶ 53. Despite making this request on October 20, 2022, the

request had neither been approved nor denied as of January 9, 2023. Id. On October 3, 2022,

Judge Michael Straus sought approval to speak about immigration court practice at a November

17, 2022 meeting of the Connecticut chapter of the American Immigration Lawyers Association

("AILA"). Id. at ¶ 54. He requested to speak in his official capacity because "he believed that

this is what the [2021 policy] required him to do," even though he would have preferred to speak

in his personal capacity. Id. On November 1, 2022, his supervisor asked him to send talking

points that the SET could consider when making its decision, advising him that the SET would

not approve any speech about "EOIR and court 'initiatives, updates, and policies, because those

are topics that only the [Assistant Chief Immigration Judge] and [Court Administrator] can

generally speak about to outside groups.'" Id. (alteration in original). He agreed to confine his

remarks to just his own docket in the court. Id. Eventually, his request was approved; however,

he received the approval on November 17, 2022, the day of the meeting, despite having

submitted his request almost two months before. Id. Because the event organizers had not

received a timely confirmation that he could participate, they had already made plans to proceed

without his participation. Id.

### B. **Procedural History**

On July 1, 2020, the NAIJ filed its initial complaint [Dkt. No. 1] and a Motion for a

Preliminary Injunction, [Dkt. No. 9], seeking to enjoin the enforcement of the 2017 and 2020

policies, both of which were still in effect. On August 6, 2020, Judge Liam O'Grady[9] denied the

Motion for a Preliminary Injunction finding that the Court did not have jurisdiction over

plaintiff's claims because NAIJ was, at the time, the "exclusive collective bargaining

---

[9] The undersigned judge was randomly reassigned this civil action after Judge O'Grady's
retirement.

representative for non-managerial immigration judges" and the Federal Service Labor-Management Relations Statute ("FSL-MRS") precluded jurisdiction by the district court over NAIJ's claims.[10]  [Dkt. No. 31] at 1, 6, 14–15.

The NAIJ appealed the dismissal to the United States Court of Appeals for the Fourth Circuit, which initially affirmed the dismissal on April 4, 2022; however, on April 15, 2022, the Federal Labor Relations Authority decertified plaintiff as a labor union.  Based on that changed circumstance, the Fourth Circuit vacated Judge O'Grady's August 6 order, and remanded this action.[11]  [Dkt. No. 43].

On remand, the plaintiff, now appearing as a voluntary organization, filed an Amended Complaint for Declaratory and Injunctive Relief ("Amended Complaint") on August 18, 2022, [Dkt. No. 47].  On October 7, 2022, defendant filed a Motion to Dismiss plaintiff's Amended Complaint, [Dkt. No. 49], which the Court granted on December 2, 2022, because the Amended Complaint had failed to allege that any of NAIJ's members had standing to challenge the 2021 policy, [Dkt. No. 62].  The Court granted plaintiff leave to file a second amended complaint, and, on January 9, 2023, the plaintiff filed the Second Amended Complaint ("SAC"), [Dkt. No. 65], which is at issue in the defendant's Motion to Dismiss, [Dkt. No. 68].

---

[10] The FSL-MRS provides administrative review of actions involving "negotiability" and "unfair labor practice" disputes and requires parties to bring their claims in front of the Federal Labor Relations Authority ("FLRA").  [Dkt. No. 31] at 6–7 (citing Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d 748, 752 (D.C. Cir. 2019)).

[11] Defendant's memorandum supporting its Motion to Dismiss indicated that NAIJ was seeking recertification as a union.  If recertified, this Court's jurisdiction over this action would again be stripped by the FSL-MRS; however, plaintiff stated in its opposition that it withdrew its petition for recertification on February 3, 2023.  [Dkt. No. 72] at 3 n.1.

## II. DISCUSSION

EOIR moves to dismiss the SAC under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), arguing that

(1) the SAC has failed to allege that plaintiff has Article III standing to bring its First and Fifth

Amendment claims; (2) the Civil Service Reform Act ("CSRA") strips the Court of jurisdiction

to hear plaintiff's claims; and (3) if the Court has jurisdiction, the SAC should be dismissed for

failure to state a claim.  For the reasons discussed below, the Court finds that, although the SAC

sufficiently alleges that plaintiff has standing, the CSRA divests this Court of jurisdiction to hear

plaintiff's claims.  As such, the SAC will be dismissed under Rule 12(b)(1).

### A. **Standard of Review**

Under Rule 12(b)(1), "a civil action must be dismissed whenever the court lacks subject

matter jurisdiction."  Al Shimari v. CACI Premier Tech., Inc., 320 F. Supp. 3d 781, 782 (E.D.

Va. 2018).  "[B]ecause 'Article III gives federal courts jurisdiction only over cases and

controversies,' and standing is 'an integral component of the case or controversy

requirement[,]'" motions to dismiss for lack of Article III standing are brought under Rule

12(b)(1).  CGM, LLC v. BellSouth Telecommunications, Inc., 664 F.3d 46, 52 (4th Cir. 2011)

(quoting Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006)).  "When a Rule 12(b)(1) challenge

is raised, the burden of proving subject matter jurisdiction is on the plaintiff."  Ortiz v.

Mayorkas, No. 20-7028, 2022 WL 595147, at *2 (4th Cir. Feb. 28, 2022) (citing Adams v. Bain,

697 F.2d 1213, 1219 (4th Cir. 1982)).  In evaluating a motion to dismiss based on Rule 12(b)(1),

the Court "may consider evidence outside the pleadings without converting the proceeding to

one for summary judgment."  In re KBR, Inc., Burn Pit Litig., 744 F.3d 326, 333 (4th Cir. 2014)

(internal quotation marks omitted); see also White Tail Park, Inc. v. Stroube, 413 F.3d 451, 459

(4th Cir. 2005) (quoting Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945

F.2d 765, 768 (4th Cir. 1991)).  Without jurisdiction, a court cannot reach any decision on the

merits of a plaintiff's claim. <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 94 (1998)

("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to

declare the law, and when it ceases to exist, the only function remaining to the court is that of

announcing the fact and dismissing the cause." (quoting <u>Ex parte McCardle</u>, 74 U.S. (7 Wall.)

506, 514 (1868))).  Because the Court does not have jurisdiction over the claims in the SAC, it

will not consider defendant's arguments as to why the SAC should be dismissed pursuant to Rule

12(b)(6).

## B. <u>Analysis</u>

### 1. <u>Standing</u>

NAIJ brings this civil action "on behalf of its members," [Dkt. No. 65] at ¶ 7, which

means it must establish that it has "associational standing." To do so, it must show that "(1) its

members would otherwise have standing to sue as individuals; (2) the interests at stake are

germane to the group's purpose; and (3) neither the claim made nor the relief requested requires

the participation of individual members in the suit." <u>White Tail Park</u>, 413 F.3d at 458 (quoting

<u>Friends for Ferrell Parkway, LLC v. Stasko</u>, 282 F.3d 315, 320 (4th Cir. 2002)).  To establish

standing, an individual "must show (i) that he suffered an injury in fact that is concrete,

particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant;

and (iii) that the injury would likely be redressed by judicial relief." <u>TransUnion LLC v.</u>

<u>Ramirez</u>, 141 S. Ct. 2190, 2203 (2021) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555,

560–561 (1992)).

Standing requirements are "'somewhat relaxed in First Amendment cases,' given that

even the <u>risk</u> of punishment could 'chill[]' speech." <u>Edgar v. Haines</u>, 2 F.4th 298, 310 (4th Cir.

2021), <u>cert. denied</u>, 142 S. Ct. 2737 (2022) (quoting <u>Cooksey v. Futrell</u>, 721 F.3d 226, 235 (4th

Cir. 2013)) (emphasis and alteration in original).  A plaintiff "need not show she ceased"

14

speaking "'altogether' to demonstrate an injury in fact." Benham v. City of Charlotte, N.C., 635 F.3d 129, 135 (4th Cir. 2011) (quoting Smith v. Frye, 488 F.3d 263, 272 (4th Cir. 2007)). Instead, "a plaintiff must allege that he or she has 'experienced a non-speculative and objectively reasonable chilling effect,' on speech." Menders v. Loudoun Cnty. Sch. Bd., 65 F.4th 157, 165 (4th Cir. 2023) (quoting Cooksey, 721 F.3d at 236). This chilling effect can be established in one of two ways. First, a plaintiff "may show that [he or she] intend[s] to engage in conduct at least arguably protected by the First Amendment but also proscribed by the policy [he or she] wish[es] to challenge, and that there is a 'credible threat' that the policy will be enforced against [him or her] when [he or she] do[es] so." Id. (quoting Abbott v. Pastides, 900 F.3d 160, 176 (4th Cir. 2018)). Second, a plaintiff may allege that he or she intends to comply with the policy, but in doing so, will suffer "self-censorship." Id. Even under this second path, to establish standing, the Fourth Circuit has emphasized that "a credible threat of enforcement is critical" because, without one, a plaintiff cannot show "an objectively good reason for refraining from speaking and 'self-censoring.'" Abbott, 900 F.3d at 176 (citations omitted).

Here, the SAC alleges that its members have complied with the 2021 policy's prohibition on personal capacity speech about immigration and EOIR, and, as a result, have been injured. For example, the SAC asserts that multiple judges, including Judge Cole, would prefer to speak or write in their personal capacity about immigration, but instead have requested to speak or write in their official capacity because they feel compelled to do so. [Dkt. No. 65] at ¶ 49. Moreover, it alleges that Judge Tsankov has stopped requesting to speak at events or publish written work about immigration altogether because she believes she will not be permitted to speak in her personal capacity and does not want to be required to recite EOIR's talking points. Id. at ¶ 48. Additionally, Judge Straus' choice to comply with the 2021 policy and wait for

EOIR to approve his speech at the Connecticut chapter of the AILA program actually prevented him from speaking because of delays in the approval process. Id. at ¶ 54. These examples show that the SAC has alleged that certain judges have self-censored their speech in an effort to comply with the 2021 policy, and, in some cases, have been denied the ability to speak. See Edgar, 2 F.4th at 310 ("[S]ome plaintiffs alleged that they have decided not to write about certain topics because of the prepublication review policies. Such self-censorship is enough 'for an injury-in-fact to lie.'").

The SAC has also sufficiently alleged that this self-censorship stemmed from an objectively reasonable chilling effect. In assessing whether a chilling effect is objectively reasonable, the Fourth Circuit considers whether a policy "would be 'likely to deter a person of ordinary firmness from the exercise of First Amendment rights,'" and has found that a prepublication review policy similar in important respects to the 2021 policy has met this standard. Edgar, 2 F.4th at 310 (quoting Benham v. City of Charlotte, 635 F.3d 129, 135 (4th Cir. 2011)). Plaintiffs in Edgar v. Haines claimed that a prepublication review policy "allowed agency officials to 'redact material unwarrantedly' . . . and caused them to write some pieces 'differently than [they] would have otherwise written them,'" and that "these infirmities, together with the delays created by the defendants' prepublication review regimes," had "'dissuaded [them] from writing some pieces' they 'would have otherwise written,'" and had "made it more difficult to engage in 'quickly evolving public debates.'" Id. at 310 (alterations in original). The Fourth Circuit found that all of these allegations taken together established an objectively reasonable chilling effect. Id.; see also Menders, 65 F.4th at 165 (finding an objectively reasonable chilling effect was imposed on students who desired to speak about certain issues but refrained from doing so out of fear that they would be investigated under a bias reporting policy).

The SAC has similarly alleged that immigration judges' speech has been chilled because they feel compelled to seek approval to speak or write about immigration or the EOIR in their official capacity when they would prefer to do so in their personal capacity, which, at least in Judge Tsankov's situation, has prevented her from speaking or writing about immigration or the EOIR at all.  Furthermore, the SAC alleges, similar to the prepublication review scheme at issue in Edgar, that the delays caused by the 2021 policy's lack of definite deadlines have entirely prevented judges from speaking or publishing written works.

Despite defendant's arguments to the contrary, an objectively reasonable chilling effect can be established without a showing of actual discipline.  In a recent Fourth Circuit opinion, the court considered whether parents representing their children's interests had standing to challenge a school's policy that permitted "students to anonymously report incidents of perceived bias." Menders, 65 F.4th at 160, 164–66.  The parents had alleged that their children wanted to speak in a manner that could be perceived as biased under the school's policy, which could trigger an anonymous report and investigation, and that "any such report, investigation or public disclosure could harm their [children's] standing in the school community and ruin their college or career prospects." Id. at 165.  Although the parents' complaint did not allege that any child had actually been disciplined as a result of the policy, the Fourth Circuit concluded that the potential negative impact of a report under the school's policy created an objectively reasonable chilling effect. Id. In so holding, the court explicitly reversed the district court's finding that the parents lacked standing because they "failed to allege that there have been any disciplinary incidents launched as a result of the reporting form or even bias incidents recommended for investigation." Id. at 164–66.  Similarly, the SAC alleges that "EOIR has warned judges that failure to comply with its speaking engagement policy may result in disciplinary action, including reprimand, suspension,

and even removal from the federal service." [Dkt. No. 65] at ¶ 20. This warning establishes that there is potential liability for any judge who fails to follow the 2021 policy. The threatened discipline, which could include termination, present in this case is far more severe than the investigation or public disclosure of certain speech that the Fourth Circuit found sufficient to establish an objectively reasonable chilling effect in <u>Menders</u>. As such, the SAC has adequately alleged that the 2021 policy has an objectively reasonable chilling effect on plaintiff's members.

The SAC has also satisfied the causation requirement for standing by alleging that the 2021 policy caused this self-censorship. For example, it alleges that Judge Tsankov has been deterred "from seeking approval to discuss substantive questions of immigration law in her private capacity" by the 2021 policy. [Dkt. No. 65] at ¶ 48. The SET's determination that Judge Cole could only publish his forthcoming article in his official capacity, and the subsequent edits it required him to make to his article, resulted from the 2021 policy. <u>Id.</u> at ¶ 49. These allegations that the 2021 policy caused the alleged chilling effects are sufficient to establish causation for purposes of the standing inquiry. <u>See</u> <u>Edgar</u>, 2 F.4th at 311 ("The chilling of the plaintiffs' speech was plainly alleged to have been caused by the particular prepublication review regimes at issue here. As the plaintiffs alleged, they would publish more <u>but for</u> those regimes." (emphasis in original) (citing <u>Cooksey</u>, 721 F.3d at 238)).

Furthermore, the relief requested by plaintiff—a declaratory judgment that the 2021 policy violates the First and Fifth Amendments and an order enjoining defendant from continuing to enforce the 2021 policy—would redress plaintiff's alleged injury—the chilling of certain judges' speech. <u>See</u> <u>id.</u> (finding "more than 'a non-speculative likelihood that [plaintiffs'] injury would be redressed by a favorable judicial decision" when "[a] favorable

decision on the plaintiffs' behalf would deem the defendants' regimes unconstitutional and enjoin the defendants from enforcing them." (citing Cooksey, 721 F.3d at 238)).

Accordingly, the SAC's allegations support the conclusion that plaintiff's members have standing to bring this First Amendment challenge. Defendant does not contest the two other required showings for associational standing—namely that "the interests at stake are germane to the group's purpose" and that the action does not "require[] the participation of individual members in the suit," White Tail Park, 413 F.3d at 458 (quoting Friends for Ferrell Parkway, 282 F.3d at 320), and the Court finds that plaintiff's challenge to the EOIR's speaking policy is sufficiently germane to the purpose of NAIJ as a voluntary association of non-supervisory immigration judges and that plaintiff's facial challenge will not require the participation of individual members in this action. For these reasons, the SAC has alleged plaintiff's associational standing as to its First Amendment claim that the SAC constitutes a prior restraint on speech.

Defendant also argues that the SAC fails to allege standing as to the plaintiff's First and Fifth Amendment claim that the 2021 policy is void for vagueness because it does not allege that any individual judge was treated arbitrarily by the 2021 policy. Responding to a similar challenge to a plaintiff's First and Fifth Amendment void for vagueness claim, the district court in Edgar recognized that "a provision may be impermissibly vague 'if it authorizes or even encourages arbitrary and discriminatory enforcement,'" and found that the plaintiffs had plausibly alleged an injury in the form of a chilling effect by alleging that "their works have been arbitrarily redacted and excised, in part because of discrimination against the viewpoints they contain." Edgar v. Coats, 454 F. Supp. 3d 502, 528 (D. Md. 2020), aff'd sub nom. Edgar, 2 F.4th 298 (quoting Hill v. Colorado, 530 U.S. 703, 732 (2000)). The Fourth Circuit affirmed,

finding that the plaintiffs had sufficiently alleged that the "vagueness and breath of the defendants' prepublication review regimes" created a chilling effect. Edgar, 2 F.4th at 310. Although the SAC does not specifically allege that any judge's work has been redacted because the EOIR wanted to discriminate against certain viewpoints, it has alleged that redactions and delays imposed by the 2021 policy have created a chilling effect on the speech of judges and have deprived some judges of speaking at all because of the delay in approving speaking requests. Additionally, it has alleged that the 2021 policy could permit arbitrary enforcement as supervisors and the SET have sole discretion over whether to label speech as official or personal capacity, and limited guidance exists within the 2021 policy to cabin this discretion. At this stage, these allegations are sufficient to state an injury in fact as to plaintiff's Fifth Amendment void for vagueness claim. Because the SAC has adequately alleged that the 2021 policy directly causes the alleged injuries and that a change of this policy would redress the injuries, and given that defendant did not contest the other requirements for associational standing, the Court finds that plaintiff has standing to raise a void for vagueness claim.

      2. <u>Civil Service Reform Act</u>

Defendant next contends that the CSRA strips this Court's jurisdiction over plaintiff's claims. Congress passed the CSRA to "replace the haphazard arrangements for administrative and judicial review of personnel action," and, in doing so, created "an elaborate 'new framework for evaluating adverse personnel actions against [federal employees].'" <u>United States v. Fausto</u>, 484 U.S. 439, 443–44 (1988) (alteration in original) (quoting <u>Lindahl v. OPM</u>, 470 U.S. 768, 773 (1985)). This framework regulates virtually every aspect of federal employment and "prescribes in great detail the protections and remedies applicable to such action[s], including the availability of administrative and judicial review." <u>Id.</u> at 443. When considering actions taken against

federal employees covered by this elaborate framework, courts almost always find that Congress intended to preclude district court jurisdiction over their claims.

The CSRA provides carefully crafted remedial administrative review schemes for three types of personnel actions taken against federal employees, two of which are relevant here.[12] First, Chapter 23 lays out "merit systems principles" by which agencies must abide. See 5 U.S.C. § 2301(b). That chapter also classifies certain violations of those principles as "prohibited personnel practices," defined by the CSRA as "any one of fourteen acts that supervisory employees may not take" against covered federal employees. Rydie v. Biden, No. 21-2359, 2022 WL 1153249, at *5 (4th Cir. Apr. 19, 2022). For example, it prohibits a supervisor from taking any "personnel action"—including "disciplinary or corrective action" or "any other significant change in duties, responsibilities, or working conditions"—against an employee if taking the action "violates any law." § 2302(a)(2)(A), (b)(12).[13] A federal employee who has experienced a "prohibited personnel practice" must file the allegation with the Office of Special Counsel ("OSC" or the "Special Counsel"). § 1214(a)(1)(A). The Special Counsel is then required to "investigate the allegation to the extent necessary to determine whether there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken." Id. If the Special Counsel determines that there are reasonable grounds to believe that a personnel action was taken or is to be taken as a result of a prohibited personnel practice, the Special Counsel must investigate the allegation and report its determination together with any findings or recommendations to the MSPB, the employing

---

[12] The third, found in Chapter 43 of the CSRA, "provides that before an employee can be removed or reduced in grade for unacceptable job performance certain procedural protections must be afforded." Fausto, 484 U.S. at 446; see 5 U.S.C. § 4303.

[13] Unless otherwise indicated, all sections cited refer to title 5 of the United States Code.

agency, and the Office of Personnel Management.  § 1214(b)(2)(B).[14]  If the employing agency

does not take corrective action within a reasonable period of time, "the Special Counsel may

petition the [MSPB]," and the MSPB can order corrective action.  § 1214(b)(2)(C).  Whenever

the Special Counsel petitions the MSPB for corrective action, both the agency involved and the

federal employee who is subject to the prohibited personnel practice have an opportunity to

provide written comments to the MSPB.  § 1214(b)(3).  Judicial review of the MSPB's final

order is available in the United States Court of Appeals for the Federal Circuit.  § 1214(c);

§ 7703(b)(1)(A).

 If the Special Counsel determines that there are not reasonable grounds to believe that a

personnel action was taken or is to be taken as a result of a prohibited personnel practice, it may

terminate the investigation.  When the Special Counsel terminates an investigation, it must notify

the employee of: 1) the "relevant facts ascertained by the Special Counsel, including the facts

that support, and the facts that do not support, the allegations;" and 2) the reasons for the

termination of the investigation.  § 1214(a)(2)(A).

 This comprehensive statutory scheme gives the Special Counsel the mandate to bring all

reasonable, nonfrivolous claims of prohibited personnel practices to the employing agency and

the MSPB; and if the MSPB makes a finding as to the agency's need to take corrective action,

that finding is subject to Article III review.[15]  Should the Special Counsel violate this non-

---

[14] The Special Counsel also has the statutory authority to "report any such determination, findings, and recommendations to the President," including recommendations for corrective action.  § 1214(b)(2)(B).

[15] This mandate is subject to two exceptions, not relevant here.  First, if the substantive law provides employees the right to appeal directly to the MSPB, employees need not first bring their claim of a prohibited personnel practice to the OSC.  § 1214(a)(3).  Second, the statute provides that an employee who seeks corrective action for retaliation, as described in § 2302(b)(8) or § 2302(b)(9)(A)(i), (B), (C), or (D) may themselves appeal to the MSPB after first going to the OSC.

discretionary statutory duty to investigate an employee's allegations, a federal district court has subject matter jurisdiction to issue a writ of mandamus directing the Special Counsel to investigate the claim.[16]

Federal employees can challenge more serious personnel actions, that is "adverse actions," through the second statutory scheme outlined in Chapter 75 of the CSRA. See Rydie, 2022 WL 1153249, at *3. Among the types of adverse actions subject to this scheme are "a suspension for 14 days or less," § 7502, "removal," "a suspension for more than 14 days," or "a reduction in pay," § 7512(1)–(5). When challenging an adverse action, a federal employee is afforded a number of procedural rights, including notice of the action, a right to respond, representation by counsel, and a written decision as to the action. § 7513(b). Employees against whom an adverse action is taken do not need to go through the Special Counsel, but can directly appeal the agency's written decision to the MSPB, § 7503(c), 7513(d), and can then appeal an unsatisfactory MSPB decision to the Federal Circuit, § 7703(b)(1)(A). Federal employees who challenge these more serious adverse actions therefore have a more expeditious journey to an Article III court after the administrative process.

Although federal district courts typically have jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, Congress may "impliedly precluded jurisdiction by creating a statutory scheme of administrative adjudication

---

[16] See, e.g., Weber v. United States, 209 F.3d 756 (D.C. Cir. 2000); Carson v. U.S. Off. of Special Couns., No. 04-0315-PLF, 2006 WL 785292, at *3 (D.D.C. March 27, 2006) (finding that district courts have jurisdiction to review whether OSC conducted an investigation); Hunt v. U.S. Dep't of Agric., 740 F. Supp. 2d 41, 51 (D.D.C. 2010) ("This Court only has jurisdiction to review whether OSC conducted an investigation, it cannot pass on the merits of OSC's decision to terminate an investigation." (citation omitted)); Krasfur v. Davenport, 736 F.3d 1032 (6th Cir. 2013) ("A court may not review the Special Counsel's decisions unless the Counsel has declined to investigate a complaint at all." (internal quotation marks omitted)).

and delayed judicial review in a particular court." Bennett v. U.S. Sec. & Exch. Comm'n, 844 F.3d 174, 178 (4th Cir. 2016) (citing Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 207 (1994)). To determine whether Congress intended to divest district courts of jurisdiction, courts generally apply the two-part test enumerated in Thunder Basin Coal Co., 510 U.S. 200. Bennett, 844 F.3d at 178, 181. "First, [courts] ask whether Congress's intent to preclude district-court jurisdiction is 'fairly discernible in the statutory scheme.'" Id. at 181 (quoting Thunder Basin, 510 U.S. at 207). "Second, [courts] ask whether [a] plaintiff['s] 'claims are of the type Congress intended to be reviewed within this statutory structure.'" Id. at 181 (quoting Thunder Basin, 510 U.S. at 212). At this second step, courts evaluate three factors: "(1) whether the statutory scheme 'foreclose[s] all meaningful judicial review.' . . . (2) the extent to which the plaintiff's claims are 'wholly collateral' to the statute's review provisions, and (3) whether 'agency expertise could be brought to bear on the . . . questions presented.'" Id. (alteration in original) (quoting Thunder Basin, 510 U.S. at 212–13, 215).

At step one, the United States Supreme Court has concluded that it is fairly discernable from the CSRA's scheme that Congress intended to preclude district-court jurisdiction over certain covered actions brought by covered federal employees. Elgin v. Dep't of Treasury, 567 U.S. 1, 11–12 (2012); Rydie, 2022 WL 1153249, at *4. Acknowledging "the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions," the Supreme Court held that "it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court." Elgin, 567 U.S. 11–12; Rydie, 2022 WL 1153249, at *4.

At step two, to present claims of the type intended to be reviewed through the statutory scheme, a plaintiff must both be a covered employee and bring a covered action. Neither party

disputes that immigration judges are "covered employees" under the CSRA.[17]  Plaintiff primarily

argues that the SAC does not challenge a covered employment action under the CSRA, and, as

such, the CSRA process would not provide meaningful judicial review of plaintiff's claims,

which are wholly collateral to the CSRA process.  Plaintiff also argues that, even if an

immigration judge could bring a challenge to a prohibited personnel practice through the

CSRA's administrative scheme, there is no meaningful judicial review because he or she would

not be guaranteed review by an Article III court under the CSRA's scheme.  Additionally,

plaintiff contends that, because its claims are "purely constitutional" and do not challenge a

covered action, the MSPB's expertise in adjudicating workplace issues in the executive branch

would not come to bear on plaintiff's claims.  By contrast, defendant argues that plaintiff's

challenge does fall under the CSRA because its First and Fifth Amendment claims "arise directly

out of [judges'] employment with EOIR and their alleged dissatisfaction with a condition of that

employment."  [Dkt. No. 69] at 17.  Moreover, defendant contends that the Fourth Circuit has

rejected the idea that the CSRA's process does not provide meaningful judicial review when an

employee challenges a lesser prohibited personnel practice.

>        a.   Meaningful Judicial Review

"A statutory scheme provides meaningful judicial review, even if it requires litigants to

begin in an administrative forum, so long as an appeal to an Article III court is available 'in due

course.'"  Rydie, 2022 WL 1153249, at *5 (quoting Bennett, 844 F.3d at 186).  If it "pose[s] a

risk of some additional and irreparable harm beyond the burdens associated with the dispute

---

[17] The CSRA defines a "covered position" as including "any position in the competitive service,"
§ 2302(a)(2)(B), § 7511(a)(1)(A), which includes "all civil service positions in the executive
branch," § 2102(a)(1), and excludes limited categories of positions, which are not relevant here.
See Rydie, 2022 WL 1153249, at *5–*6 & n.8.

25

resolution process," or requires the plaintiff "to 'bet the farm . . . by taking [a] violative action' before 'testing the validity of [a] law'" to obtain relief, the statutory scheme fails to provide meaningful judicial review. Id. (alterations in original) (quoting Tilton v. Sec. & Exch. Comm'n, 824 F.3d 276, 286 (2d Cir. 2016), then quoting Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 490 (2010)). Whether an administrative scheme provides meaningful judicial review is the most important factor at step two of the Thunder Basin analysis. Bennett, 844 F.3d at 183 n.7.

For the CSRA's scheme to provide meaningful judicial review, the plaintiff must challenge an action covered under the statute. The parties first dispute whether plaintiff's facial challenge to the 2021 policy, which has been made before any disciplinary actions have been taken or proposed against any of plaintiff's members, can constitute a CSRA covered action. Second, even if the plaintiff's members could bring these claims through the CSRA, the parties dispute whether the CSRA process provides for meaningful judicial review in an Article III court.

i.   Covered Action Under the CSRA

Plaintiff argues that it would not receive meaningful judicial review under the CSRA because the CSRA's scheme does not govern an employee speech policy such as the 2021 policy. Plaintiff emphasizes that, rather than "challenging [an] individual personnel decision[,] . . . it is challenging a policy that imposes a prior restraint on the speech of all immigration judges."[18] [Dkt. No. 72] at 30 (emphasis in original). By contrast, defendant contends that

---

[18] Plaintiff appears to argue that its status as an organization, rather than as an individual, means it could not bring a challenge under the CSRA. There is no support for this argument. Cf. Feds for Med. Freedom v. Biden, 63 F.4th 366, 369 (5th Cir. 2023) (en banc) (considering a CSRA challenge including organizational plaintiffs without concluding that the status of the organizational plaintiffs affected the CSRA analysis). To accept plaintiff's argument would permit any group of federal employees aggrieved in the same way to form a voluntary

plaintiff's First Amendment claims "arise directly out of [judges'] employment with EOIR and their alleged dissatisfaction with a condition of that employment." [Dkt. No. 69] at 17.  As such, defendant argues that plaintiff's members could bring this challenge under the CSRA's administrative scheme as either a challenge to a significant change in the judges' working conditions, or as a hypothetical challenge to the discipline that could result if an individual judge did not comply with the 2021 policy.  The Court agrees that the 2021 policy constitutes a significant change in working conditions in that it effectively eliminates all personal capacity speech involving immigration- or EOIR-related topics, and that plaintiff's members can challenge it as a prohibited personnel practice under the CSRA.  The Court rejects defendant's argument that plaintiff's members could challenge either a prohibited personnel practice or an adverse action under the CSRA based on the hypothetical discipline judges may face.[19]

The CSRA prohibits a "supervisory employee," defined as "[a]ny employee who has authority to take, direct others to take, recommend, or approve any personnel action," § 2302(b), from "tak[ing] or fail[ing] to take any . . . personnel action if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit

---

association to bring an action in the district court in the first instance, an unacceptable loophole in the CSRA's structure when the same individual members in the voluntary association would otherwise have to bring their challenges through the CSRA.

[19] Although the Fourth Circuit has held that the CSRA provides the exclusive remedy to challenge prospective, more serious adverse actions if the actions have been "proposed," Rydie, 2022 WL 1153249, at *6, because the SAC has only alleged that judges have been "warned" that failing to comply with the policy could lead to disciplinary actions and that discipline "may" result from violating the policy, it has not alleged a "proposed" adverse action that the plaintiff can properly challenge under the CSRA.  [Dkt. No. 65] at ¶ 20.  Furthermore, in contrast with the plaintiffs in Rydie, whose complaint had alleged that they intended to not comply with the policy at issue, Rydie, 572 F. Supp. 3d 153 (D. Md. 2021), vacated and remanded, 2022 WL 1153249, [Dkt. No. 1] at ¶¶ 18, 22, plaintiff here has alleged that its members intend to comply with the 2021 policy, meaning that no discipline could be proposed.  Moreover, plaintiff is correct, and defendant cites no contrary authority, that the provisions governing less severe personnel actions do not permit employees to challenge purely prospective or hypothetical disciplinary action.

system principles" as stated in the CSRA, which includes constitutional violations. § 2302(b)(12); Rydie, 2022 WL 1153249, at *5 ("Violations of an employee's constitutional rights fall within this subsection." (citing Weaver v. U.S. Info. Agency, 87 F.3d 1429, 1432 (D.C. Cir. 1996)). Included in the list of personnel actions is a "significant change in duties, responsibilities, or working conditions." § 2302(a)(2)(A)(xii). As defendant correctly argues, the actions the 2021 policy requires supervisors to take in reviewing immigration judges' requests to speak or write about immigration matters represents a "significant change in duties, responsibilities, or working conditions," and, because the SAC has alleged that the policy compels supervisors to act in a way that violates the First and Fifth Amendments, it has alleged a CSRA-covered action. § 2302(b)(12).

The parties primarily dispute whether the 2021 policy's restrictions on speech change the "working conditions" of immigration judges, or whether these restrictions solely affect the "private, off-the-job speech of employees." [Dkt. No. 72] at 32 (emphasis in original). Although the CSRA does not define "working conditions," courts have interpreted the term to encompass broadly the circumstances that affect an employee's job. For example, the Supreme Court has interpreted the term "working conditions" in "the labor-management provisions of the CSRA," Turner v. U.S. Agency for Glob. Media, 502 F. Supp. 3d 333, 367 (D.D.C. 2020), to mean "the 'circumstances' or 'state of affairs' attendant to one's performance of a job." Fort Stewart Sch. v. Fed. Labor Relations Auth., 495 U.S. 641, 645 (1990) (citation omitted); see also Dep't of Def. Dependents Sch. v. Fed. Labor Relations Auth., 863 F.2d 988, 990 (D.C. Cir. 1988), judgment vacated on reh'g on other grounds, 911 F.2d 743 (D.C. Cir. 1990) (interpreting the same provision to mean the "the day-to-day circumstances under which an employee performs his or her job."). In interpreting the specific CSRA provision at issue here, the Federal Circuit

has found that "'working conditions' most naturally connote[] the physical conditions under which an employee labors," but has also acknowledged that the ambiguity in the meaning of "conditions" could make it "possible to give it a broader interpretation to mean the conditions that the employee must satisfy to qualify for the job." Hesse v. Dep't of State, 217 F.3d 1372, 1378 (Fed. Cir. 2000); see also Mahoney v. Donovan, 721 F.3d 633, 636 (D.C. Cir. 2013) (interpreting this provision to include actions that "affect the ability of administrative law judges to do their jobs efficiently and effectively," and that "interfere with . . . [the] decisional independence" of administrative law judges when adjudicating matters); Turner, 502 F. Supp. 3d at 367 ("[C]ourts have determined that the term "working conditions" generally refers to the daily, concrete parameters of a job, for example, hours, discrete assignments, and the provision of necessary equipment and resources.").

Although the SAC alleges that the 2021 policy primarily burdens the private speech of judges, the policy broadly affects how judges interact with their supervisors and the EOIR, governs what types of speaking or writing they may do within their official capacities, and enforces these restrictions through traditional workplace disciplinary measures. For example, Judge Straus' exchange with his supervisor discussing the types of statements he may make in an official capacity speech about immigration court practice represents a traditional exchange between supervisor and employee as to how an employee should represent an agency at an external event. Moreover, the SAC's challenge to the requirement that immigration judges receive approval to attend speaking engagements during working hours certainly constitutes a challenge to a working condition, as the regulation of how employees may take time off during working hours meets even the narrowest understanding of a working condition. Although the restrictions in the 2021 policy may not directly bear on immigration judges' key responsibilities

29

of adjudicating matters that come before them, the CSRA's "working conditions" provision has

no primary purpose test.  Instead, consistent with other courts' interpretation, it encompasses the

circumstances that relate to one's performance of a job.  The 2021 policy governs just that.

The enumerated personnel actions found in § 2302(a)(2)(A) before "change in . . .

working conditions" confirm that "working conditions" encompasses a significant policy

governing employee's speech such as the 2021 policy.  For example, § 2302(a)(2)(A) includes

the following categories of personnel action: "disciplinary or corrective action," "a performance

evaluation," and "a decision concerning pay, benefits, or awards, or concerning education or

training. . . ."  Most relevant here, it also includes "the implementation or enforcement of any

nondisclosure policy, form, or agreement."  § 2302(a)(2)(A)(x)–(xi).  Listing enforcement of a

nondisclosure policy as a personnel practice suggests that Congress intended to include a policy

regulating the speech of employees in the types of "working conditions" that federal employees

can challenge through the CSRA process.  See Yates v. United States, 574 U.S. 528, 545 (2015)

("[W]here general words follow specific words in a statutory enumeration, the general words are

[usually] construed to embrace only objects similar in nature to those objects enumerated by the

preceding specific words." (alteration in original) (quoting Washington State Dept. of Social and

Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 384 (2003))).

Plaintiff urges the Court to follow three out-of-circuit decisions that held certain First

Amendment challenges fell outside of the CSRA's scheme.  Weaver, 87 F.3d at 1429; Turner v.

U.S. Agency for Glob. Media, 502 F. Supp. 3d 333 (D.D.C. 2020); Firenze v. N.L.R.B., No. 12-

10880-PBS, 2013 WL 639151 (D. Mass. Jan. 10, 2013), report and recommendation adopted,

Firenze v. N.L.R.B., No. 12-cv-10880-PBS, 2013 WL 639148 (D. Mass. Feb. 19, 2013).  In

Weaver, the United States Court of Appeals for the D.C. Circuit considered whether an

employee at Voice of America ("VOA") could bring a challenge in district court to a prepublication review policy that required all employees "to submit all speaking, writing, and teaching material on matters of 'official concern' to their employers for review prior to publication," as well as a challenge to an admonishment that she received under this policy. Weaver, 87 F.3d at 1431–32. Although the D.C. Circuit found that the admonishment was a CSRA-covered prohibited personnel practice, it found that the plaintiff did not need to bring her constitutional challenge through the CSRA as "the district court would have" otherwise had "jurisdiction over such a suit, framed as a simple pre-enforcement attack on a regulation restricting employee speech." Id. at 1432–34 (citing United States v. Nat'l Treasury Employees Union, 513 U.S. 454 (1995); Sanjour v. EPA, 56 F.3d 85 (D.C. Cir. 1995) (en banc)). Neither decision cited by the D.C. Circuit considered whether the CSRA barred consideration of the laws and regulations at issue, and, accordingly, do not support the plaintiff's proposition that a pre-enforcement constitutional challenge to an employee speech policy falls outside of the CSRA absent any enforcement (or proposed enforcement) against employees. See [Dkt. No. 31] at 13–14.

Moreover, Weaver did not consider the Thunder Basin factors to determine whether the CSRA precluded jurisdiction, as the Supreme Court in Elgin has since clarified that courts must, even when plaintiffs bring a constitutional challenge. See id.; Elgin, 567 U.S. at 15. As Judge O'Grady has already held, and as the Fourth Circuit has affirmed,[20] the Supreme Court in Elgin "expressly declined to draw 'a jurisdictional rule' based on 'amorphous distinctions' such as whether a plaintiff is bringing a facial or as-applied challenge. . . . The law is clear that, where a

---

[20] The Fourth Circuit initially affirmed Judge O'Grady's decision in full. It was only vacated after the NAIJ was decertified as a union and, accordingly, no longer met the requirements to bring a claim through the FSL-MRS's administrative scheme.

complex statutory scheme is exclusive, that 'exclusivity does not turn on the constitutional nature' of a plaintiff's claim." [Dkt. No. 31] at 9 (quoting Elgin, 567 U.S. at 15).

Plaintiff has cited to only two opinions that, it contends, support Weaver's conclusion that "challenges to employee speech policies do not qualify" as CSRA-covered actions, [Dkt. No. 72] at 30; however, neither decision addresses the same type of broad employee speech policy as plaintiff challenges here. In Turner, the plaintiffs brought First Amendment challenges to changes in policy at a government-run media agency, which they alleged permitted Executive Branch appointees to interfere with journalistic content. Turner, 502 F. Supp. 3d at 348–51, 369. In concluding that one plaintiff had experienced no covered action, and that the district court had jurisdiction to consider plaintiff's claim, the court emphasized that the media agency was a "sui generis environment," and that, in this environment which is "unique among government agencies, . . . dramatic shifts in policy and practice that implicate the very constitutional rights on which U.S.-funded international broadcasting is predicated are outside the bounds of a 'working condition.'" Id. at 367. In Firenze, after the plaintiff sought to publicize that his employer had sought to use arbitration to adjudicate six grievances that plaintiff had filed in the course of his employment, his employer sent him an email prohibiting him from doing so, which plaintiff contended was enforcing a rule from his employer preventing employees from publicizing their grievances at work. Firenze, 2013 WL 639151, at *2. Plaintiff challenged this email and rule as a prior restraint in violation of the First Amendment, and, because the court found that this communication and rule did not constitute a prohibited personnel practice under the CSRA, it concluded that it had jurisdiction to hear plaintiff's claim. Id. at *6, *8. Neither of the situations challenged by the plaintiffs in both Turner and Firenze—a broad First Amendment challenge to a media agency, which the court acknowledged as a "sui generis" environment, and an individual

32

communication enforcing a rule by an employer prohibiting employees from speaking internally about workplace grievances—are sufficiently similar to a speech policy affecting how all immigration judges can speak about immigration or EOIR to suggest that the 2021 policy does not constitute a CSRA-covered action. And, as stated, Weaver's determination that a prepublication review policy did not constitute a CSRA-covered action is of waning significance after the Supreme Court's decision in Elgin.[21]  For all the reasons explained above, notwithstanding plaintiff's reference to these three non-binding decisions, its challenge to the 2021 policy constitutes a challenge to a significant change in working conditions.

ii.  Whether There is Meaningful Review by an Article III Court

Plaintiff contends that CSRA review is inappropriate because it may not have a guaranteed avenue to an Article III court. This is because a federal employee challenging a prohibited personnel practice under the CSRA must first bring the claim to the Office of Special Counsel, which, after mandatory investigation, may decline to petition the MSPB for corrective action, making the decision potentially unreviewable by the Federal Circuit. Yet few courts have encountered the circumstance in which a plaintiff brings a nonfrivolous constitutional claim that is not acted on by the Special Counsel, and thus potentially barring Article III review after the administrative process. See, e.g., Fleming v. Spencer, 718 Fed. App'x. 185, 188 n.2 (4th Cir. 2018) (citing Webster v. Doe, 486 U.S. 592, 603 (1988)) (per curiam); Bridges v. Colvin, 136 F. Supp. 3d 620, 637–48 (E.D. Pa. 2015), aff'd sub nom. Bridges v. Comm'r Soc. Sec., 672 F.

---

[21] In Elgin, the Supreme Court observed that the "MSPB routinely adjudicates some constitutional claims, such as claims that an agency took adverse employment action in violation of an employee's First or Fourth Amendment rights, and that these claims must be brought within the CSRA." 567 U.S. at 12 (emphasis added). It went on to reject petitioner's argument seeking to carve out an exception to the CSRA exclusively for facial or as-applied constitutional challenges. Id.

App'x 162 (3d Cir. 2016). Contra Krasfur, 736 F.3d at 1038 (requiring a constitutional challenge to a prohibited personnel practice be exhausted under the CSRA despite the risk of the Special Counsel refusing to petition the MSPB).

The Thunder Basin analysis specifies that "where Congress simply channels judicial review of a constitutional claim to a particular court," such as the Federal Circuit, courts should merely ask whether Congress's intent to divest district courts of jurisdiction is "fairly discernable in the statutory scheme," Elgin, 567 U.S. at 9 (quoting Thunder Basin, 510 U.S. at 207); however, the lack of guaranteed access to an Article III court when a plaintiff brings a constitutional claim implicates "the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." Webster v. Doe, 486 U.S. 592, 603 (1988) (quoting Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 681 n.12 (1986)). To avoid this serious constitutional question, the Supreme Court has held that "where Congress intends to preclude" any Article III "judicial review of constitutional claims[,] its intent to do so must be clear." Webster v. Doe, 486 U.S. at 603 (citing Johnson v. Robison, 415 U.S. 361, 373–74 (1974)). Whether Webster's heightened standard should apply to a colorable constitutional claim that is not guaranteed Article III review under the CSRA's scheme for prohibited personnel practices is a question that has divided federal courts. See Bridges, 136 F. Supp. 3d at 637–48 (collecting cases).

The Supreme Court's decision in Elgin provides guidance but not an answer to this question because the plaintiffs in Elgin had suffered an adverse action,[22] meaning they were

---

[22] Plaintiffs were federal employees who were terminated for their failure to comply with the Military Selective Service Act, which requires male citizens and permanent residents between the ages of 18 and 26 to register for the selective service. Elgin, 567 U.S. at 6–8. Plaintiffs challenged the federal statute that authorized their terminations as an unconstitutional bill of attainder, and as unconstitutional discrimination on the basis of sex. Id. The court found the

guaranteed the ability to bring their constitutional challenges to an Article III court.[23]  Petitioners

in Elgin had urged the court to apply Webster's heightened, clear-statement standard to the

CSRA to determine whether Congress had intended to divest the district court of jurisdiction

over their constitutional claims. Elgin, 567 U.S. at 9.  In deciding to apply the Thunder Basin

factors instead, the court emphasized that Webster's heightened standard only applies to "a

statute that purports to 'deny any judicial forum for a colorable constitutional claim,'" but did not

apply "where Congress simply channels judicial review of a constitutional claim to a particular

court." Id. (quoting Webster, 486 U.S. at 603).  Because the petitioners in Elgin had a structural

guarantee that they would be able to bring their constitutional claims to the Federal Circuit, the

Court applied Thunder Basin to determine the preclusive effect of the CSRA.  Essential to the

court's determination was that the petitioners could bring their claims to the Federal Circuit, and

that the Federal Circuit would eventually be able to adjudicate the constitutional issues

underlying plaintiffs' lawsuit. Id. at 10 ("[T]he CSRA does not foreclose all judicial review of

petitioners' constitutional claims, but merely directs that judicial review shall occur in the

---

CSRA precluded district court jurisdiction over plaintiffs' claims because when "constitutional
claims are the vehicle by which [a plaintiff] seek[s] to reverse" an adverse action, a plaintiff's
claims must proceed exclusively through the CSRA's scheme. Id. at 22.

[23] As described, the CSRA provides two different avenues of review that depend on the type of
action taken against a federal employee. More serious adverse actions, such as proposed
termination, can be brought to the MSPB, and the employee can then appeal the MSPB's
decision to the Federal Circuit. § 7703(b)(1)(A).  Accordingly, federal employees who challenge
an adverse action will be guaranteed Article III judicial review should they seek it.  By contrast,
less serious prohibited personnel practices must first be brought to the OSC, who then "may
petition" the MSPB for review. § 1214(b)(2)(C).  The OSC's discretionary authority means that
federal employees who challenge a less serious prohibited personnel practice may not receive
Article III judicial review.  But the availability of judicial review under the CSRA can still be
meaningful despite the inability of a plaintiff to assert a pre-enforcement challenge initially in
federal court. See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d 748, 757 (D.C. Cir.
2019) ("[I]t is the comprehensiveness of the statutory scheme involved, not the adequacy of
specific remedies thereunder, that counsels judicial abstention." (quoting Am. Fed'n of Gov't
Emps. v. Sec. of Air Force, 716 F.3d 633, 638 (D.C. Cir. 2013)).

Federal Circuit."). Accordingly, although <u>Elgin</u> did not confront the issue presented here, which involves a prohibited personnel practice rather than an adverse action, it emphasized the importance of the eventual review of plaintiff's constitutional claims by the Federal Circuit.

The Fourth Circuit has directly considered whether <u>Webster</u>'s heightened standard applies to constitutional challenges to prohibited personnel practices. In the 1984 decision <u>Pinar v. Dole</u>, 747 F.2d 899 (4th Cir. 1984), the Fourth Circuit held that a plaintiff challenging a letter of reprimand and a two day suspension as violative of his First Amendment rights must go through the CSRA's administrative scheme to challenge a prohibited personnel practice, even if he would not have a guaranteed recourse to an Article III court. <u>Id.</u> at 910–11. The court emphasized that, to hold otherwise would "fly in the face of" Congressional intent to guarantee more serious, adverse actions, recourse to an Article III court, and guarantee less serious, personnel actions, only administrative review. <u>Id.</u> at 911.

Defendant argues that <u>Pinar</u> conclusively establishes that, even with a lack of guaranteed Article III review, the CSRA provides meaningful judicial review for prohibited personnel practices; however, more recent Fourth Circuit opinions have cast doubt on the continued relevance of <u>Pinar</u>'s holding. In 1991, the Fourth Circuit considered again whether a federal employee must bring his First Amendment claim through the CSRA process, but "decline[d] to address the continuing vitality of <u>Pinar</u>" to the case, instead, finding that the plaintiff lacked Article III standing to bring his claims. <u>Bryant v. Cheney</u>, 924 F.2d 525, 528 (4th Cir. 1991). The Fourth Circuit had the occasion in <u>Bryant</u> to address whether <u>Pinar</u> remained good law because of a remand from the Supreme Court. In a prior opinion in <u>Bryant</u>, the Fourth Circuit had found that the district court lacked jurisdiction over the claim, stating "<u>Pinar</u> holds that recourse to CSRA procedures is [plaintiff's] exclusive remedy in challenging punitive personnel

36

actions on the basis that they were undertaken in retaliation for his exercise of his [F]irst [A]mendment rights." Bryant v. Weinberger, 838 F.2d 465 (4th Cir. 1988) (unpublished table decision), cert. granted, judgment vacated sub nom. Bryant v. Carlucci, 488 U.S. 806 (1988). The Supreme Court vacated and remanded the initial opinion "for further consideration in light of Webster v. Doe, 486 U.S. 592 . . . (1988)," Bryant, 488 U.S. 806 (1988), the opinion which stated definitively that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear," Webster, 486 U.S. at 603.

More recently, albeit in an unpublished opinion, the Fourth Circuit held that Webster's clear statement test should apply to determine whether the CSRA provides meaningful judicial review of a prohibited personnel practice. In Fleming v. Spencer, 718 Fed. App'x. 185 (4th Cir. 2018), the court upheld a district court's decision to dismiss an action for lack of jurisdiction when the plaintiff challenged prohibited personnel practices as violative of his First Amendment rights. Id. at 187–89. This time, the Fourth Circuit cast the jurisdictional deficiencies as a failure to exhaust administrative remedies, rather than assuming that the CSRA completely stripped district court jurisdiction to hear any constitutional claims that federal employees had brought through the CSRA process. See id. at 188 ("The CSRA plainly precludes extrastatutory judicial review of constitutional claims that are asserted before an employee has exhausted his remedies available under the statute."). When contemplating the CSRA's exhaustion requirement, the court observed that "[a] different question would be presented here if [plaintiff] had brought his constitutional claim to the OSC and been denied an opportunity to pursue that claim in the Federal Circuit. In such a case, this court would need to address whether 'Congress intend[ed] [for the CSRA] to preclude judicial review of constitutional claims.'" Fleming, 718 Fed. App'x. at 188 n.2 (later alterations in original) (citing Webster, 486 U.S. at 603). This

approach is consistent with that of other courts that have similarly found that the CSRA does not preclude all access to Article III courts when a plaintiff raises a colorable constitutional claim, but require a plaintiff to exhaust administrative remedies by first bringing her claim to the OSC. See, e.g., Weaver, 87 F.3d at 1433; Irizarry v. United States, 427 F.3d 76, 77 (1st Cir. 2005).

Here—without question—plaintiff raises a reasonable, nonfrivolous First Amendment challenge to the 2021 policy, the type of constitutional claim that the Special Counsel would be required to investigate and report its determination and recommendation to the MSPB, the employing agency, and the Office of Personnel Management. § 1214(b)(2)(B). Should the agency fail to take corrective action within a reasonable period of time, the Special Counsel could then petition the MSPB seeking corrective action of the nonfrivolous claim. § 1214(b)(2)(C). But plaintiff has taken no such action before the Special Counsel as required by the CSRA. Nor has plaintiff actually been denied an opportunity to bring its constitutional claims to the Federal Circuit after proceeding through the statute's adjudicative structure. Accordingly, plaintiff has not exhausted its administrative remedies, and, under more recent Fourth Circuit precedent that suggests a plaintiff must exhaust administrative remedies through the CSRA process before bringing constitutional challenges to prohibited personnel practices in district court, the CSRA process does not on this record deny plaintiff meaningful judicial review. Moreover, Fleming suggests that, should plaintiff proceed through the CSRA process and not receive Article III review of its constitutional claims, it would be able to return to district court. For example, plaintiff would be well within its right to return to this Court seeking a petition for a writ of mandamus if the Special Counsel failed to investigate its nonfrivolous constitutional claims, at which time this Court could order the Special Counsel to abide by its

statutory mandate and conduct such an investigation, starting the congressionally-designed CSRA process once more.  See supra at 23 n.16.

Plaintiff's common rejoinder centers on the hypothetical scenario in which the Special Counsel fails to pursue its constitutional claims with the agency and the MSPB.  But this postulated argument—which does not reflect the facts of this case—cannot overshadow the balance that Congress has struck in "establish[ing] a comprehensive system for reviewing personnel action taken against federal employees."  Fausto, 484 U.S. at 455; Elgin, 567 U.S. at 5.  By design, the Special Counsel weeds out only frivolous complaints, see § 1214(b)(2)(B); and frivolous arguments—even those constitutional in nature—have no special entitlement to reach a federal court.  Moreover, the Special Counsel also weeds out grievances that agencies stand ready to redress without litigation.  See § 1214(b)(2)(C).  Beyond that, various safeguards attending the Special Counsel procedure diminish the risk of blocking meritorious constitutional challenges.  The Special Counsel has every incentive to help wronged federal employees.  In creating the Office of Special Counsel, Congress empowered the independent officeholder to expose agency misbehavior and to "protect employees . . . from prohibited personnel practices." § 1212(a).  The Special Counsel receives his appointment from the President, may be removed only for cause, chooses his staff without interference from other executive agencies, and has independent authority to launch investigations, to participate in MSPB proceedings, and to file amicus briefs.  §§ 1211(b), 1212(b)-(d), (h).

Allowing plaintiff to pivot straight to federal district court would undermine a central element of the CSRA's architecture: the harsher the action, the greater the employee's entitlement to judicial review.  See Kloeckner v. Solis, 568 U.S. 41, 44 (2012) (" [The CSRA] provides graduated procedural protections depending on an action's severity.").  Under Elgin,

employees facing more severe adverse actions must go through the MSPB before bringing their constitutional challenges in federal court. Under plaintiff's theory, however, employees facing less severe decisions (prohibited personnel practices) would enjoy immediate judicial review without resort to the administrative process. Put another way, an immigration judge would have more extensive and immediate remedies for a reprimand than for a dismissal, more for a temporary reassignment than for a permanent demotion, and more for a denial of leave to attend a speaking engagement than for a two-week suspension.[24]

The CSRA serves another purpose which goes unaddressed by plaintiff: ensuring that federal workplaces across the country follow a uniform body of law developed by the Federal Circuit. Elgin, 567 U.S. at 6, 14 ("The CSRA's objective of creating an integrated scheme of review would be seriously undermined if . . . a covered employee could challenge a covered employee action first in a district court, and then again in one of the courts of appeals, simply by alleging that the statutory authorization for such action is unconstitutional."). Here, plaintiff attempts to challenge a prohibited personnel practice in a regional circuit, which might have a divergent interpretation of the underlying constitutional claims than the court of Congress's choosing—the Federal Circuit.[25]

Plaintiff's interpretation of the CSRA and this Court's jurisdiction attempts to bypass the comprehensive system established by Congress for addressing the personnel complaints of federal employees. Because meaningful judicial review of nonfrivolous constitutional claims is

---

[24] Moreover, if a federal district court adjudicated a constitutional claim before the Special Counsel had an opportunity to investigate the claim, it would deny the agency the opportunity to correct its own mistakes. Direct review in federal court would also eliminate the opportunities to have issues first focused, or potentially resolved, by the Special Counsel.

[25] See Krasfur, 736 F.3d at 1040 (Sutton, C.J.) (discussing the risk of forum shopping if prohibited personnel actions could be routed to the regional circuits instead of through the Special Counsel and ultimately the Federal Circuit).

ultimately available through the statutory scheme, plaintiff's constitutional claims cannot escape the exhaustion requirement of the CSRA.

### iii.   Whether There is Otherwise No Meaningful Review

Plaintiff otherwise argues that it would not receive meaningful judicial review under the CSRA because an immigration judge may be forced to provoke a disciplinary action to receive any judicial review and review through this process could delay relief for so long as to cause "additional and irremediable harm beyond the burdens associated with the dispute resolution process." Bennett, 844 F.3d at 186 n.13 (4th Cir. 2016) (quoting Tilton v. Sec. & Exch. Comm'n, 824 F.3d 276, 286 (2d Cir. 2016)).

A statutory scheme including administrative and judicial review does not provide meaningful judicial review when it requires a plaintiff "to 'bet the farm . . . by taking the violative action' before 'testing the validity of the law," Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 490 (2010) (quoting MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 129 (2007)); see also Rydie, 2022 WL 1153249, at *5; however, merely bringing a pre-enforcement challenge to a policy does not force employees to "bet the farm."  For example, the Fourth Circuit in Rydie found that the plaintiffs did not need to be disciplined before challenging the policy because they could challenge the policy as a proposed covered action.  Rydie, 2022 WL 1153249, at *5.  Similarly here, immigration judges can bring a CSRA challenge to the 2021 policy as a change in working conditions, and therefore do not need to experience any disciplinary actions before bringing a CSRA challenge.  See Payne v. Biden, 602 F. Supp. 3d 147, 160 (D.D.C. 2022), aff'd, No. 22-5154, 2023 WL 2576742 (D.C. Cir. Mar. 21, 2023) ("[Plaintiff's] ability to challenge a change in his working conditions via the OSC allows him to raise his constitutional claims before termination is even proposed.").

Plaintiff also argues that requiring it to pursue its claims through the CSRA would unduly delay resolution of the prior restraint on speech allegedly created by the 2021 policy. "A scheme that 'pose[s] a risk of some additional and irreparable harm beyond the burdens associated with the dispute resolution process' is not meaningful" review. Rydie, 2022 WL 1153249, at *5 (alterations in original) (quoting Tilton, 824 F.3d at 286). The Fourth Circuit has held that when employees challenge covered actions under the CSRA, the administrative process generally does not impose any additional burdens beyond those associated with traditional litigation. Id.

Plaintiff argues that a challenge to a prior restraint on speech requires a faster resolution than the CSRA can provide as it represents "the most serious and the least tolerable infringement on First Amendment rights," Neb. Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976), and, in other situations, courts have held that plaintiffs bringing First Amendment challenges need not exhaust administrative remedies because this delay may result in irreparable injury. See Able v. United States, 88 F.3d 1280, 1289 (2d Cir. 1996); Ramirez v. U.S. Customs & Border Prot., 709 F. Supp. 2d 74, 84 (D.D.C. 2010); see also Nat'l Taxpayers Union v. U.S. Soc. Sec. Admin., 376 F.3d 239, 244 (4th Cir. 2004) (Wilkinson, J., concurring); however, the time plaintiff has spent litigating this civil action rather than pursuing remedies through the administrative scheme belies its contention that pursuing its claims through the CSRA would create irreparable harm. That no individual immigration judge has chosen to proceed through the administrative scheme after almost three years of litigation suggests that the irreparable harm faced by judges is not so great that the CSRA's process would fail to provide meaningful judicial review. Moreover, in Rydie, the Fourth Circuit found that the CSRA's procedure created no burdens outside those of traditional litigation even when the Rydie plaintiffs filed suit only three weeks before they needed to receive the first dose of a COVID-19 vaccine or risk being fired. See Rydie, 2022 WL

1153249, at *5; Rydie v. Biden, 572 F. Supp. 3d 153 (D. Md. 2021), vacated and remanded, 2022 WL 1153249 (4th Cir. Apr. 19, 2022), [Dkt. No. 1] at ¶ 2.  If the three-week deadline present in Rydie did not mandate review by a district court in the first instance, plaintiff's challenge to a speech policy enacted in 2021 does not here.

### b.  Wholly Collateral

Thunder Basin's second factor at step two asks whether claims are "wholly collateral" to the CSRA's review process.  "[C]laims are not wholly collateral when they are 'the vehicle by which [petitioners] seek to'" challenge a CSRA-covered action.  Bennett, 844 F.3d at 186 (quoting Elgin, 567 U.S. at 22).  "In other words, a claim isn't wholly collateral to the CSRA if the Board 'regularly adjudicate[s]' similar challenges." Rydie, 2022 WL 1153249, at *7 (alteration in original) (quoting Elgin, 567 U.S. at 22).  As the Fourth Circuit has acknowledged, because this factor also focuses on whether a plaintiff challenges a covered action, it does not have much "independent significance."  Bennett, 844 F.3d at 187.  Here again, plaintiff argues that it does not challenge a CSRA-covered action, but instead, brings a "'general challenge' to an employee speech policy," [Dkt. No. 72] at 35; however, as discussed, plaintiff challenges a significant change in the working conditions of immigration judges, and, as such, its claims are not wholly collateral to the CSRA scheme. See Elgin, 567 U.S. at 22 (finding a claim not wholly collateral when it was "precisely the type of personnel action regularly adjudicated by the Board and the Federal Circuit within the CSRA scheme.").

### c.  Agency Expertise

The third step-two Thunder Basin factor requires courts to determine "whether 'agency expertise could be brought to bear on the . . . questions presented.'"  Bennett, 844 F.3d at 181 (quoting Thunder Basin, 510 U.S. at 212, 215).  Plaintiff contends that its constitutional claims are beyond both the OSC and the MSPB's agency expertise because they have "never had

occasion to evaluate the constitutionality of a broad prior restraint like the [2021] Policy." [Dkt. No. 72] at 36 (emphasis in original). In <u>Elgin</u>, the Supreme Court held that, even if an Article III court may be necessary to ultimately adjudicate the constitutional issues in an employee's claim, the MSPB is competent to adjudicate the "threshold questions that may accompany a constitutional claim" such as "preliminary questions unique to the employment context." <u>Elgin</u>, 567 U.S. at 22. As agency expertise can be brought to bear on a challenge to a prohibited personnel practice, the OSC and the MSPB have agency expertise relevant to adjudicate plaintiff's claims.[26]

### III. CONCLUSION

In sum, evaluating the <u>Thunder Basin</u> factors, it is fairly discernable that Congress intended the CSRA scheme to preclude district court jurisdiction over plaintiff's challenge to the 2021 policy. Were plaintiff's members to pursue their reasonable, nonfrivolous constitutional claims through the CSRA's administrative process and fail to secure review in the Federal Circuit, it is possible that plaintiff would then be entitled to district court review; however, at this stage, this Court is satisfied that it lacks jurisdiction over plaintiff's claims.

For the reasons stated above, defendant's Motion to Dismiss [Dkt. No. 68] will be GRANTED by an Order to be issued with this Memorandum Opinion.

Entered this 21st day of September, 2023.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge

---

[26] For example, the OSC and the MSPB, having broad jurisdiction over federal employees, may actually have more experience with the restriction, if any, imposed on administrative law judges throughout the federal sector, which could be relevant when assessing the merits of plaintiff's First and Fifth Amendment challenges. Although counsel provided examples of only two other agencies—the Social Security Administration and the Patent and Trademark Office—that had speech policies for its administrative judges, the OSC or the MSPB may know of more.